## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PETE CZOSNYKA, PETER BARASH, ADAM VAVRICK, DOMINICK MAINO, STEVE HELD, and JAMES SUH, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 21-cv-3240 |
| v. | ) ) | Judge |
| JAMES GARDINER, Alderman of the 45 Ward of the City of Chicago; and CITY OF CHICAGO, | ) ) ) ) | Magistrate Judge |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs Pete Czosnyka, Peter Barash, Adam Vavrick, Dominick Maino, Steve Held and James Suh through counsel, complain against Defendant James Gardiner, the Alderman of the 45th Ward of the City of Chicago, and City of Chicago, as follows:

### Nature of the Case

1.     In this First Amendment case, Plaintiffs, individually and on behalf of a proposed class of similarly situated 45th Ward residents, challenge the constitutionality of the manner in which 45th Ward Alderman James Gardiner regulates speech on the Facebook Page he has created for his role as a government official.

2. Defendant Alderman James Gardiner uses his official Facebook Page (www.facebook.com/AldermanGardiner) to communicate with his constituents about a variety of government functions. In recent posts he has solicited citizen input about how Tax Increment Financing ("TIF") funds will be used for improvements in the 45th Ward; informed constituents about zoning changes and proposed developments in the community; and announced a City program that provides support to local businesses. Hundreds of Chicagoans participate in the comments sections on Alderman Gardiner's posts, expressing opinions, asking questions, and engaging in debate. Because of the way Alderman Gardiner uses his Facebook Page, the Page is a public forum under the First Amendment.

3. In an effort to suppress dissent in this forum, Alderman Gardiner routinely hides or deletes comments that criticize him or his policies, thereby making those comments invisible to the other constituents who are engaging in discussion on Alderman Gardiner's Facebook Page and preventing certain citizens from engaging in debate with other members of the community. In at least four instances, Alderman Gardiner has permanently banned constituents from being able to engage in this forum at all after they posted comments critical of the Alderman or his policies, thereby completely prohibiting these individuals from being able to petition their elected representative through Facebook. These actions amount to content-based regulation of speech that violates the First Amendment.

4. As the Supreme Court has recognized, social media platforms such as Facebook are "perhaps the most powerful mechanisms available to a private citizen

to make his or her voice heard." *Packingham v. North Carolina,* 137 S. Ct. 1730, 1737 (2017). These platforms have transformed civic engagement by allowing elected officials to communicate directly with their constituents and receive immediate feedback. "Governors in all 50 States and almost every Member of Congress have set up [social media] accounts for this purpose," allowing citizens to "petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 1735. Social media platforms such as Facebook enable ordinary citizens to speak directly to their government representatives and to listen to and debate others about issues of public interest, in much the same way they could if they were gathered on a sidewalk, public park, city council meeting or town hall assembly.

5.    Plaintiffs are residents of Chicago's 45th Ward who have been impeded from participating in the discussions that take place on Alderman Gardiner's Facebook Page, either by being banned from interacting with the Page or by having their comments hidden or deleted. Plaintiffs seek injunctive relief (on behalf of themselves and the proposed class) prohibiting Alderman Gardiner from continuing to engage in content-based regulation of speech on his official Facebook Page and compensatory damages for the violations of their First Amendment rights.

6.    Defendant City of Chicago is well aware of Alderman Gardiner's constitutional violations. Plaintiffs and others have made dozens of complaints to City entities such as the Office of the Inspector General, the Board of Ethics, and the Law Department. The City has not taken any steps to reprimand Alderman

Gardiner or to ensure that he uses his official government Facebook Page in a manner consistent with the First Amendment.

## Jurisdiction and Venue

7.     Jurisdiction is proper in this court pursuant to 28 U.S.C. §1331 because this action arises under federal law. Specifically, this case arises under 42 U.S.C. §1983 and alleges violations of the First Amendment of the United States Constitution.

8.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as the events giving rise to Plaintiffs' claims occurred in this district.

## The Parties

9.     Plaintiffs Pete Czosnyka, Peter Barash, Adam Vavrick, Dominick Maino, Steve Held and James Suh are residents of Chicago's 45th Ward and are constituents of Alderman Gardiner. Each of the named Plaintiffs maintains a Facebook account through which he has sought to interact with Alderman Gardiner's Facebook Page. Plaintiffs Czosnyka, Maino, Vavrick and Suh are completely banned from commenting on Alderman Gardiner's Facebook Page, sending a Facebook message to the Page, or responding to comments posted by others on the Page. Plaintiffs Barash and Held still have the ability to comment on Alderman Gardiner's Facebook Page, but have on numerous occasions had their comments hidden or deleted so that they are not visible to others who view the Page.

