**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Pete Czosnyka, Peter Barash, Adam Vavrick, Dominick Maino, Steve Held and James Suh, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No.  21-cv-03240 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Hon. Judge Johnson Coleman |
| v. | ) | |
| | ) | |
| James Gardiner and the City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT JAMES GARDINER'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendant James Gardiner, Alderman of the 45th Ward of the City of Chicago ("Gardiner" "the Alderman," or "Defendant"), by and through his attorney, Thomas D. Carroll of Thomas R. Raines Attorney at Law, LLC, hereby replies in support of his motion to dismiss Plaintiffs' Complaint (the "Complaint" or "Cmplt." (Dkt. 1)), with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6). In support thereof, Defendant states as follows:

### REPLY

**I.     The Gardiner Facebook Page is not a Public Forum for Purposes of First Amendment Analysis.**

In their Response to Defendant's motion to dismiss (Dkt., 29, hereafter, "Response" or "Resp."), the Plaintiffs, Czosnyka, Barash, Vavrick, Maino, Held, and Suh (the "Plaintiffs") fail to address the question presented by Defendant's motion: If Alderman Gardiner's Facebook page is a "public forum" for purposes of First Amendment analysis, what sort of public forum is it, and, consequently, how should the Court go about conducting a First Amendment analysis based on prior precedents? It is telling that Plaintiffs fail to address this question, because addressing it

raises thorny issues which are best elided by parties taking their position.

Just as the moniker suggests, a "traditional" public forum is one which has been "devoted to assembly and debate… by long tradition or government fiat." *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 677 (1998). The government has almost no power to restrict speech and expressive conduct in traditional public fora, beyond such "time, place and manner" restrictions as may be necessary to serve a compelling government interest. See *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985). It is self-evident that Facebook pages are not "traditional" public fora; Facebook itself has only existed since 2004, access to Facebook pages is inherently limited to members of the public with Facebook profiles and internet access, and Facebook itself – a private company – has total control over who may post what on its platform and individual pages. Whatever a Facebook page is, there is nothing traditional about it, nor is it an open forum for public expression in the manner of a public square.

There is no doubt that plenty of protected First Amendment activity goes on on social media *platforms*, including Facebook. That is the clear message of the dicta Plaintiffs reference in their Response, from *Packingham v. North Carolina*, 137 U.S. 1730 (2017). Resp., pp. 2-3. Even if one concludes that *Packingham* declares the entire internet or, more specifically, social media, akin to a traditional public forum, the potential "forum" at issue in this case is not the internet or social media, writ large. It is a specific page belonging to a specific public official, on which comments may be deleted, respondents blocked, and the interactive comment feature disabled completely using standard design features, employed at the behest of either Facebook itself, or the page administrator. Alderman Gardiner has no power to restrict anybody's access to the internet, or to social media, or to Facebook. He has merely, allegedly, exercised the power of any Facebook page administrator to delete certain comments and block certain users, at his own

discretion.

Even if the universe of social media is akin to a public square, it does not logically follow that a specific government-administered social media page is a purposefully-created limited public forum, subject to the First Amendment. The Gardiner Facebook page lacks several definitive criteria for a limited, government-created public forum, beginning with the failure to sufficiently allege any intention on Gardiner's part to create a limited public forum. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Forbes*, 523 U.S. at 677. Plaintiffs acknowledge that the comments feature on any given Facebook page is a passive feature; it is enabled unless an administrator specifically chooses to disable it. "Pages are inherently public… [Gardiner] could turn comments off on his Facebook posts." Resp., p. 4. Thus, Gardiner took no action to intentionally open a nontraditional public forum for public discourse. Quite the opposite, he created a Facebook page and passively declined to restrict the public's ability to comment.

