**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PETE CZOSNYKA, *et al.*,

    Plaintiffs,

        v.

JAMES GARDINER,

    Defendant.

21-cv-3240

Hon. Sharon Johnson Coleman

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Statement of Material Facts .................................................................... 2

I.    Facebook Pages ................................................................................ 2

II.   Alderman Gardiner's Facebook Page ........................................... 3

III.  Moderation of the Facebook Page ................................................. 5

IV.  Facts Pertinent to the Named Plaintiffs .................................... 6

     A.  Plaintiff Adam Vavrick .......................................................... 6

     B.  Plaintiff Pete Czosnyka ........................................................ 10

     C.  Plaintiff Dominick Maino ..................................................... 12

     D.  Plaintiff James Suh .............................................................. 14

     E.  Plaintiff Peter Barash .......................................................... 16

     F.  Plaintiff Steve Held .............................................................. 19

Argument ................................................................................................ 22

I.    Summary Judgment Standard ..................................................... 22

II.   Plaintiffs Are Entitled to Judgment on their First Amendment
     Claim .............................................................................................. 23

     A.  Alderman Gardiner's Content-Based Regulation of Speech in
        a Public Forum Violates the First Amendment ................... 23

         1.  Alderman Gardiner Acts Under Color of Law in his
            Operation of his Official Facebook Page ..................... 24

         2.  Alderman Gardiner's Page Is a Public Forum for First
            Amendment Purposes ................................................... 26

         3.  Alderman Gardiner Engaged in Unlawful Content-Based
            Regulation of Speech .................................................... 29

ii

a.   The Standards Employed are Subjective and
     Discretionary ..........................................................................30

b.   The Restrictions Amount to a Heckler's Veto ......................31

c.   Speaker-Based Exclusions Are Impermissible....................32

B. Alderman Gardiner Violated the First Amendment's
   Petition Clause ...................................................................34

Conclusion ...........................................................................................36

## TABLE OF AUTHORITIES

*Albiero v. City of Kankakee,* 246 F. 3d 927 (7th Cir. 2001)....................... 22

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr,*
    518 U.S. 668 (1996) ................................................................. 36

*Boos v. Berry,* 485 U.S. 312 (1988)................................................. 32

*Borough of Duryea, Pa. v. Guarnieri,* 564 U.S. 379 (2011)...................... 34

*City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750 (1988) ............. 30

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,*
    473 U.S. 788 (1985) ................................................................. 26

*Czosnyka v. Gardiner,* No. 21-cv-3240,
    2022 U.S. Dist. LEXIS 24070 (N.D. Ill. Feb. 10, 2022) ...................... 27

*Davison v. Randall,* 912 F.3d 666 (4th Cir. 2019) ................................... 24, 27

*Felts v. Reed,* 504 F.Supp.3d 978 (E.D. Mo. 2020) ................................. 27

*Forsyth Cnty., Ga.v. Nationalist Movement,* 505 U.S. 123 (1992)............ 32

*Garnier v. O'Connor-Ratcliff,* 41 F.4th 1158 (9th Cir. 2022)................... 23

*Heffron v. Int'l Soc. of Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981) ................................................................. 30

*Knight First Amend. Inst. at Colum. Univ. v. Trump,*
    928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom.*
    *Biden v. Knight First Amend. Inst. at Colum. Univ.,*
    141 S. Ct. 1220 (2021) ............................................................. 23

*Lamb's Chapel v. Ctr. Moriches Union Free School Dist.,*
    508 U.S. 384 (1993) ................................................................. 36

*McCullen v. Coakley,* 573 U.S. 464 (2014)................................................. 32

*Mirabella v. Villard,* 853 F.3d 641 (3d Cir. 2017).................................... 36

*One Wis. Now v. Kremer,* 354 F. Supp. 3d 940 (W.D. Wis. 2019)............. *passim*

*Packingham v. North Carolina,* 137 S. Ct. 1730 (2017) .......................... *passim*

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ................................................................. 29

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)............................................ 30, 36

*Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997)................. 27

*Schall v. Martin,* 467 U.S. 253 (1984) ...................................................... 30

*Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602 (1989) ................. 24

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ........................................... 26, 33

*Turner Broad. Sys. v. FCC,* 512 U.S. 622 (1994)...................................... 33

*West v. Atkins*, 487 U.S. 42 (1988) ........................................................... 24

Plaintiffs Pete Czosnyka, Adam Vavrick, Dominick Maino, Peter Barash, James Suh and Steve Held, through counsel, respectfully request that this Honorable Court enter summary judgment in their favor on their First Amendment claim against Defendant James Gardiner, Alderman of the 45th Ward of the City of Chicago. In support, Plaintiffs state as follows:

## INTRODUCTION

Social media platforms such as Facebook enable ordinary citizens to speak directly to their government representatives and to listen to and debate others about issues of public interest in much the same way they could if they were gathered on a sidewalk, public park, city council meeting or town hall assembly. As the Supreme Court has recognized, social media platforms such as Facebook are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). These platforms have transformed civic engagement by allowing elected officials to communicate directly with their constituents and receive immediate feedback. "Governors in all 50 States and almost every Member of Congress have set up [social media] accounts for this purpose," allowing citizens to "petition their elected representatives and otherwise engage with them in a direct manner." *Id*. at 1735.

James Gardiner, the Alderman of the City of Chicago's 45th Ward, has established an official Facebook Page (www.facebook.com/AldermanGardiner), through which he communicates with his constituents about government functions on a daily basis. The Page has approximately 10,000 followers, many of whom

participate in the comments sections that appear under his posts, expressing opinions, asking questions, and engaging in debate. Plaintiffs are six politically engaged residents of Chicago's 45th Ward who have been critical of Alderman Gardiner and the positions he has taken on political issues. They have sought to use Alderman Gardiner's Facebook Page to express their viewpoints and lobby him with regard to matters of public concern. In response, Alderman Gardiner has at various times blocked the Plaintiffs from interacting with the Page, and deleted or hidden their comments on the Page that were critical of him or his policies.

As shown below, the material facts are not in dispute and Plaintiffs are entitled to summary judgment because Alderman Gardiner's content-based regulation of speech on his Facebook Page violated Plaintiffs' First Amendment rights.

## STATEMENT OF MATERIAL FACTS

### I. Facebook Pages

In addition to allowing users to create personal profiles to interact with others on the site, Facebook allows users to create "Pages," public-facing profiles used by brands, companies, government officials, and other public figures to interact with the public. Plf. Statement of Material Facts ("SOF") at ¶1. Facebook users can control the privacy of their personal profiles by making them visible only to select audiences, *e.g.*, users they've added as "friends" or smaller subgroups of friends defined by the user. In contrast, Pages are inherently public. *Id*. Anyone on or off Facebook can view the posts and comments on Pages. Anyone with a Facebook account can interact with a Page (*e.g.*, comment on posts; link to the Page in their

own posts; ask questions; or send a message). *Id*. The Page administrator's posts appear in a feed on the Page's front page. Visitors to the Page can post comments beneath any posts unless the Page administrator has disabled commenting. SOF at ¶2.

