UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PETE CZOSNYKA, et al.,

    Plaintiffs,

        v.

JAMES GARDINER, et al.,

    Defendants.

21-cv-3240

Hon. Sharon Johnson Coleman

**PLAINTIFFS' L.R. 56.1(a) STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, through counsel, respectfully submit the following statement of undisputed material facts in support of their motion for summary judgment pursuant to L.R. 56.1(a).

**I. Facebook Pages**

1. Facebook Pages are public-facing profiles used by companies, organizations, government officials, and other public figures to interact with the public. By default, Facebook Pages are open to the public. Anyone on or off Facebook can view the posts and comments on Pages. Anyone with a Facebook account can interact with a Page (*e.g.*, comment on posts; link to the Page in their own posts; ask questions; or send a message). Ex. 3, Decl of Vavrick, at ¶9.

2. The Page administrator's posts appear in a feed on the Page's front page. Visitors to the Page can post comments beneath any posts unless the Page administrator has disabled commenting. Ex. 3, Decl of Vavrick, at ¶10.

3.      Facebook users can also "tag" Facebook Pages on posts they make on their own Facebook accounts. When a Page is "tagged" by a Facebook user, Facebook sends a notification to the Page administrator and the post in which the Page is tagged appears in the "Mentions" tab of the Page, which is visible to visitors to the Page. Until mid-2022, Pages had a "Community" tab where visitors to the Page could leave comments on the Page that were visible to other visitors to the Page in a manner similar to the "Mentions" tab. Ex. 3, Decl of Vavrick, at ¶11.

4.      A Page administrator can control who can interact with his or her Facebook Page by adding individuals to a "blocked" list. When an individual is "blocked" by a Page, the individual cannot interact with the Page at all—he or she cannot comment on the Page administrator's posts on the Page, respond to others' comments on the Page, tag the Page, or send the Page a direct message. Ex. 3, Decl of Vavrick, at ¶12.

5.      A Page administrator also has the option to "hide" or "delete" comments and posts on the Page. When a post or comment is "deleted" it is permanently removed from the Page. When a post or comment is "hidden" it will not be visible to other Facebook users who view the Page unless the user is connected as "friends" with the person who posted the hidden comment. People who are not already connected as "friends" with the user whose comment is hidden will not be able to see the post. Ex. 3, Decl of Vavrick, at ¶13.

**II. Alderman Gardiner's Facebook Page**

6.      In May 2019, Alderman Gardiner established a Facebook Page for his

work as the Alderman of Chicago's 45th Ward at the URL

www.facebook.com/AldermanGardiner. Ex. 1, Dep. of Gardiner, at 8:14-9:1; *Id*. at 45

(Screenshot of the Page marked as exhibit 1 to Gardiner's deposition).

7.      Alderman Gardiner testified that the Page is used for "government

purposes." The contact information that appears on the Page connects to Alderman

Gardiner's ward office; and the email address provided is for his official City of

Chicago email address. Ex. 1, Dep of Gardiner, at 42:11-23; *see also id*. at 45,

(Screenshot of the Page). The Page is identified as belonging to the "Alderman of the

45th Ward." *Id*.

8.      Alderman Gardiner established the Page for purposes of communicating

with constituents about the work he is doing as the Alderman of the 45th Ward,

informing residents about events and important occurrences in the Ward, allowing

constituents to contact him, and facilitating interactions with constituents,

including enabling him to respond to their questions, concerns and comments. Ex. 1,

Dep. of Gardiner, at 12:2–13:6.

9.      Alderman Gardiner allows visitors to the Page to make comments on his

posts and interact with one another to discuss their viewpoints and reactions to

whatever he has posted. Ex. 1, Dep. of Gardiner, at 20:5-18.

10.      Throughout his tenure as Alderman, Gardiner has left the interactive

elements of the Page enabled, including allowing visitors to post reactions and

comments on his posts, and allowing Facebook users to send messages to the Page. Ex. 1, Dep. of Gardiner, at 16:21–18:6.

11.     Alderman Gardiner also permits Facebook users to "tag" the Page in their own posts, which sends a notification to him about the post and cause the comment to show up on his Page. Ex. 1, Dep. of Gardiner, at 21:8-13.

12.     Alderman Gardiner posts to the Page "at least once a week" and on occasions more frequently than that. Ex. 1, Dep. of Gardiner, at 19:17-25.

13.     The Page has approximately 10,000 "followers." Ex. 1, Dep. of Gardiner at 20:1-4; *id.* at 45 (screenshot of the Page showing "10k followers.")

## III.     Moderation of the Facebook Page

14.     At this time, Alderman Gardiner is the only individual authorized to post to the Page, interact with posts or comments on the Page, or to moderate content on the Page. Ex. 1, Dep. of Gardiner, at 25:4-8.

15.     Alderman Gardiner gave his former staff member, Tanya King, who worked for Gardiner from May 2019 until November 2019, access to the Page. Ex. 2, Dep. of King, at 9:5-15. However, Ms. King testified that the only person who had authority to moderate content on the Page, including deciding whether to delete or hide comments or posts was Alderman Gardiner. Ex. 2, Dep. of Tanya King, at 24:19-25:6 ("Q. Did you ever delete or hide a comment on the Facebook Page without first getting directions or instructions from Jim Gardiner to do so? A. Never. … Q. So in your experience, he was the person making the decisions regarding the Facebook Page? A. Yes.")

4

16.    Alderman Gardiner was the only person who had the authority to decide whether to block people from the Page. Ex. 1, Dep of Gardiner, at 54:21-23 ("Q. Who actually has the authority to decide whether someone is blocked from the page? A. I do."); Ex. 2, Dep. of King, at 23:23–24:18.

