1         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3
PETE CZOSNYKA, et al.,     )
4                      )
        Plaintiffs,    )
5                      )
    vs.            )   No. 21-cv-3240
6                      )
JAMES GARDINER,       )
7                      )
        Defendant.     )
8 _____)

9

10

11

12

13

14

15

16

17           DEPOSITION OF JAMES GARDINER
      TAKEN REMOTELY VIA ZOOM IN ILLINOIS
18          SEPTEMBER 20, 2022
           12:00 P.M.
19

20

21

22

23         Reported and Transcribed by:
   Rhonda Rhodes Bentley, CSR #084-002706
24

25

JAMES GARDINER, 09/20/2022                                    Page 2..5

---

Page 2

                    INDEX
1
   APPEARANCES: (All appearing via Zoom)
2  For the Plaintiffs:
3       Adele D. Nicholas
        LAW OFFICE OF ADELE D. NICHOLAS
4       Attorneys at Law
        5707 W. Goodman Street
5       Chicago, Illinois  60630
        (847)361-3869
6       Adele@civilrightschicago.com
7
8  For the Defendant:
9       Thomas D. Carroll
        THOMAS R. RAINES ATTORNEY AT LAW, LLC
10      20 N. Wacker Drive
        Suite 556
11      Chicago, Illinois 60606
        (312)750-1166
12      Tcarroll@traalaw.com
13
14
   ALSO PRESENT:  (Via Zoom)
15
        Pete Czosnyka
16      Adam Vavrick
        Steve Held
17
18
19
20
21
22
23
24
25

---

Page 3

                 INDEX - CONTINUED
1
2  EXAMINATION BY:                            PAGE
   Ms. Nicholas...............................5, 168
3  Mr. Carroll................................166
4
5
6
7  EXHIBITS:      DESCRIPTION                 PAGE
   Exhibit 1      Screenshot FB page............41
8  Exhibit 2      Advisory Opinion..............70
   Exhibit 3      Corrected Referral Letter........74
9  Exhibit 4      Holocaust Post................78
   Exhibit 5      Vavrick Comment...............79
10 Exhibit 6      1.27.22 Screen Captures.........91
   Exhibit 7      Held Comments.................94
11 Exhibit 8      Barash.......................102
   Exhibit 9      8.18.19 Post.................124
12 Exhibit 10     10.16.20 Video...............129
   Exhibit 11     4.4.21 Screen Capture.........161
13
14
15               (Exhibits attached)
16
17
18
19
20
21
22
23
24
25

---

Page 4

                    STIPULATION
1
2
3       IT IS HEREBY EXPRESSLY STIPULATED AND
4  AGREED by and between the parties that the
5  deposition of JAMES GARDINER may be taken
6  remotely via Zoom in Illinois on
7  September 20, 2022, pursuant to the applicable
8  Supreme Court rules, local rules, and the Code of
9  Civil Procedure governing said depositions.
10
11      IT IS FURTHER STIPULATED that the
12 necessity for calling the Court Reporter for
13 impeachment purposes is waived.
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

```
1              12:00 p.m.
2              JAMES GARDINER,
3  having first been duly sworn, testifies as
4  follows:
5              EXAMINATION
6  BY MS. NICHOLAS:
7      Q.   Okay.  My name is Adele Nicholas.
8  I'm one of the attorneys for the plaintiffs.  Can
9  you please state and spell your full name.
10     A.   James Gardner, G-a-r-d-i-n-e-r.
11     Q.   Mr. Gardiner, have you ever given a
12 deposition before?
13     A.   No, I have not.
14     Q.   Okay.  Your attorney probably already
15 went over a couple of these things with you
16 before we got started.  Just so things go
17 smoothly today I'll go over just a couple of
18 ground rules.  The first and most important one
19 is you and I need to be cautious about not
20 talking at the same time.  The reason for that is
21 we have a court reporter taking down everything
22 that's said and she can't record two people
23 talking at once.  So even if you know where I'm
24 going with my question and before you start to
25 give your answer, likewise if I start asking a
```

---

Urlaub Bowen & Associates, Inc.   312-781-9586

JAMES GARDINER, 09/20/2022                    Page 6..9

Page 6

1 new question before you're done with your answer,
2 just raise your hand and give me another signal
3 and I'll let you finish your answer first. Okay?
4     A.   Understood.
5     Q.   The second rule is related which is
6 that all of your answers today need to be verbal
7 and out loud versus nods or shakes of the head or
8 gestures. The reason being those types of
9 non-verbal responses don't come out on a written
10 transcript, and we all want to be able to know
11 what happened today when we're looking back at
12 the transcript later. By the same token,
13 responses like uh-huhs or huh-uhs can often be
14 very difficult to interpret. So if from time to
15 time I'm asking you is that a yes or is that a
16 no, it's not because I'm trying to be aggressive.
17 It's just I want to make sure we have a clear
18 transcript. All right?
19    A.   Understood.
20    Q.   If I ask a question that you don't
21 understand today, just say something and I will
22 rephrase the question and ask a different
23 question or explain what I meant. The reason for
24 that rule is that if you do answer a question
25 that's asked, it will be assumed you understood

Page 7

1 it. Okay?
2     A.   (Witness nods.)
3     Q.   So just it would help if you gave a
4 verbal response to the question.
5     A.   Understood.
6     Q.   Yes. Okay. And then if you need to
7 take a break during the deposition today, that's
8 permissible. The only request we have regarding
9 breaks is that if there's a question pending,
10 answer the question first and then you can take a
11 break. All right?
12    A.   Yes.
13    Q.   All good. What is your -- what did
14 you do to prepare for your deposition?
15    A.   I spoke with my lawyer.
16    Q.   What else?
17    A.   That was it. I spoke with my lawyer.
18    Q.   Did you review any documents in your
19 preparation for the deposition?
20    A.   Yes, we did.
21    Q.   What documents?
22    A.   Some of the posts that were made in
23 the past. I think that was generally some of the
24 posts that were made on our Facebook page, and I
25 think that was the gist of it.

Page 8

1     Q.   What posts in particular do you
2 recall reviewing?
3     A.   Nothing that sticks out.
4     Q.   Other than speaking with your
5 attorney did you talk with anyone else in
6 preparation for the deposition?
7     A.   I did not.
8     Q.   You identified a couple of witnesses
9 in your initial disclosures in this case
10 including Tanya King and Ethan Brady. Did you
11 talk to either of them in connection with
12 preparation for this deposition?
13    A.   No.
14    Q.   I think we all know this case
15 concerns the use and regulation of a Facebook
16 page located at Facebook.com/AldermanGardiner.
17 For purposes of this deposition today I'll refer
18 to it as the Facebook page or your Facebook page.
19 So unless I indicate otherwise that I'm talking
20 about some other Facebook page, we're going to be
21 talking about that, the Facebook/
22 AldermanGardiner; is that okay?
23    A.   Yes.
24    Q.   When did you first establish this
25 page?

Page 9

1     A.   I believe it was in May of 2019.
2     Q.   Prior to establishing the Alderman
3 Gardiner Facebook page did you have a campaign
4 Facebook page when you were running for alderman
5 for 45th Ward?
6     A.   Yes.
7     Q.   When you maintained a campaign page
8 in relation with your candidacy or alderman of
9 45th Ward, did you have any policies about who
10 could post to that page or what they could say?
11    A.   I -- I don't recall if we did or not.
12    Q.   When you operated a campaign page in
13 connection with your candidacy for alderman, who
14 had the power to decide what could be posted to
15 that page?
16    A.   On the candidate page?
17    Q.   Yes.
18    A.   I believe to the best of my knowledge
19 there may have been one other person. I don't
20 recall. It was 2019 -- 2018, 2019.
21    Q.   Were you personally involved in
22 moderating interactions within the campaign page?
23    A.   Yes, I was -- I had a part in
24 moderating that page, yes.
25    Q.   And you kind of trailed off when you

Page 10

1 were identifying who else was involved in that.
2 You said Ms., and then you didn't. Who was that?
3     A.   I didn't -- I didn't say Ms.
4     Q.   Okay. So other than yourself, who
5 else was involved in regulating the campaign
6 page?
7     A.   I -- I believe besides myself there
8 may have been one or two other people, but I am
9 not a hundred percent sure on that.
10    Q.   Were they individuals that were
11 working on your campaign with you?
12    A.   Yes, they -- they would have been.
13    Q.   When you were operating your campaign
14 page, was anyone blocked from commenting on or
15 posting to that page?
16    A.   I don't recall.
17    Q.   Did you ever block one of the
18 plaintiffs in this case, Pete Czosnyka from
19 commenting on or posting to the campaign page?
20    A.   I don't recall.
21    Q.   Is it fair after you were elected
22 alderman for 45th Ward you stopped using a
23 campaign page and established a separate page for
24 your position as alderman?
25    A.   No, we didn't stop. I think it was

Page 11

1 still in use afterwards.
2     Q.   Did you convert the campaign page
3 into an official alderman page, or did you
4 establish a separate page for use as the
5 alderman?
6     A.   It may have been converted. I -- I
7 -- I am not that definitive on that.
8     Q.   Can I ask where you are today for
9 this deposition? You have like a virtual
10 background.
11    A.   I'm sorry? What is your question?
12    Q.   I'm going to ask you where you are
13 for the deposition today.
14    A.   Sure. I am in my office.
15    Q.   The 45th Ward office on Lawrence?
16    A.   Yes.
17    Q.   Okay. What are the focuses of the
18 Facebook page that appears at
19 Facebook.com/AldermanGardiner?
20    A.   I'm sorry, can you repeat that
21 question?
22    Q.   Yes. What are the purposes of the
23 Facebook page that appears at
24 Facebook.com/AldermanGardiner?
25    A.   Repeat that one more time if you

Page 12

1 don't mind.
2     Q.   Sure. What are the purposes of the
3 Facebook page?
4     A.   Oh, to -- to inform residents of
5 ongoings in the community.
6     Q.   What is the purposes for this
7 Facebook page to communicate -- for you to
8 communicate with your constituents about the work
9 you're doing as the alderman of the 45th Ward?
10    A.   Yes, and other occurrences that are
11 going on in the community.
12    Q.   So another purpose is to let
13 residents of the community know about events or
14 important occurrences in the ward?
15    A.   Yes, it's used for that -- those
16 purposes.
17    Q.   Is one of the purposes for which you
18 established and maintained the Facebook page to
19 let your constituents contact you?
20    A.   Some people have contacted us, yes,
21 through the page.
22    Q.   Does the Facebook page enable you to
23 interact with your constituents and respond to
24 their questions, concerns, and comments?
25    A.   Does it allow for that?

Page 13

1     Q.   Yes.
2     A.   People are allowed to ask questions,
3 yes.
4     Q.   And you respond to those questions,
5 right?
6     A.   I can.
7     Q.   Since you've been the alderman of the
8 45th Ward have you left those interactive
9 elements of the page enabled?
10    A.   Can you repeat that question.
11    Q.   Sure. And I can maybe ask some more
12 specific questions that we can break it down.
13    A.   Sure.
14    Q.   Since you've been the alderman of the
15 45th Ward have you left commenting on posts to
16 the page?
17    A.   You blurred out on that a little bit.
18 Did I block comments did you say?
19    Q.   No. Have you allowed comments?
20    A.   Have we allowed comments? Yes.
21    Q.   As a general matter constituents who
22 have responses, questions, or comments in
23 response to something that you post to the page
24 are permitted to post a comment to your post on
25 the page, right?

JAMES GARDINER, 09/20/2022                          Page 14..17

Page 14

1    A.  Can you repeat that again?

2    Q.  Sure.  As a general matter people who
3 have reactions, questions, or comments pertaining
4 to something you've posted to the page are
5 permitted to post comments?

6    A.  I still didn't understand the
7 question.

8    Q.  Do you generally welcome comments and
9 input from members of the public through your
10 Facebook page?

11   A.  People make comments, yes.  You're
12 kind of blurring out.  I don't know if it's my
13 reception.  Is anybody else having trouble with
14 the signal?

15       MR. CARROLL:  I'm actually -- I'm
16 observing that the alderman's feed is a little
17 dicey so.

18       THE WITNESS:  Okay.  Yeah.  Could I
19 -- could I maybe get on from a different signal,
20 is that okay?

21       MS. NICHOLAS:  Sure.  Sure.  Let's
22 just take a short break for you to do that.  I'll
23 just stay here and then you can log back in.

24       MR. CARROLL:  The alderman's calling
25 me.  I just want to mute for a second.

Page 15

1        So unfortunately it sounds like the
2 best option for getting a clear signal because he
3 apparently was really having trouble hearing the
4 questions is for him to relocate to a place
5 nearby.  So that will take about ten minutes
6 though.  I don't have a better solution other
7 than us constantly going back and forth with I
8 can't hear you so.

9        MS. NICHOLAS:  Well, yeah, if he has
10 another option for somewhere that has a better
11 option, let's just do that and reconvene when he
12 gets back.  I'll just stay online and say
13 something when you're ready.

14       MR. CARROLL:  Okay.  Yeah, we'll
15 shoot to be back on 12:30 at the latest.

16       MS. NICHOLAS:  Oh, good.  Thank you.

17       MR. CARROLL:  Sorry about that.

18       MS. NICHOLAS:  No worries.

19       (A break was taken.)

20 BY MS. NICHOLAS:

21   Q.  All right.  So we took a break so you
22 could relocate to a different location with
23 potentially a stronger Wi-Fi signal.  Can I ask
24 where you're located?

25   A.  I'm actually at my mother's house

Page 16

1 right now.

2    Q.  Okay.  In the ward as well?

3    A.  I'm in the -- what did you say?

4    Q.  She's also in the ward nearby?

5    A.  Yes.  Yes, she's nearby, yes.

6    Q.  Okay.  So let's go back to the series
7 of questions we were talking about with regard to
8 the purposes you use the Facebook page for.

9    A.  Sure.

10   Q.  You testified that you use the
11 Facebook page to communicate with constituents
12 about the work you're doing as the alderman of
13 the 45th Ward, right?

14   A.  Correct.

15   Q.  And you also use the Facebook page to
16 allow constituents to contact you about
17 questions, comments, or thoughts they have about
18 what you're doing as the alderman, right?

19   A.  Yes, they are -- they are -- they are
20 able to ask questions, yes.

21   Q.  And as a general matter, you have
22 left the interactive elements of the Facebook
23 page enabled, right?

24   A.  I didn't understand that question.

25   Q.  Sure.  So we can be a little bit more

Page 17

1 specific.  As a general matter you leave comments
2 turned on when you post to the Facebook page,
3 right?

4    A.  Yes.

5    Q.  So people who have reaction to
6 whatever you've posted can post a comment in a
7 thread beneath your post, right?

8    A.  Correct.

9    Q.  And if you want to, you can respond
10 or react to any comments that are posted by
11 someone who views the post on your page, right?

12   A.  Yes.

13   Q.  Does the Facebook page also have
14 messaging enabled?

15   A.  I believe so, yes.

16   Q.  So members of the public can also
17 contact you by sending a message to the page,
18 right?

19   A.  They can, yes.

20   Q.  As a general matter, have you left
21 messaging enabled on the page since you've been
22 the alderman?

23   A.  I don't know.  I have not always been
24 the administrator on that, and -- but I believe
25 for the most part people are able to message,

Page 18

1 yes.

2    Q.    The same question with regard to
3 commenting on the page.  As a general matter
4 since you've been the alderman have you left
5 commenting enabled?

6    A.    Yes.

7    Q.    Would you agree that Facebook is the
8 principal way that you communicate with your
9 constituents about the work you're doing as the
10 45th Ward alderman?

11    A.    No.

12    Q.    What is?

13    A.    There's a variety of ways.

14    Q.    Like what?

15    A.    Everything from in-person meetings.
16 We Instagram -- we have an Instagram page.  We
17 deliver fliers to residents to let them know
18 what's going on and word of mouth.  The local
19 newspaper.

20    Q.    Would you agree that a Facebook page
21 is one channel of communication for you to
22 describe to your constituents what you're doing
23 as the 45th Ward alderman?

24    A.    Is it a channel?  Is that your
25 question?

Page 19

1    Q.    Yes.

2    A.    It's a channel, yes.

3    Q.    Would you agree that the Facebook
4 page is also a channel for constituents to
5 interact with you?

6    A.    I -- there's not a lot of
7 interactions with me, but there have been.

8    Q.    I know you don't always respond to
9 comments or go back and forth with people who are
10 commenting on the page, but would you agree that
11 it's a way for people to communicate comments to
12 you?

13    A.    They can make comments, yes.

14    Q.    On average how frequently do you post
15 to the Facebook page?

16    A.    I don't have that number.

17    Q.    Would you agree that throughout your
18 term as alderman of the 45th Ward you've posted
19 to the page at least once a week?

20    A.    Yeah, I would say, yeah, on average,
21 yes.

22    Q.    Oftentimes more than that, right?

23    A.    Yeah, there's been definitely --
24 there's been more than that, yes, on occasions,
25 yes.

Page 20

1    Q.    Do you know about how many people are
2 currently following the Facebook page?

3    A.    Somewhere I would want to say plus or
4 minus 10,000.

5    Q.    Would you agree that the people who
6 are reacting to what you post on the page can
7 also talk to one another in the comment sections?

8    A.    People can make comments, and they
9 engage with one another.

10    Q.    So for -- oh, go ahead.

11    A.    I'm finished.

12    Q.    So, for example, when constituents
13 have reactions to something that you've posted
14 about, they cannot only respond to you directly
15 but they can also talk to one another about their
16 varying viewpoints and reactions to whatever it
17 is you've posted?

18    A.    Yeah, that's up to them.

19    Q.    In addition to posting reactions to
20 things that you've posted to the site can
21 individuals submit comments to the page or tag
22 the page to communicate with you?

23    A.    Can you repeat that question?

24    Q.    In addition to posting comments under
25 your posts to the Facebook page, can constituents

Page 21

1 communicate with you by posting to the page or
2 chatting the page?

3        MR. CARROLL:  Objection as to form.
4 Go ahead and answer if you understand it.

5    A.    I think the question is if they tag
6 me, is that it?  If they tag me?

7 BY MS. NICHOLAS:

8    Q.    Yes.  Can constituents tag the page?

9    A.    I believe they can.

10    Q.    And would that give you a
11 notification that someone had tagged the picture
12 and you'd be able to see that comment?

13    A.    I believe so.

14    Q.    And I'm not sure Facebook still has
15 this feature, but at least for some part of the
16 time while you were the alderman there was a
17 community tab on the Facebook page.  Are you
18 familiar with that function?

19    A.    Somewhat.  Somewhat.

20    Q.    Would you agree that that is a
21 section of the page where members of the
22 community can submit their own posts or comments?

23    A.    I don't know.  I don't know.

24    Q.    Do you recall constituents ever
25 making posts to the page where they were asking

Page 22

1 you questions or making comments on something
2 that you've done as the alderman?
3      A.   I -- I -- in the comments section we
4 have questions.  A lot of the time I know that
5 and people on messenger, you know, they can ask
6 questions as well.
7      Q.   Why do you leave the interactional
8 elements of the Facebook page enabled?
9      A.   Why do I leave -- I'm sorry.
10     Q.   Why do you leave these interactive
11 elements of the Facebook page enabled?
12     A.   I don't understand your question.
13     Q.   Sure.  Let me ask a broader question
14 first, which is why do you have a Facebook page?
15     A.   Why do we have a Facebook page?
16 Because some people would like to use social
17 media.
18     Q.   Why do you leave commenting turned on
19 on your Facebook page?
20          (Technical interruption.)
21     A.   That was the way it was set up when
22 we set up the page.
23     Q.   Would you agree that Facebook is a
24 good way for members of the public to interact
25 with their public officials?

Page 23

1      A.   I wouldn't be the one to ask that.
2      Q.   In your experience as the alderman of
3 the 45th Ward would you agree that the Facebook
4 page has been used to facilitate constituents'
5 ability to contact you and keep track of you?
6      A.   There has been some interaction.
7      Q.   So would you agree that it's a good
8 way for constituents to reach out to their
9 elected official?
10     A.   I can't speak for other elected
11 officials.
12     Q.   How about you?
13     A.   I prefer not to engage in social
14 media.
15     Q.   Why do you say that?
16     A.   There's just -- there's a lot of
17 other tasks that I have to do as alderman that I
18 can't stay on Facebook all day and wait for
19 comments or questions.
20     Q.   At the present time who has log-in
21 credentials for the Facebook page?
22     A.   Myself and --
23          Tom, is it confirmed that somebody
24 else has log-in credentials?
25          MR. CARROLL:  I am -- I am not

Page 24

1 certain.  I mean I -- I can say that I've been
2 given access for purposes of this lawsuit, but
3 that's about it.
4 BY MS. NICHOLAS:
5      Q.   Okay.  So as far as you know, you
6 have the credentials for the log-in page, you
7 gave your attorney log-in credentials for
8 purposes of this case.  At this time does anybody
9 else have log-in credentials to the page that you
10 know of?
11     A.   When we looked through there was --
12 it said that there was another individual that
13 had access to the page, I believe, and I don't
14 know if that individual still does.
15     Q.   Who is that?
16     A.   Tanya King.
17     Q.   So I understand, Ms. King is a former
18 employee of the ward, right?
19     A.   Yes.
20     Q.   So at some point she had log-in
21 credentials for the Facebook page; you're not
22 sure whether she still does?
23     A.   Correct.
24     Q.   So at this time the only individuals
25 who post to the page or have authorized access to

Page 25

1 the page are yourself, fair?
2      A.   Again I don't know if there's another
3 individual that's able to.
4      Q.   The only person who has your
5 authorization to have access to the page, post to
6 the page, interact with the page is you, right?
7      A.   I hope that I would like to think
8 that it's myself.
9      Q.   Many members of city council have
10 what they call ward nights.  Are you familiar
11 with that?
12     A.   Yes.
13     Q.   So it's essentially an open office
14 hours where constituents can come to a ward
15 office and sign up for a time to talk face to
16 face with their alderperson, right?
17     A.   If the alderperson is there.
18     Q.   You don't have ward nights, do you?
19     A.   Currently, no.
20     Q.   Have you ever had ward nights?
21     A.   Yes.
22     Q.   When is the last time you had one?
23     A.   I don't know the date of our last
24 ward night.
25     Q.   Fair to say it was more than two

Page 26

1 years ago?
2     A.   It could -- it could very well be in
3 that range.
4     Q.   Why don't you have them?
5     A.   We do a lot of outreach in the
6 community and people seem to be pleasantly happy
7 with the amount of outreach that we do, and we
8 feel as if that -- people don't have to come to
9 our office. We can come to -- we can come to
10 their doorstep if need be.
11     Q.   What do you mean by outreach?
12     A.   Getting out into the community.
13     Q.   So is this just knocking on people's
14 doors or are you -- what do you mean by getting
15 outreach?
16     A.   It could be knocking on people's
17 doors, it could be public meetings, meeting with
18 smaller groups.
19     Q.   Why in your view is that preferable
20 to having a ward night or another form of open
21 office hours?
22          MR. CARROLL: Objection as to form,
23 but go ahead and answer if you can.
24     A.   Can you repeat the question?
25 BY MS. NICHOLAS:

Page 27

1     Q.   Why in your view is it preferable to
2 go out into the community by the means you've
3 described versus having a ward night where people
4 can come to the office and meet face to face with
5 you?
6     A.   We've had better responses from the
7 outreach that we currently do.
8     Q.   What does that mean, better
9 responses?
10     A.   Better feedback, people being more
11 grateful for our outreach and being outgoing, and
12 again as I said earlier as opposed to them coming
13 to the office and waiting in line, that they can
14 kind of -- we can kind of come to them around
15 their schedule.
16     Q.   Do you have particular office hours
17 when constituents can come to the 45th Ward
18 office if they want to talk to you?
19     A.   Yes.
20     Q.   When are those?
21     A.   It's basically Monday through Friday
22 8:30 to 4:30. If they can't make it on those
23 hours, we can also accommodate them.
24     Q.   Other than what we've already talked
25 about, how do you communicate with your

Page 28

1 constituents about the goings on in the ward and
2 your work as a member of the city council?
3     A.   There's various ways that we
4 communicate with our constituents.
5     Q.   What are they?
6     A.   Using the local newspaper. There
7 is -- we have an Instagram page. We have a
8 Facebook page. We do fliers. We communicate
9 with people word of mouth.
10     Q.   Other than what we talked about, how
11 do members of the public communicate with you
12 about your work as a member of the city council?
13     A.   There's various ways.
14     Q.   What are they?
15     A.   They can phone. They can call our
16 office. They can come in person. They can email
17 our office. They can see me in person.
18     Q.   Do you maintain a website other than
19 the Facebook page?
20     A.   Yes.
21     Q.   Where is that located?
22     A.   AldermanGardiner.com.
23     Q.   For what purposes do you use the web
24 page AldermanGardiner.com?
25     A.   For people who want to utilize the

Page 29

1 worldwide web.
2     Q.   Does the Facebook -- or I'm sorry.
3 Does the web page AldermanGardiner.com have any
4 interactive elements?
5     A.   Does it interact elements -- what is
6 it?
7     Q.   Yes. Does it have any interactive
8 elements such as comments sections where people
9 can comment on things that are posted to the
10 website?
11     A.   I don't know.
12     Q.   Is the AldermanGardiner.com website
13 typically a static page, meaning it's not updated
14 on a daily basis with posts or even a weekly
15 basis, right?
16          MR. CARROLL: Objection as to form.
17 Go ahead and answer if you understand the
18 question.
19     A.   To the best of my knowledge I don't
20 believe so.
21 BY MS. NICHOLAS:
22     Q.   So the Facebook page is updated at
23 least once a week if not more whereas the website
24 is more of a static page that has information
25 that doesn't change on a weekly basis, true?