10.     Defendant James Gardiner is the Alderman of Chicago's 45th Ward. Alderman Gardiner administers and oversees the Alderman Gardiner Facebook page and has final say over whether individuals are blocked from interacting with the page and whether comments are hidden or deleted. Alderman Gardiner is sued in his individual and official capacities.

11.     Defendant City of Chicago is a municipal corporation, duly incorporated under the laws of the State of Illinois, and located in Cook County, Illinois.

## Factual Allegations

**Facebook Pages**

12.     In addition to allowing users to create personal profiles to interact with others on the site, Facebook allows users to create "Pages," public-facing profiles used by brands, companies, government officials, and other public figures to interact with the public.

13.     Facebook users can control the privacy of their personal profiles by making them visible only to select audiences, *e.g.*, users they've added as "friends" or smaller subgroups of friends defined by the user. In contrast, Pages are inherently public. Anyone on or off Facebook can view the posts and comments on Pages. Anyone with a Facebook account can interact with a Page (*e.g.*, comment on posts; ask questions; or send a message).

14.     Public Facebook pages have several tabs that visitors to the Page can view. The Page administrator's posts appear on the "Home" tab. Posts to the Page

from members of the public appear on the "Community" tab. On both the Home and Community tabs, other users can post comments beneath any posts.

15.     A Page administrator can control who can interact with his or her Facebook Page in two ways. One, the administrator can create a "banned" list. When an individual is "banned" by a Page, the banned individual cannot interact with the Page at all—he or she cannot make a post, comment on others' posts, or send the Page a direct message. Two, the administrator can control the visibility of comments and posts on the Page. The administrator has the option to "hide" or "delete" comments and posts. When a post or comment is "deleted" it is permanently removed from the Page. When a post or comment is "hidden" it will not be visible to other Facebook users who view the Page unless the user is connected as "friends" with the person who posted the hidden comment. People who are not already connected as "friends" with the user whose comment is hidden will not be able to see the post.

**Alderman Gardiner's Facebook Page**

16.     Defendant Alderman Gardiner has created a Page for his work as the Alderman of the 45th Ward. This Page appears at the URL www.facebook.com/AldermanGardiner. The Alderman Gardiner Page is separate from Gardiner's personal Facebook account and from his campaign Page. The Page description set forth on the Alderman Gardiner Page states as follows: "James 'Jim' Gardiner serves as the Alderman of the 45th Ward" and contains his office phone number and his City of Chicago email address (ward45@cityofchicago.org). The

banner image for the Page reads "Jim Gardiner, Alderman of the 45th Ward." The Page is categorized as belonging to a "Government Official."

17.    Alderman Gardiner posts on his Facebook Page nearly every day, oftentimes several times a day, to share photos of himself appearing at events in his official capacity as the 45th Ward Alderman, information about local events, goings on in City government, and other matters of interest to residents of the 45th Ward. Each post receives dozens of reactions from users who follow the Page, and most posts are followed by an active comments section in which constituents ask follow-up questions, react to the post, and debate viewpoints.

18.    Alderman Gardiner has not posted any rules or standards for users who interact with the Page—*e.g.*, limitations on how often one can post or comment, guidance about permissible topics of conversation, and/or community standards about language and civility.

**Plaintiff Pete Czosnyka**

19.    Plaintiff Pete Czosnyka has been a resident of the 45th Ward for more than 40 years.

20.    During Alderman Gardiner's campaign for 45th Ward Alderman in 2019, Plaintiff Czosnyka was critical of Gardiner's platform and policy positions. In particular, Czosnyka has been a dedicated advocate for affordable housing in the 45th Ward as a volunteer with the group Neighbors for Affordable Housing, and Gardiner opposed several developments in the community that Neighbors for Affordable Housing supported.

7

21.     After Czosnyka expressed his views and questioned Gardiner's stance on affordable housing, Gardiner banned Czosnyka from being able to comment on or respond to posts he made on the Facebook Page he created for his campaign.