If social media as a whole is a public square, Gardiner is just one of billions of people sharing information in the marketplace of ideas. If he declines to let certain fellow occupants of the marketplace share his platform, it does not deprive them of the right to say what they want to say in the virtual public square, or create any obligation on his part to assist them in the promulgation of their own messages. As the Court's statement from *Forbes* indicates, even the permission of "limited discourse" by a government actor, such as allegedly occurred in Gardiner's comments section, is not sufficient to create a limited public forum for First Amendment purposes.

Plaintiffs essentially concede that not every public-facing page or website in the public forum of the internet (per *Packingham*) is a public forum unto itself. They suggest that if

Gardiner wanted to convey messages about his activities as alderman and useful information to residents without implicating the First Amendment, he could have done so via "a traditional website" or even a Facebook page, with the interactive features disabled. Resp., p. 4. The notion that Gardiner would have been within his powers to actively, intentionally disable the comment features on his Facebook page once created – effectively barring any speech but his own on the platform he administers – but was outside his powers by leaving the standard, Facebook-created and -controlled, features of the page in place, while occasionally deleting comments or barring certain users, stands the intent analysis set forth in *Forbes* on its head. Plaintiffs do not even begin to explain how Gardiner has "intentionally open[ed] a nontraditional public forum for public discourse," by his alleged actions. See *Forbes*, 523 U.S. at 677.

Unlike the defendant in *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), there are scant allegations [in the Complaint itself] that Gardiner intended his Facebook page to serve as a public forum. The alleged fact that third parties *use* the comments section themselves is beside the point. There is only one allegation of Gardiner soliciting comments or feedback in the entire Complaint, apparently in relation to the use of "TIF" funds. Cmplt., ¶ 2. The allegation is vague, failing to specify whether he solicited feedback in the comments section or via some other means. See *Id*. Seemingly realizing this shortcoming, Plaintiffs have impermissibly included new allegations regarding the solicitation of comments in their Response brief. Resp., p. 5, FN 1. The Court should disregard those allegations. More importantly, the bare allegation that Gardiner once solicited "input" on a subject via his Facebook page is hardly equivalent to the Randall defendant's opening post, asserting that she "really want[ed] to hear from ANY Loudon citizen on ANY issues, request, criticism, complement [sic], or just your thoughts." *Randall*, 912 F.3d at 673. Applying the *Forbes* standard, Gardiner's action looks like "permitting limited discourse" which does not necessarily implicate the First Amendment. Randall's actions look much more

like, "intentionally opening a… forum for public discourse."

That said, *Randall* stands on shaky ground because of its reliance on two obsolete precedents – *Manhattan Community Access Corp. v. Halleck*, 882 F.3d 300 (2nd Cir. 2019) and *Knight First Amendment Institute v. Trump*, 928 F.3d 226 (2nd Cir. 2019) – the latter of which the Plaintiffs see fit to reference favorably anyway. See Resp., pp. 8-9. Plaintiffs pay little heed to the misgivings regarding the necessity of government ownership or control over a purported forum expressed by Justice Thomas in his concurrence in *Knight*. See *Biden v. Knight First Amendment Institute*, 141 S.Ct. 1220 [*Mem*], (2021), *Thomas, J. concurring*. Oddly, Plaintiffs assert that Gardiner's alleged blocking and deletion of comments "untethered to any written guidelines or principles" somehow solves the ownership and control quandary. Resp. p. 10. For starters, it is not at all clear what a set of written guidelines or principles would do to alleviate Gardiner's purported liability, given that a social media page does not implicate time, place, and manner restrictions in the way a physical forum would, and given that content-based restrictions in a traditional or designated forum are subject to the strictest scrutiny. Additionally, the fact remains that Facebook users, including Gardiner, have no objective "right" to say anything on Facebook, because Facebook always has absolute discretion not to permit the expression or even the page itself from appearing on the platform. This is a distinct matter from whether this case would be moot if Gardiner himself were banned from Facebook. It is a consideration which the *Packingham* Court, speaking in generalities about the internet and social media, did not meaningfully engage.