Facebook also enables other users to "tag" Facebook Pages on posts they make on their own Facebook accounts. SOF at ¶3. When a Page is "tagged" by a Facebook user, Facebook sends a notification to the Page administrator and the post in which the Page is tagged appears in the "Mentions" tab of the Page, which is visible to visitors to the Page. *Id*. Until mid-2022, Pages had a "Community" tab where visitors to the Page could leave comments on the Page that were visible to visitors to the Page in a manner similar to the "Mentions" tab. *Id*.

A Page administrator can control who can interact with his or her Facebook Page by adding individuals to a "blocked" list. SOF at ¶4. When an individual is blocked by a Page, the individual cannot interact with the Page at all—he or she cannot comment on the Page administrator's posts on the Page, respond to others' comments on the Page, tag the Page, or send the Page a direct message. *Id*. A Page administrator also has the option to "hide" or "delete" comments and posts on the Page. SOF at ¶5. When a post or comment is "deleted" it is permanently removed from the Page. When a post or comment is "hidden" it will not be visible to other Facebook users who view the Page unless the user is connected as "friends" with the person who posted the hidden comment. *Id*.

3

## II.  Alderman Gardiner's Facebook Page

In May 2019, Alderman Gardiner established a Facebook Page for his work as the Alderman of Chicago's 45th Ward at the URL www.facebook.com/AldermanGardiner. SOF at ¶6. Alderman Gardiner testified that the Page is used for "government purposes," such as communicating with constituents about the work he is doing as the Alderman of the 45th Ward, informing residents about events and important occurrences in the Ward, allowing constituents to contact him, and facilitating interactions with constituents, including responding to their questions and comments. *Id.* at ¶¶7, 8. The Page provides contact information for Gardiner's Ward Office, his office phone number and his City of Chicago email address. *Id.* at ¶7.

Throughout his tenure as Alderman of the 45th Ward, Alderman Gardiner has made use of the interactive features of the Page. For example, he allows visitors to the Page to comment on his posts and interact with one another to discuss their viewpoints and reactions to whatever he has posted. SOF at ¶¶9, 10. He also allows Facebook users to send messages to the Page and "tag" the Page in their own posts, which sends him a notification about the post and causes the post to show up on the Page. *Id.* at ¶¶10, 11. At times, Gardiner interacts with people who post on the Page and responds to their comments. *Id.* at ¶¶36, 77.

Alderman Gardiner posts to the Page "at least once a week" and on often more frequently than that. SOF at ¶12. The Page has approximately 10,000 "followers." *Id.* at ¶13.

### III.  Moderation of the Facebook Page

At this time, Alderman Gardiner is the only individual authorized to post to the Page, interact with posts or comments on the Page, or to moderate content on the Page. SOF at ¶14. Tanya King, a former staff member who worked for Gardiner from May 2019 until November 2019, also had access to the Page during her tenure. *Id*. at ¶15. However, Ms. King testified that the only person who had authority to moderate content on the Page, including deciding whether to delete or hide comments or block people from the Page, was Alderman Gardiner. *Id*. at ¶¶15, 16.

The City of Chicago's Board of Ethics published an ethics guidance for elected officials in January 2019 that explicitly states that elected officials "should not block followers from accessing [social media pages on which they communicate about government activities] or delete critical or negative comments unless the user's comments are obscene, profane, libelous or defamatory or are commercial and posted to sell goods and services." SOF at ¶17. The ethics guidance "strongly recommend[s]" that representatives' official social media accounts "include a policy, visible on the main page, outlining posting guidelines and explaining that postings are moderated and what types of comments will be deleted." *Id*. at ¶19. Despite this guidance, Alderman Gardiner has not posted any rules or standards for users who interact with the Page—*e.g.*, limitations on how often one can post or comment, guidance about permissible topics of conversation, and/or community standards about language and civility. SOF at ¶20.

While Alderman Gardiner has never had a policy, written or unwritten, about

moderation of his Facebook Page, he testified that he exercised discretion to delete comments or posts that he considered to be "harassing," "threatening," "doxing" or "inciting." *Id.* at ¶21. He described "inciting" comments as comments that are "trying to maybe get, you know… a reaction from somebody, a strong reaction that – that may be unhealthy for our community." *Id.* He described "harassing" comments as "[w]ords that or statements that are demeaning … or try to bring any type of unnecessary insults towards someone." *Id.* He stated that it is a matter of "his own personal judgment" whether something is inciting or harassing. *Id.* He agreed that "reasonable minds could differ over whether a particular comment meets [the] standard of trying to get a strong reaction from somebody that may be unhealthy." *Id.* Alderman Gardiner also testified that he may delete comments to the Page or block users from the Page if he receives "complaints" about the person or post; or if other users of the Page "have a bad reaction" to a post. *Id.* at ¶27. Alderman Gardiner testified that he is the only person authorized to decide whether a particular comment on the Page is permissible. *Id.* at ¶22.

## IV. Facts Pertinent to the Named Plaintiffs

### A. Plaintiff Adam Vavrick

Plaintiff Adam Vavrick is a homeowner in the 45th Ward who is interested in local politics and economic development in the community. SOF at ¶28. After Alderman Gardiner was elected, Vavrick frequently engaged with Alderman Gardiner's Facebook Page by asking questions of the Alderman, debating with other constituents, and expressing disagreement with some of the Alderman's policies and

actions. He did not use profanity, make threats against any person, engage in libel or defamation, or promote any commercial goods or services. *Id*. at ¶29.

Nevertheless, Alderman Gardiner deleted or hid Vavrick's comments that were critical of the Alderman or his performance more than ten times. *Id*. at ¶30. For example, on January 27, 2021, Alderman Gardiner made a public Facebook post regarding Holocaust Remembrance Day. The post received approximately 180 reactions from members of the community who follow Alderman Gardiner's Page. SOF at ¶31. The same day, the Chicago City Council held a vote on an updated version of its Welcoming City Ordinance, which prohibits Chicago police officers from cooperating with Immigrations and Customs Enforcement. The Ordinance passed by a vote of 41-8. Alderman Gardiner was one of the eight "no" votes. *Id*.