17.    The City of Chicago's Board of Ethics published an ethics guidance for elected officials in January 2019 that explicitly states that elected officials "should not block followers from accessing [social media pages on which they communicate about government activities] or delete critical or negative comments unless the user's comments are obscene, profane, libelous or defamatory or are commercial and posted to sell goods and services." Ex. 2, Dep. of King, at 14:7-15:23; *id*. at 32 (City Ethics Guidance, marked as exhibit 1 to Dep. of King).

18.    Ms. King testified that she printed out this guidance, highlighted the language stating that elected officials should not block users or delete their comments, and posted it on a corkboard in the 45th Ward Office. Ex. 2, Dep of King, at 14:7-16:2. A copy of the guidance was also mailed to Alderman Gardiner by the Office of the Inspector General on July 1, 2020. Ex. 1, Dep. of Gardiner, at 74:7–76:9; *id*. at 54-55 (letter to Gardiner from the Office of the Inspector General, marked as exhibit 2 to Gardiner's deposition).

19.    The ethics guidance "strongly recommend[s]" that elected officials' social media official accounts "include a policy, visible on the main page, outlining posting guidelines and explaining that postings are moderated and what types of comments

will be deleted." Ex. 1 at 53 (ethics guidance marked as exhibit 1 to Gardiner's deposition).

20.     Alderman Gardiner never adopted or posted a policy about how his Facebook Page will be moderated. Ex. 1, Dep. of Gardiner, at 43:4-45:1. Ex. 2, Dep. of King, at 22:12-18 ("Q. To your knowledge, did Alderman Gardiner have any policy regarding what content was allowed on the Facebook page?  A. No.").

21.     While Alderman Gardiner has no policy, written or unwritten, about moderation of his Facebook Page (Ex. 1 at 43:13–44:10), he testified that he may, in his discretion, delete comments or posts that he considers to be "harassing," "threatening," "doxing" or "inciting." Ex.1, Dep. of Gardiner, at 45:11–48:13. He described "inciting" comments as comments that are "trying to maybe get, you know… a reaction from somebody, a strong reaction that – that may be unhealthy for our community." Ex. 1, at 48:7-13. He stated that it is a matter of "his own personal judgment" whether something is inciting or harassing. *Id*. at 48:19-49:8. He agreed that "reasonable minds could differ over whether a particular comment meets [the] standard of trying to get a strong reaction from somebody that may be unhealthy." *Id*. at 51:12-16; *see also id*. at 55:19-25 ("Q. How are you deciding whether a particular comment or series of comments are harassing? A. Words that or statements that are demeaning … or try to bring any type of unnecessary insults towards someone.")

22.     Alderman Gardiner is the only person authorized to decide whether a particular comment on the Page is permissible. Ex. 1, Dep of Gardiner at 49:18-22;

*see also* Ex. 2, Dep of King, at 59:17-60:2 (stating that the standards for deleting comments and blocking users employed by Defendant Gardiner were "subjective" and that Alderman Gardiner was the only person who was deciding whether comments constituted impermissible "harassment.")

23.     Gardiner did not delete or hide the following comments from his Page, nor did he block the individuals who posted these comments: (1) photoshopped photos depicting Plaintiff Pete Czosnyka behind prison bars (Ex. 1, Dep of Gardiner, at 169:2-18; Ex. 2, Dep of King, at 52:1-53:16);  (2) a post falsely claiming that Czosnyka was "a known stalker of a woman" (*id.* at 47:23-49:17); and (3) a post falsely calling Czosnyka "a known criminal" (*id.* at 50:12-51:24).

24.     On the other hand, Gardiner decided that a comment posted by Plaintiff Peter Barash that stated that Alderman Gardiner "has restraining orders against him for harassing women" and that he "harasses constituents" was "harassing in nature" and thus violated his standards for what content could be posted on the Page. Ex. 1, Dep of Gardiner, at 106:18-107:11; *see also, id.* at 73-76 (screenshot of Barash's post attached as exhibit 8 to Gardiner's deposition).

25.     It is factually accurate that a No-Contact Order of Protection was entered against Defendant Gardiner. Ex. 1, Dep of Gardiner, at 96:14-22 (admitting that a post contained an accurate copy of an order entered against him); *id.* at 98:7-101:12 (discussing the order that was entered against him).

26.     It is not factually accurate to call Plaintiff Pete Czosnyka a "criminal" or a "stalker." He has never been convicted of a crime or had an Order of Protection entered against him. Ex. 4, Decl. of Czosnyka, at ¶6.

27.     Alderman Gardiner also testified that he may delete comments to the Page or block users from the Page if he receives "complaints" about the person or post, or if other users of the Page "have a bad reaction" to a post. Ex. 1, Dep. of Gardiner at 108:3-21 ("A. I don't know what the comment led to, what were the -- you know, if there was comments attached to this. Q….[W]hy would what it led to be relevant?... Why would you potentially take into account what a comment led to when determining whether it was appropriate to delete a comment? A. If somebody -- again I don't know if somebody had contacted my office and drew concern. Again was it harassing, was it intimidating, was it inciting. Q. Okay. So if other people have a bad reaction to a particular comment that was posted, that may lead you to delete the comment, true? A. Yes."); *id.* at 55:6-12 ("Q. Complaints from members of the community is something you might use to decide  whether to block someone from participation in the page? A. Complaints from members of the community. To consider blocking somebody, yes, I would inquire after I received complaints, yes.")