JAMES GARDINER, 09/20/2022            Page 30..33

Page 30

1    A.   The website is not updated on a
2 weekly basis, I don't -- to the best of my
3 knowledge it's not.
4    **Q.   When was the last time the website**
5 **was updated?**
6    A.   I don't have that information.
7    **Q.   Is it fair to say it was more than**
8 **six months ago?**
9    A.   I don't have that information.
10   **Q.   Who was responsible for the content**
11 **of the AldermanGardiner.com website?**
12   A.   We paid somebody to assist us with
13 that.
14   **Q.   Okay.  Okay.  So you hired a web**
15 **developer to create a page, AldermanGardiner.com?**
16 **Yes?**
17   A.   Yes.
18   **Q.   When was that?**
19   A.   Don't -- I don't know.
20   **Q.   Since the website was first created**
21 **has it been updated at all?**
22   A.   Yes.  Yes.
23   **Q.   When was it last updated?**
24   A.   I don't know.
25   **Q.   Who has made updates to the website?**

Page 31

1    A.   His name is Claudio.
2    **Q.   Who is that?**
3    A.   Somebody who has experience working
4 with web pages.
5    **Q.   Is that somebody that the 45th Ward**
6 **hired in order to create the web page**
7 **AldermanGardiner.com?**
8    A.   Yes.
9    **Q.   When is the last time you worked with**
10 **Claudio to update the website?**
11   A.   Some -- I don't know.
12   **Q.   Do you know this person's last name?**
13   A.   Medrano.
14   **Q.   Since you've become the alderman of**
15 **the 45th Ward who has had principal**
16 **responsibility for the Facebook page**
17 **Facebook.com/AldermanGardiner?**
18   A.   You want to know the administrators?
19   **Q.   Sure.  Let's start there.**
20   A.   Myself, Tanya King, and Ethan Brady.
21   **Q.   During that tenure who has principal**
22 **responsibility for the posts that are made to the**
23 **page?**
24   A.   The same three people.
25   **Q.   Would you agree that you personally**

Page 32

1 draft most of the posts to the page?
2    A.   Now yes.
3    **Q.   You qualified that with now you do.**
4 **Has that changed at some point?**
5    A.   I'm sorry.  Can you repeat that
6 question?
7    **Q.   Sure.  You seemed to qualify your**
8 **answer to the question about who drafts the posts**
9 **to the page and you said now I do.  So I'm**
10 **wondering about that qualification.  Did that**
11 **change at some point in the past?**
12   A.   I think, yeah, in the past different,
13 you know, between Tanya King, Ethan Brady, we
14 would all have opportunities to post something.
15   **Q.   During what time period was Tanya**
16 **employed at 45th Ward office?**
17   A.   From May of 2019 until November of
18 2019.
19   **Q.   Fair to say that after November of**
20 **2019 she was no longer responsible for drafting**
21 **content for the Facebook page?**
22   A.   To my knowledge, no.  To my
23 knowledge, no.  She was not supposed to be.
24   **Q.   Let's also talk about Ethan Brady.**
25 **During what time period was he employed by the**

Page 33

1 45th Ward?
2    A.   November of 2019 until April of 2020.
3    **Q.   Since April of 2020 have you had sole**
4 **responsibility for the posts to the Alderman**
5 **Gardiner Facebook page?**
6    A.   Yes.
7    **Q.   Since you've been the alderman, who**
8 **has had principal responsibility for moderating**
9 **user submitted comments to the page?**
10   A.   Can you repeat that question?
11   **Q.   Since you've been the alderman, who**
12 **has had principal responsibility for moderating**
13 **content that is submitted by users to the page?**
14   A.   Between the same three people.
15   **Q.   And would that be for those same time**
16 **frames you've already identified?**
17   A.   Yes.
18   **Q.   So for a time period of May 2019**
19 **until November of 2019, yourself and Tanya would**
20 **have had moderation capabilities for the time**
21 **period of November 19 to April of 2020 yourself**
22 **and Ethan Brady would have had moderation**
23 **capabilities and then since April 2020 it's been**
24 **solely you?**
25   A.   Yes, but when I go on the Facebook

JAMES GARDINER, 09/20/2022                                   Page 34..37

Page 34

1 page it says that Tanya King is still able to do
2 certain things on that page.
3      Q.   Would you agree she's not authorized
4 to do anything on the page?
5      A.   She's not supposed to be.
6      Q.   Do you have any knowledge of her
7 having done anything on the Facebook page since
8 November of 2019?
9      A.   On the Facebook page I don't believe
10 so.
11     Q.   Do you have any reason to believe
12 that Ethan Brady has had any access to the
13 Facebook page since April 2020?
14     A.   No.
15     Q.   So from April 2020 until now you're
16 the only authorized person to moderate content on
17 Facebook page, true?
18     A.   Yes.
19     Q.   At this time does anyone else assist
20 you with moderating Facebook page?
21     A.   No.
22     Q.   At this time does anyone other than
23 yourself post to the Facebook page on behalf of
24 you?
25     A.   No.

Page 35

1      Q.   During the time period of May 2019
2 until November 2019 what role did Tanya King play
3 with respect to Facebook page?
4      A.   Can you repeat that question?
5      Q.   During the time period of May 2019
6 until November 2019 what role did Tanya King play
7 with respect to the Facebook page?
8      A.   She was the main moderator/
9 administrator of that page.
10     Q.   Okay.  When you say she -- are you
11 still there?
12     A.   Yes.
13     Q.   At least on my end we don't have
14 video for you.
15     A.   Okay.  I'm just trying to hit off my
16 phone here, but I can hear you.  Can you hear me?
17     Q.   I can, but it would be much better if
18 we can be on video.
19     A.   Sure, just trying to -- well, okay.
20 Okay.  Yep, I'm back.
21     Q.   Great.
22     A.   Yep.
23     Q.   I think the question was I think you
24 testified Tanya was the main administrator of the
25 page for the time period of May 2019 until

Page 36

1 November of 2019.  My question is what role in
2 particular did she play moderating the Facebook
3 page.
4      A.   She would moderate the Facebook page.
5      Q.   Did she have authority to make posts
6 to the page on your behalf?
7      A.   She was able to make posts, yes.
8      Q.   To your knowledge did she ever do
9 that?
10     A.   Yes.
11     Q.   Can you identify what posts she was
12 responsible for making during that time?
13     A.   No, there's -- there's too many to --
14     Q.   When you say she had responsibility
15 for monitoring the page, what do you mean by
16 that?
17     A.   She would make posts, and she, I
18 guess, was keeping a more -- a -- more of an eye
19 on what was occurring on the page.
20     Q.   During that time period were you in
21 frequent communication with Tanya King about what
22 was being posted on the Facebook page?
23     A.   Yes.
24     Q.   You say you also had responsibility
25 for posting to and moderating the page during

Page 37

1 that time?
2      A.   Yes.
3      Q.   During the time when Tanya King had
4 responsibility or shared responsibility for the
5 Facebook page, was she an employee of the City of
6 Chicago?
7      A.   Yes.
8      Q.   Okay.  And so any work she did
9 moderating the Facebook page was done in her
10 capacity as a city employee?
11     A.   It was supposed to be, yes.
12     Q.   Same series of questions with regard
13 to Ethan Brady.  You said that during the time
14 period of November of 2019 until April 2020 he
15 was working in your office?
16     A.   Uh-huh.
17     Q.   During that time period what role did
18 he play with respect to the Facebook page?
19     A.   He was also to make posts.
20     Q.   Was he also able to moderate content
21 posted to the Facebook page during that time?
22     A.   Yes.
23     Q.   Were you in frequent communication
24 with Mr. Brady about what was being posted to the
25 Facebook page?

JAMES GARDINER, 09/20/2022                                    Page 38..41

Page 38

1    A.   Yeah.  Yes.
2    Q.   Could -- strike the question.
3         Any work that Mr. Brady did with
4  respect to the Facebook page was done in his
5  capacity as a city employee?
6    A.   It was supposed to be, yes.
7    Q.   Did you authorize Ms. King or
8  Mr. Brady to block constituents from the Facebook
9  page without first talking about it with you?
10   A.   I don't recall.
11   Q.   To your knowledge did either Mr. King
12 or Ms. Brady block anyone from the Facebook page?
13   A.   I don't recall.  Tanya -- Tanya King
14 blocked Pete Czosnyka, I believe.
15   Q.   We'll talk about that in, you know,
16 more specifics as the deposition goes on, but at
17 the time that Tanya blocked Mr. Czosnyka did you
18 talk to her about that before she made the final
19 call to block him?
20   A.   Yes, I had asked her if she -- you
21 know, if that was okay for her to do that.
22   Q.   You asked -- I'm not sure I totally
23 understood what you just said.  So you said you
24 communicated with Tanya about blocking Pete
25 Czosnyka, and you said you asked her if it was

Page 39

1  okay to do that.  What do you mean?
2    A.   I just -- you know, I said can -- you
3  know, can we do that.  I didn't even know how to
4  block people at that time on Facebook.
5    Q.   Okay.  So you asked her whether it
6  was possible to block Pete?
7    A.   Uh-huh.
8    Q.   Yes?
9    A.   Maybe -- maybe -- I don't know if I
10 asked that question, but, you know, I do recall
11 her informing me that she was going to block Pete
12 Czosnyka.
13   Q.   Did you agree with that decision?
14   A.   Yeah, I -- I said okay, you know, and
15 she had made at that time kind of -- she was more
16 involved with the Facebook page than I was.
17   Q.   So at the time she blocked Pete
18 Czosnyka, you gave her authorization to do that,
19 fair?
20   A.   I don't recall if I gave her
21 authorization to do that.
22   Q.   Did you know she was going to do it?
23   A.   Yeah, I remember her saying that she
24 was going to block Pete Czosnyka.
25   Q.   And you didn't tell her don't do

Page 40

1  that, right?
2    A.   No, I just said, you know, if we're
3  able to do that and that's in the best interest
4  of the community or the page, then --
5    Q.   Then?
6    A.   Then -- yeah, if, you know, that's
7  the best thing, the best route to go, then
8  that's what -- okay.
9    Q.   You agree that the Facebook page at
10 Facebook.com/AldermanGardiner is not a campaign
11 page?
12   A.   Yes.
13   Q.   Do you agree that that page is not
14 your personal Facebook page?
15   A.   Yes.
16   Q.   Do you agree that the page was
17 established and maintained specifically in
18 connection with your work as an elected official
19 to the City of Chicago?
20   A.   Can you repeat that question?
21   Q.   Do you agree that the page was
22 established and maintained specifically with
23 you -- specifically for use as your role as an
24 elected official of the City of Chicago?
25   A.   Yes.

Page 41

1    Q.   Do you agree that the Facebook page
2  is a government resource rather than a personal
3  site?
4         MR. CARROLL:  I'm going to object to
5  that on the basis that that requires a legal
6  analysis and my client isn't a lawyer, but go
7  ahead and answer to the extent you can.
8    A.   I wouldn't know the legalities of
9  that.
10 BY MS. NICHOLAS:
11   Q.   Okay.  That's a fair objection.
12 Let's just talk about some of the aspects of the
13 page.  So I'll mark this as we'll call them
14 Exhibit 1 for the deposition.  I'll share my
15 screen so you can see it.
16        Okay.  Can you see Exhibit 1?
17   A.   I can.
18   Q.   Okay.  So this I'll just represent is
19 a screenshot of the page as it looks today this
20 morning to a member of the public who is on
21 Facebook.
22   A.   Okay.
23   Q.   Would you agree that based on the
24 information you've included on the Facebook page
25 this is functioning as a government website

JAMES GARDINER, 09/20/2022                                          Page 42..45

---

Page 42

1 versus a personal one?

2    A.   Yes. Yeah.

3    Q.   Okay. So when you made the page you

4 selected for the type of page government

5 official, right?

6    A.   I didn't select that. I was not the

7 one who made the page.

8    Q.   Who actually set it up?

9    A.   To the best of my knowledge it was

10 Tanya King.

11    Q.   You concur that this is a government

12 official Facebook page as opposed to some other

13 type of page?

14    A.   Yes, it's used for government

15 purposes.

16    Q.   The phone number on the page

17 (773)853-0799, is that the ward office phone

18 number?

19    A.   It is.

20    Q.   And the email address is at the City

21 of Chicago's official domain, City of

22 Chicago.org?

23    A.   Yes.

24    Q.   Okay. And I believe you told us

25 earlier that there were approximately 10,000

---

Page 43

1 people following the page, which you can see here

2 on Exhibit 1, right?

3    A.   Yes.

4    Q.   All right. At the present time do

5 you have any written policies about what content

6 users can post to the Facebook page?

7    A.   I don't know.

8    Q.   I'm a little confused by that answer.

9 What do you mean you don't know whether you have

10 any written policies. Maybe I need to clarify

11 the question that I'm asking. So I want to know

12 not about what the City tells you to do or

13 doesn't tell you to do. I just want to know

14 about you, your policies pertaining to the

15 Facebook page, Facebook.com/AldermanGardiner. Do

16 you have any policies concerning what content

17 users can post to the Facebook page?

18    A.   I don't know if there was anything

19 written at any time I've been in office.

20    Q.   At any time have you personally

21 created any personal policies about the content?

22    A.   No.

23    Q.   Why not?

24    A.   I don't know.

25    Q.   Do you have any unwritten policy

---

Page 44

1 about what content is permissible on the Facebook

2 page?

3    A.   No.

4    Q.   Have you ever considered publishing a

5 policy about what content can be posted to the

6 page?

7    A.   I may have. I -- I -- yeah. No.

8 No.

9    Q.   Why not?

10    A.   I don't know.

11    Q.   You understand that in this lawsuit

12 you're being sued for what's called content-based

13 regulation of content that's posted to the

14 Facebook page, right?

15    A.   Can you repeat the question?

16    Q.   You understand that this lawsuit is

17 about first amendment violations including

18 content-based regulation speech on Facebook page,

19 right?

20    A.   Yes.

21    Q.   At any time after this lawsuit was

22 filed, did it occur to you that it would help to

23 provide a written policy with clear guidelines

24 about what contents can and can't be posted to

25 the page?

---

Page 45

1    A.   No.

2    Q.   What criteria do you currently use to

3 decide whether a particular comment can be posted

4 to the page?

5    A.   I don't -- I don't have a criteria,

6 you know. I don't have a criteria.

7    Q.   Is that something that you considered

8 to be within your discretion to decide?

9    A.   No. It's -- if something is brought

10 to my attention, you know, I will inquire.

11    Q.   I don't think I understood that

12 answer. Other than your own personal discretion

13 are there any standards that you use to decide

14 whether a particular content can be posted to the

15 page?

16    A.   No. It's -- anything that is

17 threatening to individuals, you know, I'd like to

18 inquire about that or threatening in some way or

19 harassing in some way.

20    Q.   Who decides whether a particular

21 comment is threatening?

22    A.   I would be -- I would be one if

23 somebody had contacted me or my office and said

24 hey, I really feel uncomfortable with an

25 individual's comment and I can look at that

---

Page 46

1 comment.

2    Q.   How about with regard to whether a
3 comment is harassing, who is deciding whether a
4 comment is harassing?

5    A.   I could look at that.

6    Q.   Anyone else?

7    A.   As of now, nobody is supposed to.

8    Q.   Okay.  So I think you identified two
9 bases when you moderate comments to the page, if
10 you deem it to be threatening or if you deem it
11 to be harassing.  Anything else?

12    A.   Doxxing, inciting, you know, you
13 know, something that could be threatening to
14 someone else.

15    Q.   How do you define doxxing?

16    A.   Saying this is -- this individual or
17 trying to identify someone and who they are, what
18 they represent.

19    Q.   I guess, you know, I'm familiar with
20 that term, and I think it kind of has a couple of
21 different meanings.  So I just want to understand
22 how you define doxxing for purposes of regulating
23 the Facebook page.  Would it be -- I guess I'll
24 give you some examples.  Would it be posting the
25 person's personal phone number?

Page 47

1    A.   Yes.  Yes.

2    Q.   That would be one example.  How about
3 posting someone's home address?

4    A.   Yes.

5    Q.   How about posting their place of
6 employment or where they work?

7    A.   I guess that would -- yeah, I guess
8 that would depend on how it's brought about, but
9 that would be a way of trying to doxxing someone.

10    Q.   How about not posting a specific
11 address but posting a block on which somebody
12 lives, do you consider that doxxing?

13    A.   If we do what?  I'm sorry.

14    Q.   Posting not the specific address but
15 the block on which someone lives.

16    A.   I don't know.  I guess I would have
17 to read the comments.

18    Q.   So that could be an example of
19 doxxing depending on the context?

20    A.   Depending -- again I would have to
21 look at the comment.

22    Q.   Anything else that you would consider
23 to be doxxing other than the examples we've
24 talked about?

25    A.   Possibly, you know, going at their --

Page 48

1 or trying to identify somebody's spouse in an
2 intimidating way or their family members.

3    Q.   Anything else?

4    A.   Not that I can -- I can think of.
5 Friends maybe possibly, yeah.  I don't know.
6 Maybe close friends.

7    Q.   Okay.  And then the other thing you
8 mentioned was inciting.  What do you mean by
9 inciting?

10    A.   Trying to maybe get, you know -- you
11 know, a reaction from somebody, a strong
12 reaction, that -- that may be unhealthy for our
13 community.

14    Q.   Since Mr. Brady left the office would
15 you agree that you're the only person who's
16 deciding whether a particular comment falls under
17 this category of inciting?

18    A.   Yes, it would be myself.

19    Q.   How do you determine whether a
20 particular comment meets the standard that you've
21 just set, trying to get a strong reaction from
22 somebody that may be unhealthy?

23    A.   I don't know.

24    Q.   Is that a matter of your own personal
25 judgment?

Page 49

1    A.   Yes, I would use my judgment in some
2 of these, yes.

3    Q.   So you would look at the comment in
4 context and you would personally make the
5 judgment call about whether it was trying to get
6 a strong reaction from someone in a way that may
7 be unhealthy?

8    A.   Yes.

9    Q.   Okay.  You listed four categories of
10 content that would be prohibited on the page.
11 Something that's threatening, something that's
12 harassing, doxxing, or what you call inciting.
13 Other than those four categories, is there any
14 other type of content that is prohibited on the
15 Facebook page?

16    A.   As of now, no, there isn't.  Anybody
17 can make any comments that they so choose to.

18    Q.   Would you agree that at this time
19 you're the only person who has the power to
20 decide whether a particular comment on the page
21 is permissible?

22    A.   Yes.  Again there's another
23 individual that's on there when we looked that
24 possibly may have access to that.

25    Q.   Okay.  So in theory Ms. King might

Page 50

1 possibly have access to the page.  Would you
2 agree that any access she has is not authorized?
3      A.   Yes.
4      Q.   Okay.  Have you ever tried to remove
5 her as an admin from the page just to make sure
6 she can't?
7      A.   Yes.
8      Q.   Okay.  At any time when Ms. King or
9 Mr. Brady were working at the office, did you
10 have any conversations with them about how they
11 should moderate content on the page?
12      A.   I am sure, but I don't remember the
13 conversations.
14      Q.   So, you know, today you've listed a
15 couple or four categories of things that you
16 would think would be prohibited on the page.
17 Threatening, harassing, doxxing, or inciting.
18 Did you ever communicate those criteria to Ms.
19 King or Mr. Brady?
20      A.   I -- I don't know.  I -- I -- I'm
21 sure we've had conversations with regards to some
22 of the content.
23      Q.   Would you agree that it's apparently
24 kind of open-ended -- let me ask a better
25 question.  Inherent.  Would you agree that

Page 51

1 whether something is inciting, meaning trying to
2 get a strong reaction from someone that may be
3 unhealthy, is inherently subjective in theory?
4      A.   Can you -- can you rephrase the
5 question?
6      Q.   Sure.  Would you agree that
7 determining whether a particular post or comment
8 meets the standard of inciting is inherently
9 subjective?
10      A.   Again I don't understand what you're
11 asking.
12      Q.   Would you agree that reasonable minds
13 could differ over whether a particular comment
14 meets that standard of trying to get a strong
15 reaction from somebody that may be unhealthy?
16      A.   Yes.
17      Q.   Other than what you've already told
18 us about at any time since you've been the
19 alderman have you had any other standards with
20 regard to what comments can be posted to the
21 Facebook page?
22      A.   I think there was some posts that
23 were made that -- that asked individuals to be
24 mindful or considerate of others.
25      Q.   Was it ever made more specific than

Page 52

1 that, you know, be mindful or be considerate?
2      A.   I don't know.
3      Q.   Do you have a specific example in
4 mind of the kind of post you're talking about?
5      A.   I remember -- I believe there was a
6 post in maybe June, in the beginning of getting
7 in office that was asking people to be polite or
8 to be respectful.
9      Q.   I think there was a post made to the
10 page that was produced in discovery in this case
11 that just said be nice.  Is that the post you're
12 talking about?
13      A.   No, I think there's another one where
14 it's basically asking people to be respectful to
15 one another as best we can.
16      Q.   Who made that post?
17      A.   I believe it was Tanya King.
18      Q.   Did you approve the language of the
19 post?
20      A.   Did I approve what?
21      Q.   The language of the post.
22      A.   I may have.
23      Q.   Other than asking people to be
24 respectful of one another, was it any more
25 specific than that?

Page 53

1      A.   I don't recall.
2      Q.   Other than what you've already told
3 us about, have you ever had any other policies or
4 practices with regard to content moderation of
5 the page?
6      A.   I don't know.
7      Q.   None that you can recall sitting here
8 today?
9      A.   Not that I can recall.
10      Q.   Have you ever had an official policy
11 with regard to what could lead to someone being
12 blocked from interacting with the page?
13      A.   I don't -- I don't believe so.
14      Q.   As a matter of practice what criteria
15 have you used to decide whether an individual
16 would be blocked from interacting with the page?
17      A.   I think from the comments we
18 mentioned earlier, if there was a continued
19 pattern of harassing, threatening, or doxxing, or
20 intimidation.  Complaints from residents in the
21 community who are on the page.
22      Q.   So you listed a few things that could
23 lead to someone being blocked from the page.  The
24 first thing that you mentioned it would have to
25 be a pattern.  What do you mean by a pattern?

JAMES GARDINER, 09/20/2022                                    Page 54..57

Page 54

1     A.   I think if we had noticed that --
2 that the individual had done it before, that we
3 started to notice a pattern.
4     Q.   Is there a particular number of times
5 that a behavior would have had to have happened
6 for you to determine it was a pattern?
7     A.   No, I would say two or more.
8     Q.   Who decides whether there's been a
9 sufficient number of incidents to establish a
10 pattern?
11    A.   I think anybody who was an
12 administrator on that page or somebody that was
13 on my staff.
14    Q.   So that would have been yourself, Ms.
15 King, and Mr. Brady?
16    A.   Or any other member of our staff.
17    Q.   Who else?
18    A.   It could have been people who were
19 working on our staff had noticed that an
20 individual was becoming threatening or harassing.
21    Q.   Who actually has the authority to
22 decide whether someone is blocked from the page?
23    A.   I do.
24    Q.   You said one item that might be taken
25 into account in deciding whether to block someone

Page 55

1 from the page is complaints from the community.
2 Can you expand on that?  What do you mean?
3     A.   People had made contact with the
4 office to say that they felt threatened or
5 intimidated by individuals on that Facebook page.
6     Q.   Complaints from members of the
7 community is something you might use to decide
8 whether to block someone from participation in
9 the page?
10    A.   Complaints from members of the
11 community.  To consider blocking somebody, yes, I
12 would inquire after I received complaints, yes.
13    Q.   How do you decide whether a
14 particular complaint should lead to a person
15 being blocked?
16    A.   If there was reasonable evidence that
17 showed that somebody was being harassing or
18 threatening or intimidating.
19    Q.   How are you deciding whether a
20 particular comment or series of comments are
21 harassing?
22    A.   Words that or statements that are
23 demeaning -- that would demean others or dox
24 somebody or try to bring any type of unnecessary
25 insults towards someone.

Page 56

1     Q.   Anything else?
2     A.   I think just trying to have a
3 positive -- it doesn't even have to be positive,
4 I would say, but just a dialogue -- people had
5 dialogue without feeling, you know, threatened.
6     Q.   Would you ultimately be the person
7 making the judgment call about whether the
8 comments or series of comments rose to the level
9 where you'd want to block the person?
10    A.   Would I make that decision?
11    Q.   Yes.
12    A.   Yes, I have made the decision.
13    Q.   Okay.  So ultimately you're going to
14 look at the comments and determine whether in
15 your judgment they're sufficiently demeaning or
16 insulting or harassing and based on your analysis
17 you will decide on whether to block the person?
18    A.   Yes, I have done that, yes.
19    Q.   Do you understand that Facebook has a
20 couple of different options for moderating
21 content?  One is that the page administrator can
22 delete the comment, right?
23    A.   Uh-huh.
24    Q.   Another is that a comment can be
25 hidden.  Are you familiar with that function?

Page 57

1     A.   Yes.
2     Q.   Other than yourself, is there anyone
3 else involved in the decision about whether to
4 delete or hide comments that are posted to the
5 page?
6     A.   Just the individuals that we
7 mentioned prior to.
8     Q.   At this time you would be the person
9 who would be making that decision?
10    A.   Yes.  Facebook hides comments though
11 outside of my jurisdiction.  They have hid
12 comments.
13    Q.   Can you tell me what you mean by
14 that?
15    A.   Like if -- I don't hide comments, but
16 I've noticed that there was comments hidden that
17 I thought that Facebook was -- was doing.
18    Q.   Can you give an example of where you
19 had that thought?
20    A.   No, I -- there's been several
21 occasions where I believe that Facebook has taken
22 administrative rights and hid comments from under
23 my page.
24    Q.   So I understand that Facebook has its
25 own standards -- community standards, and if they

JAMES GARDINER, 09/20/2022                                    Page 58..61

Page 58

1 receive reports there can be action taken
2 administratively by Facebook, right, to either
3 suspend someone's account or delete a post that
4 it deems to not meet community standards?
5     A.   Uh-huh.
6     Q.   Right.  So I don't -- that's not that
7 pertinent.  I want to talk about your personal
8 role in moderating the content on your page.
9          So you have the capacity as the
10 administrator of the page to delete comments that
11 are submitted by users, right?
12    A.   Do I have that ability?
13    Q.   Yes.
14    A.   I do, yes.
15    Q.   And the same with hiding comments, do
16 you have that ability?
17    A.   Yes.
18    Q.   You've told us about the criteria you
19 use for deciding whether a particular content is
20 permissible.  Are those the criteria you would
21 use to decide whether a particular comment should
22 be deleted or hidden?
23    A.   I -- I don't delete or hide any
24 comments any longer.
25    Q.   When did you stop doing that?

Page 59

1     A.   I don't know when it was.
2     Q.   What's the best estimate you can give
3 us of the last time you deleted or hid a comment
4 on Facebook?
5     A.   Over a year.
6     Q.   Why did you stop?
7     A.   I believe when this lawsuit was filed
8 that I no longer wanted to engage in anything
9 that could be controversial, I guess.
10    Q.   If the plaintiff in this case
11 testified that content that they have posted or
12 comments that they have posted are disappearing
13 from the page, what would you attribute that to?
14    A.   You mean still?
15    Q.   Yes.
16    A.   I would probably err on the side of
17 Facebook doing that.
18    Q.   How soon after the lawsuit was filed
19 did you stop deleting or hiding comments?
20    A.   I don't know.
21    Q.   Would you say it was within a month
22 of the lawsuit, six months of the lawsuit?
23    A.   When was the lawsuit filed?
24    Q.   June 3, 2021.  I'm sorry June 17,
25 2021.