22.     When Gardiner was elected as 45th Ward Alderman and created the Alderman Gardiner Facebook Page on May 7, 2019, Gardiner pre-emptively banned Czosnyka from interacting with the Page.

23.     Czosnyka wrote a letter to Gardiner's office on May 21, 2019, requesting that he be given the ability to interact with the Alderman Gardiner Facebook Page. In his letter, Czosnyka cited a January 8, 2019, City of Chicago Board of Ethics Advisory Opinion in which the Board stated that elected officials who maintain social media accounts on which they post about "public affairs or matters involving City government should not block followers from accessing such pages or delete critical comments unless the user's comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods and services."

24.     In mid-June 2019, Alderman Gardiner restored Czosnyka's ability to interact with the Page. Czosnyka was again able to interact with members of the community and comment on Alderman Gardiner's posts.

25.     In his comments on Alderman Gardiner's posts, Czosnyka did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services.

26.     On June 24, 2019, Alderman Gardiner posted a note on his Page telling commenters to "Be Nice" and that "harassment and personal attacks will not be tolerated."

27.     On June 25, 2019, Alderman Gardiner again banned Czosnyka from his Page. To this day, Czosnyka remains banned from engaging with Alderman Gardiner's Facebook Page. As a result, Czosnyka cannot comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer his comments on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman.

28.     Even though Plaintiff Czosnyka is banned from responding to posts on Alderman Gardiner's Facebook Page, Gardiner has made several references to Plaintiff Czosnyka on his Page. For example, on August 19, 2019, Gardiner posted a photo of himself at a dunk tank at a neighborhood festival and wrote: "For those of you who have waited since February 26th (Pete!!!), now is your chance to take aim at the Edison Park Fest... Come out to dunk your Alderman and support the Homes for Heroes Foundation." Although his elected official was directly referring to him in a public forum, Czosnyka was blocked from responding.

29.     On October 16, 2020, Alderman Gardiner posted a video of himself standing in front of Czosnyka's house and referred to Czosnyka as "one of [my] biggest fans," ending the post with the hashtag #besties. Several other constituents spoke in Czosnyka's defense, but Czosnyka was unable to respond because he is banned from interacting with Alderman Gardiner's Facebook page.

30.     During the past year, Czosnyka has made written complaints to the City's Office of Inspector General, Board of Ethics, and Law Department about being blocked from Alderman Gardiner's Facebook Page.

31.     To date, none of these entities have taken any action regarding Alderman Gardiner's blocking constituents from interacting with his official Facebook Page.

**Plaintiff Dominick Maino**

32.     Plaintiff Dominick Maino has a longstanding interest in local politics and business development in the 45th Ward. At the time of Gardiner's election as 45th Ward Alderman, Maino was serving as a board member of the Six Corners Association, a non-profit economic development association located within the Ward.

33.     After Alderman Gardiner created the Alderman Gardiner Facebook Page, Maino posted several comments questioning some of Gardiner's policy positions. In particular, Maino expressed frustration about actions Alderman Gardiner took to delay projects that had been approved under the previous alderman such as the construction of The Point, a senior living complex, and Cuyler Plaza, a pedestrian plaza, both of which were planned to be built in the Six Corners area (near the intersection of Irving Park Road, Cicero Avenue and Milwaukee Avenue). Maino also posted about the large amount of signs branded with Gardiner's campaign logo littering the public ways throughout the Ward.

34.     In his posts on Alderman Gardiner's Facebook Page, Maino did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services.

35.     Without warning in June or July 2019, Alderman Gardiner blocked Maino from his Page. To this day, Maino remains blocked from engaging with Alderman Gardiner's Facebook Page. As a result, Maino cannot comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer his comments on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman.

36.     In 2020, Maino made a complaint to the City's Office of Inspector General regarding being blocked from Alderman Gardiner's Facebook Page. To date, the OIG's office has taken no action.

**Plaintiff Adam Vavrick**

37.     Plaintiff Adam Vavrick is a homeowner and businessowner in the 45th Ward who is engaged in local politics and interested in economic development in the Ward.

38.     Plaintiff Vavrick frequently engaged with Alderman Gardiner's Facebook Page by asking questions of the Alderman, debating with other constituents, and expressing disagreement with some of the Alderman's policies actions or positions. In so doing, Vavrick did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services.