Facebook is nothing like a physical space, such as a public accommodation where a government might rent and occupy space for a given period of time, creating a limited public forum. Facebook has absolute, constant discretion to delete any post, ban any user, and enact any standards for user behavior and expression that its sees fit. By contrast, if a government entity

leases or rents a space for purposes of creating a limited public forum, what they have rented is a temporary possessory interest in the space, during which time and in which place it may presumably exercise discretion over who enters or stays, subject to First Amendment limitations. The purported "right" to say anything on Facebook is an illusory right, whether a Facebook page user is an organ of government or a private person.

Plaintiffs allege that the Gardiner Facebook page is a "public forum" without elaboration, and ask the Court to fashion a new doctrine from that assertion, heedless of the numerous ways in which a Facebook page differs from, and directly conflicts, with the criteria for any other species of First Amendment-protected forum. They do not allege the purposeful creation of a forum with any specificity, and they do not explain how one can be deprived of a right that does not exist, thanks to the inherent, unregulated power of a private entity like Facebook. There is no precedent in this Circuit for the relief they seek, and the sole authority on the subject from outside the Circuit is both distinguishable, and reliant in itself on questionable precedents. The Complaint should be dismissed for failure to state a claim.

II. **Plaintiffs' Alternative Argument, That Their Right to Petition Has Been Infringed, Does Not Appear Anywhere in the Complaint and Should Be Disregarded**.

The word "petition" appears twice in the entire Complaint, in paragraphs 3 and 4, respectively; once when generally alleging that Gardiner deprived Plaintiffs of their ability to petition him, and once when quoting *Packingham*. Count I of the Complaint makes no reference to, and seeks no relief under, the First Amendment's Petition Clause. The Complaint does not come anywhere close to stating a claim under the Petition Clause, and Plaintiffs' arguments to that effect in their Response brief cannot serve to redeem a flawed claim. A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the *complaint*, not the sufficiency of new theories of recovery shoehorned into a response brief. See *Bell v. City of Country Club Hills*, 841 F.3d 713,

6

716 (7th Cir. 2016). If the Plaintiffs wished to plead a constitutional violation under Section 1983 and the Petition Clause of the First Amendment, they could have availed themselves of the opportunity afforded plaintiffs under Rule 15(a)(1)(B) of the Federal and Local Rules of Civil Procedure, and obtained leave as a "matter of course" to advance a distinct or new cause of action under the Petition Clause. See FRCP 15(a)(1)(B). The Plaintiffs acknowledge, nay insist, that a Petition Clause claim is a distinct cause of action subject to distinct analysis under the First Amendment. Resp., pp. 11-12; (citing *Borough of Duryea, PA. v. Guarnieri*, 564 U.S. 379, 388 (2011)). A distinct cause of action requires a distinct claim for relief. Plaintiffs' Petition Clause argument should be disregarded, and should not form the basis for a future grant of leave to amend.

**WHEREFORE**, the Defendant, James Gardiner, moves this honorable Court to grant his Motion to Dismiss Plaintiffs' Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6), and for any additional relief that the Court deems just.

Respectfully Submitted,

THOMAS R. RAINES ATTORNEY AT LAW, LLC

/s/ Thomas D. Carroll
Thomas D. Carroll
Thomas R. Raines Attorney at Law, LLC
20 N. Wacker Dr., Suite 556
Chicago, IL 60606
T: (312) 750-1166
F: (312) 750-1164
tcarroll@traalaw.com

Dated: October 21, 2021

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the Defendant, hereby certifies that on <u>October 21, 2021</u> he served a copy of the <u>Defendant James Gardiner's Reply in Support of His Motion to Dismiss Plaintiffs' Complaint</u> on all counsel of record by electronic means via the Northern District of Illinois's Electronic Case Filing (ECF) system, which notifies all counsels and parties of record.

/s/ Thomas D. Carroll

Thomas D. Carroll