As someone with family murdered in the Holocaust, Vavrick was very disappointed with Alderman Gardiner's vote on this Ordinance and posted a comment on Gardiner's Holocaust Remembrance Day post, criticizing Alderman Gardiner's vote on the Welcoming City Ordinance, writing as follows:

> This morning at the City Council meeting, you voted "No" on expanded immigrant protections. When I heard your vote registered, I … started thinking about the kids in cages, right here in the U.S., and how those kids are a painful reminder of the USA's racist, xenophobic & tireless war on immigrants, and it's impossible not to remember on this solemn day, the lesson of the MS St. Louis that sailed from Germany in 1939 with 700ish Jews on board seeking asylum. They were denied entry by the USA, Cuba & Canada, eventually forced to head back to Europe. Historians estimate around 250 were murdered in the death camps that, wouldn't ya know it, started as a way of simply housing separated families. Based on your vote today, I believe you would have voted to keep the MS St. Louis from landing at our shores. The lessons and parallels should be plainly obvious to anyone who isn't smooth-brained, and yet even today, proud Irish immigrant whose family surely heard

the cries of NO IRISH or worse, chose to vote No to protect those who need protecting.

You profess to be at least mildly Catholic, right? "He executes justice for the fatherless and the widow, and loves [t]he sojourner, giving him food and clothing. Love the sojourner, therefore, for you were sojourners in the land of Egypt." (Deuteronomy 10:18) Yet, you still vote "No."

SOF at ¶32.

Alderman Gardiner deleted the comment. SOF at ¶33. Gardiner's Holocaust Remembrance Day post is still visible to anyone who visits his Facebook Page, as are more than a dozen other comments on the post, but Vavrick's comment and responses that appeared below it are not. *Id*. Alderman Gardiner admitted that the comment was deleted from the Page, but could not identify a reason why. *Id*. Gardiner agreed that the comment did not violate any of his rules against "threating, harassing, doxing, inciting, or provoking" content. *Id*.

On November 30, 2020, Plaintiff Vavrick responded to another constituent who was commenting in a thread on Alderman Gardiner's Page about Gardiner's hiding or deleting posts and comments. SOF at ¶34. Vavrick advised the other constituent to make a complaint to the Office of the Inspector General if Gardiner hid or deleted their comments and provided a link to the OIG's website. Alderman Gardiner deleted Plaintiff Vavrick's comment and link to the inspector general's page. *Id*.

In fall 2020, Vavrick posted in the "Community" section of Alderman Gardiner's Page asking for the Alderman's position regarding a brewery and property manager that were seeking to purchase property owned by the City in the 45th Ward to open a taproom and develop residential housing units. SOF at ¶35. Vavrick mentioned a

lawsuit that had been filed against the City regarding the sale of the property and asked what steps Gardiner was taking to support the project. Alderman Gardiner deleted the comment. *Id*.

Alderman Gardiner made it clear that he was unhappy with Vavrick's criticism of him on the Page because he took the time to read Vavrick's comments and personally respond to them. SOF at ¶36. For example, when Vavrick posted a comment under one of Gardiner's posts pointing out that Alderman Gardiner had decided to do away with projects that the community had voted to support through the City's "participatory budgeting" program, Gardiner personally responded to Vavrick, sarcastically calling him "an asset to our community." *Id*.

On May 26, 2021, Vavrick posted two comments on Alderman Gardiner's Page. One was in response to Alderman Gardiner's post about a public meeting about a proposed development in the Ward. Vavrick posted the Zoom meeting code and log-in credentials for the meeting. SOF at ¶37. The other post was a link to a media article about Alderman Gardiner from the local news organization Block Club. *Id*. Shortly after these posts, Alderman Gardiner blocked Vavrick from his Page on May 26, 2021. SOF at ¶38. Alderman Gardiner admitted that he made the decision to block Vavrick but could not recall why he did so. *Id*.

As a result of being blocked, Vavrick was unable comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer feedback on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman, which obviously impeded his ability to petition his elected representative

and communicate with members of the community about issues of importance. For example, he was unable to submit constituent service requests, post questions about how Alderman Gardiner planned to vote on matters before City Council, or ask questions about how Alderman Gardiner intended to allocate "menu money" that is distributed to each ward. *Id*. at ¶39. On June 21, 2021, a few days after this lawsuit was filed, Gardiner unblocked Vavrick from his Page. *Id*. at ¶40.

### B. Pete Czosnyka

Plaintiff Pete Czosnyka has been a resident of the 45th Ward for more than 45 years and volunteers for organizations in the community including Neighbors For Affordable Housing. SOF at ¶¶41, 42. During Alderman Gardiner's campaign for 45th Ward Alderman in 2019, Czosnyka was critical of Gardiner's platform and policy positions. In particular, Czosnyka is an advocate for affordable housing in the 45th Ward, and Gardiner opposed several developments in the community that Neighbors for Affordable Housing supported. Czosnyka made several public Facebook posts that criticized Gardiner's stance on affordable housing. *Id.* at ¶42.

When Gardiner was elected as 45th Ward Alderman and created the Alderman Gardiner Facebook Page on May 7, 2019, Gardiner immediately blocked Czosnyka from interacting with the Page. SOF at ¶43. Czosnyka wrote a letter to Gardiner's office on May 21, 2019, requesting that he be given the ability to interact with the Alderman's Facebook Page. *Id*. at ¶44. In mid-June 2019, Alderman Gardiner unblocked Czosnyka and he was again able to interact with members of the community and comment on Alderman Gardiner's posts. *Id*. at ¶45.

10

After Czosnyka began interacting with the Page, some members of the community who disagreed with Czosnyka's positions on local politics posted antagonistic and threatening responses to Czosnyka—for example, posting his address and descriptions of his home, falsely calling him a "criminal," and posting photoshopped pictures of his face behind bars. *Id.* at ¶46. Czosnyka responded to many of these insults and attacks, but in so doing, he did not use profanity, make threats against any person, or engage in libel or defamation. *Id.* at ¶47.

Characterizing Czosnyka's responses to the individuals who were antagonizing and defaming him as "harassment and personal attacks," Alderman Gardiner again blocked Czosnyka from his Page on June 25, 2019. SOF at ¶¶47 – 48. For the next two years, Czosnyka was blocked from the Page. On June 21, 2021, a few days after this lawsuit was filed, Alderman Gardiner unblocked Czosnyka. *Id.* at ¶51.

As a result of being blocked from Alderman Gardiner's page, Czosnyka was prohibited from commenting on Alderman Gardiner's posts, engaging in discussion with other constituents, offering his comments on Alderman Gardiner's performance of his public duties, or asking questions of the Alderman. *Id.* at ¶52. This impeded Czosnyka's ability to petition his elected official concerning issues of importance to him, including municipal infrastructure funding, the workings of the local Special Services Area Commission, the city budget, civilian oversight of the Chicago Police Department, and the mistreatment of homeless neighbors in the community. *Id.*

11

During the time Czosnyka was banned from responding to posts on Alderman Gardiner's Facebook Page, Gardiner made several references to Czosnyka on his Page. SOF at ¶¶53–55. For example, on August 19, 2019, Gardiner posted a photo of himself at a dunk tank at a neighborhood festival and wrote: "For those of you who have waited since February 26th (Pete!!!), now is your chance to take aim at the Edison Park Fest... Come out to dunk your Alderman and support the Homes for Heroes Foundation." Czosnyka was blocked from responding. *Id*. at ¶53.