## IV.  Facts Relevant to the Named Plaintiffs

### A.  Plaintiff Adam Vavrick

28.     Plaintiff Adam Vavrick is a homeowner in the 45th Ward who is interested in local politics and economic development in the Ward. Ex 3, Decl. of Vavrick, at ¶1.

29.     After Alderman Gardiner was elected, Vavrick frequently engaged with Alderman Gardiner's Facebook Page by asking questions of the Alderman, debating with other constituents, and expressing disagreement with some of the Alderman's policies actions or positions. In so doing, he did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. Ex 3, Decl. of Vavrick, at ¶2.

30.     Alderman Gardiner deleted or hid Vavrick's comments that were critical of the Alderman or his performance more than ten times. Ex 3, Decl. of Vavrick, at ¶3.

31.     For example, on January 27, 2021, Alderman Gardiner made a public Facebook post regarding Holocaust Remembrance Day. The post received approximately 180 reactions from members of the community who follow Alderman Gardiner's Page. Ex 3, Decl. of Vavrick, at ¶3(A). The same day, the Chicago City Council held a vote on an updated version of its "Welcoming City" Ordinance, which prohibits Chicago police officers from cooperating with Immigrations and Customs Enforcement. The Ordinance passed by a vote of 41-8. Alderman Gardiner was one of the eight "no" votes. *Id*.

32.     As a descendant of Jews and as someone with family murdered in the Holocaust, Vavrick was very disappointed with Alderman Gardiner's vote on this Ordinance and posted a comment on Gardiner's Holocaust Remembrance Day post, criticizing Alderman Gardiner's vote on the Welcoming City Ordinance, writing as follows:

This morning at the City Council meeting, you voted "No" on expanded immigrant protections. When I heard your vote registered, I … started thinking about the kids in cages, right here in the U.S., and how those kids are a painful reminder of the USA's racist, xenophobic & tireless war on immigrants, and it's impossible not to remember on this solemn day, the lesson of the MS St. Louis that sailed from Germany in 1939 with 700ish Jews on board seeking asylum. They were denied entry by the USA, Cuba & Canada, eventually forced to head back to Europe. Historians estimate around 250 were murdered in the death camps that, wouldn't ya know it, started as a way of simply housing separated families. Based on your vote today, I believe you would have voted to keep the MS St. Louis from landing at our shores. The lessons and parallels should be plainly obvious to anyone who isn't smooth-brained, and yet even today, proud Irish immigrant whose family surely heard the cries of NO IRISH or worse, chose to vote No to protect those who need protecting.

You profess to be at least mildly Catholic, right? "He executes justice for the fatherless and the widow, and loves [t]he sojourner, giving him food and clothing. Love the sojourner, therefore, for you were sojourners in the land of Egypt." (Deuteronomy 10:18) Yet, you still vote "No." Ex 3, Decl. of Vavrick, at ¶3(A).

33. Alderman Gardiner deleted the comment. Gardiner's Holocaust Remembrance Day post is still visible to anyone who visits his Facebook Page (https://www.facebook.com/AldermanGardiner/posts/pfbid02LpJ7xgFQT5xTHGLtvh hxvTDwc9rypfjbfqN84us9hQCgLmp6zXoCEGk4L6iA969zl), as are more than a dozen other comments on the post, but Vavrick's comment and responses that appeared below it are not. Ex 3, Decl. of Vavrick, at ¶3(A); *see also* Ex. 1, Dep. of Gardiner, at 78:19–83:11 (admitting that the comment was deleted from the Page; that Gardiner was the only individual moderating content on the page at the time of the comment; and that the post did not violate any rules against "threating, harassing, doxing, inciting, or provoking" content; or any of Facebook's community moderation standards).

34. On November 30, 2020, Plaintiff Vavrick responded to another constituent who was commenting in a thread on Gardiner's Page about Gardiner's hiding or deleting posts and comments. Ex 3, Decl. of Vavrick, at ¶3(B). Vavrick advised the other constituent to make a complaint to the Office of the Inspector General if Gardiner hid or deleted their comments and provided a link to the OIG's website. Gardiner deleted the comment and link to the inspector general's page. *Id.*

35. In fall 2020, Vavrick posted in the "Community" section of Alderman Gardiner's Page asking for the Alderman's position regarding a brewery and property manager that were seeking to purchase property owned by the City in the 45th Ward to open a taproom and develop residential housing units. Ex 3, Decl. of Vavrick, at ¶3(C). Vavrick mentioned a lawsuit that had been filed against the City regarding the sale of the property and asked what steps Gardiner was taking to support the project. Gardiner deleted the comment. *Id.*

36. Alderman Gardiner made it clear that he was unhappy with Vavrick's criticism of him on the Page because he took the time to read Vavrick's comments and personally respond to them. Ex 3, Decl. of Vavrick, at ¶4. For example, when Vavrick posted a comment under one of Gardiner's posts pointing out that Alderman Gardiner had decided to do away with projects that the community had voted to support through the City's "participatory budgeting" program, Gardiner personally responded to Vavrick, sarcastically calling him "an asset to our community." *Id.*

37.     On May 26, 2021, Vavrick posted two comments on Alderman Gardiner's Page. One was in response to Alderman Gardiner's post about a public meeting about a proposed development in the Ward. Vavrick commented to provide the Zoom meeting code and log-in credentials for the meeting. Ex 3, Decl. of Vavrick, at ¶5. The other post was a link to a media article about Alderman Gardiner from the local news organization Block Club. *Id.*

38.     Alderman Gardiner blocked Vavrick from his Page on May 26, 2021. Ex 3, Decl. of Vavrick, at ¶6; *see also* Ex. 1, Dep. of Gardiner, at 84:23-85-5 (admitting that he made the decision to block Vavrick).