Page 60

1     A.   I don't know.  I don't know when.
2     Q.   Prior to your receiving notice of
3 this lawsuit?
4     A.   Right.
5     Q.   Would you agree that there were
6 occasions when you deleted or hid comments that
7 were posted to the page?
8     A.   Prior to, yes.
9     Q.   During that time period what criteria
10 were you using to decide whether a comment would
11 be deleted or hidden?
12    A.   If it was harassing, it was
13 threatening, it was inciting or provoking, the
14 chance of either issues being elevated in the
15 community.
16    Q.   What do you mean by that?
17    A.   I think -- in some instances there
18 was threats made -- not threats, I guess -- yes,
19 there was threats, but like I think people
20 discussing if they wanted to meet in person;
21 where obviously, you know, we didn't think that
22 was in the best interest of the community.
23    Q.   As a general matter when you were
24 deciding whether to delete or hide a comment that
25 has posted to the Facebook page, is that the

Page 61

1 standard we were generally using?  I know you
2 gave me specific examples, but was your -- the
3 general thing you had in mind like best interest
4 of the community?
5     A.   Was that my -- is that my intention?
6 Is that what you're saying?
7     Q.   Yeah.  I guess I'm just trying to
8 understand what criteria or thought process
9 you're using when you're moderating the page and
10 deciding what can and can't be posted.
11    A.   Again anything that was like
12 harassing, threatening, doxxing, intimidating.
13    Q.   And you're the person who is making
14 the judgment of whether a particular post or
15 comment meets those criteria?
16    A.   Yes.
17    Q.   Did you ever discuss the criteria for
18 regulating content on the page with Tanya King or
19 Ethan Brady?
20    A.   There was discussions about that.
21    Q.   Did you ever give them a set of
22 criteria to use for their regulation of content
23 on the page?
24    A.   Yes, we've had discussions about it.
25    Q.   Tell me about those discussions.

JAMES GARDINER, 09/20/2022                           Page 62..65

Page 62

1     A.   I don't recall them offhand.
2     Q.   Something I think you told us today
3 that, you know, you're generally using your
4 judgment to decide whether certain comments
5 should be permitted on the page, so you'd look at
6 whether they were threatening, whether they were
7 harassing, inciting, provoking.  So you're using
8 your judgment.  Is that a fair characterization?
9     A.   Yes.
10    Q.   Did you also authorize Tanya and
11 Ethan to exercise their own individual judgment
12 about whether something was threatening,
13 harassing, inciting, or provoking?
14    A.   I believe we've had those
15 discussions.
16    Q.   Did you require them to talk to you
17 before they deleted a comment from the page or
18 hid a comment from the page?
19    A.   I -- I -- I don't remember if we ever
20 had that discussion.
21    Q.   Facebook has a function that allows a
22 page to use keywords.  Are you familiar with that
23 function?
24    A.   What is it?  Keyboard blocking?
25    Q.   I'm sorry.  Keyword blocking.

Page 63

1     A.   Keyword blocking.
2     Q.   Or filtering?
3     A.   Yes.
4     Q.   Have you ever used that function on
5 your Facebook page?
6     A.   Yes.
7     Q.   Tell us about that.
8     A.   There's words that you can put in
9 there that if people are using it, they
10 wouldn't -- I think they would be hidden or --
11 yes, I believe hidden.
12    Q.   So you as the administrator of the
13 page are permitted to set up a list of keywords
14 that will automatically be filtered if or that
15 will lead to a comment automatically being
16 filtered?
17    A.   Yes.
18    Q.   Okay.  Are you currently using
19 keyword filtering on the page?
20    A.   I don't believe so, no.
21    Q.   When is the last time you were using
22 keyboard filtering?
23    A.   Over a year ago, I want to say.
24    Q.   What keywords were you filtering?
25    A.   Profanity words, words that I had

Page 64

1 seen used on the page frequently that were --
2 that were derogatory in nature.
3     Q.   What words in particular?
4     A.   I don't recall which words were used
5 on there.  Words that I had seen on the page.
6     Q.   How about the word rebuke, would you
7 ever use the word rebuke?
8     A.   Rebuked?
9     Q.   As a filtered word that would lead to
10 a comment being filtered out.
11    A.   I don't -- I don't believe so.
12    Q.   How about stalker?
13    A.   I believe so.
14    Q.   So you had a filter turned on that if
15 the word stalker was used, the comment would be
16 automatically hidden?
17    A.   I believe so.
18    Q.   Why?
19    A.   Because it was being used to -- to --
20 in a derogatory manner towards people on the
21 page.
22    Q.   -- including you, right?
23         COURT REPORTER:  I'm sorry?
24 BY MS. NICHOLAS:
25    Q.   I mean in a derogatory manner towards

Page 65

1 people on the page including yourself, right?
2     A.   Yeah, I believe that's -- that the
3 word was used in towards me as well.
4     Q.   Is that the main reason you decided
5 to filter out comments that included that word?
6     A.   No, I think it was just words that
7 were used towards anybody that were derogatory in
8 nature.
9     Q.   Other than calling you a stalker or
10 using that term towards you, do you have any
11 specific recollection of who else that was used
12 about?
13    A.   I don't recall offhand.
14    Q.   Okay.  Other than words that
15 constitute profanity, sitting here today do you
16 recall any other words that you added to the
17 keyword filtering?
18    A.   I don't.
19    Q.   Do you know how you find out what
20 words you've added to Facebook's keyword
21 filtering function over the years since you've
22 been alderman?
23    A.   I don't.
24         MS. NICHOLAS:  Okay.  If anybody
25 needs a quick break, we can take one while I

JAMES GARDINER, 09/20/2022                                    Page 66..69

Page 66

1 switch to my next topic.  I'm also okay to keep
2 going.
3          MR. CARROLL:  I could actually use a
4 quick restroom break if that's okay.
5          MS. NICHOLAS:  Yeah, this is a good
6 breaking point.  Let's just take five, six
7 minutes.
8          MR. CARROLL:  Okay.  Sounds good.
9 Thank you.
10         MS. NICHOLAS:  Thank you.
11         (A break was taken.)
12 BY MS. NICHOLAS:
13     Q.   Okay.  Before the break you testified
14 that you don't currently -- before we took a
15 break you testified that you don't currently
16 delete or hide comments posted to the page,
17 right?
18     A.   That I don't currently delete or hide
19 comments?
20     Q.   Correct.
21     A.   Yes.  Correct.
22     Q.   Do you have any current policy about
23 content that can be posted to the page?
24     A.   No.
25     Q.   Is there any limit to what somebody

Page 67

1 can post to the page?
2     A.   I don't -- I don't censor anything.
3     Q.   What about racial slurs?
4     A.   I don't -- I don't censor anything.
5     Q.   What about profanity?
6     A.   Again I don't censor anything.
7     Q.   Threats of violence?
8     A.   I no longer censor anything.
9     Q.   So at this time you take a totally
10 hands-off approach to regulating the content on
11 the page?
12     A.   Yes.
13     Q.   Have you ever thought it might be
14 helpful to have a clear content neutral policy
15 about what can and can't be posted?
16     A.   Have I ever thought of that?  No.
17     Q.   Do you think it might be helpful to
18 keeping things under control if you had a policy
19 that said no profanity, no racial slurs, no
20 selling of commercial products, something like
21 that that would just set clear standards for
22 everybody?
23     A.   Have I ever thought of that?  Is that
24 your question?
25     Q.   Yeah.

Page 68

1     A.   I have not, no.
2     Q.   I'll ask you some more specific
3 questions about this a little later, but I think
4 you testified that in the past you would use some
5 judgment and discretion about deciding whether to
6 block someone; so, for example, if you're seeing
7 complaints about the person's conduct or if you
8 deem their conduct to be harassing, you could
9 block a person from participating in the page,
10 right?
11     A.   Yes.
12     Q.   After this lawsuit was filed did
13 anything change about your practices with regard
14 to blocking?
15     A.   I no longer block anybody.
16     Q.   Okay.  So I know that in our
17 complaint we identified several of the named
18 plaintiffs who had been blocked from interacting
19 with the page and on June 30 of last year all of
20 them were restored.  So were you the person who
21 made the decision to unblock them?
22     A.   Yes.
23     Q.   That was in response to this case
24 being filed?
25     A.   Yes.

Page 69

1     Q.   Since that time, meaning since you
2 became aware that this lawsuit had been filed
3 against you, have you developed any policy with
4 regard to blocking people from interacting with
5 the page?
6     A.   No.
7     Q.   Do you currently have anyone blocked
8 from the Alderman Gardiner page?
9     A.   No.
10     Q.   When's the last time you had someone
11 blocked?
12     A.   I don't know.
13     Q.   It's my understanding from
14 conversations with my clients that they were
15 unblocked from the page on approximately June 30
16 of last year.  Would that be the last time that
17 you had anybody blocked?
18     A.   I believe so.
19     Q.   Sitting here today is there anything
20 that can lead to someone being blocked from
21 interacting with the page?
22     A.   Is there anybody -- what did you say?
23     Q.   Is there anything that could lead to
24 someone being blocked from interacting with the
25 page?

JAMES GARDINER, 09/20/2022                    Page 70..73

Page 70

1    A.   I sneezed.  Can you repeat that one
2  more time?
3       Q.   Of course.  Sitting here today is
4  there anything that could lead to someone being
5  blocked from the page?
6       A.   Is there any way to lead to someone
7  getting blocked from the page?
8       Q.   Is there anything that could lead to
9  someone being blocked?
10      A.   I have decided not to block anybody.
11      Q.   Okay.  So even if someone is using
12  racial or ethnic slurs you won't block them?
13      A.   I just -- I don't have the time to
14  monitor the page as much as would be needed.
15      Q.   What if members of the community
16  brings to your attention that someone is posting
17  threats of violence or racial or ethnic slurs?
18      A.   I -- I -- I don't block anybody.
19      Q.   Okay.  Let's mark another exhibit.
20  We'll mark this as Exhibit 2 to your deposition,
21  and I'll share my screen so you can see it.
22           Okay.  Can you see Exhibit 2?
23      A.   Yes, I can see that.
24      Q.   Are you familiar with this document?
25      A.   I -- I've seen it.  I've seen that

Page 71

1  document.
2       Q.   So this is an eight-page document
3  dated January 8 of 2019, and the heading
4  Board of Ethics City of Chicago on the top.
5       A.   Yes.
6       Q.   And looking at the first page of this
7  it states that it is an advisory opinion with the
8  number 18038.A.1 addressing the use of social
9  media accounts such as Facebook or Twitter by
10  City of Chicago elected officials or candidates.
11  Do you see that?
12      A.   Yes.
13      Q.   Have you reviewed the advisory
14  opinion that's referenced in this document?
15      A.   I have not.
16      Q.   After you received notice that you
17  were being sued by the plaintiffs for your use of
18  social media, did you ever refer to this ethics
19  guide about social media use?
20      A.   No.
21      Q.   I'll ask you a couple of specific
22  questions about that.  I know you said you had
23  some familiarity with it.
24      A.   Uh-huh.
25      Q.   I won't -- if you want to read the

Page 72

1  whole thing before I ask you any questions, I'm
2  perfectly fine with your taking the time to do
3  that, but I also don't need to belabor
4  everything.  If you're comfortable just going to
5  the relevant part and I'll ask you some specific
6  questions about that.
7       A.   Sure.
8       Q.   Okay.  All right.  This is an
9  eight-page document so it has the Board of Ethics
10  cover page.  Then it goes to the advisory
11  opinion.  I'm going to direct your attention to
12  page 8 of this document --
13      A.   Uh-huh.
14      Q.   -- and just for our convenience I've
15  just put a red mark next to the paragraph that I
16  want to direct your attention to.  So can you
17  read that section to yourself and then I'll ask a
18  couple questions about it.  Then -- actually I'm
19  sorry.  You can continue down to this next
20  paragraph as well.
21           Are you prepared to answer a couple
22  questions about this?
23      A.   Not yet.
24      Q.   Let me know.
25      A.   Okay.

Page 73

1       Q.   Okay.  So page 8 of this ethics
2  advisory opinion states that public officials who
3  use social media to communicate with constituents
4  about your government work should not delete
5  comments or block users unless the comments are,
6  quote, "obscene, profane, libelous or defamatory,
7  or are commercial and used to sell goods or
8  services.  Have you ever considered using a
9  policy like that to regulate the content on your
10  Facebook page?
11      A.   No, I have not.
12      Q.   Why not?
13      A.   I've probably been involved in the
14  other ongoings of the board business.
15      Q.   According to the last page of this
16  advisory opinion it states that public officials
17  are strongly recommended to post a policy like
18  this to their Facebook page if they're going to
19  use Facebook to communicate about government
20  business.
21      A.   Uh-huh.
22      Q.   Do you know whether any of your
23  colleagues on city council have taken this
24  recommendation?
25      A.   I do not.

JAMES GARDINER, 09/20/2022                    Page 74..77

Page 74

1    Q.   Other than just being busy with other
2 things and not taking the time to think about it,
3 is there any other reason you haven't taken this
4 recommendation from the Board of Ethics to post a
5 policy?
6    A.   No.  I wasn't aware of this.
7    Q.   Okay.  Well, let's look at the next
8 exhibit.  This we've marked as Exhibit 3 to your
9 deposition.
10    A.   Uh-huh.
11    Q.   Can you see Exhibit 3?
12    A.   Yes.
13    Q.   Okay.  This is a document we've
14 received in response to our subpoena to the
15 office of inspector general for the city.
16    A.   Uh-huh.
17    Q.   The first page has the insignia of
18 the office of inspector general, and it is a
19 letter addressed to you dated July 1, 2020.
20    A.   Okay.
21    Q.   Did you ever read this letter?
22    A.   I'm sorry.  Can you repeat that
23 question?
24    Q.   Did you receive this letter?
25    A.   I -- I don't know if I have received

Page 75

1 this.
2    Q.   Have you ever read this letter?
3    A.   Sorry.  I had an issue with my dog
4 here.  What was the question?
5    Q.   Did you ever read this letter?
6    A.   I don't know if I have.
7    Q.   This is a ten-page document.  The
8 first page of the letter is addressed to you
9 dated July 1, 2020, and signed by William
10 Marback, the deputy inspector general for
11 investigations.
12    A.   Okay.
13    Q.   The next page is an envelope showing
14 that this letter was mailed to you at 121 North
15 LaSalle Street.
16    A.   Okay.
17    Q.   And the pages after that is a full
18 copy of the document we marked as Exhibit 2,
19 which is the Board of Ethics press release that
20 we just looked at and the advisory opinion that
21 we looked at.
22         So according to the OIG, they printed
23 out that press release and this advisory opinion
24 and mailed it to you directly because as set
25 forth on the first page of this document the

Page 76

1 letter they sent to you they have received a
2 complaint that a user is being improperly blocked
3 from commenting on your aldermanic Facebook page.
4    A.   Okay.
5    Q.   So in response to receiving this
6 letter from the OIG on July 1, 2020, did you
7 change anything about how you were regulating the
8 Facebook page?
9    A.   I'm not sure.
10    Q.   Did you take any response or any
11 action in response to receiving this letter?
12    A.   I -- I don't know.
13    Q.   I believe you told us that you didn't
14 change your practice with regard to content
15 moderation or blocking constituents until after
16 you received notice of this lawsuit in June of
17 2021, right?
18    A.   Yes.  I believe.
19    Q.   So even though this letter that was
20 sent to you specifically sets forth that elected
21 officials should not block followers from
22 accessing their government accounts --
23    A.   Uh-huh.
24    Q.   -- and that the only content that
25 should be regulated is that which is obscene,

Page 77

1 profane, libelous or defamatory, or are
2 commercial and used to sell goods and services,
3 you still did not adopt a policy that mirrored
4 the language of the ethics ordinance, right?
5    A.   What was your question?
6    Q.   So even though you -- this letter
7 specifically informed you that government
8 officials should not block users and should not
9 delete content unless it's obscene, profane,
10 libelous or defamatory or commercial, you did not
11 at this time adopt a policy for content
12 moderation that mirrored that language?
13    A.   I don't know if I read this document.
14    Q.   I believe you told us that today your
15 policy with regard to the page is just no
16 moderation at all.  You're not going to delete or
17 hide any comments?  You're not going to block
18 anyone?
19    A.   Uh-huh.
20    Q.   Why have you chosen that position
21 versus the policy that would prohibit obscene,
22 profane, libelous, and commercial posts?
23    A.   I don't have the staffing to keep up
24 with all the comments that come on a particular
25 post.

JAMES GARDINER, 09/20/2022                                    Page 78..81

Page 78

1    Q.  I think you told us that you're not
2  using keyword filtering anymore, right?
3    A.  Uh-huh.
4    Q.  Is that true?
5    A.  Yes.  I believe so, yes.
6    Q.  Have you considered using keyword
7  filters to at least filter out profanity?
8    A.  No.
9    Q.  Why not?
10    A.  Again I -- I -- I don't know.
11    Q.  Okay.  I want to walk us through a
12  couple of examples of some of the posts that are
13  at issue in this case.  I'm not going to belabor
14  this with every single incident and every single
15  example, but we'll just go through a couple of
16  them so we can understand a little bit further
17  what your reasoning is with regard to moderation
18  found on the page, okay.
19        The first thing I'm going to show you
20  is what we've marked as Exhibit 4 to the
21  deposition.  Exhibit 4 is a screen capture of a
22  post made by your page on January 27, 2021, and
23  this is a post that you made that is in honor of
24  International Holocaust Remembrance Day.  Do you
25  recall making this post?

Page 79

1    A.  Yeah, I remember this vaguely.
2    Q.  Okay.  And I'll represent to you that
3  I just took this screen capture myself today so I
4  will represent to you that it's still on the
5  Facebook page now, in the form that I've captured
6  here.  Okay?
7    A.  Okay.
8    Q.  All right.  I'm going to mark another
9  exhibit which is a comment that was made to this
10  post.  We'll mark it as Exhibit 5.
11        Exhibit 5 is a screen capture of a
12  comment that was made to this post.  It has the
13  plaintiff's Bates numbers 79 through 81.  Have
14  you seen this document before?
15    A.  Have I seen the document?
16    Q.  Yes.
17    A.  I don't know.  The comment you're
18  asking, correct?
19    Q.  Right.
20    A.  I don't know if I have.
21    Q.  Okay.  So this is a screen capture of
22  a comment made by one of the plaintiffs to this
23  case in response to the International Holocaust
24  Remembrance Day post on January 27, 2021?
25    A.  Right.

Page 80

1    Q.  This was a comment by Adam Vavrick?
2    A.  Uh-huh.
3    Q.  And this comment was set forth in
4  full in our complaint.  So if you need to read it
5  first, that's absolutely fine or if not, we can
6  just -- I can ask you a couple questions about
7  it.
8    A.  Okay.
9    Q.  Okay.  So in response to your
10  Holocaust Remembrance Day post --
11    A.  Uh-huh.
12    Q.  -- Adam Vavrick, one of the
13  plaintiffs in this case, made a rather lengthy
14  response to the post criticizing a vote that you
15  had made at city council regarding the welcoming
16  city's ordinance that Mr. Vavrick characterized
17  as expanding immigrant protections, and he
18  connected the Holocaust with, you know, the
19  current climate faced by migrant children,
20  especially border detainees.  This post was
21  deleted from the Facebook page, right?
22    A.  I don't know.
23    Q.  Okay.  Well, we can go look at the
24  Facebook page to just confirm that it's not there
25  if you want or you can take my word for it.  I'm

Page 81

1  happy to do it either way.  Would you like to
2  actually go to the page itself to see whether
3  it's still there?
4    A.  I don't think that we need to, do we?
5  Does anybody?
6    Q.  I mean it's up to you.  I meant we
7  need to establish that it's not there anymore.
8  So you can either admit that, or you can look
9  at --
10        MR. CARROLL:  Adele, I think it's
11  okay to stipulate that it was deleted.
12    A.  Okay.
13  BY MS. NICHOLAS:
14    Q.  So okay.  You're going to take your
15  lawyer's advice about that?
16    A.  Yes.
17    Q.  Okay.  So this comment posted by
18  Mr. Vavrick to the International Holocaust
19  Remembrance Day post that you made was deleted
20  from the page?
21    A.  Okay.
22    Q.  Why was it deleted?
23    A.  I don't know.
24    Q.  Who decided to delete it?
25    A.  I don't know.

JAMES GARDINER, 09/20/2022                                    Page 82..85

Page 82

1       MR. CARROLL: Adele, can you scroll
2  down for the entirety of the post? I just want
3  to make sure that it's the one I'm thinking. It
4  goes on from there, correct?
5       MS. NICHOLAS: Yes. Yes. It's in
6  three separate screen captures here.
7       MR. CARROLL: Thank you.
8  BY MS. NICHOLAS:
9       Q.   Does anything about this post violate
10 any of the standards that you talked about before
11 meaning that it is threatening, harassing,
12 doxxing, inciting, or provoking?
13      A.   Not that I -- I see.
14      Q.   You testified that beginning in
15 November of 2021, you were the only person who
16 was moderating content on the Facebook page. So
17 was it your testimony today that it's just a
18 complete mystery to you how this comment got
19 deleted?
20      MR. CARROLL: Objection to the extent
21 that mischaracterizes the testimony, but go ahead
22 and answer if you can.
23      A.   I don't -- I don't recall why or when
24 this comment was deleted.
25 BY MS. NICHOLAS:

Page 83

1       Q.   Would you agree that the only person
2  who would have deleted it is you?
3       A.   Well, I also know that Facebook as I
4  said had taken down comments.
5       Q.   So Facebook has community moderation
6  standards and can take down content if it doesn't
7  meet their community standards. Is there
8  anything in this comment that indicates to you it
9  might not meet Facebook standards?
10      A.   Not that I see. I didn't read it
11 thoroughly, but not that I see.
12      Q.   Do you have any personal knowledge
13 here today that Facebook did delete this comment?
14      A.   No. No. Facebook doesn't inform me
15 when they take down a comment on my page.
16      Q.   Do you have any idea why this comment
17 was deleted from your Facebook page?
18      A.   I don't. I don't recall this
19 comment.
20      Q.   So you actually -- it's your
21 testimony -- well, let me ask you this. Did you
22 delete this comment from the Facebook page?
23      A.   I don't know.
24      Q.   Other than yourself would anyone else
25 have deleted this comment?

Page 84

1       A.   I don't know.
2       Q.   Sitting here today you don't know why
3  or how this comment was deleted from your
4  Facebook page?
5       A.   I -- I don't recall.
6       Q.   You agree that this comment is
7  germane to your work as an elected official of
8  the City of Chicago?
9       A.   I don't understand your question.
10      Q.   Sure. Mr. Vavrick was critical of a
11 vote that you'd made in your capacity as a member
12 of city council. Would you agree that this type
13 of post criticizing a vote that you made is
14 pertinent to your work as a member of the
15 government?
16      A.   What do you mean by pertinent?
17      Q.   Sure. Is it relevant?
18      A.   To my job as an alderman?
19      Q.   Right.
20      A.   When he's talking about the vote that
21 I took? Yes, as an alderman, yes, it pertains to
22 my job.
23      Q.   A few months after this post was made
24 on May 26, 2021, Adam Vavrick was blocked from
25 interacting with your Facebook page. Do you know

Page 85

1  why that happened?
2       A.   I do not.
3       Q.   Who decided to block Adam Vavrick
4  from your page?
5       A.   I believe I did.
6       Q.   Identify every reason why you decided
7  to block Adam.
8       A.   If we were getting complaints from
9  residents about harassing, intimidating comments
10 for or invoking comments, you know, I would
11 inquire about those, and if it was a repeated
12 individual that then I think I made the decision
13 to block somebody.
14      Q.   What specific conduct did you deem to
15 be harassing, intimidating, or provoking, such
16 that it was appropriate to block Adam from your
17 Facebook page?
18      A.   I don't recall.
19      Q.   You said that you based the decision
20 in part at least -- well, you testified that you
21 had received complaints about Mr. Vavrick; is
22 that true?
23      A.   I believe I have.
24      Q.   From whom?
25      A.   I don't recall.

Urlaub Bowen & Associates, Inc.    312-781-9586

JAMES GARDINER, 09/20/2022                    Page 86..89

Page 86

1    Q.   How did you receive the complaint?
2    A.   In various ways.  It could come from
3 phone calls to the office.  It could come as
4 emails.  It could come as --
5    COURT REPORTER:  You muted yourself.
6 BY MS. NICHOLAS:
7    Q.   Sorry.  We didn't hear your full
8 response to that.  You stated it could come as
9 phone calls.  It could come as emails.  What
10 else?
11    A.   It could come as people stopping in
12 the office and asking us to address something.
13    Q.   Who in particular complained?
14    A.   Who in particular complained?  Hello?
15    Q.   Yes, with regard to Mr. Vavrick.
16    A.   I don't recall.
17    Q.   How many complaints?
18    A.   I don't recall.
19    Q.   Other than receiving some complaints
20 or requests from other members of the community
21 concerning Mr. Vavrick, what else did you take
22 into account in deciding to block him?
23    A.   Again if any of the comments were
24 inciteful, defamatory, threatening, harassing.
25    Q.   Sitting here today do you recall any

Page 87

1 comments that Mr. Vavrick made that were
2 inciteful or harassing or defamatory?
3    A.   I think we have some screenshots that
4 I gave to my lawyer.
5    Q.   They haven't been turned over to me
6 so I'm going to have to ask you to describe them
7 to the best of your ability today what in
8 particular was said.
9    A.   I don't recall.
10    Q.   Okay.  Well, I'm hopeful that I'll
11 receive any documents -- let me ask you this.
12 Have you turned over to your lawyer any
13 documentary evidence that you relied on in
14 support of your decision to block Adam Vavrick
15 from the page?
16    A.   Again I think I gave -- I submitted
17 screenshots.
18    Q.   You said you may have received email
19 complaints.  If you actually have any email
20 complaints pertaining to Mr. Vavrick that led to
21 your decision to block him, did you turn those
22 over to your lawyer?
23    A.   I don't believe we have.
24    Q.   Other than yourself was anyone else
25 involved in the decision to block Mr. Vavrick

Page 88

1 from the page?
2    A.   No.
3    Q.   Other than potentially receiving some
4 complaints and your judgment that perhaps his
5 comments were somehow unacceptable, did you base
6 your decision to block Mr. Vavrick from the page
7 on anything else?
8    A.   No.
9    Q.   Can you be as specific as you can
10 about what conduct Adam engaged in that led to
11 your blocking him from the page?
12    A.   I don't recall.
13    Q.   What would refresh your memory, if
14 anything?
15    A.   I don't know.  If I had screenshots,
16 if I was looking at screenshots at the comments
17 made.
18    Q.   Are those the screenshots that you're
19 talking about that you turned over to your
20 attorney?
21    A.   Yes, but they're -- I didn't take
22 screenshots of everybody's comment through the
23 years of being an alderman.
24    Q.   I understand that.  I guess I'm just
25 asking that, you know, now here we are in 2022.