39.     Alderman Gardiner repeatedly deleted or hid Plaintiff Vavrick's comments when they were critical of the Alderman or his performance. Vavrick estimates that Gardiner has hidden or deleted his comments more than ten times in the past two years. The following are four examples of the comments that Alderman Gardiner has deleted or hidden.

40.     On January 27, 2021, Alderman Gardiner made a public Facebook post regarding Holocaust Remembrance Day. The post received approximately 180 reactions from members of the community who follow Alderman Gardiner's page.

41.     The same day, the Chicago City Council held a vote on an updated version of its "Welcoming City" Ordinance, which prohibits Chicago police officers from cooperating with Immigrations and Customs Enforcement. The Ordinance passed by a vote of 41-8. Alderman Gardiner was one of the eight "no" votes.

42.     Plaintiff Vavrick, who is a descendant of Holocaust survivors, posted a comment on Gardiner's Holocaust Remembrance Day post, strongly criticizing Alderman Gardiner's vote on the Welcoming City Ordinance, writing as follows:

> This morning at the City Council meeting, you voted "No" on expanded immigrant protections. When I heard your vote registered, I … started thinking about the kids in cages, right here in the U.S., and how those kids are a painful reminder of the USA's racist, xenophobic & tireless war on immigrants, and it's impossible not to remember on this solemn day, the lesson of the MS St. Louis that sailed from Germany in 1939 with 700ish Jews on board seeking asylum. They were denied entry by the USA, Cuba & Canada, eventually forced to head back to Europe. Historians estimate around 250 were murdered in the death camps that, wouldn't ya know it, started as a way of simply housing separated families. Based on your vote today, I believe you would have voted to keep the MS St. Louis from landing at our shores. The lessons and parallels should be plainly obvious to anyone who isn't smooth-brained, and yet even today, proud Irish immigrant whose

family surely heard the cries of NO IRISH or worse, chose to vote No to protect those who need protecting.

You profess to be at least mildly Catholic, right? "He executes justice for the fatherless and the widow, and loves [t]he sojourner, giving him food and clothing. Love the sojourner, therefore, for you were sojourners in the land of Egypt." (Deuteronomy 10:18) Yet, you still vote "No."

43. Alderman Gardiner deleted the comment. Gardiner's Holocaust Remembrance Day post is still visible to anyone who visits his Facebook Page, as are more than a dozen other comments on the post, but Vavrick's comment and responses that appeared below it are not.

44. On November 30, 2020, Vavrick responded to another constituent who was commenting in a thread on Gardiner's Page about comments on Gardiner's Page being hidden or deleted. Vavrick advised the other constituent to make a complaint to the Office of the Inspector General if Gardiner hid or deleted their comments and provided a link to the OIG's website. Gardiner deleted the comment and link to the inspector general's page.

45. In fall 2020, Vavrick posted in the "Community" section of Alderman Gardiner's Page asking for the Alderman's position regarding a brewery and property manager that were seeking to purchase property owned by the City in the 45th Ward to open a taproom and develop residential housing units. Vavrick mentioned a lawsuit that had been filed against the City regarding the sale of the property and asked what steps Gardiner was taking to support the project. Gardiner deleted the comment.

13

46. On May 26, 2021, Vavrick posted two comments on Alderman Gardiner's Page. One was in response to Alderman Gardiner's post about a public meeting about a proposed development in the Ward. Vavrick commented to provide the Zoom meeting code and log-in credentials for the meeting. The other post was a link to a media article about Alderman Gardiner from the local news organization Block Club.

47. Without warning, Alderman Gardiner banned Vavrick from his Page on May 26, 2021. As a result, Vavrick cannot comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer his comments on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman.

48. Vavrick has complained to the City's Office of Inspector General about Gardiner's misuse of his Facebook Page, including deleting or hiding comments that are critical of him or his policies. When Vavrick did not hear a response, he emailed Steve Berlin at the City's Board of Ethics and William Marback at the Office of Inspector General to ask for an update. To date, the Office of Inspector General and Board of Ethics have taken no action.

**Plaintiff James Suh**

49. Plaintiff James Suh is a resident of the 45th Ward and the owner of a business near Six Corners.

50. After Alderman Gardiner's election, Suh was unhappy that Alderman Gardiner delayed some projects that had been approved under the previous alderman, such as the planned construction of The Point, a senior living complex.

51.     Suh organized a rally to protest Alderman Gardiner's delay of The Point and co-founded a grassroots neighborhood organization called Six Corners Organizing for Progress and Engagement ("SCOPE") to connect neighbors who were interested in advocating for economic development in the community.