On October 16, 2020, Alderman Gardiner posted a video of himself standing in front of Czosnyka's house. Czosnyka is visible in the background of the video standing on his porch. Gardiner referred to Czosnyka as "one of [my] biggest fans," ending the post with the hashtag #besties. SOF at ¶54. More than 100 people commented on the post and several other constituents spoke in Czosnyka's defense, but Czosnyka was unable to respond because he was blocked from interacting with Alderman Gardiner's Facebook page. *Id*.

### C. Plaintiff Dominick Maino

Plaintiff Dominick Maino is a resident of the 45th Ward with a longstanding interest in local politics and business development in the area. At the time of Gardiner's election as 45th Ward Alderman, Maino was serving as a board member of the Six Corners Association, a non-profit economic development association located within the Ward. SOF at ¶56.

After Alderman Gardiner created the Alderman Gardiner Facebook Page, Maino posted several comments questioning some of Gardiner's policy positions. SOF at

¶57. In particular, he expressed frustration about actions Alderman Gardiner took to delay projects that had been approved under the previous alderman such as the construction of The Point, a senior living complex, and Cuyler Plaza, a pedestrian plaza, both of which were planned to be built in the Six Corners area (near the intersection of Irving Park Road, Cicero Avenue and Milwaukee Avenue). *Id*. He also posted about the large amount of signs branded with Gardiner's campaign logo littering the public ways throughout the Ward. *Id*. In his posts, he did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. *Id*. at ¶58.

Without warning, Alderman Gardiner blocked Maino from his Page in June or July 2019. SOF at ¶59. Gardiner did not recall why he blocked Maino but "had no reason to dispute" that he was blocked from the Page. *Id*. Maino remained blocked from engaging with Alderman Gardiner's Facebook Page for approximately two years, until June 21, 2021, a few days after he filed this lawsuit. *Id*.

As a result of being blocked, Maino could not comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer his comments on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman. SOF at ¶60. Maino was deprived of the opportunity to comment on issues of importance to him, such as Alderman Gardiner's being stripped of committee assignments which impaired his ability to act as an effective member of City Council. *Id*.

13

**D. Plaintiff James Suh**

Plaintiff James Suh is a resident of the 45th Ward and the owner of a business near Six Corners. As a resident and business owner in the community, he is interested in local politics and economic development issues that impact the Ward. SOF at ¶61. After Alderman Gardiner's election, Suh was unhappy that Alderman Gardiner delayed some projects that had been approved under the previous alderman, such as the planned construction of The Point, a senior living complex that was going to replace a vacant lot at Six Corners. *Id.* at ¶62. Suh organized a rally to protest Alderman Gardiner's delay of The Point and co-founded a grassroots neighborhood organization called Six Corners Organizing for Progress and Engagement ("SCOPE") to connect neighbors who were interested in advocating for economic development in the community. *Id.* at ¶63.

After Gardiner's election, Suh engaged with Alderman Gardiner's Facebook Page a few times a month to share his viewpoints on Alderman Gardiner's performance of his public duties, to ask questions, and to talk to other members of the community about City politics and other matters of local interest. None of Suh's posts used profanity, made threats against any person or elected official, engaged in libel or defamation, or promoted any commercial goods or services. SOF at ¶64.

On at least three occasions, Alderman Gardiner deleted or hid comments that Suh posted. SOF at ¶65. For example, on November 25, 2020, Alderman Gardiner posted on his Page that he had decided to vote against Mayor Lightfoot's proposed 2021 budget and told constituents that he would explain his logic for doing so in a

future newsletter. Suh questioned why Alderman Gardiner didn't share his rationale for voting no on the budget on Facebook and questioned whether Alderman Gardiner had any "common sense." *Id.* Alderman Gardiner hid the comment. *Id.*

On another occasion, Suh commented on Alderman Gardiner's Page asking why City funds were being spent on large bonuses for politically connected people who worked in his office. Again, Alderman Gardiner deleted the comment. *Id.* at ¶66.

On June 6 and 7, 2021, Alderman Gardiner was in the news because one of his supporters deliberately drove her car over Pete Czosnyka's pollinator garden in retaliation for Czosnyka's criticism of Alderman Gardiner. *Id.* at ¶67. On June 7, 2021, Suh made the following post to Alderman Gardiner's Page with a link to the video of the vandalism of Plaintiff Czosnyka's property:

> If you're prioritizing listening to constituent concerns then it seems obvious for you to address one of your constituents being criminally targeted and harassed by one of your supporters. This troubling occasion calls for actual leadership, condemnation of this act and an appeal to universal common decency, whatever anyone's differences are. Ignoring it and pretending it didn't happen with yet another performative, pandering post is a direct acknowledgement that you don't possess even the most basic of human values. https://fb.watch/5Z-Wnl22xr/

*Id.*

Alderman Gardiner deleted the comment and blocked Suh from his Page on June 7, 2021. SOF at ¶68. Gardiner admitted that Suh was blocked on June 7, 2021, and that he was the person responsible for deciding to block Suh, but he could not recall what led to his decision to block Suh. *Id.*

Suh remained blocked from engaging with Alderman Gardiner's Facebook Page until June 21, 2021, a few days after filing this lawsuit. SOF at ¶69. As a result of being blocked, Suh was unable to comment on Alderman Gardiner's posts, engage in discussion with other constituents, give feedback on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman. This impeded Suh's ability to petition his elected representative about matters of concern to him, including proposed developments in the Ward and the expenditure of taxpayer funds (*e.g.*, "TIF" funds or menu money). *Id*. Suh was also impeded from obtaining information and asking follow-up questions about upcoming Ward events and City Council votes. *Id*.

### E. Plaintiff Peter Barash

Plaintiff Peter Barash is a resident of the 45th Ward and a co-founder of the grassroots neighborhood group SCOPE. He has a strong interest in economic and community development in the Ward. SOF at ¶70. When Alderman Gardiner was elected, Barash was disappointed with Gardiner's decision to delay projects that were approved under the previous alderman, including The Point. Barash participated in a protest meant to draw attention to the vacant lot and Alderman Gardiner's role in stalling the development. SOF at ¶71.

Because Alderman Gardiner was unwilling to meet with Barash and did not hold Ward Nights to meet with constituents, Barash found Facebook to be the best way to reach out to the Alderman. SOF at ¶72. Barash frequently engaged with Alderman Gardiner's Facebook Page to ask questions, debate with other

constituents, and express his views on the Alderman's policy positions and official actions. *Id*. When Barash engaged with the Page, he did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. *Id*.