39.     As a result of being blocked, Vavrick was unable comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer feedback on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman. This impeded his ability to petition his elected representative and communicate with members of the community about issues of importance. For example, he was unable to submit constituent service requests, post questions about how Alderman Gardiner was planning to vote on matters before City Council, ask questions about how Alderman Gardiner was planning to allocate "menu money" that is distributed to each ward, or refute misleading information posed by the Alderman. *Id.*

40.     On June 21, 2021, a few days after this lawsuit was filed, Gardiner unblocked Vavrick from his Page. Ex 3, Decl. of Vavrick, at ¶7; *see also* Ex. 1, Dep.

of Gardiner, at 68:16-25 (stating that he decided to unblock the Plaintiffs in response to this case being filed).

**B. Pete Czosnyka**

41.    Plaintiff Pete Czosnyka has been a resident of the 45th Ward for more than 45 years. Ex. 4. Decl. of Czosnyka, at ¶1.

42.    During Alderman Gardiner's campaign for 45th Ward Alderman in 2019, Czosnyka was critical of Gardiner's platform and policy positions. In particular, Czosnyka is an advocate for affordable housing in the 45th Ward as a volunteer with the group Neighbors for Affordable Housing, and Gardiner opposed several developments in the community that Neighbors for Affordable Housing supported. Czosnyka made several public Facebook posts that criticized Gardiner's stance on affordable housing. Ex. 4. Decl. of Czosnyka, at ¶2.

43.    When Gardiner was elected as 45th Ward Alderman and created the Alderman Gardiner Facebook Page on May 7, 2019, Gardiner immediately banned Czosnyka from interacting with the Page. Ex. 4, Decl. of Czosnyka, at ¶3.

44.    Czosnyka wrote a letter to Gardiner's office on May 21, 2019, requesting that he be given the ability to interact with the Alderman Gardiner Facebook Page. Ex. 4. Decl. of Czosnyka, at ¶4.

45.    In mid-June 2019, Alderman Gardiner unblocked Czosnyka and he was again able to interact with members of the community and comment on Alderman Gardiner's posts. Ex. 4. Decl. of Czosnyka, at ¶5.

46.     After Czosnyka began interacting with the Page again, some members of the community who disagreed with Czosnyka's positions on local politics posted defamatory and threatening responses to Czosnyka—for example, posting his address and descriptions of his home, falsely calling him a "criminal," and posting photoshopped pictures of his face behind bars. Ex. 4. Decl. of Czosnyka, at ¶6. This conduct was encouraged by Alderman Gardiner, who asked his friends and supporters antagonize Czosnyka on the Facebook Page. Ex. 2, Dep. of King, at 42:15-43:12 (stating that Ald. Gardiner had been "calling some of his fans to post to antagonize Pete Czosnyka" … and that in response, Gardiner's supporters "posted the block [Pete] lived on; posted descriptions of Pete's home" and posted photos of "Mr. Czosnyka behind bars" in order to "get Pete to respond.") Czosnyka responded to many of these insults and attacks, but in so doing, he did not use profanity, make threats against any person, or engage in libel or defamation. Ex. 4. Decl. of Czosnyka, at ¶6.

47.     On June 24, 2019, Ms. King made a post to the Page stating "harassment and personal attacks will not be tolerated" with a big smiley face. Ex. 2, Dep. of King, at 58:6-17. Czosnyka commented on the post asking "Alderman Gardiner, what do you consider 'harassment and personal attacks?'" No one responded to Czosnyka's question. *Id*. at ¶59:7-19 ("Q. There is a long series of comments from many different individuals on this be nice post, but I want to draw your attention to the last one … from Pete Czosnyka that says, Alderman Gardiner, what do you consider "harassment and personal attacks?" Did you anyone ever respond to Pete's

question regarding, what do you consider harassment and personal attacks? A. Not that I'm aware."); *see also*, Ex. 4, Decl. of Czosnyka at ¶7 ("I responded to the post, asking 'Alderman Gardiner, What do you consider 'harassment and personal attacks'?" I also posted a few examples of other poster's comments about me on Alderman Gardiner's Page, such as posts calling me 'a known criminal,' 'delusional,' and 'deranged' and asked whether he considered the comments to be 'harassment and personal attacks.' Alderman Gardiner never responded to my request for an explanation of what constitutes 'harassment and personal attacks."")

48.     On June 25, 2019, Alderman Gardiner again blocked Czosnyka from his Page. Ex. 4. Decl. of Czosnyka, at ¶8.

49.     Tanya King, who was on Gardiner's staff at the time, described Alderman Gardiner's reason for blocking Plaintiff Pete Czosnyka as "personal grudge issues" because Czosnyka frequently "call[ed] out" Gardiner. Ex. 2, Dep. of King, at 56:12-18. She stated that Alderman Gardiner described Czosnyka as "a rat" he was going to "eradicate" from the Ward. *Id*. at 16:6-15.