Page 89

1 That was a decision that was made in May of 2021,
2 and I just want to know what it is out there that
3 you could rely on to refresh your memory of why
4 you blocked him from your page.
5    MR. CARROLL:  Adele, I don't mean to
6 inject myself too much here, but there is a
7 blatantly inappropriate comment right at the
8 bottom --
9    MS. NICHOLAS:  Whoa.  Whoa.  You're
10 not testifying here.
11    MR. CARROLL:  Well, read the comment.
12    MS. NICHOLAS:  I mean I am reading
13 the comment, and it's -- you're not the one who's
14 testifying here.
15    MR. CARROLL:  I'm not testifying.
16    MS. NICHOLAS:  I'm going to object to
17 the speaking objection.
18 BY MS. NICHOLAS:
19    Q.   So based on -- I want to know,
20 Mr. Gardiner, sitting here today whether you are
21 aware of anything that would refresh your memory
22 about why you blocked Adam from your Facebook
23 page?
24    A.   Again -- again if there was anything
25 that was inciting and unhealthy environment, that

Page 90

1 would have probably led to a blocking of an
2 individual.
3     **Q.   Sitting here today you don't know**
4 **what that was?**
5     A.   I don't know what the particular
6 comments were or what it led to.
7     **Q.   We talked earlier about your decision**
8 **to later unblock Mr. Vavrick from the page in**
9 **June of 2021.**
10     A.   Uh-huh.
11     **Q.   Other than your receiving notice of**
12 **this lawsuit, did anything else play into your**
13 **opinion of whether to unblock -- or I'm sorry.**
14 **Let me ask that -- I'll start over.**
15     **Other than your receiving notice of**
16 **this lawsuit, did you take anything else into**
17 **account in deciding to unblock Adam Vavrick?**
18     A.   I spoke to corporate counsel, and
19 they thought that it was probably best to unblock
20 anybody on the account.
21     **Q.   So somebody from the city law**
22 **department?**
23     A.   Uh-huh.
24     **Q.   They weren't representing you**
25 **individually, right?**

Page 91

1     A.   No.
2     **Q.   Okay.   Who did you talk to?**
3     A.   I've forgotten who the corporate
4 counsel head is now, the name.
5     **Q.   Oh, it was actually the corporation**
6 **counsel?**
7     A.   Yeah.
8     **Q.   Okay.   So based on that conversation**
9 **you decided to unblock anyone you had blocked at**
10 **that time?**
11     A.   Yes.
12     **Q.   All right.   Let's look at another --**
13 **we'll mark this one as No. 6 to your deposition.**
14 **Can you see Exhibit 6?**
15     A.   Yes.
16     **Q.   This is a screen capture of a January**
17 **27, 2022, post about this year's Holocaust**
18 **Memorial Day that you made to your page.   Do you**
19 **recall making this post?**
20     A.   I recall this post.
21     **Q.   Let's look at the second page of**
22 **Exhibit 6.   This is a screenshot of some of the**
23 **comments that currently appear under your post**
24 **for this year's Holocaust Remembrance Day.   So**
25 **I'll direct your attention to a couple of them.**

Page 92

1 **The first one is a user named Darren Urbaszewski,**
2 **U-r-b-a-s-z-e-w-s-k-i.**
3     A.   Okay.
4     **Q.   He has posted some kind of photo that**
5 **has some Star of David in it, and it says as a**
6 **Catholic, these people will never have my**
7 **respect.   And then a few comments down from that**
8 **the same user says:   With so much inflation and**
9 **other trust issues between the powers that be and**
10 **regular folks, I don't know if you Jews have the**
11 **same power to squash dissent like you did just a**
12 **few years ago.   But we'll see.   Just keep a fresh**
13 **set of your man panties nearby in case you get**
14 **upset.**
15     **This comment is -- these two comments**
16 **are still on your Facebook page right now.   Do**
17 **these meet your community standards?**
18     A.   I -- as I said I don't -- I never
19 read these comments.   I did -- I was not aware of
20 these comments being up there.
21     **Q.   Would you agree that what's said in**
22 **these comments is much more offensive than**
23 **anything that was included in Mr. Vavrick's post**
24 **which was deleted from your page?**
25     A.   Yeah.   Yeah.   What was shared there

Page 93

1 is derogatory.
2     **Q.   Right.   And anti-Semitic?**
3     A.   Sure.   Yes.
4     **Q.   Why does this remain up when**
5 **Mr. Vavrick's post on your page was deleted?**
6     A.   I -- I -- again I didn't read this
7 comment.
8     **Q.   Is there other comments in this same**
9 **thread saying that people are complaining to you**
10 **about the anti-Semitic comments being made on**
11 **this user and on this and other posts?   Does that**
12 **ring a bell for you?**
13     A.   Does it ring a bell of what did you
14 say?
15     **Q.   Have you received complaints from**
16 **other constituents about anti-Semitic posts being**
17 **made by Darren Urbaszewski?**
18     A.   I -- I may have.
19     **Q.   What in particular do you remember**
20 **about complaints that have been made to you about**
21 **posts made by Mr. Urbaszewski?**
22     A.   I don't remember any offhand.
23     **Q.   Okay.   But because now you've adopted**
24 **a more hands-off policy, you've just decided not**
25 **to take any action in response to those**

Page 94

1 complaints?
2    A.   I don't delete.  I don't censor
3 anything.
4    Q.   Okay.  Let's look at what we've
5 marked as Exhibit 7 to the deposition.  This is a
6 three-page document from the document production
7 that we shared with your counsel in response to
8 your discovery request.
9    A.   Uh-huh.
10    Q.   Have you seen this before?
11    A.   Let me -- I have not seen this.
12    Q.   Mr. Gardiner, I'm just going to stop
13 you.  It's very natural.  I do this too when I'm
14 reading to myself, but it's totally impossible
15 for the court reporter to take down what's being
16 said.  So just stop.  Read quietly to yourself
17 and then I'll ask you some questions about it.
18    A.   Okay.  I don't recall reading this.
19    Q.   Okay.  I'll give you an opportunity
20 to look at this document, and then I'll ask you a
21 couple questions about it.
22    A.   Do you want me to read the comments
23 here?
24    Q.   Sure.  Yes, I have specific questions
25 about them.

Page 95

1    A.   Okay.  All right.  Okay.
2    Q.   Then we'll just look at the third
3 page of this.
4    A.   Okay.
5    Q.   All right.  So what we've marked as
6 Exhibit 7 is a September 1, 2020, email from one
7 of the plaintiffs in this case, Steve Held, to
8 Steve Berlin.
9    A.   I'm sorry.  My phone went out there.
10 Can you repeat yourself?
11    Q.   No problem.  We've marked as Exhibit
12 7 a September 1, 2020, email from Plaintiff Steve
13 Held --
14    A.   Okay.
15    Q.   -- directed to Steve Berlin in the
16 OIG's office, and in this email --
17    A.   I don't think -- is Steve Berlin with
18 IG?
19    Q.   Oh, I'm sorry, he may have been with
20 the Board of Ethics.  I apologize.
21         Okay.  So Steve Berlin from the Board
22 of Ethics.  So this is -- oh, and it's also
23 copied to reportcorruption@igChicago.org.  So
24 it's to the Board of Ethics and the inspector
25 general, and in this email he has attached some

Page 96

1 screen captures of a thread from your Facebook
2 page.
3    A.   Uh-huh.
4    Q.   So looking at page 2 of this
5 document, Steve said this is what it appears like
6 when he looks at the thread himself.  So a user
7 named Sheila Hall Moreno makes a post -- well --
8    A.   A comment.
9    Q.   The comment before that says:  Sheila
10 Hall Moreno stalker?  Any facts to back up these
11 allegations?  If so, let's get the alderman
12 involved, and then Sheila Hall Moreno responds:
13 A simple FOIA request will show you the
14 alderman's history as a stalker.  And then
15 beneath that there are several comments from
16 Plaintiff Steve Held, and two of them include
17 photographs of court documents.
18    A.   Uh-huh.
19    Q.   Do you know what those court
20 documents are?
21    A.   It looks like it's an order of
22 protection that was filed with my name on it.
23    Q.   Now, if we look at page 3 of this
24 document, this is a screen capture of what the
25 thread looked like when viewed by someone who's

Page 97

1 not connected as a friend or who isn't Steve.  So
2 if you just were not a Facebook user viewing the
3 same thread, you can see Ms. Moreno's comment is
4 the same.  It says:  A simple FOIA request will
5 show you the alderman's history as a stalker, and
6 then Mr. Held's first comment under that is
7 visible but the two comments that included
8 photographs of the documents from the order of
9 protection that was entered against you are not
10 visible?
11    A.   Correct.
12    Q.   How were those comments deleted from
13 the page?
14    A.   I don't -- I don't recall.
15    Q.   Did you delete them?
16    A.   I don't know if I did or not.
17    Q.   Do you recall any conversations with
18 anyone else on your staff regarding those
19 comments?
20    A.   What -- what date is this?
21    Q.   September 1, 2020.
22    A.   Okay.  No, I don't -- I don't
23 remember having a conversation with anybody on my
24 staff about this.
25    Q.   Can you tell us every reason why

JAMES GARDINER, 09/20/2022                    Page 98..101

Page 98

1 Mr. Held's responses were deleted?
2    A.   I know that those documents had a
3 name of an individual on that.  So it could have
4 been to help protect any -- any names that had
5 nothing to do with me being an alderman on that
6 document.
7    Q.   So the documents that Mr. Held posted
8 were obtained via FOIA, and they were as the name
9 FOIA implies, you know, public record that are
10 open to the public, and --
11   A.   Sure.
12   Q.   -- you can see from the photo here
13 that they are pretty heavily redacted --
14   A.   Uh-huh.
15   Q.   -- consistent with how documents are
16 when they're obtained by FOIA.  So what evidence
17 do you have that there was a name included in
18 those documents that you were trying to protect
19 from disclosure?
20   A.   I just know in the past that those
21 documents that that individual would share would
22 have the woman that was involved in that case
23 listed.
24   Q.   Sitting here today do you know
25 whether these versions of those documents

Page 99

1 contained anybody's name --
2    A.   I don't know.
3    Q.   -- other than yours?
4    A.   Yes, I don't know.
5    Q.   I mean if you look at -- I know it's,
6 you know, small, but if you would look at the
7 bottom of this page you can see that the name of
8 complaining party is blacked out on the caption
9 of the order, right?
10   A.   Yes.  I see -- I see where the
11 blackout is, yes.
12   Q.   So if this document did not contain
13 the name of the complaining party who sought this
14 order of protection is there any other reason
15 that they were deleted from the page?
16   A.   I don't know.
17   Q.   Would you agree that this is
18 potentially damaging information for you?
19        MR. CARROLL:  Objection.  That calls
20 for a legal conclusion among other things, but go
21 ahead and answer if you have an opinion on it.
22   A.   I don't have an opinion.
23 BY MS. NICHOLAS:
24   Q.   Would you -- I mean I don't want to
25 put words in your mouth, but do you like it when

Page 100

1 people talk about this part of your past?
2    A.   It's not of my concern what people
3 post on the Facebook page.
4    Q.   I'm not sure if that answered the
5 question.  Do you like it when people bring up
6 your history of having had an order of protection
7 entered against you?
8    A.   I don't have feelings one way or the
9 other.
10   Q.   Can you think of any other reason why
11 you deleted Mr. Held's comments from the Facebook
12 page?
13   A.   No, only if it was again something
14 that was threatening, harassing, or intimidating
15 or led to inciting of other comments that were
16 intimidating, harassing.
17   Q.   I want to focus just on these
18 particular comments where Mr. Held posted:  No
19 need for FOIA.  I happen to have his restraining
20 order docs handy.  This is the handwritten
21 affidavit from the woman he stalked and harassed.
22 And then photo of that affidavit is included.
23 And then his next post is:  This is the yearlong
24 restraining order where he agreed not to
25 physically abuse or stalk her or her family or

Page 101

1 friends.
2        Is there anything within those posts
3 that you deemed to be threatening, harassing or
4 inciting?
5    A.   I don't know because I'm not looking
6 at the entire thread.
7    Q.   And I asked you about just those
8 particular posts.
9    A.   Harassing, no, those are public
10 documents.
11   Q.   So why were they deleted?
12   A.   I don't know.
13   Q.   Fair to say that you approved the
14 decision to delete them?
15   A.   I don't know.
16   Q.   Are you claiming this was -- these
17 comments were deleted by Facebook rather than
18 yourself?
19   A.   I -- I -- I don't know.
20   Q.   Do you have any reason to believe
21 that someone other than yourself was the final
22 decisionmaker who deleted these posts by
23 Mr. Held?
24   A.   I don't know.
25   Q.   So you don't have any reason to

Page 102

1 believe it was someone other than yourself?
2     A.   I don't know if it was Facebook.
3 Again Facebook doesn't contact me when they do
4 take down a comment or hide a comment.
5     Q.   I guess we should ask the same
6 question with regard to Mr. Vavrick's comment on
7 the Holocaust Remembrance Day post.  Do you have
8 any reason to believe that it was someone other
9 than yourself who decided to delete that comment?
10     A.   I don't know.
11     Q.   Okay.  Let's look at what we're going
12 to mark as Exhibit 8 to your deposition.  I'm
13 just going to keep going unless you tell me you
14 need a break.  It's fine if you or your counsel
15 need a break at some point, but otherwise I'll
16 just move on.
17           Okay.  We've marked as Exhibit 8 to
18 your deposition a screen capture of a January 14,
19 2021, post.
20           I'm sorry.  I actually meant to mark
21 a different document as this exhibit.  Sorry
22 about that.  Okay.  Put that one aside.  We'll
23 look at this as Exhibit 8.  Okay.  Exhibit 8 is
24 four pages from the plaintiff's document
25 production.  It has our Bates numbers 16 through

Page 103

1 19.  It's an excerpt from a larger document that
2 Mr. Barash or that Mr. Held sent to the inspector
3 general and Board of Ethics on behalf of himself
4 and Mr. Barash and other individuals who claimed
5 their comments were deleted from your page.  Have
6 you seen this document before?
7     A.   I don't believe so.
8     Q.   So these are -- it starts with
9 Mr. Held's description of what these screen
10 captures showed, and then it contains several
11 screen captures of content that was posted to the
12 page.  So the first one is how it looked when
13 Steve was logged in and looking at the Facebook
14 page.  Okay.
15     A.   You want me to read all these
16 comments?
17     Q.   Pardon?
18     A.   Do you want me to read all these
19 comments?
20     Q.   Well, I'll ask you first about this
21 short section that we're looking at on the screen
22 right now.  So viewing this thread on your page,
23 as a friend of Peter Barash you can see someone
24 using the username Kara Adele made a post in
25 which she tagged Peter Barash and stated, among

Page 104

1 other things:  I can't even believe you're a
2 grade school teacher, and in response you can see
3 a post by Peter Barash saying, among other
4 things:  With CPS family you should be offended
5 at how JG blatantly misrepresents his experience
6 in education.  Do you see that?
7     A.   Uh-huh, yes, I see it.
8     Q.   Okay.  Now, looking at the next page,
9 it's a screen capture -- this is a screen capture
10 of the same thread, but this is viewed as someone
11 who is not connected as a friend to Peter Barash.
12 So here you can see the same comment from the
13 user Kara Adele saying, among other things:  I
14 can't even believe you're a grade school
15 teacher --
16     A.   Uh-huh.
17     Q.   -- but in response to that you don't
18 see any comment from Peter calling into question
19 your representations about your experience and
20 education.  Did you delete or hide Peter Barash's
21 comments calling into question your education
22 credentials?
23     A.   I don't recall.
24     Q.   Do you know who did?
25     A.   No.

Page 105

1     Q.   Do you recall any conversations about
2 Peter Barash's comment calling into question your
3 experience as an educator?
4     A.   What date is this?
5     Q.   This is from November 25, 2020.
6     A.   I -- I don't -- I don't recall
7 offhand.
8     Q.   Do you know who hid this comment?
9     A.   I don't.
10     Q.   Do you know why that comment was
11 hidden?
12     A.   No, I don't.
13     Q.   Does a comment calling into question
14 your experience as a teacher or educator violate
15 any of the standards or policies you have for
16 your Facebook page?
17     A.   If the comments are harassing in some
18 way and it led to inciteful comments after, those
19 comments may have been taken down or deleted or
20 hidden.
21     Q.   Okay.  So it's your testimony that
22 you may have decided to delete particular content
23 based on other people's reaction to it?
24     A.   Yes.  As I said if people were
25 contacting us and telling us, hey, this comment

JAMES GARDINER, 09/20/2022                    Page 106..109

Page 106

1 was -- I feel threatened by this comment, yes.
2    Q.   I guess I'm asking about something a
3 little bit more specific than that, which is even
4 if the original comment wasn't inciting or
5 harassing, if in response to that other comment
6 or down the line were engaged in harassing
7 commentary you might delete the original comment
8 because of those other user's reaction?
9    A.   Can you repeat that question?
10    Q.   Sure.  Let's be a little bit more
11 specific and focus on this example.  So we first
12 looked at Peter Barash's comment here in response
13 to Kara Adele.  Looking at that comment do you
14 see anything in there that violated your
15 community standards for regulating content on the
16 Facebook page?
17    A.   And what is your question?
18    Q.   Does anything in Mr. Barash's comment
19 that's screen captured here violate any of the
20 standards that you had for content on the page?
21    A.   Yes, I think it's -- it's harassing
22 in nature.
23    Q.   Harassing in nature.  How so?
24    A.   Uh-huh.  By stating -- goes for -- by
25 saying that I'm harassing women, I harass

Page 107

1 constituents.
2    Q.   Okay.  So accusing you of harassing
3 women and harassing constituents led you to deem
4 this comment to be harassing in nature?
5    A.   Yes.  Yes.  Yeah.
6    Q.   Does that refresh your memory about
7 why this comment was deleted?
8    A.   No.
9    Q.   But you would deem this to be
10 potentially harassing?
11    A.   Yes.
12    Q.   And based on your reviewing it today,
13 do you think it would have been appropriate under
14 the standards you were employing at that time to
15 delete this comment?
16    A.   I don't know what -- exactly at that
17 time, what went into that decision.  If that
18 decision was made by me or whoever it was made
19 by.
20    Q.   Okay.  And I -- just for clarity of
21 the record when I'm referring to this comment,
22 it's on Plaintiff's Bates page 18.
23         Okay.  So you think that this was --
24 this comment was potentially harassing.  Anything
25 else that based on your reviewing it that would

Page 108

1 make you think it was appropriate to delete this
2 type of comment?
3    A.   I don't know.  I don't know what the
4 comment led to, what were the -- you know, if
5 there was comments attached to this.
6    Q.   Okay.  So I think that gets me back
7 to the question I was trying to ask earlier,
8 which is why would what it led to be relevant?
9    A.   I don't -- I don't know.  I don't
10 remember.
11    Q.   Why would you potentially take into
12 account what a comment led to when determining
13 whether it was appropriate to delete a comment?
14    A.   If somebody -- again I don't know if
15 somebody had contacted my office and drew
16 concern.  Again was it harassing, was it
17 intimidating, was it inciting.
18    Q.   Okay.  So if other people have a bad
19 reaction to a particular comment that was posted,
20 that may lead you to delete the comment, true?
21    A.   Yes.
22    Q.   In this same document that we've
23 marked as Exhibit 8 to the deposition there is a
24 screen capture here of a message from Kara Adele
25 that this represents -- was sent to the local

Page 109

1 school council at the school where Peter Barash
2 works.
3    A.   Okay.
4    Q.   And there are references to
5 Mr. Barash working at the Bell Elementary School
6 in here.
7    A.   Okay.  Okay.
8    Q.   You told us earlier that doxxing was
9 something that you were concerned about.  Would
10 you consider identifying a person's place of work
11 as a form of doxxing?
12         MR. CARROLL:  Objection.  Asked and
13 answered, but go ahead and answer it again if you
14 can.
15    A.   I -- I -- I would say so.  It depends
16 in what context.
17    Q.   Okay.  Would you state that using the
18 Facebook page to contact someone's employer and
19 try to get them in trouble with their work is a
20 potential form of doxxing?
21    A.   Again it would -- it would depend
22 upon, yes, in what nature.
23    Q.   So if we look at the screen capture
24 of this -- this thread when viewed as someone who
25 is not connected with a friend to Peter Barash,

Page 110

1  you can see that although Peter's comment calling
2  you out or misrepresenting your educational
3  credentials for harassing women and harassing
4  constituents is gone, but Kara Adele's comment
5  remains, which says: I am so sick of seeing your
6  ridiculous posts on this page. I can't even
7  believe you're a grade school teacher. It makes
8  me sick since my three family members are CPS.
9  Stop bullying a special education
10 teacher/firefighter gone alderman because you
11 have zero class. I would be absolutely sick if
12 my child went to Bell. Your trashy online
13 bullying is a disgrace to anyone in education.
14      So in this comment Kara Adele has
15 identified the school that Mr. Barash works at.
16 Why did this comment remain up when Mr. Barash's
17 comments about you was taken down?
18     A.  Again I don't monitor every comment
19 that's made on my Facebook page.
20     Q.  Well, someone was monitoring at least
21 some of the comments, one made by Mr. Barash,
22 right?
23     A.  I don't -- I don't recall.
24     Q.  I mean that one's gone. So you do --
25 I mean I guess I'm just trying to understand why.

Page 111

1  So Kara Adele's comment identifying Mr. Barash's
2  place of work saying that he has zero class and
3  he's trashy is still there, but the response to
4  that by Mr. Barash is gone. So I'm trying to
5  understand why.
6      A.  I don't know.
7      Q.  Other than yourself, would anybody
8  know?
9      A.  I don't know. Again I don't know how
10 much Facebook steps in on this, how much that
11 they are involved in the Facebook page.
12     Q.  Well, you think that Facebook
13 potentially was looking at this thread and
14 deleted Mr. Barash's comment about you but didn't
15 delete Kara Adele's comment about Mr. Barash?
16     A.  I don't know.
17     Q.  Does it seem likely to you?
18     A.  I don't know. I don't have a good --
19 you know, I don't have a working relationship
20 with Facebook as far as what they do and don't
21 do.
22     Q.  Would you agree that Pete Czosnyka,
23 one of the plaintiffs in this case, has been one
24 of your most vocal critics since you became the
25 alderman?

Page 112

1      A.  He's a critic, sure. He's a
2  resident.
3      Q.  I don't know if everybody else could
4  hear that. I didn't hear the last part of your
5  answer.
6      A.  He's a resident.
7      Q.  A resident of the ward?
8      A.  Uh-huh.
9      Q.  Yes? Is that right?
10     A.  Yes, he's a resident of the ward,
11 yes.
12     Q.  Okay. And Mr. Czosnyka has been very
13 critical of your job performance since you became
14 alderman, fair?
15     A.  He's been critical.
16     Q.  As soon as you created the Alderman
17 Gardiner Facebook page after your election,
18 Mr. Czosnyka was automatically blocked, right?
19     A.  I don't recall.
20     Q.  Who made the decision to block
21 Mr. Czosnyka from the page in May 2019?
22     A.  I believe that was Tanya King.
23     Q.  Did you have any conversation with
24 her about blocking Pete Czosnyka from the page?
25     A.  I believe I did. I just asked if we

Page 113

1  were allowed to do -- you know, do that, is that
2  allowable.
3      Q.  And in conversation with Tanya you
4  decided that it was?
5      A.  She had mentioned that she contacted
6  the Board of Ethics, I believe. She contacted
7  somebody, and they said that it was allowed.
8      Q.  Why was Mr. Czosnyka preemptively
9  blocked when you created the Facebook page?
10     A.  I don't know. I did not -- I did not
11 create the page.
12     Q.  Why was the decision made to block
13 Mr. Czosnyka from the page at the time it was
14 created?
15     A.  I don't recall.
16     Q.  Is it fair to say you didn't want to
17 hear his criticisms?
18     A.  No.
19     Q.  Do you have any -- can you identify
20 any reasons why Mr. Czosnyka was blocked from the
21 Facebook page in May 2019?
22     A.  I know that many of the residents had
23 voiced their concerns with regards to
24 Mr. Czosnyka, some of the threatening or
25 harassing comments that he had made in the past,

JAMES GARDINER, 09/20/2022                          Page 114..117

Page 114

1 and --
2    Q.   Who in particular complained to you
3 about Mr. Czosnyka?
4    A.   I don't recall.
5    Q.   And can you be any more specific than
6 they complained about threatening or harassing
7 comments?
8    A.   Threatening, harassing, following,
9 doxxing.
10    Q.   Okay.  Tell me about the following.
11 What did someone tell you about following?
12    A.   I knew in the past that he was
13 arrested for stalking.  I was aware of that.
14    Q.   What do you mean by that?
15    A.   What do I what?
16    Q.   What do you mean by that?
17    A.   I was at a public meeting and I saw
18 that he was arrested by the Chicago Police
19 Department.
20    Q.   Are you aware that no charges were
21 ever filed against Mr. Czosnyka in connection
22 with that arrest?
23    A.   No, I don't know.
24    Q.   So not only was he not convicted of
25 anything, he wasn't even charged?