52.     Until recently, Suh engaged with Alderman Gardiner's Facebook Page a few times a month to share his viewpoints on Alderman Gardiner's performance of his public duties, to ask questions, and to talk to other members of the community about City politics and other matters of local interest. In so doing, Suh did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services.

53.     On at least three occasions, Alderman Gardiner deleted or hid comments that Suh posted.

54.     For example, on November 25, 2020, Alderman Gardiner posted on his Page that he had decided to vote against Mayor Lightfoot's proposed 2021 budget and told constituents that he would explain his logic for doing so in a future newsletter. Suh questioned why Alderman Gardiner didn't share his rationale for voting no on the budget on Facebook and questioned whether Alderman Gardiner had any "common sense." Gardiner hid the comment.

55.     On another occasion, Suh commented on Alderman Gardiner's Page asking why City funds were being spent on large bonuses for politically connected people who worked in his office. Gardiner deleted the comment.

56. On June 6 and 7, 2021, Alderman Gardiner was in the news because one of his supporters deliberately drove her car over Plaintiff Czosnyka's pollinator garden in retaliation for his criticism of Alderman Gardiner. *See, e.g.,* https://chicago.cbslocal.com/2021/06/07/northwest-side-yard-suv-vandalism-alderman-james-gardiner-critic/

57. On June 7, 2021, Suh made the following post to Alderman Gardiner's Page with a link to the video of the vandalism of Plaintiff Czosnyka's property:

> If you're prioritizing listening to constituent concerns then it seems obvious for you to address one of your constituents being criminally targeted and harassed by one of your supporters. This troubling occasion calls for actual leadership, condemnation of this act and an appeal to universal common decency, whatever anyone's differences are. Ignoring it and pretending it didn't happen with yet another performative, pandering post is a direct acknowledgement that you don't possess even the most basic of human values. https://fb.watch/5Z-Wnl22xr/

58. Alderman Gardiner deleted the comment and blocked Suh from his Page on June 7, 2021. As a result, Suh cannot comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer his comments on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman.

**Plaintiff Steve Held**

59. Plaintiff Steve Held is a resident of the 45th Ward who has lived in the community for 14 years and has a longstanding interest in local politics and economic development in the Ward. Held is a co-founder of the grassroots neighborhood organization SCOPE, and from 2018 through early 2021 served on the board of the not-for-profit advocacy organization Indivisible Chicago.

60. Plaintiff Held frequently engages with Alderman Gardiner's Facebook Page by asking questions of the Alderman, debating with other constituents, and expressing disagreement with the Alderman's policy positions and performance of his public duties. In so doing, Held does not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services.

61. Alderman Gardiner has repeatedly deleted or hidden Plaintiff Held's comments when they are critical of the Alderman or his performance. Gardiner has hidden or deleted his comments numerous times in the past two years. The following are three examples of the comments that Alderman Gardiner has deleted or hidden.

62. On January 6, 2021, Plaintiff Held posted a comment to the Community section of Alderman Gardiner's Facebook Page. In the comment, Held posted a photo of Alderman Gardiner appearing at a public "Support the Police" rally at which many attendees were waving flags supporting Donald Trump's reelection. Held wrote as follows: "Alderman Jim Gardiner[,] several other Aldermen have spoken out about today's events in DC, while you have remained silent. Do you denounce Trump, his coup attempt, and today's violence in DC?" Several other constituents commented on the post, asking Alderman Gardiner for his statement. Alderman Gardiner deleted Held's post and all of the comments that appeared below it.

63.     On September 11, 2020, Plaintiff Held posted in the Community section of Alderman Gardiner's page, asking for an explanation of his vote to reject a proposed settlement between the City and a former Chicago police officer who alleged she was retaliated against for reporting a fellow officers' threatening behavior towards her. Held wrote as follows: "could you please explain to your constituents why you were the solitary no vote in this 49-1 vote to approve this harassment settlement? Did you feel the city should have continued litigation and almost certainly pay more? Or do you not believe we should protect women from workplace harassment and retaliation? Or some other explanation? What did you see that no other Alderman on the Council saw?" Alderman Gardiner deleted the comment without responding.