Alderman Gardiner deleted or hid Barash's comments when they were critical of the Alderman or his performance on approximately ten occasions. SOF at ¶ 73 – 76. For example, on June 10, 2020, several constituents commented on Alderman Gardiner's Facebook Page asking him about his position on the Civilian Police Accountability Council ("CPAC"), a proposed civilian oversight board for claims of police misconduct. In the comments, Barash responded to another commenter who opposed CPAC because he believed it would lead to an increase in violent crime in the City, writing as follows:

> [Y]ou're conflating two issues – one is police accountability and another is gun violence. They're not connected. COPA has proven not effective enough. George Floyd is not an isolated incident. It's part of a national pattern supported by dat[a] and my city is a big part of that. Policing cannot be "the ends justify the means" and for most officers it is not. I do not believe good officers will leave because of CPAC. I believe officers who don't care that John Burge wasn't stripped of his pension will leave and we'll be better for it. Officers will still be well paid, pensions will be intact and worthy officers will still be promoted. What you will have hopefully is less politics and more accountability. What exactly is it you think CPAC will do other than drive a few folks who be[long] in the suburbs out to the suburbs finally?

SOF at ¶ 74. Alderman Gardiner hid the comment, making it invisible to anyone who viewed his Page who wasn't already connected as friends with Barash. *Id*.

On April 29, 2020, Alderman Gardiner posted on his Page about his plans for distributing surgical masks to residents after receiving a donation of masks from

Willie Wilson. Barash questioned whether it was logical for the Alderman to demand that people show identification proving that they reside in the 45th Ward in order to receive a mask, writing as follows:

> This isn't an attack and I don't mean to sound political. Wilson's donation is wonderful. The 20k donation per Ward will outpace demand in most wards. I love your idea of going to senior centers for donations. I'd add to share some to grocery stores as well. I just believe this moment transcends politics and getting caught up in artificial boundaries undermines Wilson's intentions – get masks to people. Asking for IDs will also slow down distribution and create a more dangerous point of contact for everyone. All this for one person?

SOF at ¶75. Alderman Gardiner hid the post. *Id.*

On March 8, 2021, Barash posted on Alderman Gardiner's Page asking the alderman to restart Ward Nights in person or virtually. SOF at ¶76. Ward Nights are open office hours during which constituents can sign up to meet with their City Council representatives which are held in many wards throughout the City. *Id.* In his comment, Barash noted that other members of City Council were holding virtual Ward Nights via Zoom. *Id.* Alderman Gardiner deleted the comment. *Id.*

Having his comments deleted or hidden from Alderman Gardiner's Page impeded Barash's ability to petition his elected representative and express his viewpoints to others in the community about important issues such as how Alderman Gardiner was performing his duties as an elected official, economic development in the Ward, and upcoming City Council votes. SOF at ¶78.

**F. Plaintiff Steve Held**

Plaintiff Steve Held is a resident of the 45th Ward. He has lived in the community for 15 years and has a longstanding interest in local politics and economic development in the Ward. He is a co-founder of the grassroots neighborhood organization SCOPE, and from 2018 through early 2021 served on the board of the not-for-profit advocacy organization Indivisible Chicago. SOF at ¶79. After Alderman Gardiner's election, Held frequently engaged with Alderman Gardiner's Facebook Page by asking questions of the Alderman, debating with other constituents, and expressing disagreement with the Alderman's policy positions and performance of his public duties. His posts did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. *Id.* at ¶80.

On numerous occasions, Alderman Gardiner deleted or hid Held's comments when they were critical of Gardiner. SOF at ¶¶81-88. For example, on January 6, 2021, Held posted a comment to the Community section of Alderman Gardiner's Facebook Page. In the comment, Held posted a photo of Alderman Gardiner appearing at a public "Support the Police" rally at which many attendees were waving flags supporting Donald Trump's reelection. SOF at ¶82. Held wrote as follows: "Alderman Jim Gardiner several other Aldermen have spoken out about today's events in DC, while you have remained silent. Do you denounce Trump, his coup attempt, and today's violence in DC?" Several other constituents commented

on the post, asking Alderman Gardiner for his statement. Alderman Gardiner deleted the post. *Id.*

As described above, on October 16, 2020, Alderman Gardiner posted a video of himself standing in front of Pete Czosnyka's house with Czosnyka visible in the background of the video standing on his porch. Held knew that Alderman Gardiner had blocked Czosnyka from the Page at that time and was taunting him by making this video and making specific reference to Czosnyka and the block where he lives. SOF at ¶84. Held commented in Czosnyka's defense, writing as follows: "Way to confirm that you are exactly as small as I thought you were. Keep up the stalking, bullying, and harassment of constituents, you're definitely winning hearts and minds in the ward." Alderman Gardiner hid the comment. *Id.*

On September 1, 2020, Held was participating in a comment thread along with other members of the community under a post made by Alderman Gardiner in which Gardiner stated that he would stand against "bullying" and "disrespectful and abusive behavior." SOF at ¶85. In the comments, a user named Shelia Hall Moreno commented that "a simple FOIA request will show you the Aldermans [sic] history as a stalker." In response, Held commented with a copy of a Stalking/No-Contact Order that had been entered against Alderman Gardiner. *Id.* Alderman Gardiner deleted the comment. *Id.* Gardiner admitted the comment was deleted and that the court records are "public documents." He testified that he "[doesn't] know" why the comment was deleted. *Id.*

On September 9, 2020, Held posted in the Community section of Alderman

Gardiner's Page, asking for an explanation of his vote to reject a proposed settlement between the City and a former Chicago police officer who alleged she was retaliated against for reporting a fellow officers' threatening behavior towards her. SOF at ¶86. Held wrote as follows: "could you please explain to your constituents why you were the solitary no vote in this 49-1 vote to approve this harassment settlement? Did you feel the city should have continued litigation and almost certainly pay more? Or do you not believe we should protect women from workplace harassment and retaliation? Or some other explanation? What did you see that no other Alderman on the Council saw?" *Id.* Without responding, Alderman Gardiner deleted the comment. *Id.*

On November 25, 2020, Alderman Gardiner posted a statement concerning his vote against Mayor Lightfoot's proposed 2021 budget. SOF at ¶87. He attributed his opposition to the budget in part to "city owned properties being sold for less than their appraised values." In response, Held asked Alderman Gardiner to comment on a recent civil lawsuit filed against him in which he was accused of "harassing a constituent and having him falsely arrested … costing us even more money on lawyers and potential legal settlements/judgments." Held asked, "Do you think your antics will cost the city more or less than your concerns around city property sales?" and posted a link to a Chicago Sun-Times story about the lawsuit. *Id.* Alderman Gardiner hid the comment, making it invisible to anyone who viewed his page who wasn't already connected as friends with Held on Facebook. *Id.*

On June 16, 2019, Alderman Gardiner posted about attending an event hosted by "The Greater Irving Park Neighborhood Association." Held commented that Gardiner was mistaken about the name of the neighborhood group that hosted the event; it was the "Greater Independence Park Neighborhood Association." *Id*. Gardiner hid the comment so it was not visible to anyone who was not connected with Held as a friend on Facebook. *Id*. Held later received a screenshot of text messages between Alderman Gardiner and his then staffer Tanya King in which Ms. King tells Alderman Gardiner he should unhide the comment. SOF at ¶88.