50.     When Alderman Gardiner decided he wanted to block Pete Czosnyka from his Facebook Page, Ms. King informed Alderman Gardiner that he should not do so without authorization from a City entity such as the Board of Ethics. Ex. 2, Dep of King, at 40:20-41:4. When Ms. King spoke to the Board of Ethics on Gardiner's behalf about whether Gardiner could block Pete Czosnyka from the Page, Gardiner dictated what should be communicated to the Board of Ethics. *Id*. at 41:2-4 ("[T]o be clear, my phone calls with Lisa Eilers [at the Board of Ethics] and my emails. Jim

stood next to me in my office and he was telling me what I should write."). In response to the Board's request for evidence supporting Gardiner's decision to block Czosnyka, Gardiner selectively chose screenshots of comments made by Czosnyka in response to people who were calling him names, threatening him and falsely claiming that he was a "criminal" to make it look like Czosnyka was engaged in unwarranted harassment of other constituents. Ex. 2 at 54:16-55:3 ("Q. So is it fair to say that when the Board of Ethics gave you the go-ahead to block Pete Czosnyka from the page, it was based on a set of screenshots that were selectively chosen by Mr. Gardiner to portray Pete as the person who was being harassing? A. Yes. Q. And when the Board of Ethics said, go ahead and block Pete Czosnyka, they didn't have any of this context, including the multiple people who were defaming Pete, and falsely claiming that he was a criminal, right? A. Correct."); *id*. at 47:1-14 ("Who decided actually what to share with the Board of Ethics concerning Pete Czosnyka? A. Defendant Gardiner. … Q. So he ultimately decided what to take screen captures of and what to send to the Board of Ethics? A. Yes … Q. Would you agree that his aim was to make it look like Pete was engaging in unwarranted harassment of other constituents? A. Absolutely.")

51.     Pete Czosnyka was blocked from Alderman Gardiner's Page until June 21, 2021, a few days after this lawsuit was filed. Ex. 4, Decl. of Czosnyka, at ¶8.

52.     As a result of being blocked from Alderman Gardiner's page, Czosnyka was prohibited from commenting on Alderman Gardiner's posts, engaging in discussion with other constituents, offering his comments on Alderman Gardiner's

performance of his public duties, or asking questions of the Alderman. Ex. 4, Decl. of Czosnyka, at ¶11. This impeded Czosnyka's ability to petition his elected official concerning many issues of importance to him, including municipal infrastructure funding, the workings of the local Special Services Area Commission, the city budget, civilian oversight of the Chicago Police Department, and the treatment of homeless neighbors in the community. *Id*. at ¶11.

53.     During the time Czosnyka was banned from responding to posts on Alderman Gardiner's Facebook Page, Gardiner made several references to Czosnyka on his Page. For example, on August 19, 2019, Gardiner posted a photo of himself at a dunk tank at a neighborhood festival and wrote: "For those of you who have waited since February 26th (Pete!!!), now is your chance to take aim at the Edison Park Fest... Come out to dunk your Alderman and support the Homes for Heroes Foundation." Czosnyka was blocked from responding. The post is available at the following URL:

https://www.facebook.com/photo/?fbid=340764493474297&set=a.296677284549685. Ex. 4, Decl. of Czosnyka at ¶9.

54.     On October 16, 2020, Alderman Gardiner posted a video of himself standing in front of Czosnyka's house. Czosnyka is visible in the background of the video standing on his porch. Gardiner and referred to Czosnyka as "one of [my] biggest fans," ending the post with the hashtag #besties. The video is available at the following URL:

https://www.facebook.com/AldermanGardiner/posts/pfbid02CEAgfnZQ26FQgGbgA

HGztGxGQCjKbLqchpLvCvqRD1a3QkPMBdDH1vZn9geGVpZAl. Ex. 4 at ¶10. More than 100 people commented on the post and several other constituents spoke in Czosnyka's defense, but Czosnyka was unable to respond because he was banned from interacting with Alderman Gardiner's Facebook page. *Id*.

55.     It was "immediately apparent" to Ms. King that Alderman Gardiner was "targeting" Pete Czosnyka with this video by "purposefully filming in front of his house so everyone can have his address." Ex. 2, Dep of King, at 61:4-62:11.

**C. Dominick Maino**

56.     Plaintiff Dominick Maino is a resident of the 45th Ward with a longstanding interest in local politics and business development in the community. At the time of Gardiner's election as 45th Ward Alderman, Maino was serving as a board member of the Six Corners Association, a non-profit economic development association located within the Ward. Ex. 5, Decl. of Maino, at ¶1.

57.     After Alderman Gardiner created the Alderman Gardiner Facebook Page, Maino posted several comments questioning some of Gardiner's policy positions. In particular,  he expressed frustration about actions Alderman Gardiner took to delay projects that had been approved under the previous alderman such as the construction of The Point, a senior living complex, and Cuyler Plaza, a pedestrian plaza, both of which were planned to be built in the Six Corners area (near the intersection of Irving Park Road, Cicero Avenue and Milwaukee Avenue). He also posted about the large amount of signs branded with Gardiner's campaign logo littering the public ways throughout the Ward. Ex. 5, Decl. of Maino, at ¶2.

58.     In his posts on Alderman Gardiner's Facebook Page, he did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. Ex. 5, Decl. of Maino, at ¶3.

59.     Without warning, Alderman Gardiner blocked Maino from his Page in June or July 2019. Ex. 5, Decl. of Maino, at ¶4; *see also* Exhibit 1, Dep. of Gardiner, at 154:19-155:15 (testifying that he did not personally recall why Mr. Maino was blocked but "had no reason to dispute" that Maino was blocked from the Page). Mr. Maino remained blocked from engaging with Alderman Gardiner's Facebook Page until June 21, 2021, a few days after he filed this lawsuit. Ex. 5 at ¶4.