Page 115

1    A.   I don't know.  Why was he arrested?
2    Q.   You might be in a better position to
3 answer that than me.  Why was he arrested?
4    A.   I'm not the Chicago police.
5    Q.   Did you have any conversations with
6 Chicago police about that arrest?
7    A.   No.
8    Q.   So they placed him under arrest and
9 you think that was for stalking.  What gives you
10 the impression it was for stalking?
11    A.   I believe I read that on social
12 media.
13    Q.   Okay.  So someone said on social
14 media that he was arrested for stalking?
15    A.   I remember reading something in
16 regards to that.
17    Q.   Other than someone commenting that on
18 Facebook, saying he was arrested for stalking,
19 did you have any other basis for that belief?
20    A.   No.
21    Q.   Do you agree that people are innocent
22 until proven guilty?
23    A.   Yes.
24    Q.   So someone -- there was a rumor
25 perhaps on social media that you saw that he was

Page 116

1 arrested for stalking, but you didn't have any
2 independent confirmation that he was even charged
3 with a crime, right?
4    A.   No, it was not really of my concern.
5    Q.   Well, I mean it was of your concern,
6 right?  You said it was one of the reasons you
7 blocked him from the page, right?
8       MR. CARROLL:  Objection as to the
9 form, but go ahead and answer if you understand
10 it.
11    A.   No, I -- I don't think -- again I
12 don't know why an individual three years ago may
13 have been blocked.
14 BY MS. NICHOLAS:
15    Q.   Other than yourself and Tanya was
16 anybody else involved in that decision?
17    A.   From what I understood, the Board of
18 Ethics.
19    Q.   So it's your understanding that Tanya
20 talked to the Board of Ethics as soon as you
21 created the Facebook page to see whether you
22 could immediately block Mr. Czosnyka?
23    A.   No, I don't think it was immediately.
24 I think it was sometime thereafter.
25    Q.   Right.  So I think -- let's get the

Page 117

1 timeline here.  I think there were two different
2 instances where Mr. Czosnyka was blocked, and I'm
3 talking now about May 2019.  So right when you
4 created the page, right at the beginning he was
5 blocked immediately before he had any
6 interactions with you.  That's the part I'm
7 trying to understand right now, and then I know
8 he was blocked again later, and we'll talk about
9 that, but let's talk about just initially when
10 you created the page.  Were the only people
11 involved in that initial decision yourself and
12 Ms. King?
13    A.   Sorry.  Somebody was trying to call
14 my phone.  Can you repeat that?
15    Q.   Sure.  No problem.  I want to take
16 you back to May 2019 when the page was first
17 created and Mr. Czosnyka was blocked before
18 having any interactions with the page.  Other
19 than yourself and Ms. King, was anyone else
20 involved in that decision?
21    A.   Again I think the Board of Ethics was
22 -- I remember the conversation --
23    Q.   So we do have some information that a
24 few months later Tanya connected with the Board
25 of Ethics and talked with them about

JAMES GARDINER, 09/20/2022                    Page 118..121

Page 118

1 Mr. Czosnyka, but that was the second time that
2 he was blocked.  So I think I wanted to take you
3 back to May 2019.  Sitting here today do you have
4 any personal knowledge of -- did you personally
5 have any conversations with the Board of Ethics
6 about Mr. Czosnyka before you decided to block
7 him in May 2019?
8     A.    I did not block him in May of 2019.
9     Q.    Okay.  He was blocked from the page
10 when it was created.  Do you know who did that?
11    A.    Again I believe that was Tanya King.
12    Q.    You talked with her about it though,
13 right?
14    A.    Yes, I remember a brief conversation
15 about that.
16    Q.    And you approved of the decision to
17 block him?
18    A.    I didn't approve or disapprove.  She
19 had just informed me that the Board of Ethics
20 gave her the okay to block him.
21    Q.    I think that -- her conversation with
22 the Board of Ethics didn't happen until a couple
23 months later.
24    A.    I don't recall.
25    Q.    Okay.  So what do you recall about

Page 119

1 your conversation with Ms. King, if anything,
2 about the decision to block Pete Czosnyka when
3 you created the page?
4     A.    I don't recall very much.
5     Q.    Other than someone having voiced
6 concerns about him being potentially harassing
7 and the rumor that you saw on Facebook that he'd
8 been arrested for stalking, do you have any other
9 basis for blocking him?
10    A.    Again if it was harassing or
11 intimidating or demeaning to people, those would
12 be reasons.
13    Q.    Can you think of anything in
14 particular that you were relying on at the time
15 that decision was made?
16    A.    I know there was some screenshots
17 that I submitted to my lawyer.
18    Q.    Other than screenshot, do you have
19 any other documents that would support your
20 initial decision to block Mr. Czosnyka from the
21 page?
22    A.    Again I -- I don't remember
23 recalling.  I think at that time I didn't even
24 know how to block people on the Facebook page.
25    Q.    At some point in about a month after

Page 120

1 the page was created, Pete was unblocked from the
2 page.  Were you involved in that decision?
3     A.    I don't recall.
4     Q.    Did you have any conversations with
5 Tanya King about unblocking Pete in mid June
6 2019?
7     A.    I don't recall.
8     Q.    Do you know why the decision was made
9 to unblock Pete Czosnyka in middle of June 2019?
10    A.    I don't recall.
11    Q.    A couple weeks later on June 25,
12 2019, Pete Czosnyka was blocked again.  Were you
13 involved in that decision?
14    A.    I don't -- I don't recall.
15    Q.    Well, do you agree that Pete was
16 blocked from your page on June 25, 2019?
17    A.    I don't recall.
18    Q.    Do you have any reason to dispute
19 Pete Czosnyka's testimony that he was blocked
20 from the page on that date?
21    A.    Again I don't recall.
22    Q.    Yeah.  And that's what I'm asking.  I
23 know you don't have a personal recollection of
24 it.  Pete does have a personal recollection of it
25 and screenshots from that day showing that he

Page 121

1 wasn't able to interact with the page.  So I'm
2 just wondering whether you have any reason to
3 doubt that he was actually blocked on that date?
4     A.    I don't know.  I can't speak for him.
5         MR. CARROLL:  I think, Alderman, I
6 think that for purposes of this deposition alone,
7 whether or not the precise date is accurate, we
8 can stipulate that he was blocked from the
9 page --
10    A.    Yes, he was blocked from the page.
11         MR. CARROLL:  -- on or around that
12 date.
13 BY MS. NICHOLAS:
14    Q.    Okay.
15    A.    Okay.
16    Q.    Great.  Great.  That helps clear
17 things up.  So I understand you don't have a
18 particular recollection of the date that it
19 happened but for purposes of this deposition,
20 you'll stipulate that on or around June 25, 2019,
21 Pete Czosnyka was blocked from interacting with
22 Alderman Gardiner's Facebook page.  Can you
23 identify for me all the reasons he was blocked
24 from the page at that time?
25    A.    If he was making comments that were

Page 122

1 intimidating or harassing or demeaning in nature.

2    Q.   You say if he was.  Do you know
3 whether he was?

4    A.   I believe we sent them screenshots.
5 Yes, I gave screenshots to my lawyer.

6    Q.   What in particular -- what particular
7 comments did Pete make that led to the decision
8 to block him from the Facebook page on June 25,
9 2019?

10    A.   I don't recall.

11    Q.   Can you identify every piece of
12 evidence that you relied on for the decision to
13 block him from the page on June 25, 2019?

14    A.   Do I -- I'm sorry.

15    Q.   Identify everything you were relying
16 on for the decision to block him from the page on
17 June 25, 2019.

18    A.   I still don't understand your
19 question.

20    Q.   You said that you -- so I asked you
21 to identify all reasons why he was blocked from
22 the page.  You stated that if he was making
23 comments that were demeaning or harassing, that
24 would have been the reason.  Other than if he was
25 making comments, can you identify any other

Page 123

1 reason he was blocked from the page at that time.

2    A.   I don't recall.

3    Q.   Can you identify with any more
4 particularity what conduct he engaged in that led
5 to the decision to block him from the page?

6    A.   I don't recall.

7    Q.   Did it have anything to do with the
8 number or amount of comments he made?

9    A.   I don't recall.

10    Q.   Have you ever had a -- I know you
11 don't have a written policy about it, but have
12 you ever had an informal policy or practice with
13 regard to how often or how many times a person
14 can comment on the page?

15    A.   I don't believe so.

16    Q.   Other than yourself and Ms. King was
17 anyone involved in the decision to block Pete
18 Czosnyka from the page on June 29, 2019?

19    A.   I don't recall.

20    Q.   Would you agree that you approved --
21 either you blocked it yourself or approved of Ms.
22 King blocking Pete?

23    A.   Can you repeat that question?

24    Q.   Would you agree that either you
25 personally blocked Pete or approved of Ms. King

Page 124

1 blocking Pete in June 2019?

2    A.   I don't know if it was me or if it
3 was the Board of Ethics.  I remember her telling
4 me that she contacted the Board of Ethics and
5 they said it was okay to block him.

6    Q.   Okay.  I guess I'm just trying to get
7 to you didn't personally say, Tanya, don't block
8 him, right?

9    A.   I don't recall.

10    Q.   So sitting here today you don't have
11 any recollection of your conversations with Ms.
12 King about why Pete was going to be blocked?

13    A.   I would -- I would think that it was
14 in regards to harassing, intimidating comments.

15    Q.   Is it fair to say that you approved
16 of the decision to block him from the page?

17    A.   I don't recall.

18    Q.   Fair to say that you knew it was
19 happening?

20    A.   I was aware.

21    Q.   Okay.  So you were aware that
22 beginning in June 2019 Pete Czosnyka was blocked
23 from interacting with your Facebook page, right?

24    A.   I'm aware of that.

25    Q.   Okay.  Let's look at Exhibit 9 to

Page 125

1 your deposition.  Okay.  We've marked as Exhibit
2 9 a screenshot of an August 18, 2019, post to the
3 Facebook page, and this is a photo of you sitting
4 on a dunk tank and your post reads:  For those of
5 you who have waited since February 26th -- then
6 in parentheses Pete with three exclamation
7 points, now is your chance to take aim at the
8 Edison Park Fest.  Come out to dunk your alderman
9 and support the Homes for Heroes Foundation.

10    A.   Uh-huh.

11    Q.   Were you referencing Pete Czosnyka
12 with your parentheses there?

13    A.   I don't know.  I know -- I don't
14 know.

15    Q.   I mean come on, is it a different
16 Pete?

17    A.   I think there's a couple different
18 Pets on this lawsuit.

19    Q.   Yeah.  But is it really your
20 testimony this is not a reference to Pete
21 Czosnyka?

22    A.   I don't recall three years ago.

23    Q.   At the time you made this post in
24 August of 2019, you agree that Pete Czosnyka was
25 still blocked from your page, right?

JAMES GARDINER, 09/20/2022                          Page 126..129

Page 126

1    A.   During this time?
2    Q.   Yeah.
3    A.   I don't recall.
4    Q.   Do you have any reason to believe you
5  unblocked at some point between June 25,
6  2019, and August 18, 2019?
7    A.   I don't recall.
8    Q.   Who else might this have been
9  referring to if not Pete Czosnyka?
10   A.   I don't know.
11   Q.   Did you write this post?
12   A.   At the time I think -- I would work
13 on these posts with Tanya King.
14   Q.   You were at least involved in writing
15 it, right?
16   A.   I -- I definitely may have been, yes.
17   Q.   And you approved it before it was
18 posted, right?
19   A.   I believe -- I -- I believe I did.
20   Q.   Okay.  So in -- perhaps on your own
21 or in conjunction with Tanya, you made the
22 decision to post a photo of yourself on the dunk
23 tank saying for those of you who have waited
24 since February 26, Pete, now is your chance.  Why
25 did you post that?

Page 127

1    A.   I don't recall.
2    Q.   Would you agree that a person who is
3  blocked from your Facebook page could not respond
4  to or interact with this post?
5    A.   If somebody was blocked?  I guess
6  they could if they had different names.
7    Q.   Okay.  So in theory somebody could
8  create a separate Facebook account and try to
9  access the page that way?
10   A.   Yeah.
11   Q.   Okay.  But if you had Pete Czosnyka
12 blocked at this time, he would not have been able
13 to respond to this post?
14   A.   I don't know.  I didn't know.  I was
15 not informative of all the rules of Facebook at
16 the time nor am I now.
17   Q.   Is there anyone else you would have
18 been calling out in this post other than Pete
19 Czosnyka?
20   A.   I don't recall.
21   Q.   Would you agree that Pete Czosnyka
22 was frequently criticizing your performance of
23 your duties as an alderman during this time
24 period?
25   A.   He had criticized me.

Page 128

1    Q.   So would he in theory have been one
2  of the people who might enjoy dunking the
3  alderman?
4    A.   I can't speak for him.
5    Q.   I mean it's just difficult to fathom
6  that you don't have any recollection of who you
7  were referring to in a post that got 207
8  reactions and 57 comments.  I mean is that really
9  your testimony that you just have no idea who
10 you're referring to as Pete?  I guess that's your
11 testimony.  I just find it difficult to believe
12 that this could be referring to anyone else other
13 than Pete Czosnyka.  So is it your testimony that
14 you just have no idea?
15        MR. CARROLL:  Objection.  Asked and
16 answered.  Go ahead and answer.
17   A.   I don't recall.
18 BY MS. NICHOLAS:
19   Q.   Do you know whether other people in
20 the community reacted to this post thinking it
21 was Pete Czosnyka?
22   A.   I don't recall.
23   Q.   Do you recall other people
24 criticizing you for posting about someone who was
25 blocked from responding?

Page 129

1    A.   I don't recall offhand.
2    Q.   Let's look at Exhibit 10 to your
3  deposition.
4        Okay.  Mr. Gardiner, I marked as an
5  exhibit Exhibit 10 to your deposition a screen
6  capture of an October 16, 2020, post to the
7  Alderman Gardiner page, and this is a video that
8  you posted on October 16, 2020.
9    A.   Uh-huh.
10   Q.   Do you remember making this video in
11 this post?
12   A.   I do.  I do recall this.
13   Q.   You can see in this still that
14 there's a person on the porch behind you.  Do you
15 know who that is?
16   A.   I believe that's Pete Czosnyka.
17   Q.   And your post reads:  Thank you to
18 our friends on the 5700 North Menard who came out
19 today to acknowledge our efforts to improve long
20 overlooked infrastructure issues on their street.
21 Hashtag besties.  Why did you post that?
22   A.   I don't recall.
23   Q.   What was the hashtag referring to?
24   A.   I don't recall.
25   Q.   Was it referring -- I mean was it a

JAMES GARDINER, 09/20/2022                           Page 130..133

Page 130

1  sarcastic joke about how much bad blood between
2  yourself and Mr. Czosnyka?
3      A.  I don't have any bad blood with Pete
4  Czosnyka.
5      Q.  Okay.  Are you good friends with Pete
6  Czosnyka?
7      A.  I wouldn't say that we're good
8  friends.
9      Q.  Okay.  Has he ever been your best
10 friend?
11     A.  No, he's never been my best friend.
12     Q.  Okay.  So what does the hashtag
13 besties refer to here?
14     A.  Don't know.
15     Q.  Why did you identify the block that
16 Pete Czosnyka lives on in this post?
17     A.  We often go out into the community
18 and tell the community what projects we're
19 working on, and we often make mention of where --
20 where we are.
21     Q.  Is there a particular reason you
22 decided to film right in front of Pete Czosnyka's
23 house?
24     A.  It was -- I remember -- I believe
25 that street was about to get done.  It was a very

Page 131

1  poorly conditioned street for many years.
2      Q.  You knew that Pete was blocked from
3  your Facebook page at this time, right?
4      A.  I don't know that.
5      Q.  Do you recall unblocking Pete at any
6  point between June 2020 and October of 2020?
7      A.  I don't recall.
8      Q.  You can see from this post on October
9  16, 2020, based on this screen capture you can
10 see 143 comments and 136 like or love reactions,
11 right?
12     A.  Uh-huh.
13     Q.  And Pete was unable to interact with
14 this post because he was blocked from the page;
15 is that true?
16     A.  I don't know.
17     Q.  Do you have any reason to dispute
18 that Mr. Czosnyka was blocked from the page at
19 this time?
20     A.  I don't know.
21     Q.  Okay.  So sitting here today you
22 don't?
23     A.  I don't know.  I don't -- I don't
24 recall if he was blocked or not blocked at that
25 time.

Page 132

1      Q.  Do you think it was a good judgment
2  call for an elected official to make a post about
3  a constituent who was blocked from responding to
4  it on social media?
5          MR. CARROLL:  Objection to the extent
6  that mischaracterizes the nature of the post, but
7  go ahead and answer if you can.
8      A.  What is the question?
9  BY MS. NICHOLAS:
10     Q.  Do you think it was a good judgment
11 call to make a post that refers to a constituent
12 who is blocked from responding to it?
13         MR. CARROLL:  Same objection.  Go
14 ahead if you can.
15     A.  Can you repeat your question one more
16 time?
17 BY MS. NICHOLAS:
18     Q.  Do you think it was a good judgment
19 call to make a post that refers to a member of
20 the community who is blocked from responding to
21 that?
22         MR. CARROLL:  Same objection, but go
23 ahead and answer it.
24     A.  I'm not referring to anybody in this
25 post.

Page 133

1  BY MS. NICHOLAS:
2      Q.  What is besties referring to?
3      A.  I don't recall.
4      Q.  What is thank you to our friends --
5  well, who is our friends who came out to
6  acknowledge our efforts to improve long
7  overlooked infrastructure issues?  Who were you
8  referring to in that?
9      A.  I would imagine residents on the
10 block.
11     Q.  Including the one who's standing
12 behind you in the photo?
13     A.  I -- it could be.  I don't recall.
14     Q.  Would you agree that members of the
15 community interpreted this post as referring to
16 Pete Czosnyka?
17     A.  I don't know how that -- the
18 community inferred that.
19         MS. NICHOLAS:  Okay.  Let's take a
20 short break if you don't mind.  Just ten minutes.
21         MR. CARROLL:  Sure.
22         (A break was taken.)
23 BY MS. NICHOLAS:
24     Q.  Okay.  Go back on.  All right.  Just
25 looking again at Exhibit 10, which is the

JAMES GARDINER, 09/20/2022                    Page 134..137

Page 134

1 screenshot of your October 16, 2020, post. Could
2 hashtag besties have referred to anyone other
3 than Pete Czosnyka?
4     A.   I don't know.
5     Q.   Other than what you've already told
6 us today in your deposition, do you recall any
7 other reason why Mr. Czosnyka was blocked from
8 the page in June 2019?
9     A.   I don't remember.
10    Q.   Have you told us everything you do
11 remember about why he was blocked?
12    A.   To the best of my recollection.
13    Q.   What was the principal reason that
14 you blocked Mr. Czosnyka from the Facebook page
15 in June 2019?
16    A.   I don't recall.
17    Q.   Would you agree that you are the
18 final decisionmaker with regard to the content
19 that is posted on the Facebook page?
20    A.   Final decisionmaker, yeah, it's my
21 name, yes.
22    Q.   Would you agree that you had the
23 final decision about whether someone was blocked
24 from interacting the Facebook page?
25    A.   Well, yes, and if the Board of

Page 135

1 Ethics, you know, had one leaning or the other,
2 they would as well.
3     Q.   Okay. Would you agree that you were
4 the final decisionmaker -- well, I guess let me
5 go back to that Board of Ethics comment. You
6 told us that you believe Ms. King spoke to the
7 Board of Ethics pertaining to Mr. Czosnyka. Do
8 you know whether she ever talked to the Board of
9 Ethics regarding any of the other named
10 plaintiffs in this case?
11    A.   I don't recall.
12    Q.   So sitting here today you don't have
13 any memory of her telling you that she talked to
14 the Board of Ethics about anything with the other
15 named plaintiffs?
16    A.   I don't recall.
17    Q.   Did you ever personally have any
18 conversations with the Board of Ethics pertaining
19 to any of the named plaintiffs?
20    A.   Yes.
21    Q.   Okay. Tell me about that.
22    A.   Pete Czosnyka. There was a
23 discussion, and the Board of Ethics advised me to
24 block Pete Czosnyka.
25    Q.   Who in particular did you talk to?

Page 136

1     A.   I don't recall that. I don't have
2 that name.
3     Q.   How did that conversation take place?
4 On the phone? By email? In person?
5     A.   I have an email from the Board of
6 Ethics to say to go ahead and block Pete
7 Czosnyka.
8     Q.   Have you turned that over to your
9 counsel?
10    A.   I have.
11    Q.   Other than regarding Mr. Czosnyka
12 have you had any conversations with the Board of
13 Ethics about any of the named plaintiffs in this
14 case?
15    A.   I'm sorry. Can you repeat that
16 question?
17    Q.   Sure. Other than with regard to
18 Mr. Czosnyka, have you had any conversations with
19 the Board of Ethics about any of the named
20 plaintiffs?
21    A.   Just other than -- well, with the
22 Board of -- no, I don't believe so.
23    Q.   Other than --
24    A.   I don't recall.
25    Q.   Other than the letter that was sent

Page 137

1 to you by the Board of Ethics pertaining to
2 social media use, have you talked to anybody from
3 the Board of Ethics regarding your use and
4 regulation of your Facebook page?
5     A.   I -- I believe so.
6     Q.   Tell me what you recall about that.
7     A.   I don't recall those conversations.
8 I don't recall details of the conversation.
9     Q.   I'm sorry. Was your answer to the
10 question of whether you had other conversations I
11 believe so or I don't believe so?
12    A.   What was your question?
13    Q.   Have you had any conversations with
14 the Board of Ethics pertaining to your use of
15 social media or your regulation of your Facebook
16 page?
17    A.   Yes.
18    Q.   When did those conversations take
19 place?
20    A.   As recently as this year.
21    Q.   Who at the Board of Ethics did you
22 talk to?
23    A.   I don't recall. I don't have that
24 name with me.
25    Q.   What was the nature of the

JAMES GARDINER, 09/20/2022                          Page 138..141

Page 138

1 conversation?

2    A.  Them advising me that it's okay to
3 block Pete Czosnyka.

4    Q.  How did that conversation take place?

5    A.  I believe there was a representative
6 from the Board of Ethics to talk about social
7 media and we -- there was a discussion and some
8 of the posts were relayed or comments were
9 relayed to this individual, and then that
10 individual had suggested that I block Pete
11 Czosnyka.

12    Q.  Was that in connection with your June
13 2020 decision to block Pete?

14    A.  No, this was this year I believe.

15    Q.  Did you ever block Pete again?

16    A.  No.

17    Q.  My understanding -- and correct me if
18 I've got something wrong about this -- is that
19 you blocked Pete on June 25, 2019?

20    A.  Uh-huh.

21    Q.  And then unblocked him approximately
22 June 30, 2021?

23    A.  Oh, okay.

24    Q.  Am I wrong about that?

25    A.  I don't know.

Page 139

1    Q.  Do you have a personal recollection
2 of unblocking Pete at any time in between those
3 two dates?

4    A.  I don't know.

5    Q.  So sitting here today you don't
6 remember unblocking Pete?

7    A.  Yes, I don't remember unblocking
8 Pete.

9    Q.  Okay.  But you did testify that after
10 you were served with this lawsuit you decided to
11 stop blocking people all together and you
12 unblocked everybody including Pete at that time?

13    A.  Yes, everybody.

14    Q.  So sitting here today you don't have
15 any reason to believe that there was another
16 intervening time when you unblocked him and then
17 blocked him again in between June of 2019 and
18 June of 2021?

19    A.  I don't recall.

20    Q.  Okay.  Do you have anything that
21 would refresh your recollection if that had
22 happened?

23    A.  Do I have anything that would refresh
24 my memory?

25    Q.  Yeah, I understand that you don't

Page 140

1 recall that today.  I'm just wondering if
2 there's -- if there's something that would jog
3 your memory about that.

4    A.  I don't know.

5    Q.  Okay.  So you had testified that you
6 spoke to the Board of Ethics about Mr. Czosnyka
7 and your potentially blocking him.  Would that
8 have been in connection with your previous
9 decision to block him?

10    A.  No, I think it's just getting a more
11 clear idea of what can be done or what cannot be
12 done on our social media pages.

13    Q.  Okay.  So that helps me.  So you said
14 that you had also talked to the Board of Ethics
15 sometime within the past year, right?

16    A.  Yes.

17    Q.  And what was the nature of that
18 conversation?

19    A.  They came out to talk about the
20 nature of social media and how to run these
21 pages.

22    Q.  Was that specifically with you or
23 with a group of other city council members?

24    A.  There was another city council member
25 present.

Page 141

1    Q.  Who else?

2    A.  Alderman Sposato.

3    Q.  Okay.  So Alderman Sposato and
4 yourself spoke to somebody from the Board of
5 Ethics about social media pages?

6    A.  Yes.

7    Q.  Where did that conversation take
8 place?

9    A.  At Alderman Sposato's office.

10    Q.  Approximately when?

11    A.  Within the last four months -- four
12 to five months.

13    Q.  Who requested that meeting?

14    A.  I believe it was Alderman Sposato.

15    Q.  Fair to say it wasn't you?

16    A.  I didn't request that meeting, no.

17    Q.  Who requested that you be present for
18 the meeting?

19    A.  Alderman Sposato had mentioned that
20 somebody from the Board of Ethics was coming to
21 their office to talk about social media.  So I
22 went to listen.

23    Q.  I apologize if I already asked this.
24 Do you know the name of the person from the Board
25 of Ethics that was at that meeting?

JAMES GARDINER, 09/20/2022                    Page 142..145

Page 142

1    A.   I don't recall the person.
2    Q.   Do you know why Alderman Sposato
3 asked for the meeting?
4    A.   I don't.  I know that Alderman
5 Sposato was involved with some issues related to
6 social media.
7    Q.   After you had that meeting did
8 anything change about the way that you use and
9 regulate your Facebook page?
10   A.   No, that I recall.
11   Q.   So is it fair to say that since you
12 received notice of this lawsuit your policy has
13 been you are not going to censor any comments and
14 you're not going to block anyone, right?
15   A.   I have not censored any comments or I
16 don't block anybody.
17   Q.   And your conversation with the Board
18 of Ethics didn't change anything about that
19 policy?
20   A.   No.
21   Q.   Did the Board of Ethics suggest to
22 you in that meeting that you create a written
23 policy about what can be posted on your Facebook
24 page?
25   A.   Not that I remember.

Page 143

1    Q.   Other than yourself, Alderman Sposato
2 and someone from the Board of Ethics was anyone
3 else present for that conversation?
4    A.   I believe a staff member from
5 Alderman Sposato's office.
6    Q.   Were there any staff members from
7 your office there?
8    A.   No.
9    Q.   Have you ever talked to anybody from
10 the office of inspector general pertaining to
11 your Facebook page or your use and regulation of
12 that?
13   A.   As far as I recall, no.
14   Q.   Has anyone from the inspector
15 general's office reached out to let you know that
16 complaints have been filed pertaining to your
17 regulation of content on Facebook page?
18   A.   You showed me the document earlier
19 today, but I did not read that document.
20   Q.   Okay.  That's a fair clarification.
21 So other than that letter, have you had any
22 conversations with anyone from the inspector
23 general's office pertaining to complaints made
24 about your use and regulation of the Facebook
25 page?

Page 144

1    A.   As far as I remember, no.
2    Q.   So I know that since you received
3 notice of this lawsuit you've kind of taken the
4 approach of not blocking anyone and not censoring
5 any comment.  Are there any circumstances under
6 which you would block someone from the page?
7    A.   No.
8    Q.   So at this point it is your firm
9 policy that no one will be blocked?
10   A.   As of now I have not blocked anybody.
11   Q.   Right.  And I guess I'm just trying
12 to understand whether that's a policy decision or
13 something that might change in the future?
14   A.   I cannot speak for what -- what would
15 occur in the future.
16   Q.   Okay.  Are there circumstances under
17 which you would block someone from the Facebook
18 page in the future?
19   A.   I don't know.
20   Q.   Is it your understanding that you
21 have the discretion to make a judgment call about
22 whether to block someone from the page?
23   A.   Can I judge whether or not to block
24 somebody?  Yes, I have the decision to block or
25 unblock somebody.