64.     On November 25, 2020, Alderman Gardiner posted a statement concerning his vote against Mayor Lightfoot's proposed 2021 budget. He attributed his opposition to the budget in part to "city owned properties being sold for less than their appraised values." In response, Held asked Alderman Gardiner to comment on a recent civil lawsuit filed against him in which he was accused of "harassing a constituent and having him falsely arrested … costing us even more money on lawyers and potential legal settlements/judgments." Held asked, "Do you think your antics will cost the city more or less than your concerns around city property sales?" and posted a link to a *Chicago Sun-Times* story about the lawsuit. *See* https://chicago.suntimes.com/news/2020/11/24/21635370/cellphone-ald-james-gardiner-charles-sikanich-benjamin-george-45th-ward-lawsuit. Gardiner hid the

comment, making it invisible to anyone who viewed his page who wasn't already connected as friends with Plaintiff Held.

65. Over the past year, Held has made several reports to the City's Office of Inspector General about Gardiner's misuse of his Facebook Page, including deleting comments that are critical of him or his policies. To date, the Office of Inspector General has taken no action.

**Plaintiff Peter Barash**

66. Plaintiff Peter Barash is a resident of the 45th Ward and a co-founder of the grassroots neighborhood organization SCOPE. Barash has a strong interest in economic development in the Ward and was dissatisfied with Alderman Gardiner's decision to delay projects that were approved under the previous alderman, including the construction of The Point.

67. Plaintiff Barash frequently engages with Alderman Gardiner's Facebook Page by asking questions, debating with other constituents, and expressing his views on the Alderman's policy positions and official actions. In so doing, Barash does not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services.

68. Alderman Gardiner has repeatedly deleted or hidden Plaintiff Barash's comments when they are critical of the Alderman or his performance. Barash estimates that Gardiner has hidden or deleted his comments more than 10 times in the past two years. The following are three examples of the comments that Alderman Gardiner has deleted or hidden.

69.     On April 18, 2021, Plaintiff Barash commented on Alderman Gardiner's Facebook Page asking him to restart Ward Nights in person or virtually. Ward Nights are open office hours during which constituents can sign up to meet with their City Council representatives which are held in many wards throughout the City. Alderman Gardiner hid the comment, making it invisible to anyone who viewed his page who wasn't already connected as friends with Plaintiff Barash.

70.     On March 22, 2021, Plaintiff Barash posted in the Community section of Alderman Gardiner's Page, writing as follows:

> The sun is shining. The vaccine is flowing. Maybe it's time to reinstate Ward Night as so many people have requested? You can do it in person with social distancing or virtually. Most of your colleagues have been doing this for some time. It's hard to say you're a full service Alderman when you avoid so many aspects of your job that involve interfacing with constituents (that aren't hand picked). PS – please stop deleting posts. It's illegal.

71.     Alderman Gardiner deleted the post. It is no longer visible to people who visit Alderman Gardiner's Facebook page.

72.     On June 8, 2020, several constituents commented on Alderman Gardiner's Facebook Page asking him about his position on the Civilian Police Accountability Council (CPAC), a proposed civilian oversight board for claims of police misconduct. In the comments, Plaintiff Barash responded to another commenter who was opposed to CPAC because he believed it would lead to an increase in violent crime in the City, writing as follows:

> [Y]ou're conflating two issues – one is police accountability and another is gun violence. They're not connected. COPA has proven not effective enough. George Floyd is not an isolated incident. It's part of a national pattern supported by dat[a] and my city is a big part of that. Policing cannot be "the ends justify the means" and for most officers it is not. I do not believe good

officers will leave because of CPAC. I believe officers who don't care that John Burge wasn't stripped of his pension will leave and we'll be better for it. Officers will still be well paid, pensions will be intact and worthy officers will still be promoted. What you will have hopefully is less politics and more accountability. What exactly is it you think CPAC will do other than drive a few folks who be[long] in the suburbs out to the suburbs finally?

73.     Alderman Gardiner hid Barash's comment, making it invisible to anyone who viewed his page who wasn't already connected as friends with Plaintiff Barash.

74.     Over the past year, Barash has made several complaints to the City's Office of Inspector General about Gardiner's deletion of constituents' comments from his Facebook page. To date, the OIG has not taken any action.

**The City's Liability**

75.     The City of Chicago is liable for Alderman Gardiner's violation of Plaintiffs' constitutional rights because it knew of Alderman Gardiner's violations of the First Amendment and failed to take any action to stop his ongoing and repeated misconduct.