Having his comments deleted or hidden from Alderman Gardiner's Page impeded Held's ability to petition his elected representative and express his viewpoints to others in the community about important issues such as how Alderman Gardiner was performing his duties and how taxpayer funds were being allocated. *Id*. at ¶89.

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Albiero v. City of Kankakee*, 246 F. 3d 927, 931 (7th Cir. 2001); citing Fed.R.Civ.P. 56(c). As shown below, Plaintiffs are entitled to summary judgment in their favor because the undisputed facts demonstrate that Defendant Gardiner violated their First Amendment rights.

## II. Plaintiffs Are Entitled to Summary Judgment on their First Amendment Claim

There are two ways in which Defendant Alderman Gardiner's conduct violated Plaintiffs' First Amendment rights. First, Alderman Gardiner engaged in impermissible content-based regulation of speech in a public forum. Second, Alderman Gardiner imposed a viewpoint-based burden on Plaintiffs' right to petition the government. As shown below, Plaintiffs are entitled to judgment on both theories.

### A. Alderman Gardiner's Content-Based Regulation of Speech in a Public Forum Violates the First Amendment

Courts considering First Amendment challenges to public officials' regulation of content on their social media pages typically employ a three-step analysis to determine whether the public official's action violates the First Amendment: (1) whether the official was acting under color of law; (2) whether the social media page constitutes a public forum to which First Amendment protections apply; and (3) whether the restrictions imposed are properly tailored to the governmental interest. *See, e.g., Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1169–83 (9th Cir. 2022) (applying this three-step analysis and concluding that school district trustees violated the First Amendment by blocking constituents who were critical of them on Facebook); *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021) (applying a similar analysis and concluding

that former President Trump violated the First Amendment by blocking users from interacting with his account on Twitter).

Taking each of these elements in turn, Plaintiffs show that Alderman Gardiner has violated Plaintiffs' First Amendment rights.

### 1. Alderman Gardiner Acts Under Color of Law in his Operation of his Official Facebook Page

Pursuant to 42 U.S.C. §1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. §1983. A public official "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988).

To determine whether an official was acting "under color of law" when regulating a social media page, courts have asked whether the official's actions had a "sufficient nexus" to the performance of public duties "based on the totality of the circumstances." *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 950 (W.D. Wis. 2019) (finding that members of the Wisconsin State Assembly acted under color of law when they blocked plaintiff's Twitter account) (citing *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 614-15 (1989)); *see also Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019) (finding that county supervisor acted under color of law when blocking a citizen on Facebook where the public official "administered the … Facebook Page to further her duties as a municipal official" by, *inter alia*,

"provid[ing] information to the public about her and the Loudoun Board's official activities and solicit[ing] input from the public on policy issues she and the Loudoun Board confront.")

Here, the evidence firmly establishes that Defendant Gardiner acts under color of law in the operation and regulation of his Facebook Page. The Page contains numerous indicia that it is being used in furtherance of his performance of his duties as a public official, including the following:

- The Page is identified as belonging to the "Alderman of the 45th Ward" and the contact information that appears on the Page is Alderman Gardiner's official City phone number, office address, and email address (SOF at ¶7);

- Alderman Gardiner himself testified that he established the Page for "government purposes," such as communicating with constituents about the work he is doing as Alderman and informing residents about events and important occurrences in the Ward (SOF at ¶¶7, 8);

- In his posts on the Page, Alderman Gardiner frequently indicates that he is speaking on behalf of the 45th Ward, rather than as himself in an individual capacity. For example, in an October 28, 2022, Post, he wrote: "The #45thward wishes to recognize and appreciate the efforts made by our women and men who risk their lives to ensure our safety.";[1] and

- Alderman Gardiner uses the Page for communications related to his role as a government official, such as posting about City-sponsored events and programs; sharing the agendas, times and locations of upcoming public meetings; and updating constituents on goings-on in the Ward, including zoning changes, repaving, and infrastructure upkeep.[2]

---

[1] *See* https://www.facebook.com/AldermanGardiner/posts/pfbid0o1cC88KM4TEDDvLsBsi4ULcdv4JFE6abLi6XhxL3PjBbfWGMsP1t5NGAZxARWxHpl The Court can take judicial notice of the contents of Alderman Gardiner's Facebook Page. *See Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018) (finding that where a party refers to another party's website in its briefing, the district court may take judicial notice of the entire contents of that website).

[2] *See, e.g.,* https://www.facebook.com/AldermanGardiner/posts/pfbid029hAtrEKrGoYYrwoe5k6WKDR

Based on these factors, it is clear that Ald. Gardiner acted under color of law in prohibiting Plaintiffs from interacting with his Facebook Page and hiding or deleting their comments.

### 2. Alderman Gardiner's Page Is a Public Forum for First Amendment Purposes

"[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *see also Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011) (public forums are "locations or channels of communication that the government opens for use by the public for expressive activity."). In determining whether government officials have created a designated public forum under the First Amendment, courts consider the forum's compatibility with expressive activity and whether the government's overall "policy and past practice" shows that the forum is intended to be used for speech by the public. *Cornelius*, 473 U.S. at 802.

Here, there are three principal reasons to conclude that Alderman Gardiner's Facebook Page (particularly the comments sections under each post) is a designated public forum to which First Amendment protections apply.

---

yP5ud4xAdTgkHaFiCV6c9n3QJismL8FRvFWQ6775Vl (inviting constituents to a public safety meeting with 16th District police and his office); https://www.facebook.com/AldermanGardiner/posts/pfbid0Bmxb8qbrKXSLMFtH7ey95SJXnHBnPAUdp1ujoEjzmZUPPPVYxavB3BequETH8YT3l (sharing a post from the Department of Streets and Sanitation about snow removal parking restrictions).

First, the Supreme Court has explicitly held that social media websites are the "most important places" where First Amendment activities take place today. In *Packingham v. North Carolina*, 137 U.S. 1730 (2017), the U.S. Supreme Court considered the constitutionality of a North Carolina law that made it illegal for a person on the sex offender registry to access social media websites. The Court found the statute unconstitutional, writing as follows:

> While in the past there may have been difficulty in identifying the most important places … for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular. On [social media], users can debate religion and politics with their friends and neighbors … and petition their elected representatives and otherwise engage with them in a direct manner. … [S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought.