60.     As a result of being blocked, Maino could not comment on Alderman Gardiner's posts, engage in discussion with other constituents, offer his comments on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman. *Id*. Mr. Maino was deprived of the opportunity to comment on issues of importance to him, including many news media stories about how Jim Gardiner's behavior affected his duties as alderman or about his being stripped of committee assignments which impeded his ability to act as a member of City Council. Nor could Maino discuss his viewpoints about local politics and Gardiner's job performance with other neighbors. Ex. 5, Decl. of Maino, at ¶4.

**D. James Suh**

61.     Plaintiff James Suh is a resident of the 45th Ward and the owner of a business near Six Corners (the intersection of Irving Park Road, Cicero Avenue and

Milwaukee Avenue). As a resident and business owner in the community, he is interested in local politics and economic development issues that impact the Ward. Ex. 1, Decl. of Suh, at ¶1.

62.     After Alderman Gardiner's election, Suh was unhappy that Alderman Gardiner delayed some projects that had been approved under the previous alderman, such as the planned construction of The Point, a senior living complex that was going to replace a unsightly vacant lot at Six Corners. Ex. 6, Decl. of Suh, at ¶2.

63.     Suh organized a rally to protest Alderman Gardiner's delay of The Point and co-founded a grassroots neighborhood organization called Six Corners Organizing for Progress and Engagement ("SCOPE") to connect neighbors who were interested in advocating for economic development in the community. Ex. 6, Decl. of Suh, at ¶3.

64.     After Gardiner's election, Suh engaged with Alderman Gardiner's Facebook Page a few times a month to share his viewpoints on Alderman Gardiner's performance of his public duties, to ask questions, and to talk to other members of the community about City politics and other matters of local interest. In so doing, Suh did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. Ex. 6, Decl. of Suh, at ¶4

65.     On at least three occasions, Alderman Gardiner deleted or hid comments that Suh posted. Ex. 6, Decl. of Suh, at ¶5. For example, on November 25, 2020,

Alderman Gardiner posted on his Page that he had decided to vote against Mayor Lightfoot's proposed 2021 budget and told constituents that he would explain his logic for doing so in a future newsletter. Suh questioned why Alderman Gardiner didn't share his rationale for voting no on the budget on Facebook and questioned whether Alderman Gardiner had any "common sense." Ex. 6, Decl. of Suh, at ¶5. Gardiner hid the comment. *Id.*

66.     On another occasion, Suh commented on Alderman Gardiner's Page asking why City funds were being spent on large bonuses for politically connected people who worked in his office. Gardiner deleted the comment. Ex. 6, Decl. of Suh, at ¶7.

67.     On June 6 and 7, 2021, Alderman Gardiner was in the news because one of his supporters deliberately drove her car over Pete Czosnyka's pollinator garden in retaliation for his criticism of Alderman Gardiner. *See, e.g.,* https://chicago.cbslocal.com/2021/06/07/northwest-side-yard-suv-vandalism-alderman-james-gardiner-critic/. Ex. 1, Decl. of Suh, at ¶9. On June 7, 2021, Suh made the following post to Alderman Gardiner's Page with a link to the video of the vandalism of Plaintiff Czosnyka's property:

> If you're prioritizing listening to constituent concerns then it seems obvious for you to address one of your constituents being criminally targeted and harassed by one of your supporters. This troubling occasion calls for actual leadership, condemnation of this act and an appeal to universal common decency, whatever anyone's differences are. Ignoring it and pretending it didn't happen with yet another performative, pandering post is a direct acknowledgement that you don't possess even the most basic of human values. https://fb.watch/5Z-Wnl22xr/

Ex. 6, Decl. of Suh, at ¶9.

68.     Alderman Gardiner deleted the comment and blocked Suh from his Page on June 7, 2021. Ex. Decl. of Suh, at ¶10; *see also*, Ex. 1, Dep. of Gardiner, at 147:23–148:20 (testifying that Suh was blocked on June 7, 2021, that he was the person responsible for deciding to block Suh, and that he could not recall what led to his decision to block Suh).

69.     Suh remained blocked from engaging with Alderman Gardiner's Facebook Page until June 21, 2021, a few days after he filed this lawsuit. Ex. 6, Decl. of Suh, at ¶10. As a result of being blocked, Suh was unable to comment on Alderman Gardiner's posts, engage in discussion with other constituents, give feedback on Alderman Gardiner's performance of his public duties, or ask questions of the Alderman. This impeded Suh's ability to petition his elected representative about matters of concern to him, including proposed developments in the Ward and the expenditure of taxpayer funds (*e.g.* "TIF" funds or menu money). *Id*. Likewise, Suh was impeded from obtaining information or and asking follow-up questions about upcoming Ward events and City Council votes. *Id*.

**E. Peter Barash**

70.     Plaintiff Peter Barash is a resident of the 45th Ward and a co-founder of the grassroots neighborhood group Six Corners Organizing for Progress and Engagement ("SCOPE"). He has a strong interest in economic and community development in the Ward. Ex. 7, Decl. of Barash, at ¶1.

71.     When Alderman Gardiner was elected, Barash was dissatisfied with Gardiner's decision to delay projects that were approved under the previous

alderman, including the construction of The Point, a senior housing complex that was slated to be built on an unsightly vacant lot at the intersection of Irving Park Road and Milwaukee Avenue that had been in disrepair and presented a hazard for years. Barash participated in a protest meant to draw attention to the vacant lot and Alderman Gardiner's role in stalling the development without explanation. Ex. 7, Decl. of Barash, at ¶2.

72.    Because Alderman Gardiner was unwilling to meet with Barash and frequently did not hold Ward Nights to meet with constituents, Barash frequently engaged with Alderman Gardiner's Facebook Page to ask questions, debate with other constituents, and express his views on the Alderman's policy positions and official actions. Ex. 7, Decl. of Barash, at ¶3. When Barash engaged with the Page, he did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. *Id*.