Page 145

1    Q.   And I understand your testimony is at
2 the present time no one is blocked.  Do you know
3 what might lead to your blocking someone in the
4 future?
5        MR. CARROLL:  Objection.  For the
6 extent it calls -- to the extent it calls for
7 speculation, but go ahead and answer as a general
8 matter if you can.
9    A.   Yeah.  No.  I can't speculate just on
10 what the future would hold.
11 BY MS. NICHOLAS:
12   Q.   Okay.  So circumstances might come up
13 in the future and there would still be the
14 potential that you would block someone but don't
15 have any present plans to do so; is that fair?
16   A.   I don't have any present plans to
17 block somebody.
18   Q.   Okay.  But you're not ruling it out
19 as a possibility?
20   A.   I can't speak of the future.
21   Q.   The same with regard to comments.  I
22 understand that you've now adopted a hands-off
23 moderation policy.  Might that change at any
24 point in the future?
25   A.   I cannot speak about what would

JAMES GARDINER, 09/20/2022                                   Page 146..149

Page 146
1 happen in the future.
2      Q.   So it's not your official policy that
3 you will never moderate content on the Facebook
4 page in the future; is that fair?
5      A.   I don't know what the future holds.
6      Q.   Okay.  So it's possible that at some
7 point in the future you may start moderating
8 content on the Facebook page even though right
9 now you're not?
10     A.   It's possible.
11     Q.   The same question with regard to
12 blocking.  While you're presently not blocking
13 anyone, it's possible that you might again in the
14 future?
15          MR. CARROLL:  Objection.  Asked and
16 answered, but go ahead and answer if you can.
17     A.   I cannot speak about what would
18 happen in the future.
19 BY MS. NICHOLAS:
20     Q.   On or about June 30, 2021, you
21 unblocked Pete Czosnyka, and I believe you
22 testified that was after you received notice of
23 this lawsuit you made the decision to do that.
24 Other than this lawsuit having been filed is
25 there any other reason you decided to unblock

Page 147
1 Mr. Czosnyka?
2      A.   Corporate counsel advised me to.
3      Q.   Okay.  Anything else?
4      A.   Not that I remember.
5      Q.   One of the plaintiffs in this case is
6 James Suh.  Are you familiar with him?
7      A.   I -- I'm aware of him.
8      Q.   He also has other litigation against
9 you right now, right?
10     A.   Yes.  Yes, he does.
11     Q.   What's the status of the other case
12 that Mr. Suh has against you if you know?
13     A.   I don't.  I don't know.
14     Q.   Have you answered the complaint in
15 that case?
16     A.   I'm not sure.
17     Q.   Have you answered any discovery in
18 that case?
19     A.   I don't believe so.
20     Q.   I know you haven't given a deposition
21 yet, but have you received notice of one?
22     A.   I -- I have not as far as I know.
23     Q.   On June 7, 2021, James Suh was
24 blocked from interacting with your Facebook page.
25 Who decided to block Mr. Suh?

Page 148
1      A.   June 7, 2021?  I would presume it
2 would be me.
3      Q.   Why was Mr. Suh blocked from the
4 page?
5      A.   I don't recall.
6      Q.   Can you identify any conduct that
7 Mr. Suh engaged in that led to your decision to
8 block him from your page?
9      A.   Unless there was comments made that
10 were derogatory, intimidating, or defamatory
11 towards individuals.
12     Q.   Can you recall any defamatory or
13 derogatory or intimidating comments that were
14 made by Mr. Suh on the page?
15     A.   I believe so.  I believe I submitted
16 those screenshots to my lawyer.
17     Q.   To the best of your recollection what
18 comments led to your decision to block Mr. Suh
19 from the page?
20     A.   I don't recall.
21     Q.   Would the -- I know you said you took
22 some screenshots that you shared with your
23 counsel which presumably he'll share with me
24 after this deposition.  Other than screenshots
25 that you took, did you rely on anything else for

Page 149
1 your decision to block Mr. Suh from the page?
2      A.   I don't recall.
3      Q.   You testified earlier that one thing
4 you might take into account when deciding on
5 whether to block somebody would be whether you
6 received complaints or requests from other
7 constituents?
8      A.   Yes.
9      Q.   Do you know whether you received any
10 complaints or requests from other people
11 concerning blocking Mr. Suh?
12     A.   We may have.
13     Q.   Are there any that you can recall?
14     A.   Not offhand.
15     Q.   To the best of your recollection what
16 is it that Mr. Suh did that led to your decision
17 to block him from the page?
18     A.   Again if it was derogatory,
19 defamatory, or intimidating or harassing in some
20 ways, or repeated offense, I think that's
21 primarily when people were blocked.
22     Q.   I guess I'm a little confused by your
23 answer.  You're saying if it was harassing or
24 derogatory and I'm just -- I know that in general
25 that was your practice -- is that if you deemed a

Urlaub Bowen & Associates, Inc.   312-781-9586

JAMES GARDINER, 09/20/2022                          Page 150..153

Page 150

1  comment to be or series of comments to be
2  derogatory or otherwise unacceptable, you'd make
3  the decision to block someone.  I want you to be
4  a little bit more specific about what you recall
5  about Mr. Suh in particular and why you had to
6  block him.
7      A.   Again any screenshots I sent to my
8  lawyer.
9      Q.   Okay.  So other than screenshots you
10 have of comments that Mr. Suh had made, you don't
11 have any other basis for having blocked Mr. Suh
12 from the page?
13     A.   I don't -- I don't recall.
14     Q.   Other than those screenshots, is
15 there anything else that would refresh your
16 recollection why you made that decision?
17     A.   Maybe somebody had contacted us in
18 regards to comments that were intimidating or
19 harassing.
20     Q.   Have you searched your emails to see
21 whether you received any emails about Mr. Suh?
22     A.   Have I searched them?  I have not.
23     Q.   If you do have any emails that
24 pertain to any of the named plaintiffs regarding
25 your decisions to block them from the Facebook

Page 151

1  page or delete or hide or remove comments that
2  they've made, I'm going to ask you to turn those
3  over to your attorney, okay?
4          MR. CARROLL:  I'm making a note.
5          MS. NICHOLAS:  Okay.  Thank you.  I
6  appreciate that.  I'll follow up with an email
7  just to make sure we both have a reminder.
8          MR. CARROLL:  No problem.
9  BY MS. NICHOLAS:
10     Q.   Okay.  So sitting here today do you
11 recall the specific content of any of the posts
12 that Mr. Suh made that led to your decision to
13 block him from the page?
14     A.   Any screenshots that I've taken I've
15 sent to my lawyer.
16     Q.   Okay.  Early in your tenure as
17 alderman do you recall a protest taking place in
18 October 2019 about a proposed development on the
19 corner of Milwaukee and Cicero and Irving Park?
20     A.   Do I recall a protest?  Yes.  Yes, a
21 protest, yes.
22     Q.   Would you agree that Mr. Suh was one
23 of the most visible organizers of that protest?
24     A.   Okay.  I wouldn't say -- I don't know
25 who was most visible or wasn't most visible.

Page 152

1      Q.   Do you recall Mr. Suh being in the
2  media about that protest?
3      A.   I do.  I believe he was, yeah, in the
4  media.
5      Q.   How about any of the other named
6  plaintiffs, do you recall whether any of the
7  other named plaintiffs were involved in the
8  protest pertaining to the development at Six
9  Corners?
10     A.   I don't recall.
11     Q.   Do you know whether Peter Barash was
12 one of the organizers of the protest?
13     A.   I don't know.
14     Q.   Okay.  Do you recall whether Dominic
15 Maino was one of the organizers of the protest?
16     A.   I don't know, but I believe he was
17 present.
18     Q.   How about Steve Held, do you know
19 what involvement he had, if any, with the
20 protest?
21     A.   No, I do not know.
22     Q.   What was your understanding of the
23 reason for the protest that took place in October
24 of 2019?
25     A.   What was the reasoning for the

Page 153

1  protest?
2      Q.   As far as you know.
3      A.   I don't -- I don't know.
4      Q.   Would you agree that the protest
5  generated media attention?
6      A.   Yes.
7      Q.   Were you unhappy about receiving
8  negative press about your job earlier in your
9  term?
10     A.   I wasn't one way or the other.
11     Q.   Did that protest and the media
12 coverage that it generated create any negativity
13 between yourself and any of the named plaintiffs?
14     A.   During that time there may have been
15 questions about -- as best as I remember, yes.
16     Q.   Yeah.  What do you mean by that?
17     A.   I know that we had meetings that were
18 in regards to that development, so I know that
19 there was questions with regards to that.
20     Q.   As a result of that protest did you
21 develop any opinions concerning any of the named
22 plaintiffs in this case?
23     A.   I don't recall.
24     Q.   Did you find this protest concerning
25 the development at Six Corners to be

Page 154

1 embarrassing?

2    A.   No.

3    Q.   Did the October 2019 protest at Six
4 Corners have anything to do with your decision to
5 block James Suh from your Facebook page?

6    A.   I -- I don't believe so.

7    Q.   How about with regard to any of the
8 other named plaintiffs, did the protest that took
9 place at Six Corners in October of 2019 play any
10 role in your decision to either block him from
11 the page or delete their comments from the page?

12    A.   I don't remember.

13    Q.   Are you familiar with Plaintiff
14 Dominic Maino?

15    A.   I'm familiar with Mr. Maino.

16    Q.   Can you describe best you can what
17 your relationship is like with Mr. Maino?

18    A.   Cordial.

19    Q.   In June or July of 2019 Mr. Maino was
20 blocked from interacting with the page.  Do you
21 know who decided to block him from the page?

22    A.   I don't remember.

23    Q.   Do you have any reason to dispute
24 that he was blocked?

25    A.   I don't have reason to dispute that.

Page 155

1    Q.   Other than yourself and Ms. King
2 would anyone else have been involved in the
3 decision to block Mr. Maino from the page?

4    A.   No unless the Board of Ethics was
5 contacted.

6    Q.   And I think you testified earlier
7 that as far as you know they weren't, right?

8    A.   I don't -- I wouldn't believe so.

9    Q.   What particular conduct did Mr. Maino
10 engage in that led to your decision to block him
11 from the Facebook page?

12    A.   I don't remember.

13    Q.   Sitting here today do you -- are you
14 aware of any reasons why Mr. Maino was blocked?

15    A.   No, I don't recall.

16    Q.   Would it be fair to describe
17 Mr. Maino as someone who's been critical of your
18 performance of your job as alderman in the 45th
19 Ward?

20    A.   Yes, he's criticized me.

21    Q.   You testified that you've taken some
22 screenshots of Mr. Suh's comments that you shared
23 with your counsel that you said perhaps were
24 among the reasons why you decided to block
25 Mr. Suh from the page.  Did you do anything like

Page 156

1 that with regard to Mr. Maino?

2    A.   I don't know if I have screenshots
3 that I submitted from Mr. Maino or not.

4    Q.   Do you have any other documents that
5 would support your decision to have blocked
6 Mr. Maino from the page?

7    A.   Not that I believe -- not that I'm
8 aware of right now.

9    Q.   Do you know why you blocked Mr. Maino
10 from the page?

11    A.   Not right now.

12    Q.   Other than this lawsuit having been
13 filed was there any other reasons you decided to
14 unblock Mr. Maino?

15    A.   Not that I'm aware of.

16    Q.   Is it fair to say that all of the
17 plaintiffs in this case have been among your
18 harshest critics of your performance of your job
19 as alderman of the 45th Ward?

20    A.   They've been critics, yes.  They've
21 been critical.

22    Q.   Would you characterize the plaintiffs
23 in this case as being allies or perceived allies
24 of the former alderman of the ward?

25    A.   I don't know if they are or not.

Page 157

1    Q.   Other than the named plaintiffs in
2 this case, have you blocked anyone else from
3 engaging with the Facebook page at any time since
4 you've been the alderman?

5    A.   If there was I cannot recall
6 particular names.

7    Q.   How would you find out if you had?

8    A.   I don't know.

9    Q.   Do you recall a June 2021 incident
10 where a motorist ran her car over Pete Czosnyka's
11 lawn, destroying his pollinator garden?

12    A.   I recall that.

13    Q.   Do you recall the media coverage that
14 attributed that incident to your supporter being
15 unhappy with Mr. Czosnyka's criticism of you?

16    A.   I recall my being a part of that
17 story.

18    Q.   Was that story embarrassing to you?

19    A.   No.

20    Q.   Would you agree that the press
21 coverage was not positive?

22    A.   Yeah, it wasn't positive for our
23 community, no.

24    Q.   It wasn't positive for you, right?

25    A.   I had nothing to do with that so I

Page 158

1  was looking at it as a resident of the 45th Ward,
2  our community.
3      Q.   But in the media it was tied to you,
4  would you agree with that?
5      A.   In the media?
6      Q.   That incident was being tied to you.
7      A.   Yes, it was, yes.
8      Q.   Did that bother you?
9      A.   It bothered me because I had
10  absolutely nothing to do with it -- it bothered
11  me because I had absolutely nothing to do with
12  that incident.
13      Q.   Do you recall Mr. Suh making a post
14  to your Facebook page with a link to the media
15  coverage of the incident involving Mr. Czosnyka's
16  lawn asking you why you hadn't said anything
17  about it or condemned it?
18      A.   I don't recall.
19      Q.   Did Mr. Suh's posting of that
20  information on your Facebook page have anything
21  to do with your decision to block him?
22      A.   I don't -- I don't recall.
23      Q.   In your campaign materials related to
24  your candidacy for alderman of the 45th Ward, you
25  stated that you were formerly a public

Page 159

1  schoolteacher, right?
2      A.   Yes.
3      Q.   And Peter Barash who is a public
4  schoolteacher has repeatedly questioned that you
5  were an actual certified teacher, right?
6      A.   I believe he's questioned it, yes.
7      Q.   And so have some of the other
8  plaintiffs in this case, true?
9      A.   I don't -- I don't know if some of
10  the other plaintiffs have.
11      Q.   And they pointed out that you only
12  had temporary provisional credentials to teach,
13  right?
14      A.   I don't know.  I don't know what they
15  claim.
16      Q.   Did that criticism bother you?
17      A.   I don't recall if it did.  It doesn't
18  now.
19      Q.   Were you ever a licensed and
20  credentialed public schoolteacher?
21      A.   Yes.
22      Q.   When?
23      A.   From 2003 to 20 -- to May 2005.
24      Q.   Did you ever teach full time?
25      A.   Yes, during that time I was a

Page 160

1  full-time teacher.
2      Q.   As a substitute?
3      A.   No, full-time teacher.
4      Q.   Where?
5      A.   At de la Cruz Elementary School and
6  Curie High School.
7      Q.   Would you characterize the criticism
8  launched by some of the plaintiffs as being
9  unfair, particularly about your teaching
10  credentials?
11      A.   Sure at times it could be saw at --
12  viewed as unfair.
13      Q.   Would you characterize any of the
14  other plaintiffs' criticisms of you as being
15  unfair?
16      A.   It's up to the individual viewing
17  that.
18      Q.   Yeah.  I guess I'm asking about your
19  reaction to it.
20      A.   Do I think it's unfair,
21  unsubstantiated, yes.
22      Q.   Does that criticism that you
23  characterize as unfair or unsubstantiated play
24  any role in your decision about who can interact
25  with your Facebook page?

Page 161

1      A.   Well, now anybody can interact with
2  Facebook page.
3      Q.   Historically?
4      A.   Historically, I don't -- I don't know
5  as much as that would play a role as much as
6  making intimidating, defamatory, or harassing
7  statements.
8      Q.   Let's look at what we're marking as
9  Exhibit 11 to your deposition.
10      A.   Uh-huh.
11      Q.   This is a screen capture of a comment
12  on your Facebook page by someone named Vince
13  Gerage.  Do you know who that is?
14      A.   I'm aware of that individual.
15      Q.   Who is he?
16      A.   He used to live in the city but now
17  lives in the suburbs.  I -- I believe he went to
18  a neighboring high school.
19      Q.   Would you characterize him as a
20  friend?
21      A.   No.
22      Q.   Would you characterize him as a
23  supporter?
24      A.   No.
25      Q.   Would you agree that he frequently

JAMES GARDINER, 09/20/2022                                      Page 162..165

Page 162

1 interacts with your Facebook page praising your
2 performance of your job?
3       A.   I have not seen that name in quite
4 some time.
5       Q.   Historically would you agree that he
6 posted comments that were supportive of you?
7       A.   Yes.
8       Q.   And would you agree that historically
9 he often called out your critics?
10      A.   Yes.
11      Q.   In this post Vince Gerage says:  I
12 seriously hope he chokes and I mean it with every
13 fiber in my being. I don't intend to do anything
14 to make sure that comes to fruition, but if it
15 happens, I'll use that obituary notice to clean
16 up my dog's excrement that day.  Would you
17 characterize this post as harassing or
18 intimidating?
19      A.   It's -- it's -- yeah, it's not -- not
20 welcoming, that's for sure, yes.
21      Q.   Did you delete this post from the
22 page?
23      A.   I don't know.
24      Q.   Did you ever block Vince Gerage from
25 interacting with the page?

Page 163

1       A.   I don't believe so.
2       Q.   Why not?
3       A.   I don't know if I ever read this
4 comment before.
5       Q.   You don't have any reason to dispute
6 that this was actually posted to the page, right?
7       A.   I don't have reason to object to
8 that.
9       Q.   All right.  You testified earlier
10 that you had previously used keyword filtering on
11 the page but that was no longer in use.
12      A.   Yes.
13      Q.   Do you have any plans to use key word
14 filtering again in the future?
15      A.   I don't have plans.
16      Q.   Might you do that?
17      A.   Again I don't have plans for my
18 future use of social media.
19      Q.   I know that you've testified that
20 your policy now has just been no censorship,
21 totally hands-off.  Do you think at any point in
22 the future you might adopt a policy about content
23 on a page?
24           MR. CARROLL:  Objection.  Asked and
25 answered, but go ahead and answer if you can.

Page 164

1       A.   Again I can't speak about what I will
2 do in the future or what I won't do.
3           MS. NICHOLAS:  Okay.  Can we just
4 take -- I think I just want to look at my notes
5 one more time, make sure I didn't miss anything I
6 wanted to go over.  I'm quite close to being
7 done.  If we could just take like five or six
8 minutes and come back --
9           THE WITNESS:  I cannot go a minute
10 past 5:00.
11          MS. NICHOLAS:  I will make every
12 effort to be done very shortly.  Your counsel may
13 have a few follow-ups, which I don't have any
14 control over, but we'll make every effort to get
15 done before 5.
16          MR. CARROLL:  My follow-ups will be
17 extremely brief.
18          MS. NICHOLAS:  So we'll make every
19 effort to get you done by 5.  Thank you.
20          (A break was taken.)
21 BY MS. NICHOLAS:
22      Q.   All right.  Let's just go back on.  A
23 couple follow-up questions.  Why don't you
24 currently moderate any of the content on your
25 Facebook page?

Page 165

1       A.   I don't have the time with the
2 responsibilities that I have as an alderman.
3       Q.   Have you considered hiring somebody
4 to help you with that task?
5       A.   With the allotment that we have it's
6 difficult to hire that amount of additional
7 staff.
8       Q.   At this time do you have any plans to
9 do so?
10      A.   I don't have plans.
11      Q.   You're not required as part of your
12 job to have a Facebook page, right?
13      A.   No, we're not required as far as I
14 know.
15      Q.   Some of your city council probably do
16 and others don't; is that a fair
17 characterization?
18      A.   I don't want to comment on what my
19 other colleagues do or don't do.
20      Q.   Okay.  But there's no rule requiring
21 aldermen to maintain Facebook pages to
22 communicate with their constituents, right?
23      A.   Yes.  No.  No, there is not --
24      Q.   Okay.
25      A.   -- a rule.

JAMES GARDINER, 09/20/2022                     Page 166..169

Page 166

1        MS. NICHOLAS: Okay. I don't have
2 anything else.
3              EXAMINATION
4 BY MR. CARROLL:
5    Q.   Alderman, I just have a couple of
6 brief questions for -- mostly for clarification
7 purposes. First and foremost -- we'll start from
8 the back end regarding the content moderation.
9 In addition to the timing element would it be
10 fair to say that you are concerned about
11 liability for first amendment violations as part
12 of your decision not to block content or moderate
13 content or users on Facebook?
14    A.   Yeah. That would -- that would be a
15 concern.
16    Q.   Okay. Regarding the conversation
17 with the Board of Ethics, if I were to tell you
18 that that conversation had occurred around July 5
19 of 2022, would that be -- would that help refresh
20 your recollection?
21    A.   That timeline sounds accurate.
22    Q.   Okay. And if I were to tell you that
23 you spoke with Lisa Eilers from the Board of
24 Ethics, would that be one of the people that you
25 spoke with?

Page 167

1    A.   Lisa sounds familiar, yes.
2    Q.   Okay. And then just quickly
3 regarding contents on your page, if you had
4 seen -- prior to -- prior to the current period
5 of time, when you were still blocking --
6 potentially blocking posts and users on Facebook,
7 would a reference to one as having a physical or
8 developmental disability be a potential basis for
9 blocking a comment on Facebook?
10    A.   Yes.
11    Q.   Okay. What about --
12    A.   Yes. Can you hear me? I'm sorry.
13    Q.   Yes. What about the attribution of
14 criminal behavior to a person who had not been
15 adjudicated a criminal?
16    A.   Yes, if that was brought to my
17 attention -- again I don't read every single
18 comment, but if it was brought to my attention
19 and I was aware of that, I would -- that would be
20 something that -- that I would more than likely
21 address.
22    Q.   Are you at all versed in the law of
23 defamation? Do you have any technical
24 familiarity with that law?
25    A.   I don't.

Page 168

1    Q.   Can you tell me the categories of
2 defamation that are considered defamatory per se?
3    A.   I can't, no.
4    Q.   Okay. Are you an expert of any kind
5 on commercial speech versus political speech?
6    A.   No, I am not.
7        MR. CARROLL: Okay. That's all I
8 have. No further questions.
9              FURTHER EXAMINATION
10 BY MS. NICHOLAS:
11    Q.   Do you have any recollection of ever
12 having deleted a comment from Facebook because it
13 made reference to someone's physical or
14 developmental disability?
15    A.   I can't recall.
16    Q.   With regard to your counsel's
17 question about attributing criminal activity to
18 someone who hadn't been adjudicated being a basis
19 for deleting a comment or blocking a user, have
20 you ever done that?
21    A.   I don't -- I can't recall.
22    Q.   In fact people post to your Facebook
23 page all the time that Pete Czosnyka is a
24 criminal, right?
25    A.   I don't -- I don't know. I can't

Page 169

1 verify that.
2    Q.   I mean it's a meme to show Pete's
3 face behind bars implying that he's in prison,
4 right?
5    A.   I have -- I have seen that meme.
6    Q.   But other than having seen a rumor on
7 Facebook that he was arrested for stalking, you
8 don't have any basis for believing that Pete
9 actually does have any kind of criminal record,
10 right?
11    A.   I don't know whether or not he has a
12 criminal record.
13    Q.   Have you ever deleted one of those
14 photos of Pete Czosnyka behind bars?
15    A.   I don't know.
16    Q.   Sitting here today do you recall ever
17 having done so?
18    A.   I don't -- I don't recall.
19        MS. NICHOLAS: Okay. I don't have
20 anything else.
21        MR. CARROLL: All right.
22        MS. NICHOLAS: Do you want to explain
23 signature?
24        MR. CARROLL: We'll waive signature.
25        COURT REPORTER: Are you going to

Urlaub Bowen & Associates, Inc.   312-781-9586

JAMES GARDINER, 09/20/2022                                    Page 170..171

Page 170

1  order the transcript?
2          MS. NICHOLAS:  We'll order it.  Just
3  regular delivery.  If I can get a PDF mini would
4  be my preference.
5          COURT REPORTER:  Do you want a copy,
6  Mr. Carroll?
7          MR. CARROLL:  Yeah, I think we better
8  take a copy.
9          COURT REPORTER:  Do you want a PDF
10  also?
11          MR. CARROLL:  PDF is fine.
12          (The deposition was concluded at 4:56
13  p.m., and the signature of the deponent was
14  waived.)
15
16
17
18
19
20
21
22
23
24
25

Page 171

1                    CERTIFICATION
2          I, Rhonda Rhodes Bentley, CSR, a
   Certified Shorthand Reporter (IL), do hereby
3  certify that JAMES GARDINER, came before me on
   September 20, 2022, and swore before me to
4  testify to the truth, the whole truth and nothing
   but the truth regarding his knowledge touching
5  upon the matter in controversy.
6          I do further certify that I did take
   stenographic notes of the questions propounded to
7  said witness and his answers thereto and that
   said notes were reduced to typewritten form under
8  my direction and supervision.
9          I do further certify that the
   attached and foregoing is a true, correct and
10  complete copy of my notes and that said testimony
   is now herewith returned.  I do further certify
11  that said deposition was taken remotely via Zoom
   in Illinois.
12
          I do further certify that I am not
13  related in any way to any of the parties involved
   in this action and have no interest in the
14  outcome thereof.  Dated at Divernon, Illinois,
   the 28th day of September, 2022.
15
16
17
18          _____
            Rhonda Rhodes Bentley, CSR
19          CSR# 084-002706
20
21
22
23
24
25

Exhibit 1



Exhibit 2



BOARD OF ETHICS

CITY OF CHICAGO

### PRESS RELEASE

January 8, 2019

In response to inquiries raised by numerous aldermen to the staff of the Board of Ethics, the Board has issued Advisory Opinion 18038.A.1, addressing the use of social media accounts such as Facebook or Twitter by City of Chicago elected officials or candidates, Chicago Police Department personnel, and, by extension, City employees and officials generally.

The opinion addresses the three (3) primary types of social media accounts or websites used by City elected officials: (i) official City pages; (ii) political/campaign pages; and (iii) personal pages that typically have elements of the first two. It discusses in detail what content can be posted to each type of account, consistent with the City's Governmental Ethics Ordinance. The Executive Summary section of the opinion provides an overview of the Board's advice and determinations with respect to each type of account. The opinion also establishes general rules covering, among other topics: (i) when disclaimer language should be used; (ii) when the City seal and/or other official indicia of the City can be used, and when they cannot be used; (iii) when account administrators can block followers or delete comments; and (iv) the key distinction between "political" commentary or content and "electioneering" content — the latter cannot be posted on any account or page that is or functions as an official City account page by, for example, dispensing information to constituents about how to request City services.