76.     In particular, the City's Office of Inspector General has been tasked with investigating claims of "misconduct, inefficiency and waste" by all elected and appointed officers of City government, including Aldermen. *See* Chicago Municipal Code §2-56-030; §2-56-050. The Inspector General has the power to investigate claims of misconduct and refer valid claims to the City's Board of Ethics for disciplinary action.

77.     The City's Board of Ethics has the power to adjudicate violations of the City Governmental Ethics Ordinance. The Board has issued guidance to elected officials that explicitly states that elected officials "should not block followers from

accessing [social media pages on which they communicate about government activities] unless the user's comments are obscene, profane, libelous or defamatory or are commercial and posted to sell goods and services." The Board of Ethics has the power to fine elected officials who violate the City's ethics guidelines.

78.     Plaintiffs and others have made more than twenty complaints to the Office of the Inspector General and the Board of Ethics concerning Alderman Gardiner's misconduct on social media, including blocking constituents and deleting or hiding constituents' comments. These complaints document dozens of incidents in which Alderman Gardiner violated constituents' constitutional rights over the course of the past two years.

79.     Despite being on notice of Alderman Gardiner's repeated and ongoing misconduct, the City has failed to take any action to reprimand Alderman Gardiner, although it has the power to do so.

80.     Thus, the City is liable because it acquiesced in Alderman Gardiner's constitutional violations and permitted Gardiner to act with impunity.

## Class Allegations

81.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiff Class.

82.     The Class that Plaintiffs seek to represent is defined as all Chicago residents who presently or in the future seek to comment on Alderman Gardiner's Facebook Page and are subject to content-based regulation of their speech.

83. Plaintiffs meet the requisites for filing a class action pursuant to Fed. R. Civ. P. 26(b)(2). Proceeding as a class action is the most efficient means of adjudicating Plaintiffs' claims because (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims of the representative Plaintiffs are typical of the claims of the class; and (4) the representative Plaintiffs will fairly and adequately protect the interests of the class.

84. The members of the Class are so numerous that their joinder is impracticable. More than 7,400 people have "liked" Alderman Gardiner's Facebook page and may seek to react to posts that they see the Alderman make. Because Alderman Gardiner blocks people and deletes comments at his sole discretion, untethered to any written guidelines or principles, any one of these Facebook users is at risk of being subjected to content-based regulations of their speech.

85. The core legal and factual questions are common to the class and can be answered on a class-wide basis. The common questions include the following:

- Is Alderman Gardiner's Facebook Page a public forum under the First Amendment?

- Is it permissible under the First Amendment for Alderman Gardiner to decide who may participate in the conversations that take place on his Facebook Page?

- Is it permissible under the First Amendment for Alderman Gardiner to decide what viewpoints and opinions can be expressed on his Facebook Page?

86. These common questions predominate over any questions affecting only individual class members.

87.     The Named Plaintiffs' claims are typical of the claims of the Class because the Named Plaintiffs have been subjected to content-based regulation of their speech on Alderman Gardiner's Facebook Page, which is the same harm that members of the class have suffered and will continue to suffer in the future in the absence of classwide injunctive relief.

88.     The Named Plaintiffs are adequate class representatives because their interests overlap with and are not in conflict with the interests of the Class. Plaintiffs have retained counsel experienced in class action litigation, including First Amendment class actions against the City of Chicago, and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

89.     This matter is brought as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the class as a whole.

# COUNT I
## 42 U.S.C. §1983
## Violation of the First Amendment

90.     Plaintiffs reallege and reincorporate, as though fully set forth herein, each and every allegation above.

91.     Alderman Gardiner's Facebook Page is a public forum within the meaning of the First Amendment.

92.     Because the Page is a public forum, Defendant Gardiner's content-based regulation of speech within that forum violates the First Amendment.

WHEREFORE, Plaintiffs respectfully request that this Court:

    (a)   certify that this case may be maintained as a class action against Defendant Alderman Gardiner pursuant to Fed. R. Civ. P. 23(b)(2);

    (b)   issue a preliminary and then permanent injunction prohibiting Defendant Gardiner from engaging in content-based regulation of speech on his Facebook Page as to Plaintiffs and the class they seek to represent;

    (c)   issue a declaratory judgment that Alderman Gardiner's content-based regulation of speech on his Facebook Page violates the First Amendment;

    (d)   enter judgment in favor of the named Plaintiffs and against Defendant Gardiner for compensatory and/or nominal damages in an amount to be determined at trial;

    (e)   enter judgment for reasonable attorney's fees and costs incurred in bringing this action; and

    (f)   grant Plaintiffs any other relief the Court deems appropriate.