*Id.* at 1735-36 (citing *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997)). Thus, the Supreme Court regards social media platforms as important public fora for expression.

Second, as this Court recognized when denying Defendant's motion to dismiss, in the specific context at issue here (*i.e.,* government officials' social media pages), numerous courts have concluded that, when a government official "uses a social media account for official business, the interactive portions of the social media platforms are public forums for First Amendment purposes." *Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 U.S. Dist. LEXIS 24070, at *5-6 (N.D. Ill. Feb. 10, 2022) (citing *Davison*, 912 F.3d at 682 and *Knight First Amendment Inst.*, 928 F.3d at 237); *see also Felts v. Reed*, 504 F.Supp.3d 978, 985 (E.D. Mo. 2020); *One Wisconsin*, 354 F.Supp. 3d at 953. These decisions are consistent with the City's Board of Ethics

Advisory Opinion which instructs public officials that official social media accounts on which they post about "public affairs or matters involving city government" are subject to First Amendment protections. SOF at ¶¶17-19.[3]

Third, Alderman Gardiner's own conduct indicates that he regards the comments sections of his Facebook Page as a forum for speech by members of the public. This is so in at least three respects:

(1) Alderman Gardiner chose to use a Facebook Page to communicate with his constituents regarding government business. Facebook Pages are inherently interactive and are designed to solicit feedback in the form of comments, posts and messages. SOF at ¶1. Anyone with a Facebook account who is not blocked can interact with his Page by commenting on posts; tagging the Page; or sending the Page a message. *Id.* Alderman Gardiner is not required to maintain a Facebook Page. Nor is he required to allow comments on his Facebook Page. If he wanted to create a one-way channel of communication, he could turn comments off on his Facebook posts. In the alternative, he could use a traditional website (*i.e.*, not a social media page) to publish press releases without inviting feedback and comments. His choice to establish a Facebook Page and leave its interactive elements enabled demonstrates that Alderman Gardiner has intentionally created a public forum;

(2) Alderman Gardiner allows and encourages comments on his Facebook Page. Gardiner has actively invited and solicited public feedback on his Facebook posts.[4] He specifically testified that he established the Page for the purpose of facilitating interactions with constituents and that he has decided to allow visitors to the Page to interact with one another to share their viewpoints and reactions to his posts. SOF at ¶¶8, 9. Hundreds of people participate actively

---

[3]  Ms. King testified that a highlighted copy of the guidance was posted to a corkboard in Alderman Gardiner's office when she worked for him in 2019. SOF at ¶18. A copy of the guidance was also mailed to Alderman Gardiner by the City's Office of Inspector General on July 1, 2020. *Id.*

[4]  *See, e.g.,* https://www.facebook.com/AldermanGardiner/posts/520252068858871 (April 27, 2020 post that reads as follows: "Did anyone notice a difference with the bike lanes on Milwaukee Avenue today? Leave a comment below to let us know how we can further address safety issues for both bicyclists and motorists."); https://www.facebook.com/AldermanGardiner/posts/527577434793001 (May 8, 2020 post that reads in part: "Leave a comment below if you know of an area in our community that could use some love.").

in the comments sections on his posts. *See* SOF at ¶¶33, 54, 85 (describing posts that are followed by active comment threads with ongoing discussions between members of the community); and

(3) Alderman Gardiner himself makes use of the interactive aspects of the Page by responding to comments from constituents. *See* SOF at ¶36; ¶77 (examples of Gardiner responding directly to comments posted by Plaintiffs Vavrick and Barash to express his disagreement with the views they expressed).

In short, Defendant Gardiner elected to use an interactive platform to discuss government business and decided to make extensive use of the platform's interactive features. Defendant Gardiner's decision to use Facebook to communicate with his constituents and allow constituents to communicate with each other is powerful evidence of an intent to create a forum open to speech.

### 3. Defendant Alderman Gardiner Engaged in Unlawful Content-Based Regulation of Speech

Where, as here, a government official has created a designated public forum, there are limited circumstances in which he can restrict speech in that forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983) (designated public forums are subject to the same standards as traditional public forums). Specifically, the government can impose "reasonable time, place and manner regulations" on speech within the forum. *Id.* at 46. What the government cannot do, however, "is exclude speech based on its content, unless it can meet the extraordinarily high burden of proving exclusion is 'necessary to serve a compelling state interest and that it is narrowly drawn to achieve that interests.'" *One Wisconsin*, 354 F. Supp. at 955 (quoting *Perry*, 460 U.S. at 45). Put another way, "the government's reason for content-based restrictions must satisfy strict scrutiny."

29

*Id.*; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.")

Here, there are three reasons that Alderman Gardiner's regulation of the Plaintiffs' interactions with his Facebook Page should be seen as impermissible content-based regulation of speech.

### a. The Standards Employed are Subjective and Discretionary

As described above, Alderman Gardiner exercises unchecked discretion to decide who can comment on the Page and what they can say based on his view of whether a post is "harassing," "demeaning," "unhealthy," or "inciting." *See* SOF at ¶21-22. Such standards are not content-neutral because they are inherently subjective.

Subjective standards for restrictions on speech violate the First Amendment because they vest too much discretion with government officials, creating a risk of arbitrary and discriminatory enforcement. *Heffron v. Int'l Soc. of Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) ("discretion has the potential for becoming a means of suppressing a particular point of view"); *see also Schall v. Martin,* 467 U.S. 253, 307 (1984) ("we have consistently held violative of the First Amendment ordinances which make the ability to engage in constitutionally protected speech contingent upon the uncontrolled will of an official.") (citations omitted); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) (a statute that vests "unbridled discretion" in a government official to permit or deny

expressive activity poses significant risks of "content-based censorship").

Here, the undue subjectivity of the unwritten standards that Gardiner uses to regulate the Facebook Page is apparent from the inconsistent way the standards are applied based on whether Gardiner agrees with the content communicated. For example, Gardiner has not censored posts falsely calling Plaintiff Czosnyka a "stalker" and a "criminal" and photoshopped photos of Czosnyka's face behind bars. SOF at ¶23. In contrast, comments criticizing Alderman Gardiner's inappropriate conduct or truthfully pointing out that he has had an order of protection entered against him are deemed impermissible "harassment" and hidden or deleted from the Page. *See, e.g.*, SOF at ¶¶84, 85 (comments by Plaintiff Held regarding Gardiner's "harassment of constituents" and the Order of protection entered against him were hidden or deleted); *Id.* at ¶24 (Alderman Gardiner deemed a comment posted by Plaintiff Barash that stated that Gardiner "harass[ed] women and harass[ed] constituents," to violate his standards for what content could be posted on the Page).[5] A standard for regulating speech that varies based on the allegiances and subjective beliefs of government officials cannot be said to be "neutral."