73.    Alderman Gardiner deleted or hid Barash's comments when they were critical of the Alderman or his performance on approximately ten occasions. Ex. 7, Decl. of Barash, at ¶4.

74.    For example, on June 10, 2020, several constituents commented on Alderman Gardiner's Facebook Page asking him about his position on the Civilian Police Accountability Council (CPAC), a proposed civilian oversight board for claims of police misconduct. In the comments, Barash responded to another commenter who was opposed to CPAC because he believed it would lead to an increase in violent crime in the City, writing as follows:

> [Y]ou're conflating two issues – one is police accountability and another is
> gun violence. They're not connected. COPA has proven not effective enough.
> George Floyd is not an isolated incident. It's part of a national pattern
> supported by dat[a] and my city is a big part of that. Policing cannot be "the
> ends justify the means" and for most officers it is not. I do not believe good
> officers will leave because of CPAC. I believe officers who don't care that
> John Burge wasn't stripped of his pension will leave and we'll be better for
> it. Officers will still be well paid, pensions will be intact and worthy officers
> will still be promoted. What you will have hopefully is less politics and more
> accountability. What exactly is it you think CPAC will do other than drive
> a few folks who be[long] in the suburbs out to the suburbs finally?

Ex. 7, Decl. of Barash, at ¶4(a). Alderman Gardiner hid the comment, making it

invisible to anyone who viewed his page who wasn't already connected as friends

with Barash. Ex. 7, Decl. of Barash, at ¶4(c).

75.    On April 29, 2020, Alderman Gardiner posted on his Facebook Page about

his plans for distributing masks to residents after receiving a donation of masks

from Willie Wilson. Barash questioned whether it was logical for the Alderman to

demand that people show identification proving that they reside in the 45th Ward

in order to receive a mask. Ex. 7, Decl. of Barash, at ¶4(b). Barash responded to

another constituent, writing as follows:

> This isn't an attack and I don't mean to sound political. Wilson's donation
> is wonderful. The 20k donation per Ward will outpace demand in most
> wards. I love your idea of going to senior centers for donations. I'd add to
> share some to grocery stores as well. I just believe this moment transcends
> politics and getting caught up in artificial boundaries undermines Wilson's
> intentions – get masks to people. Asking for IDs will also slow down
> distribution and create a more dangerous point of contact for everyone. All
> this for one person?

Alderman Gardiner hid the post. *Id*. Gardiner's original post remains visible at the

URL: https://www.facebook.com/AldermanGardiner/posts/pfbid02esBc6DVsxnCaDq

Dnr6y24QyLvTws5BSdGWVZwyEGJEbDBk4YeRBjnoPuyLfG1dHxl. A visitor to

the Page can see that Barash's comment was hidden from the thread and is not visible to anyone who visits Alderman Gardiner's Facebook Page unless they are connected to him as a friend on Facebook. *Id.*

76.  On March 8, 2021, Barash posted on Alderman Gardiner's Facebook Page asking the alderman to restart Ward Nights in person or virtually. Ex. 7, Decl. of Barash, at ¶4(c). Ward Nights are open office hours during which constituents can sign up to meet with their City Council representatives which are held in many wards throughout the City. *Id.* In his comment, Barash noted that other members of City Council were holding virtual Ward Nights by Zoom. *Id.* Alderman Gardiner deleted the comment. *Id.*

77.  Alderman Gardiner has personally responded to Barash's comments on the Page. For example, after Barash posted a comment on March 24, 2020, questioning the adequacy of the Alderman's response to flooding in an alley, Alderman Gardiner responded with a comment in which he identified Barash's place of employment, writing as follows: "Peter Barash 10 families? Now, I know you are not a Math teacher at Bell Elementary Peter, but there is far more than 10 families living on that block. If you were truly concerned, you would go and walk the alley yourself, and speak to the people who are affected. And if it is on private property as you say it is, why do city crews use that alley to collect their garbage? So please Peter, take your own advice and own YOUR mistakes." Ex. 7, Decl. of Barash at ¶4(d).

78.     Having his comments deleted or hidden from Alderman Gardiner's Page impeded Barash's ability to petition his elected representative and express his viewpoints to others in the community about important issues such as how Alderman Gardiner was performing his duties as an elected official, economic development in the ward, and upcoming City Council votes.  Ex. 7, Decl. of Barash at ¶5.

**F. Steve Held**

79.     Plaintiff Steve Held is a resident of the 45th Ward. He has lived in the community for 14 years and has a longstanding interest in local politics and economic development in the Ward. He is a co-founder of the grassroots neighborhood organization Six Corners Organizing for Progress and Engagement ("SCOPE"), and from 2018 through early 2021 served on the board of the not-for-profit advocacy organization Indivisible Chicago.  Ex. 8, Decl. of Held, at ¶1.

80.     After Alderman Gardiner's election, Held frequently engaged with Alderman Gardiner's Facebook Page by asking questions of the Alderman, debating with other constituents, and expressing disagreement with the Alderman's policy positions and performance of his public duties. In so doing, Held did not use profanity, make threats against any person or elected official, engage in libel or defamation, or promote any commercial goods or services. Ex. 8, Decl. of Held, at ¶2.

81.     Alderman Gardiner repeatedly deleted or hid Held's comments when they were critical of Gardiner or his performance of his job. Ex. 8, Decl. of Held, at ¶3.