Please contact the Board at 312-744-9660 with questions.



BOARD OF ETHICS

CITY OF CHICAGO

**ADVISORY OPINION**

Date:     January 8, 2019

Re:       Case No. 18038.A.1, Use of Social Media; City-owned Property, Prohibited Political Activity

---

**Executive Summary**

This Board of Ethics advisory opinion addresses: (i) the use of social media accounts[1] by City of Chicago elected officials and Chicago Police Department personnel, and, by extension, City employees and officials generally; and (ii) what content can be posted to each type of social media account, consistent with the City's Governmental Ethics Ordinance (the "Ordinance"). There are three (3) essential types of these accounts or sites discussed: (i) official, (ii) political/campaign, and (3) "personal" ones displaying elements of the first two.

The issues we address are nuanced.  Websites, Facebook pages, Twitter accounts – all are, by design and intention – personalized.  Yet, we can, and do here, establish the following general rules:[2]

• City elected officials' "political/campaign" (as described below) websites or social media accounts may include content regarding City/ward business, provided these websites or accounts: (i) are not funded or maintained with City resources; (ii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; and (iii) contain appropriate disclaimer language on the main page identifying the accounts as personal, non-governmental accounts that do not represent the official policies or positions of the City of Chicago.

• Elected officials may post political or electioneering content on their "personal" (and, of course, their "political/campaign") accounts or websites, including friendly or critical commentary on other politicians or their policies, campaign donation links, sample ballots, candidate endorsements, etc., provided these accounts or pages: (i) are not funded or maintained with City resources; (ii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; and (iii) contain appropriate disclaimer language on the main page identifying the accounts as personal, non-governmental accounts that do not represent the official policies or positions of the City of Chicago.

• If City elected officials' "official" or "personal" websites or social media accounts (as described below) do include the City seal and/or other indicia of an "official" City or ward website and otherwise meet the criteria described above, they must remain free of "electioneering" content, such as "Reelect me for the

---

[1] For purposes of this opinion, "social media" refers to, but is not limited to, Facebook, Instagram and Twitter accounts.  The meaning of the term "social media" for purposes of this opinion is Merriam-Webster's: "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos)."  *See* https://www.merriam-webster.com/dictionary/social%20media

[2] This advisory opinion is intended to supplement the **Handbook for Effective and Ethical Ward Operations,** First Edition (2019) (the "Handbook"), currently being produced by the City Council's Committee on Workforce Development.  The *Handbook* contains significant content written by staff of the Board of Ethics, and our staff will update it accordingly.

following reasons …" and may have no links to any political committee or for making campaign donations, even if the sites or accounts are funded fully with political or campaign funds and include any legally mandated language about their funding.

• Elected officials whose "personal" social media accounts include political content, such as political endorsements and/or opinion pieces on topics related to official City business, or include no political content but include postings commenting on public affairs or matters involving City government, **should not** block or delete followers from accessing such pages or delete critical or negative comments, unless the comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods or services.

• Chicago Police Department ("CPD") personnel are prohibited, pursuant to a departmental order, from posting intellectual property of the CPD or the City of Chicago, such as badges and logos, on their personal social media accounts.

## I. Background

Several questions were posed to Board staff by aldermen before, during and after our agency's budget hearing on October 30, 2018, regarding how the Ordinance limits what elected officials (and CPD personnel) may post on social media platforms, namely, their "official City" pages; their purely "political" pages; and their "personal" pages. This opinion addresses these questions.

Some City elected officials may have all three types of pages, while others may have only one or two.

In addition to the questions posed at the budget hearing, requests for informal advisory opinions and guidance from aldermen and other elected officials or their staff regularly come to the Board by phone or email regarding whether, and to what extent, the Ordinance applies to aldermanic social media accounts and what content can be posted, and on which accounts. This opinion is intended to address these as well.

The Board recognizes the ever-expanding role of social media as a means of communication[3] and, in turn, the increase in the number and complexity of related issues raised.  In the course of preparing this opinion, our staff has examined dozens of "official," "personal," and "political" social media account and websites of City, state, and federal elected officials. Accordingly, and as stated by our Executive Director at our agency's budget hearing, we issue this formal advisory opinion pursuant to our authority under §§2-156-380(e) and (l) of the Ordinance.

## II. Relevant Governmental Ethics Ordinance Provisions

In this opinion, we discuss and interpret two (2) Ordinance sections.  They are:

**§2-156-060. City-owned property. No official or employee shall engage in or permit the unauthorized use of any real or personal property owned or leased by the City for City business.**

**§2-156-135. Prohibited political activities…**
**(b)        No official or employee shall intentionally misappropriate any city property or resources of the city in connection with any prohibited political activity; provided, however, any official or employee may reserve and rent a city-owned facility at a fair market value before any such activity or event connected therewith.**

---

[3] In a 2017 case, the U.S. Supreme Court recognized that social media platforms like Facebook and Twitter provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S.Ct. 273, 582 U.S. _ (2017).

Case No. 18038.A.1    January 8, 2019

### III. Application of the Ethics Ordinance to the Questions Posed

A. Chicago Police Department Personnel. Prior to our budget hearing, Alderman          asked "what are the limits in terms of posting political content on one's Facebook or Twitter or Instagram page, particularly for City employees, like Chicago Police Department ["CPD"] members, who may describe themselves factually as Chicago Police personnel, or even display a CPD badge or reasonable facsimile thereof on their social media pages?"

With respect to the alderman's specific question regarding CPD officers who may describe themselves factually as police officers and/or display a Department badge on their personal social media pages, the CPD's General Order G-09-01-06(V)(c)[4] prohibits the "posting, displaying, or transmitting" on social media outlets of:

  (5) any intellectual property of the Department or the City of Chicago without the specific authorization of the Superintendent or his/her designee. Department or City of Chicago   intellectual property includes but is not limited to logos, uniforms, [and] official photographs…

Police departments across the country have policies similar to that of CPD.[5] In light of CPD's order regarding the use of social media, the Board advises that, while CPD officers cannot post the intellectual property of the department, such as a badge, on their social media accounts, they may use their job title, and may post political content, provided they: (i) include disclaimers making it clear that they are not speaking for the Chicago Police Department; and (ii) comply with any CPD-specific directives and rules.

B. Elected Officials' Social Media Pages.  We set our discussion of elected officials' social media accounts and websites in the context of the overarching general principle: government funds or resources should not be spent to help incumbents gain reelection.[6]

With that cardinal rule in mind, we advise, in general, that non-official "personal" or "political" social media accounts of City elected officials (or any City employees or officials) who may wish to comment on public affairs or matters involving City. State, or federal government policies or politicians include a disclaimer, visible on the account's main page, identifying the account as a personal or political account. For example:

*"This is the personal, non-governmental account of Alderman Jane Smith" or "This is the political account of the Friends of Jane Smith, and is paid for entirely by funds from that organization in accordance with any applicable State laws or policies."*

Or

*"This is a private account that contains my personal views and impressions. While I may occasionally provide information of an official nature as a convenience to my readers, this is not an official social media account of the City of Chicago and does not represent the official policies or positions of the City of Chicago (or the Department of X or the City Council")*.

---

[4] http://directives.chicagopolice.org/directives/data/a7a57bf0-135f9205-ceb13-5f94-7e998c13b2be7890.pdf

[5] See, e.g., Philadelphia Police Directive 6.10 http://www.phillypolice.com/assets/directives/D6.10-SocialMediaAndNetworking.pdf;   Minneapolis Police Department Policy and Procedure Manual http://www.minneapolismn.gov/police/policy/mpdpolicy_1-300_1-300; and Albuquerque Police Department Order SOP1-2 http://documents.cabq.gov/police/standard-operating-procedures/1-02-social-media.pdf

[6]  See Common Cause v. Bolger, 574 F. Supp. 672,683 (D.D.C. 1982), aff'd, 461 US 911 (1983); see also Board Case No. 18038.A.2, in which we determined that aldermen and their staffers may not engage in "political activity" (as defined) in or with visitors to their City or ward office, but that they may give out general information such as where to vote and assist walk-ins in completing voter registrations form while on City time or with City resources, though these activities are fraught: no "political activity" can occur.
https://www.chicago.gov/content/dam/city/depts/ethics/general/AO_ElectOfficials/18038.A.2.pdf

Similarly, should City elected officials have Twitter (or Facebook) accounts that link to or list their "City" or "official" website or pages (e.g., in the left-hand column, underneath the user's profile (@) and location icons (⚲), or next to the user's website icon (✎)), then: (i) if they choose to include "electioneering" content (for example, "reelect me because …" or "my opponent claims this … here's why that's bad policy …") on these accounts, the accounts become "political" or campaign accounts, and thus cannot contain any links to their "City" or any other "personal" website or social media account that displays the City seal[7]; and (ii) the Twitter (or Facebook) pages must have a prominent disclaimer such as the following: "This is the political, non-official twitter account of Alderman A, and represents his or her personal and political views only.  To view his or her official Aldermanic Twitter account, see @AldermanChicago51."

However, we note that our examination of dozens of websites and Facebook and Twitter accounts shows that many include political commentary (for example, retweeting President Trump's tweets with critical commentary) but are not otherwise campaign or "political" sites.  We conclude that such postings are analogous to public statements politicians regularly make to the media, and are qualitatively different from "electioneering" content.  While we recognize that this distinction – which is a critical one – may be subtle in some instances (some could argue that all actions or posting made by an incumbent are in part to secure reelection), we here determine that "electioneering content" may occur only on "political" or campaign websites or accounts, and that any site or account that contains such statements may not contain links to their official City pages or any other pages or accounts that display the City seal.

C.  Posting Community Events or Other Notices. Aldermen                    and         raised additional questions regarding what they can post on their official City and their political or personal social media pages. The general advice outlined in section III.B of this opinion is responsive to their questions.

However, Alderman          question was more specific. He has two Facebook pages. On one, he advertises ward events, like job fairs, and posts links to City operating departments (like the Departments of Planning & Development, Water Management, Streets & Sanitation, and Transportation), and his ward newsletter, many of which postings feature the City seal.  (This site, we conclude, is and functions as an "official" City site, regardless of how it is funded.) He has another page that is for his re-election campaign, which does not display the City seal, but of course uses his title, "Alderman."  (This site includes political content, and a link for users to contribute to his re-election campaign – we conclude that it is "political" and subject to the conditions described two paragraphs below and in section III.B, above).

His question: a local business is hosting a free shredding event, and he knows it is of interest to his constituents. May he post a notice advertising the event on *both of these* pages?

The answer: it depends. We advise that, if he received notice of this event as alderman, and no other residents or campaign opponents received notice of the event, then he cannot post it on his political page (but of course can post it on his "official page"). However, if the event is in fact advertised by its host on

---

[7] An already-settled question is whether a City elected official can include the City seal or other indicia of an official City or ward social media platform (like Facebook or Twitter) on a "political/campaign" or "personal" website or social media account. In Case No. 15014.C, we issued a letter of admonition to an alderman whose campaign-funded website had become "in effect, a City or ward website" precisely because it had all the indicia of an official City/ward site," but it also included a button for making campaign donations.  This was a problem. On the Board's advice, the alderman immediately removed the donation button from this website, and placed it on his campaign website. The Board determined that having this political contribution button on the site – which he thought of as his campaign-funded, "personal" website – but which included the City seal, links for residents or other users to request City services, information about ward nights, and news – constituted an improper use of City-owned property for political purposes in violation of §2-156-060 of the Ordinance (prohibiting unauthorized use of City-owned property), and created the impression that the City officially supported the alderman's candidacy, in violation of §2-156-135(b) of the Ordinance (prohibiting the use of City property or resources for any prohibited political activity). The Board advised the alderman that, if a website/social media account includes "the City seal and/or other indicia of an official City or ward website," it cannot include electioneering content and may have no links to a political committee or links for making campaign donations, even when the site is fully campaign-funded and includes any legally mandated language about its funding.  *See* https://www.chicago.gov/content/dam/city/depts/ethics/general/AOMinorViolations/15014.mem.doc.

More recently, in Case No. 18036.A1, the Board recently determined that *no person* may use the City seal in any printed, filmed, broadcast or web-based electioneering communications supporting a candidate for City office, unless the appropriate City authorities specifically authorize it, by ordinance or licensing agreement. *See* https://www.cityofchicago.org/content/dam/city/depts/ethics/general/AO_PolActvty/18036.A.1.pdf.

(but of course can post it on his "official page"). However, if the event is in fact advertised by its host on the host's own social media pages, or through mass media like hyper-local newspapers, websites, radio, etc., then the alderman may use it on *both* pages – as could his election opponents, as it's public information.

More generally, we reiterate the principle that aldermens' "personal" or "political/campaign" social media pages or websites may include content regarding City/ward business, provided these pages or sites: (i) are not funded or maintained with City resources; (ii) do not use or display the City seal or any likeness thereof; (iii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; (iv) may have newsworthy content (for example, they may have photos of the alderman participating in ground-breaking ceremonies for new construction in the ward with other elected officials and business leaders, or discuss how many miles of streets or water mains have been improved during the alderman's term, or other achievements the alderman has had while in office), with links to an official City site to back up such claims (*e.g.*, a link to a bulletin from the website of the Chicago Department of Transportation); and (v) state clearly and prominently that the sites are the aldermens' (or employee's or other official's) own personal or political/campaign website or social media page and do not represent the official views of the City.[8]

We have also been asked whether aldermen can convert their pre-existing "personal" social media accounts to a political/campaign account. Our advice is that, if the "personal" pages or accounts have displayed links to City services, or ward events, ward newsletters, or other indicia of an "official" account (*see* Case No. 15014.C, discussed in fn. 7), then the aldermen may *not* convert those accounts into political/campaign pages or accounts, which would thereby in effect convert these pages' subscribers, followers or friends and their contact information to what would now be a political/campaign account.[9]

D.  Posting Political Photos; Blocking or "Defriending" Users. Following the budget hearing, Alderman ____ shared her Facebook page with the Board's Executive Director. The page has announcements and photos of her appearing as alderman at various public events, and photos of her appearing with other politicians. It also has City service announcements on it, as well as her official reaction as alderman to the Van Dyke verdict,[10] and links to her ward newsletter. She asked whether: (i) she can post her political endorsements on this page; and (ii) whether she can block/defriend followers who have posted profanity and/or called her racist or other offensive names on the page. As we explain, our answers are: (i) no: we advise creating a third purely "political/campaign" page or account to do this; and (ii) users or followers can be deleted or blocked only under rare circumstances.

i.  Political photos or other political content. First, we address whether elected officials can post political endorsements or other political content on "personal" social media pages or platforms like this one, which is not purely "official" or purely "political." The Board has consistently advised City elected officials that they may share political content on their *personal* or *political/campaign* accounts.[11] Posting political

---

[8] The Board advises that disclaimers must be prominent, written in a font that is easily legible, and in a color that contrasts with the background, following the example of the City of Los Angeles. *See* LAMC § 49.7.34(A): https://ethics.lacity.org/wp-content/uploads/2018/02/law_CFO_2017.pdf

[9] Analogously, our colleagues at the New York City Conflicts of Interest Board have determined that a list of contact information maintained by an elected official's City office to disseminate official City communications is a City resource and therefore cannot be used for any non-City purpose. They have also said, and we agree, that the opposite transfer is allowable: an elected official may accept from his or her campaign the campaign-maintained list of email addresses or contact information and use this in pursuit of his or her own official City duties. *See* COIB Advisory Opinion No. 2017-4, at 8-9, https://www1.nyc.gov/assets/coib/downloads/pdf5/aos/2017/AO2017-4.pdf. *See also* Handbook, at 4.4.1.

[10] *See* https://www.chicagotribune.com/news/local/breaking/ct-met-laquan-mcdonald-jason-van-dyke-trial-verdict-20181005-story.html

[11] Similarly, in Advisory Opinion 11-02E, the Seattle Ethics and Elections Commission determined that if a public official maintains a personal social media account, and does **not** provide links to these platforms from a City social media account or other City communication, then the official can post political or electioneering material to the site. http://www.seattle.gov/ethics/etpub/pdfs/1102e.pdf

*See also* New York Conflicts of Interest Board Advisory Opinion No. 2017-1 (Revised), in which the Board explained that although the endorsement of candidates for elective office is a political activity, a City official may use his or her City title in connection with the endorsement of

content (such as endorsements for upcoming elections for public office, sample ballots, political party-based messages, links for users to make political contributions, *etc.*), however, is not the same as maintaining a personal, non-official social media account, such as the one our Executive Director reviewed, that *de facto* includes governmental information, *e.g.*, a calendar of job fairs and ward nights, and/or posts promoting such events and otherwise publicizing City services – because the public will reasonably view this kind of "personal" page as directly related to the official's performance of their governmental duties. Put another way, these "personal" pages will either tend toward being an "official" page (as in Case No. 15014.C), or a "political/campaign" page, depending on the bulk of the content on the page.

Accordingly, if an alderman wishes to maintain such a "personal page," we advise that he or she in effect have three (3) distinct social media pages:

(1) one that is purely political/campaign-related, and may include political or electioneering content such as endorsements, political advertisements, party-supplied content, sample ballots, links for campaign donations, or other kinds of electioneering communications or postings (note: this page may identify the alderman as an alderman, and may also include factual statements about the alderman's accomplishments in office, and photographs of the alderman at ground-breaking ceremonies, *e.g.*, *but no images or likenesses of the official City seal* (per Board Case No. 18036.A1, cited in fn. 7, above)), and of course, this page may not be funded with City money, and City employees or campaign staff may not maintain this kind of page on or with City property, such as during compensated City time or in or with City offices, computers, smart phones, *etc.*;

(2) a second, "personal page," that *could* include governmental information, such as photographs of the alderman in his or her capacity as alderman, <u>or even the City seal</u>, and links to City services or operating departments, but if it does, then it may NOT include electioneering content; and

(3) should the alderman wish, a third, "official" City site, that can be funded with City (or political[12]) money, with the assistance of professionals at the City's Department of Innovation and Technology, and that can display all official City insignia, including the City seal, and have links to City departments, but may NOT have any electioneering content on it.

In all cases, aldermen should take reasonable steps to ensure that shared content avoids creating the impression that a political/campaign or "personal" account is a City resource or an official City account. Further, as we have advised informally, but now formally: an "official" City site *cannot* include links and/or information regarding an alderman's political/campaign social media pages, nor even a disclaimer that the page is an official City page, not a political/campaign page, nor a link re-directing users to the political/campaign page.

ii.  <u>Blocking or deleting comments, friends or followers.</u>  Second, we address whether and to what extent elected officials can block and/or delete followers or "friends" and/or delete comments. We first note that this is a fluid area of the law. In a case that centers on the issue of how the First Amendment applies to social media platforms used by government officials to interact with people, *Knight First Amendment Institute v. Trump*, 302 F.Supp.3d 541 (S.D.N.Y. 2018), *appeal filed*, Dkt. No. 18-1691 (2d Cir. June 5, 2018),[13] a New York federal district court recently ruled that, when an elected official uses a personal

---

candidates for elective office. Accordingly, an elected official may speak as an elected official on his or her personal social media account. https://www1.nyc.gov/assets/coib/downloads/pdf5/aos/2017/AO2017_1.pdf

[12] We note here the Illinois Election Code specifically authorizes City elected officials (and other elected officials in the State) to use funds from their official candidate committees "to defray the customary and reasonable expenses . . . in connection with [their] performance of governmental and public service functions." *See* 10 ILCS 5/9-8.10(c). How a site is funded does not determine whether it is a "City," "personal" or "political/campaign" site. Only its content is relevant in making that determination, and thus which postings can or cannot be made on them.

[13] The U.S. Department of Justice has appealed the Second Circuit's ruling and the appeal is pending.

account to take or describe actions in his or her official capacity, the account becomes a public forum. Thus, comments posted to this type of account are protected by the First Amendment and cannot be deleted, and those commenting cannot be blocked from accessing the account.  In *Knight*, the plaintiffs were seven (7) individuals who were blocked by President Trump from viewing or responding to tweets from his "personal" Twitter account.[14] The plaintiffs argued that, by blocking people from reading his tweets, or from viewing and replying to message chains based on them, the President violated their First Amendment rights because they expressed views he did not like. The District Court agreed, holding that the President's actions in barring access of users to his account were the result of viewpoint discrimination in violation of the First Amendment.  The case is on appeal to the Second Circuit.

Accordingly, the Board advises that elected officials whose "personal" account includes postings commenting on public affairs or matters involving City government, **should not** block followers from accessing such pages or delete critical comments, **unless** the user's comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods or services.[15] Moreover, we strongly recommend that personal accounts (and of course political/campaign accounts) that include political content include a policy, visible on the main page, outlining posting guidelines and explaining that postings are moderated and what types of comments will be deleted. However, if an alderman's personal account does not include content related to political/campaign or official City business, but is truly "personal," with postings only about non-work related matters like the official's family, vacations, favorite movies, restaurants, sports teams' performance, *etc.*, then the official is **not** required to provide access to all members of the public, and nothing in the Ordinance prohibits the official from blocking or deleting comments, users, or followers.  We express no opinion regarding whether users can be blocked or deleted from purely political/campaign pages or accounts, as that is beyond the purview of this Board or the Ordinance.  We urge those maintaining such sites to consult with qualified counsel before blocking or deleting users.

Finally, regardless of the type of social media account at issue, the Board urges that all posted content be true and accurate to the best of the poster's knowledge.

## IV.  Conclusion

The Board's conclusions and advice are based solely on the application of the Ethics Ordinance to the situations and facts described in it. Other laws and/or regulations may apply.  As the issues surrounding social media are often fact-specific, we urge Chicago's elected officials to seek confidential guidance from Board staff with any questions they may have about social media use and the appropriateness of a specific posting.

William F. Conlon
Board Chair

---

[14] The Twitter handle at issue is @realDonaldTrump.
[15] *See also* Seattle Ethics and Elections Commission, Opinion 11-02E:  http://www.seattle.gov/ethics/etpub/pdfs/1102e.pdf

Exhibit 3

filed under seal

filed under seal



BOARD OF ETHICS

CITY OF CHICAGO

**PRESS RELEASE**

January 8, 2019

In response to inquiries raised by numerous aldermen to the staff of the Board of Ethics, the Board has issued Advisory Opinion 18038.A.1, addressing the use of social media accounts such as Facebook or Twitter by City of Chicago elected officials or candidates, Chicago Police Department personnel, and, by extension, City employees and officials generally.

The opinion addresses the three (3) primary types of social media accounts or websites used by City elected officials: (i) official City pages; (ii) political/campaign pages; and (iii) personal pages that typically have elements of the first two. It discusses in detail what content can be posted to each type of account, consistent with the City's Governmental Ethics Ordinance. The Executive Summary section of the opinion provides an overview of the Board's advice and determinations with respect to each type of account. The opinion also establishes general rules covering, among other topics: (i) when disclaimer language should be used; (ii) when the City seal and/or other official indicia of the City can be used, and when they cannot be used; (iii) when account administrators can block followers or delete comments; and (iv) the key distinction between "political" commentary or content and "electioneering" content — the latter cannot be posted on any account or page that is or functions as an official City account page by, for example, dispensing information to constituents about how to request City services.

Please contact the Board at 312-744-9660 with questions.

OIG-21-CV-3240-000150
Confidential, Subject to Protective Order 21-CV-3240(N.D. Ill)



BOARD OF ETHICS

CITY OF CHICAGO

**ADVISORY OPINION**

Date:    January 8, 2019

Re:    Case No. 18038.A.1, Use of Social Media; City-owned Property, Prohibited Political Activity

---

<u>Executive Summary</u>

This Board of Ethics advisory opinion addresses: (i) the use of social media accounts[1] by City of Chicago elected officials and Chicago Police Department personnel, and, by extension, City employees and officials generally; and (ii) what content can be posted to each type of social media account, consistent with the City's Governmental Ethics Ordinance (the "Ordinance"). There are three (3) essential types of these accounts or sites discussed: (i) official, (ii) political/campaign, and (3) "personal" ones displaying elements of the first two.

The issues we address are nuanced.  Websites, Facebook pages, Twitter accounts – all are, by design and intention – personalized.  Yet, we can, and do here, establish the following general rules:[2]

• City elected officials' "political/campaign" (as described below) websites or social media accounts may include content regarding City/ward business, provided these websites or accounts: (i) are not funded or maintained with City resources; (ii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; and (iii) contain appropriate disclaimer language on the main page identifying the accounts as personal, non-governmental accounts that do not represent the official policies or positions of the City of Chicago.

• Elected officials may post political or electioneering content on their "personal" (and, of course, their "political/campaign") accounts or websites, including friendly or critical commentary on other politicians or their policies, campaign donation links, sample ballots, candidate endorsements, etc., provided these accounts or pages: (i) are not funded or maintained with City resources; (ii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; and (iii) contain appropriate disclaimer language on the main page identifying the accounts as personal, non-governmental accounts that do not represent the official policies or positions of the City of Chicago.

• If City elected officials' "official" or "personal" websites or social media accounts (as described below) do include the City seal and/or other indicia of an "official" City or ward website and otherwise meet the criteria described above, they must remain free of "electioneering" content, such as "Reelect me for the

---

[1] For purposes of this opinion, "social media" refers to, but is not limited to, Facebook, Instagram and Twitter accounts.  The meaning of the term "social media" for purposes of this opinion is Merriam-Webster's: "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos)."  *See* https://www.merriam-webster.com/dictionary/social%20media

[2] This advisory opinion is intended to supplement the **Handbook for Effective and Ethical Ward Operations,** First Edition (2019) (the "Handbook"), currently being produced by the City Council's Committee on Workforce Development.  The *Handbook* contains significant content written by staff of the Board of Ethics and our staff will update it accordingly.

740 NORTH SEDGWICK STREET, SUITE 500, CHICAGO, ILLINOIS 60654

Case No. 18038.A.1    January 8, 2019

following reasons …" and may have no links to any political committee or for making campaign donations, even if the sites or accounts are funded fully with political or campaign funds and include any legally mandated language about their funding.

• Elected officials whose "personal" social media accounts include political content, such as political endorsements and/or opinion pieces on topics related to official City business, or include no political content but include postings commenting on public affairs or matters involving City government, **should not** block or delete followers from accessing such pages or delete critical or negative comments, unless the comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods or services.

• Chicago Police Department ("CPD") personnel are prohibited, pursuant to a departmental order, from posting intellectual property of the CPD or the City of Chicago, such as badges and logos, on their personal social media accounts.