## COUNT II
### 42 U.S.C. §1983
### *Monell* Claim Against the City of Chicago

93.     Plaintiffs reallege and reincorporate, as though fully set forth herein, each and every allegation above.

94.     The City of Chicago was on notice of Defendant Alderman Gardiner's violations of Plaintiffs' and others' First Amendment rights, but failed to take any action to stop or remedy those violations, leading to further violations of Plaintiffs' rights.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     certify that this case may be maintained as a class action against Defendant City of Chicago pursuant to Fed. R. Civ. P. 23(b)(2);

(b)     issue a declaratory judgment that Defendant City of Chicago's failure to act was the moving cause behind Defendant Gardiner's violations of Plaintiffs' constitutional rights;

(c)     enter judgment in favor of Plaintiffs and against Defendant City of Chicago for compensatory damages in an amount to be determined at trial;

(d)     enter judgment for reasonable attorney's fees and costs incurred in bringing this action; and

(e)     grant Plaintiffs any other relief the Court deems appropriate.

**Plaintiffs demand trial by jury.**

Respectfully submitted,

/s/ Mark G. Weinberg
*Counsel for Plaintiffs*

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

# CIVIL COVER SHEET

ILND 44 (Rev. 09/20)

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS
PETE CZOSNYKA, PETER BARASH, ADAM VAVRICK, DOMINICK MAINO, STEVE HELD, and JAMES SUH

### DEFENDANTS
Alderman James Gardiner

**(b)** County of Residence of First Listed Plaintiff  Cook
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant  Cook
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*
Law Office of Mark G. Weinberg; 3612 N. Tripp Avenue
Chicago, Illinois 6064; (773) 283-3913; mweinberg@sbcglobal.net

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
   *(U.S. Government not a party.)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity
   *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 320 Assault, Libel & Slander / ☐ 330 Federal Employers' Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability / ☐ 535 Death Penalty | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 340 Marine | **Habeas Corpus:** / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 345 Marine Product Liability / ☐ 350 Motor Vehicle | ☐ 540 Mandamus & Other / ☐ 555 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 430 Banks and Banking / ☐ 450 Commerce / ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 355 Motor Vehicle Product Liability | ☐ 555 Prison Condition / ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 791 Employee Retirement Income Security Act | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loan (Excludes Veterans) | ☐ 360 Other Personal Injury / ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL PROPERTY** | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Veteran's Benefits | | ☐ 370 Other Fraud | **PROPERTY RIGHTS** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | | ☐ 371 Truth in Lending | ☐ 820 Copyright | |
| ☐ 190 Other Contract | | ☐ 380 Other Personal Property Damage | ☐ 830 Patent | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 840 Trademark / ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) | ☐ 890 Other Statutory Actions / ☐ 891 Agricultural Acts |

| REAL PROPERTY | CIVIL RIGHTS | BANKRUPTCY | FORFEITURE/PENALTY | SOCIAL SECURITY | |
|---|---|---|---|---|---|
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 861 HIA (1395ff) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | **IMMIGRATION** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/Accommodations | ☐ 462 Naturalization Application | | ☐ 864 SSID Title XVI | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/ Disabilities- Employment | ☐ 463 Habeas Corpus – Alien Detainee (Prisoner Petition) | | ☐ 865 RSI (405(g)) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 465 Other Immigration Actions | | **FEDERAL TAXES** | |
| | ☒ 448 Education | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) / ☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Check one box, only.)*

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District (specify)
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION ( Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)
First Amendment

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:
☒ Check if this is a **class action** under Rule 23, F.R.CV.P.

Demand $

CHECK Yes only if demanded in complaint:
Jury Demand: ☒ Yes  ☐ No

## IX. RELATED CASE(S) IF ANY (See instructions):
Judge                            Case Number

## X. Is this a previously dismissed or remanded case?  ☐ Yes  ☒ No  If yes, Case #          Name of Judge

Date: 6-17-21

Signature of Attorney of Record  /s/ Mark G. Weinberg

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority for Civil Cover Sheet

The ILND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use
(b)    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the
(c)    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here. United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box. Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.