### b. The Restrictions Amount to a Heckler's Veto

As explained, Alderman Gardiner testified that he may delete comments to the Page or block users from the Page if he receives "complaints" about the person or post; or if other users of the Page "have a bad reaction" to a post. SOF at ¶27.

---

[5]    It is factually accurate that a No-Contact Order of Protection was entered against Defendant Gardiner. *Id.* at ¶25. It is not factually accurate to call Plaintiff Pete Czosnyka a "criminal" or a "stalker." He has never been convicted of a crime or had an Order of Protection entered against him. *Id.* at ¶26.

It is an impermissible form of content discrimination to regulate speech based on other people's reactions to it. The Supreme Court has explained that offense and discomfort with speech that occurs in a public forum are not sufficient reasons to abridge First Amendment speech rights. Such a restriction essentially amounts to a "heckler's veto" that suppresses the expression of unpopular or controversial views. *See Forsyth Cnty., Ga.v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."); *see also McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (a statute justified based on the "undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech'" cannot be regarded as content neutral) (quoting *Boos v. Berry*, 485 U.S. 312, 321 (1988)); *see also id*. at 481-82 ("if, for example, the speech … caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech.")

Here, Alderman Gardiner has admitted that he regulated Plaintiffs' speech on his Facebook Page based on whether other members of the community complained about the speech or reacted negatively to it. Such a standard is content-based and therefore impermissible.

### c. Speaker-Based Exclusions Are Impermissible

Finally, Gardiner's regulation of speech on the Page is content-based because he blocked individuals who were critical of him or his policies while allowing persons whom he perceived as favorable to him to remain on the Page. *See Turner Broad. Sys. v. FCC,* 512 U.S. 622, 658 (1994) ("speaker-based laws demand strict scrutiny

when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say).”). The Seventh Circuit has held that the exclusion of a particular speaker who is otherwise “within the class to which the designated public forum was available” is a form of impermissible content-based discrimination. *Surita*, 655 F.3d at 870 (finding an impermissible content-based restriction where a mayor blocked an individual from speaking at a city council meeting); *see also, One Wisconsin*, 354 F. Supp. 3d at 955-56 (finding that general assembly members engaged in impermissible content-based restriction of speech where they “blocked a select number of Twitter accounts,” which supported an inference that they “selectively blocked plaintiff for a specific reason and not as a matter of happenstance.”)

Here, the undisputed evidence shows that Alderman Gardiner engaged in impermissible content-based regulation of speech on his Facebook Page by selectively banning particular users (in particular, those he deems to be his political opponents or critics) from commenting on the Page and removing particular comments based on their being critical of him. Put simply, the First Amendment allows Alderman Gardiner to adopt a content-neutral policy to regulate postings on his Facebook Page, but it is not permissible for him to selectively pick and choose who may participate in the forum.

For all of these reasons, Plaintiffs are entitled to judgment on their claim that Alderman Gardiner engaged in unlawful content-based regulation of their speech.[6]

---

[6]   As explained above, content-based regulations of speech may be permissible if they are necessary to achieve a compelling government interest and narrowly drawn to achieve that

**B. Alderman Gardiner Violated the First Amendment's Petition Clause**

Independent of whether the Facebook Page is a public forum, Alderman Gardiner's blocking of Plaintiffs also violated the First Amendment because it imposed a viewpoint-based burden on their right "to petition the Government for a redress of grievances." U.S. Const. Amdt. I. Though the right to speak and the right to petition are related, they are not duplicative: "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Accordingly, the Supreme Court has cautioned courts not to "presume ... that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Id.*

Defendant Gardiner's blocking of the Plaintiffs violates the Petition Clause because the Facebook Page is, in addition to being a forum for discussion, a channel through which constituents can petition their elected official directly. Indeed, Alderman Gardiner testified that one of the reasons he created a Facebook Page was to facilitate constituents' ability to contact him (SOF at ¶8), and the Supreme Court has observed that the interactive features of social media make these

---

interest. *See One Wisconsin*, 354 F. Supp. at 955  Here, there is no evidence that blocking Plaintiffs was necessary to achieve a compelling government objective. Nor is there any evidence that deleting or hiding Plaintiffs' comments was necessary to achieve a compelling government objective. The interest that Alderman Gardiner has in regulating the content on his Page can be achieved through the enactment of a content-neutral policy that applies equally to all members of the community.

platforms especially suited to this purpose. *Packingham*, 137 S. Ct. at 1735 ("users can petition their elected representatives and otherwise engage with them in a direct manner.").

The undisputed evidence shows that Plaintiffs sought to use the Facebook Page to lobby Alderman Gardiner with regard to matters of public concern. *See, e.g.,* SOF at ¶39 (Plaintiff Vavrick wanted to use the Facebook Page to lobby Gardiner regarding upcoming votes in City Council and the expenditure of "menu money" disbursed to each ward); ¶52 (Plaintiff Czosnyka wanted to lobby Gardiner regarding civilian oversight of the Chicago police department); ¶69 (Plaintiff Suh wanted to petition Gardiner regarding proposed developments in the ward and the expenditure of "TIF" funds); ¶78 (Plaintiff Barash wanted to petition Gardiner regarding economic development in the ward and upcoming City Council votes). Being blocked from the Facebook Page and having their comments deleted or hidden cut Plaintiffs off from this important channel for petitioning their elected representative. This was particularly problematic in light of the difficulty Plaintiffs had getting in-person meetings with Alderman Gardiner and Gardiner's failure to have regularly scheduled Ward Nights to meet with constituents. *See* SOF at ¶72.

Plaintiffs do not contend that Alderman Gardiner is required to make his Facebook Page available as a channel through which members of the public may exercise their Petition Clause rights. Nor do Plaintiffs contend that the First Amendment requires Alderman Gardiner to respond to the public's petitions, or even to read them. Having made the channel available, however, Alderman

Gardiner cannot close the channel solely to those who disagree with him or his policies. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996) (noting that "the government has no legitimate interest in repressing" "ordinary citizens['] ... viewpoints on matters of public concern"); *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Reed*, 576 U.S. at 163 ("a municipal government … has no power to restrict expression because of its message, its ideas, its subject matter, or its content.") (citation omitted); *see also Mirabella v. Villard*, 853 F.3d 641, 649-50 (3d Cir. 2017) (holding retaliation for petition activity unconstitutional).

## CONCLUSION

For the above-stated reasons, Plaintiffs respectfully request that this Honorable Court grant them summary judgment on their First Amendment claim.

Respectfully submitted,

/s/Adele D. Nicholas
/s/ Mark G. Weinberg
*Counsel for Plaintiffs*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net