82.    For example, on January 6, 2021, Held posted a comment to the Community section of Alderman Gardiner's Facebook Page. In the comment, Held posted a photo of Alderman Gardiner appearing at a public "Support the Police" rally at which many attendees were waving flags supporting Donald Trump's reelection. Ex. 8, Decl. of Held, at ¶3(A). Held wrote as follows: "Alderman Jim Gardiner several other Aldermen have spoken out about today's events in DC, while you have remained silent. Do you denounce Trump, his coup attempt, and today's violence in DC?" Several other constituents commented on the post, asking Alderman Gardiner for his statement. Alderman Gardiner deleted the post. Ex. 8, Decl. of Held, at ¶3(A).

83.    On October 16, 2020, Alderman Gardiner posted a video of himself standing in front of Pete Czosnyka's house with Pete visible in the background of the video standing on his porch. Gardiner referred to Pete as "one of [my] biggest fans," ending the post with the hashtag #besties. The post is available at the following URL:

https://www.facebook.com/AldermanGardiner/posts/pfbid02CEAgfnZQ26FQgGbgA HGztGxGQCjKbLqchpLvCvqRD1a3QkPMBdDH1vZn9geGVpZAl. Ex. 8, Decl. of Held, at ¶3(B).

84.    Held knew that Alderman Gardiner had blocked Pete Czosnyka from the Page at that time and was taunting Pete by making this video and making specific reference to Pete and the block where he lives. Ex. 8, Decl. of Held, at ¶3(B). Held commented in Pete's defense, writing as follows: "Way to confirm that you are

exactly as small as I thought you were. Keep up the stalking, bullying, and harassment of constituents, you're definitely winning hearts and minds in the ward." Alderman Gardiner hid the comment. Ex. 8, Decl. of Held, at ¶3(B).

85. On September 1, 2020, Held was participating in a comment thread along with other members of the community under a post made by Alderman Gardiner in which Gardiner stated that he would stand against "bullying" and "disrespectful and abusive behavior." The post appears at the following URL: https://www.facebook.com/AldermanGardiner/posts/607713150112762. Ex. 8, Decl. of Held, at ¶3(C). In the comments, a user named Shelia Hall Moreno made the comment "a simple FOIA request will show you the Aldermans history as a stalker." In response, Held commented with a copy of a Stalking/No-Contact Order that had been entered against Alderman Gardiner. Ex. 8, Decl. of Held, at ¶3(C). The name and other identifying information of the complainant was redacted from the Order. *Id*. Alderman Gardiner deleted the comment. *Id.*; *see also*, Exhibit 1, Dep. of Gardiner, at 96:4–102:4 (admitting the comment was deleted; admitting that the court records are "public documents"; and stating that he "[doesn't] know" why the comment was deleted).

86. On September 9, 2020, Held posted in the Community section of Alderman Gardiner's Page asking for an explanation of his vote to reject a proposed settlement between the City and a former Chicago police officer who alleged she was retaliated against for reporting a fellow officers' threatening behavior towards her. Ex. 8, Decl. of Held, at ¶3(D). Held wrote as follows: "could you please explain

to your constituents why you were the solitary no vote in this 49-1 vote to approve this harassment settlement? Did you feel the city should have continued litigation and almost certainly pay more? Or do you not believe we should protect women from workplace harassment and retaliation? Or some other explanation? What did you see that no other Alderman on the Council saw?" *Id*. Alderman Gardiner deleted the comment without responding. Ex. 8, Decl. of Held, at ¶3(D).

87.     On November 25, 2020, Alderman Gardiner posted a statement concerning his vote against Mayor Lightfoot's proposed 2021 budget. Ex. 8, Decl. of Held, at ¶3(E). He attributed his opposition to the budget in part to "city owned properties being sold for less than their appraised values." In response, Held asked Alderman Gardiner to comment on a recent civil lawsuit filed against him in which he was accused of "harassing a constituent and having him falsely arrested … costing us even more money on lawyers and potential legal settlements/judgments." Held asked, "Do you think your antics will cost the city more or less than your concerns around city property sales?" and posted a link to a Chicago Sun-Times story about the lawsuit. *See* https://chicago.suntimes.com/news/2020/11/24/21635370/cellphone-ald-james-gardiner-charles-sikanich-benjamin-george-45th-ward-lawsuit. *Id*. Gardiner hid the comment, making it invisible to anyone who viewed his page who wasn't already connected as friends with Held on Facebook. Ex. 8, Decl. of Held, at ¶3 (E).

88.     On June 16, 2019, Alderman Gardiner posted about attending an event hosted by "The Greater Irving Park Neighborhood Association." The post is

available at the following URL:

https://www.facebook.com/AldermanGardiner/posts/304795057071241. Ex. 8, Decl.

of Held, at ¶3(F). Held commented that Gardiner was mistaken about the name of

the neighborhood group that hosted the event; it was the "Greater Independence

Park Neighborhood Association." *Id*. Alderman Gardiner hid the comment so it was

not visible to anyone who was not connected with Held as a friend on Facebook. *Id*.

Held later received a screenshot of text messages between Alderman Gardiner and

his then staffer Tanya King in which Ms. King tells Alderman Gardiner he should

unhide the comment. Ex. 8, Decl. of Held, at ¶3(F).

89.     Having his comments deleted or hidden from Alderman Gardiner's Page

impeded Held's ability to petition his elected representative and express his

viewpoints to others in the community about important issues such as how

Alderman Gardiner was performing his duties and how taxpayer funds were being

allocated. Ex. 8, Decl. of Held, at ¶4.

Respectfully submitted,

/s/ Adele D. Nicholas
*Counsel for Plaintiffs*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net