## I. Background

Several questions were posed to Board staff by aldermen before, during and after our agency's budget hearing on October 30, 2018, regarding how the Ordinance limits what elected officials (and CPD personnel) may post on social media platforms, namely, their "official City" pages; their purely "political" pages; and their "personal" pages. This opinion addresses these questions.

Some City elected officials may have all three types of pages, while others may have only one or two.

In addition to the questions posed at the budget hearing, requests for informal advisory opinions and guidance from aldermen and other elected officials or their staff regularly come to the Board by phone or email regarding whether, and to what extent, the Ordinance applies to aldermanic social media accounts and what content can be posted, and on which accounts. This opinion is intended to address these as well.

The Board recognizes the ever-expanding role of social media as a means of communication[3], and, in turn, the increase in the number and complexity of related issues raised. In the course of preparing this opinion, our staff has examined dozens of "official," "personal," and "political" social media account and websites of City, state, and federal elected officials. Accordingly, and as stated by our Executive Director at our agency's budget hearing, we issue this formal advisory opinion pursuant to our authority under §§2-156-380(e) and (l) of the Ordinance.

## II. Relevant Governmental Ethics Ordinance Provisions

In this opinion, we discuss and interpret two (2) Ordinance sections. They are:

**§2-156-060. City-owned property. No official or employee shall engage in or permit the unauthorized use of any real or personal property owned or leased by the City for City business.**

**§2-156-135. Prohibited political activities…**
**(b)        No official or employee shall intentionally misappropriate any city property or resources of the city in connection with any prohibited political activity; provided, however, any official or employee may reserve and rent a city-owned facility at a fair market value before any such activity or event connected therewith.**

---

[3] In a 2017 case, the U.S. Supreme Court recognized that social media platforms like Facebook and Twitter provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S.Ct. 273, 582 U.S. _ (2017).

2

OIG-21-CV-3240-000152
Confidential, Subject to Protective Order 21-CV-3240(N.D. Ill)

Case No. 18038.A.1    January 8, 2019

### III. Application of the Ethics Ordinance to the Questions Posed

A. Chicago Police Department Personnel. Prior to our budget hearing, Alderman         asked "what are the limits in terms of posting political content on one's Facebook or Twitter or Instagram page, particularly for City employees, like Chicago Police Department ["CPD"] members, who may describe themselves factually as Chicago Police personnel, or even display a CPD badge or reasonable facsimile thereof on their social media pages?"

With respect to the alderman's specific question regarding CPD officers who may describe themselves factually as police officers and/or display a Department badge on their personal social media pages, the CPD's General Order G-09-01-06(V)(c)[4] prohibits the "posting, displaying, or transmitting" on social media outlets of:

   (5) any intellectual property of the Department or the City of Chicago without the specific authorization of the Superintendent or his/her designee. Department or City of Chicago  intellectual property includes but is not limited to logos, uniforms, [and] official photographs…

Police departments across the country have policies similar to that of CPD.[5] In light of CPD's order regarding the use of social media, the Board advises that, while CPD officers cannot post the intellectual property of the department, such as a badge, on their social media accounts, they may use their job title, and may post political content, provided they: (i) include disclaimers making it clear that they are not speaking for the Chicago Police Department; and (ii) comply with any CPD-specific directives and rules.

B. Elected Officials' Social Media Pages.  We set our discussion of elected officials' social media accounts and websites in the context of the overarching general principle: government funds or resources should not be spent to help incumbents gain reelection.[6]

With that cardinal rule in mind, we advise, in general, that non-official "personal" or "political" social media accounts of City elected officials (or any City employees or officials) who may wish to comment on public affairs or matters involving City. State, or federal government policies or politicians include a disclaimer, visible on the account's main page, identifying the account as a personal or political account. For example:

*"This is the personal, non-governmental account of Alderman Jane Smith" or "This is the political account of the Friends of Jane Smith, and is paid for entirely by funds from that organization in accordance with any applicable State laws or policies."*

Or

*"This is a private account that contains my personal views and impressions. While I may occasionally provide information of an official nature as a convenience to my readers, this is not an official social media account of the City of Chicago and does not represent the official policies or positions of the City of Chicago (or the Department of X or the City Council")*.

---

[4] http://directives.chicagopolice.org/directives/data/a7a57bf0-135f9205-ceb13-5f94-7e998c13b2be7890.pdf

[5] *See, e.g.*, Philadelphia Police Directive 6.10 http://www.phillypolice.com/assets/directives/D6.10-SocialMediaAndNetworking.pdf;  Minneapolis Police Department Policy and Procedure Manual http://www.minneapolismn.gov/police/policy/mpdpolicy_1-300_1-300; and Albuquerque Police Department Order SOP1-2 http://documents.cabq.gov/police/standard-operating-procedures/1-02-social-media.pdf

[6]  *See Common Cause v. Bolger*, 574 F. Supp. 672,683 (D.D.C. 1982), aff'd, 461 US 911 (1983); *see also* Board Case No. 18038.A.2, in which we determined that aldermen and their staffers may not engage in "political activity" (as defined) in or with visitors to their City or ward office, but that they may give out general information such as where to vote and assist walk-ins in completing voter registrations form while on City time or with City resources, though these activities are fraught: no "political activity" can occur. https://www.chicago.gov/content/dam/city/depts/ethics/general/AO_ElectOfficials/18038.A.2.pdf

3

Case No. 18038.A.1    January 8, 2019

Similarly, should City elected officials have Twitter (or Facebook) accounts that link to or list their "City" or "official" website or pages (*e.g.*, in the left-hand column, underneath the user's profile (@) and location icons (♀), or next to the user's website icon (✎), then: (i) if they choose to include "electioneering" content (for example, "reelect me because …" or "my opponent claims this … here's why that's bad policy …") on these accounts, the accounts become "political" or campaign accounts, and thus cannot contain any links to their "City" or any other "personal" website or social media account that displays the City seal[7]; and (ii) the Twitter (or Facebook) pages must have a prominent disclaimer such as the following: "This is the political, non-official twitter account of Alderman A, and represents his or her personal and political views only.  To view his or her official Aldermanic Twitter account, see @AldermanChicago51."

However, we note that our examination of dozens of websites and Facebook and Twitter accounts shows that many include political commentary (for example, retweeting President Trump's tweets with critical commentary) but are not otherwise campaign or "political" sites.  We conclude that such postings are analogous to public statements politicians regularly make to the media, and are qualitatively different from "electioneering" content.  While we recognize that this distinction – which is a critical one – may be subtle in some instances (some could argue that all actions or posting made by an incumbent are in part to secure reelection), we here determine that "electioneering content" may occur only on "political" or campaign websites or accounts, and that any site or account that contains such statements may not contain links to their official City pages or any other pages or accounts that display the City seal.

C.  Posting Community Events or Other Notices. Aldermen                    and           raised additional questions regarding what they can post on their official City and their political or personal social media pages. The general advice outlined in section III.B of this opinion is responsive to their questions.

However, Alderman            question was more specific. He has two Facebook pages. On one, he advertises ward events, like job fairs, and posts links to City operating departments (like the Departments of Planning & Development, Water Management, Streets & Sanitation, and Transportation), and his ward newsletter, many of which postings feature the City seal.  (This site, we conclude, is and functions as an "official" City site, regardless of how it is funded.) He has another page that is for his re-election campaign, which does not display the City seal, but of course uses his title, "Alderman."  (This site includes political content, and a link for users to contribute to his re-election campaign – we conclude that it is "political" and subject to the conditions described two paragraphs below and in section III.B, above).

His question: a local business is hosting a free shredding event, and he knows it is of interest to his constituents. May he post a notice advertising the event on *both of these* pages?

The answer: it depends. We advise that, if he received notice of this event as alderman, and no other residents or campaign opponents received notice of the event, then he cannot post it on his political page (but of course can post it on his "official page"). However, if the event is in fact advertised by its host on

---

[7] An already-settled question is whether a City elected official can include the City seal or other indicia of an official City or ward social media platform (like Facebook or Twitter) on a "political/campaign" or "personal" website or social media account. In Case No. 15014.C, we issued a letter of admonition to an alderman whose campaign-funded website had become "in effect, a City or ward website" precisely because it had all the indicia of an official City/ward site," but it also included a button for making campaign donations.  This was a problem. On the Board's advice, the alderman immediately removed the donation button from this website, and placed it on his campaign website. The Board determined that having this political contribution button on the site – which he thought of as his campaign-funded, "personal" website – but which included the City seal, links for residents or other users to request City services, information about ward nights, and news – constituted an improper use of City-owned property for political purposes in violation of §2-156-060 of the Ordinance (prohibiting unauthorized use of City-owned property), and created the impression that the City officially supported the alderman's candidacy, in violation of §2-156-135(b) of the Ordinance (prohibiting the use of City property or resources for any prohibited political activity). The Board advised the alderman that, if a website/social media account includes "the City seal and/or other indicia of an official City or ward website," it cannot include electioneering content and may have no links to a political committee or links for making campaign donations, even when the site is fully campaign-funded and includes any legally mandated language about its funding.  *See* https://www.chicago.gov/content/dam/city/depts/ethics/general/AOMinorViolations/15014.mem.doc.

More recently, in Case No. 18036.A1, the Board recently determined that *no person* may use the City seal in any printed, filmed, broadcast or web-based electioneering communications supporting a candidate for City office, unless the appropriate City authorities specifically authorize it, by ordinance or licensing agreement. *See* https://www.cityofchicago.org/content/dam/city/depts/ethics/general/AO_PolActvty/18036.A.1.pdf.

4

Case No. 18038.A.1     January 8, 2019

(but of course can post it on his "official page"). However, if the event is in fact advertised by its host on the host's own social media pages, or through mass media like hyper-local newspapers, websites, radio, etc., then the alderman may use it on *both* pages – as could his election opponents, as it's public information.

More generally, we reiterate the principle that aldermens' "personal" or "political/campaign" social media pages or websites may include content regarding City/ward business, provided these pages or sites: (i) are not funded or maintained with City resources; (ii) do not use or display the City seal or any likeness thereof; (iii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; (iv) may have newsworthy content (for example, they may have photos of the alderman participating in ground-breaking ceremonies for new construction in the ward with other elected officials and business leaders, or discuss how many miles of streets or water mains have been improved during the alderman's term, or other achievements the alderman has had while in office), with links to an official City site to back up such claims (*e.g.*, a link to a bulletin from the website of the Chicago Department of Transportation); and (v) state clearly and prominently that the sites are the aldermens' (or employee's or other official's) own personal or political/campaign website or social media page and do not represent the official views of the City.[8]

We have also been asked whether aldermen can convert their pre-existing "personal" social media accounts to a political/campaign account. Our advice is that, if the "personal" pages or accounts have displayed links to City services, or ward events, ward newsletters, or other indicia of an "official" account (*see* Case No. 15014.C, discussed in fn. 7), then the aldermen may *not* convert those accounts into political/campaign pages or accounts, which would thereby in effect convert these pages' subscribers, followers or friends and their contact information to what would now be a political/campaign account.[9]

D.  Posting Political Photos; Blocking or "Defriending" Users. Following the budget hearing, Alderman shared her Facebook page with the Board's Executive Director. The page has announcements and photos of her appearing as alderman at various public events, and photos of her appearing with other politicians. It also has City service announcements on it, as well as her official reaction as alderman to the Van Dyke verdict,[10] and links to her ward newsletter. She asked whether: (i) she can post her political endorsements on this page; and (ii) whether she can block/defriend followers who have posted profanity and/or called her racist or other offensive names on the page. As we explain, our answers are: (i) no: we advise creating a third purely "political/campaign" page or account to do this; and (ii) users or followers can be deleted or blocked only under rare circumstances.

i.  Political photos or other political content. First, we address whether elected officials can post political endorsements or other political content on "personal" social media pages or platforms like this one, which is not purely "official" or purely "political". The Board has consistently advised City elected officials that they may share political content on their *personal* or *political/campaign* accounts.[11]   Posting political

---

[8] The Board advises that disclaimers must be prominent, written in a font that is easily legible, and in a color that contrasts with the background, following the example of the City of Los Angeles. *See* LAMC § 49.7.34(A): https://ethics.lacity.org/wp-content/uploads/2018/02/law_CFO_2017.pdf

[9] Analogously, our colleagues at the New York City Conflicts of Interest Board have determined that a list of contact information maintained by an elected official's City office to disseminate official City communications is a City resource and therefore cannot be used for any non-City purpose. They have also said, and we agree, that the opposite transfer is allowable: an elected official may accept from his or her campaign the campaign-maintained list of email addresses or contact information and use this in pursuit of his or her own official City duties. *See* COIB Advisory Opinion No. 2017-4, at 8-9, https://www1.nyc.gov/assets/coib/downloads/pdf/5aos/2017/AO2017-4.pdf. *See also* Handbook, at 4.4.1.

[10] *See* https://www.chicagotribune.com/news/local/breaking/ct-met-laquan-mcdonald-jason-van-dyke-trial-verdict-20181005-story.html

[11] Similarly, in Advisory Opinion 11-02E, the Seattle Ethics and Elections Commission determined that if a public official maintains a personal social media account, and does **not** provide links to these platforms from a City social media account or other City communication, then the official can post political or electioneering material to the site. http://www.seattle.gov/ethics/etpub/pdfs/1102e.pdf

*See also* New York Conflicts of Interest Board Advisory Opinion No. 2017-1 (Revised), in which the Board explained that although the endorsement of candidates for elective office is a political activity, a City official may use his or her City title in connection with the endorsement of

5

content (such as endorsements for upcoming elections for public office, sample ballots, political party-based messages, links for users to make political contributions, *etc.*), however, is not the same as maintaining a personal, non-official social media account, such as the one our Executive Director reviewed, that *de facto* includes governmental information, *e.g.*, a calendar of job fairs and ward nights, and/or posts promoting such events and otherwise publicizing City services – because the public will reasonably view this kind of "personal" page as directly related to the official's performance of their governmental duties. Put another way, these "personal" pages will either tend toward being an "official" page (as in Case No. 15014.C), or a "political/campaign" page, depending on the bulk of the content on the page.

Accordingly, if an alderman wishes to maintain such a "personal page," we advise that he or she in effect have three (3) distinct social media pages:

(1) one that is purely political/campaign-related, and may include political or electioneering content such as endorsements, political advertisements, party-supplied content, sample ballots, links for campaign donations, or other kinds of electioneering communications or postings (note: this page may identify the alderman as an alderman, and may also include factual statements about the alderman's accomplishments in office, and photographs of the alderman at ground-breaking ceremonies, *e.g.*, *but no images or likenesses of the official City seal* (per Board Case No. 18036.A1, cited in fn. 7, above)), and of course, this page may not be funded with City money, and City employees or campaign staff may not maintain this kind of page on or with City property, such as during compensated City time or in or with City offices, computers, smart phones, *etc.*;

(2) a second, "personal page," that *could* include governmental information, such as photographs of the alderman in his or her capacity as alderman, or even the City seal, and links to City services or operating departments, but if it does, then it may NOT include electioneering content; and

(3) should the alderman wish, a third, "official" City site, that can be funded with City (or political[12]) money, with the assistance of professionals at the City's Department of Innovation and Technology, and that can display all official City insignia, including the City seal, and have links to City departments, but may NOT have any electioneering content on it.

In all cases, aldermen should take reasonable steps to ensure that shared content avoids creating the impression that a political/campaign or "personal" account is a City resource or an official City account. Further, as we have advised informally, but now formally: an "official" City site *cannot* include links and/or information regarding an alderman's political/campaign social media pages, nor even a disclaimer that the page is an official City page, not a political/campaign page, nor a link re-directing users to the political/campaign page.

ii.  Blocking or deleting comments, friends or followers.  Second, we address whether and to what extent elected officials can block and/or delete followers or "friends" and/or delete comments.  We first note that this is a fluid area of the law.  In a case that centers on the issue of how the First Amendment applies to social media platforms used by government officials to interact with people, *Knight First Amendment Institute v. Trump*, 302 F.Supp.3d 541 (S.D.N.Y. 2018), *appeal filed*, Dkt. No. 18-1691 (2d Cir. June 5, 2018),[13] a New York federal district court recently ruled that, when an elected official uses a personal

---

candidates for elective office.  .Accordingly, an elected official may speak as an elected official on his or her personal social media account. https://www1.nyc.gov/assets/coib/downloads/pdf5/aos/2017/AO2017_1.pdf

[12] We note here the Illinois Election Code specifically authorizes City elected officials (and other elected officials in the State) to use funds from their official candidate committees "to defray the customary and reasonable expenses . . . in connection with [their] performance of governmental and public service functions." *See* 10 ILCS 5/9-8.10(c). How a site is funded does not determine whether it is a "City," personal" or "political/campaign" site. Only its content is relevant in making that determination, and thus which postings can or cannot be made on them.

[13] The U.S. Department of Justice has appealed the Second Circuit's ruling and the appeal is pending.

OIG-21-CV-3240-000156
Confidential, Subject to Protective Order 21-CV-3240(N.D. Ill)

account to take or describe actions in his or her official capacity, the account becomes a public forum. Thus, comments posted to this type of account are protected by the First Amendment and cannot be deleted, and those commenting cannot be blocked from accessing the account.  In *Knight*, the plaintiffs were seven (7) individuals who were blocked by President Trump from viewing or responding to tweets from his "personal" Twitter account.[14] The plaintiffs argued that, by blocking people from reading his tweets, or from viewing and replying to message chains based on them, the President violated their First Amendment rights because they expressed views he did not like. The District Court agreed, holding that the President's actions in barring access of users to his account were the result of viewpoint discrimination in violation of the First Amendment.  The case is on appeal to the Second Circuit.

Accordingly, the Board advises that elected officials whose "personal" account includes postings commenting on public affairs or matters involving City government, ***should not*** block followers from accessing such pages or delete critical comments, ***unless*** the user's comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods or services.[15] Moreover, we strongly recommend that personal accounts (and of course political/campaign accounts) that include political content include a policy, visible on the main page, outlining posting guidelines and explaining that postings are moderated and what types of comments will be deleted. However, if an alderman's personal account does not include content related to political/campaign or official City business, but is truly "personal," with postings only about non-work related matters like the official's family, vacations, favorite movies, restaurants, sports teams' performance, *etc.*, then the official is **not** required to provide access to all members of the public, and nothing in the Ordinance prohibits the official from blocking or deleting comments, users, or followers.  We express no opinion regarding whether users can be blocked or deleted from purely political/campaign pages or accounts, as that is beyond the purview of this Board or the Ordinance.  We urge those maintaining such sites to consult with qualified counsel before blocking or deleting users.

Finally, regardless of the type of social media account at issue, the Board urges that all posted content be true and accurate to the best of the poster's knowledge.

## IV.  Conclusion

The Board's conclusions and advice are based solely on the application of the Ethics Ordinance to the situations and facts described in it. Other laws and/or regulations may apply.  As the issues surrounding social media are often fact-specific, we urge Chicago's elected officials to seek confidential guidance from Board staff with any questions they may have about social media use and the appropriateness of a specific posting.

William F. Conlon
Board Chair

---

[14] The Twitter handle at issue is @realDonaldTrump.
[15] *See also* Seattle Ethics and Elections Commission, Opinion 11-02E:  http://www.seattle.gov/ethics/etpub/pdfs/1102e.pdf

7

OIG-21-CV-3240-000157
Confidential, Subject to Protective Order 21-CV-3240(N.D. Ill)

Exhibit 4



**Alderman Jim Gardiner**
January 27, 2021 · 🌐

#BetheLightintheDarkness
#holocaustremembranceday2021



👍😢🥰 179          48 Comments  21 Shares

👍 Like          💬 Comment          ↗ Share

10:00

Exhibit 5

# facebook

🏠 👥 ▶️ 🏪 🔔 ☰

*International Holocaust*
*Rememberance Day*

👍😢❤️ 113     57 Comments • 15 Shares

👍 Like          💬 Comment          ↗️ Share

**Adam Vavrick**
This morning at the City Council meeting, you voted "No" on expanded immigrant protections. When i heard your vote registered, i sat there considering it as i went about my day, and then i started thinking about the kids in cages, right here in the US, and how those kids are a painful reminder of the USA's racist, xenophobic & tireless war on immigrants, and it's impossible not to remember, on this solemn day, the lesson of the MS St. Louis that sailed from Germany in 1939 with 700ish Jews on board seeking asylum. They were denied entry by the USA, Cuba & Canada, eventually forced to head back to Europe. Historians estimate around 250 were murdered in the death camps that, wouldn't ya know it, started as a way of simply housing

|||     ◯     ‹

10:00 LTE



separated families.

Based on your vote today, i believe you would have voted to keep the MS St. Louis from landing at our shores.

The lessons and parallels should be plainly obvious to anyone who isn't smooth-brained, and yet even today, you, proud Irish immigrant whose family surely heard the cries of NO IRISH or worse, chose to vote No to protect those who need protecting.

You profess to be at least mildly Catholic, right?

"He executes justice for the fatherless and the widow, and loves the sojourner, giving him food and clothing. Love the sojourner, therefore, for you were sojourners in the land of Egypt." (Deuteronomy 10:18)

Yet, you still vote "No."

--

For everyone else that's not Jim reading this: there's really nothing anyone can do to bring back my

10:00 ☑ 🖼 ··                    �e 🔪 LTE .ull 🔋

# facebook                     

     

protect those who need protecting.

You profess to be at least mildly Catholic, right?

"He executes justice for the fatherless and the widow, and loves the sojourner, giving him food and clothing. Love the sojourner, therefore, for you were sojourners in the land of Egypt." (Deuteronomy 10:18)

Yet, you still vote "No."

--

For everyone else that's not Jim reading this: there's really nothing anyone can do to bring back my relatives who were gassed or shot dead in the ditches they had to dig in the frozen ground, but what you CAN do is work with me to make sure that it never happens again to anyone else, and that work starts with who you vote for....all the way down at the local level.

 Write a comment...            

|||     ◯     ‹

 **Alderman Jim Gardiner**
January 27 · 🌐

Exhibit 6

• • •

Today, #HolocaustMemorialDay, we honor the lives lost during the Holocaust.



 124

53 Comments  5 Shares

👍 Like          💬 Comment          ↪ Share

Most relevant ▾

  Write a comment...          

Press Enter to post.

**Darren Urbaszewski**
As a Catholic, these people will never have my respect.





**Darren Urbaszewski**
As a Catholic, these people will never have my respect.



Like    Reply    33w



**Daniel Russell**
**Darren Urbaszewski** why are posting photos of masons?

Like    Reply    33w



**Pete Czosnyka**
**Daniel Russell** another failure by Jim Gardiner

Like    Reply    33w



**Darren Urbaszewski**
**Daniel Russell** with so much inflation and other trust issues between the powers that be and regular folks, I don't know if you Jews have the same power to squash dissent like you did just a few years ago. But we'll see. Just keep a fresh set of your man panties nearby in case you get upset.

Like    Reply    33w    Edited



**Jeff Mcnally**
Daniel Russell make sure you screenshot that random post,so you can say Jim Gardiner and his supporters are antisemitic in the future,lol,I'm pretty sure that's even a made up person by people who don't like the alderman

Like    Reply    33w                                    



**Pete Czosnyka**
**Jeff Mcnally** this isn't DUs first anti-semitic comment that remains unchallenged by the Alderman of many failures

Like    Reply    33w

Exhibit 7

| | |
|---|---|
| **From:** | Steve Held |
| **To:** | reportcorruption@igchicago.org |
| **Cc:** | Steve Berlin |
| **Subject:** | Gardiner hiding constituent comments |
| **Date:** | Tuesday, September 1, 2020 9:18:00 PM |
| **Attachments:** | image001.png |
| | image003.png |
| | image004.png |

Alderman Gardiner is once again hiding constituent comments. Someone asked for proof of his history of stalking. I simply provided the relevant court documents. My two comments with screenshotted below with documents have been hidden.

https://www.facebook.com/AldermanGardiner/posts/607713150112762?
comment_id=607862616764482&notif_id=1599011946676624&notif_t=feedback_reaction_generic&ref=notif

Under this thread





This is incognito mode and you see my comments are hidden.

2h

**Sheila Hall Moreno** Nadine Ann it's funny how telling me I should move for not supporting our alderman and not sharing your views is telling me I don't have a right to take part in our democracy which is my right and freedom as a citizen but when asked to say it plainly you seem to struggle so.

2h · Edited        1

**Michael Zamora** Sheila Hall Moreno Stalker? Any facts to back up these allegations? If so let's get the alderman involved

2h        1

**Sheila Hall Moreno** Michael Zamora a simple FOIA request will show you the Aldermans history as a stalker

1h · Edited        2

**Steve Held** Sheila Hall Moreno funny how none of these people feel the need to pick up and move when they disagree with the previous Alderman, State Rep, State Senator, Congressman, or Governor.

23m        2

**Tom Schraeder Sr.** Sheila Hall Moreno
WOW!!!!
You got ALL OF THAT from the Alderman helping our community?



19m · Edited

**Sheila Hall Moreno** Tom Schraeder Sr. If hate has no home here then why do they have a home in the racist letters being sent to residents?
And please do tell how the alderman is helping the

Exhibit 8

3. Peter Barash comments (2) to Kara Adele
    a. Post: https://www.facebook.com/AldermanGardiner/posts/673212670229476
    b. Comment (JG hid the comment tagging Kara Adele and the comment with the screenshot of that same comment which he posted after the original was hidden) https://www.facebook.com/AldermanGardiner/posts/673212670229476?comment_id= 673311713552905&reply_comment_id=674765523407524
    c. NOTE: Around the same time, Kara Adele messaged the LSC at Barash's school. One of the examples of Gardiner rallying his fans to go after critics' at their place of employment. She doesn't reside in the city, but she is Facebook friends with people like Tom Schraeder and Vince Gerage and spouting the same "bully" line against Peter that they and Gardiner use. This is the message she sent the LSC:



d.   View as myself









e.   View as anon



Note above it says 4 replies but only two are displayed. JG hid Peter's comment and then hid Peter's comment with the screenshot of the hidden comment.



Exhibit 9



Exhibit 10

 **Alderman Jim Gardiner**
October 16, 2020 · 🌐

Thank you to our friends on the 5700 N Menard who came out today to acknowledge our efforts to improve long overlooked infrastructure issues on their street.

#besties



👍❤️ 136                                                                    143 Comments  5 Shares

👍 Like            💬 Comment            ↪ Share

Exhibit 11



**Vince Gerage**

**Michael Koffski** I seriously hope he chokes and I mean it with every fiber in my being. I don't intend to do anything to make sure that comes to fruition but if it happens... I'll use that obituary notice to clean up my dogs excrement that day.