```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     PETE CZOSNYKA, et al.,          )
 4                                   )
                     Plaintiff,      )
 5                                   )
                  -vs-               ) No. 21-cv-3240
 6                                   )
     JAMES GARDINER,                 )
 7                                   )
                     Defendant.      )
 8

 9

10              The deposition of TANYA KING, taken

11    pursuant to notice and the Federal Rules of Civil

12    procedure for the United States District Courts,

13    reported by Sally Durkin, Certified Shorthand Reporter

14    and Notary Public within and for the County of Cook,

15    State of Illinois, via Zoom videoconference from

16    Chicago, Illinois, on Monday, September 26, 2022 at

17    the hour of 12:00 o'clock p.m.

18

19

20

21

22

23

24
```

Page 2

```
 1   APPEARANCES:
 2
 3        LAW OFFICE OF ADELE D. NICHOLAS
          BY:  MS. ADELE D. NICHOLAS
 4        5707 West Goodman Street
          Chicago, Illinois  60630
 5        adele@civilrightschicago.com
          (847) 361-3869
 6
          and
 7
          LAW OFFICE OF MARK G. WEINBERG
 8        BY:  MR. MARK G. WEINBERG
          3612 North Tripp Avenue
 9        Chicago, Illinois  60641
          mweinberg@sbcglobal.net
10        (773) 283-3913
11
12             On behalf of the Plaintiffs.
13
14   ALSO PRESENT:
15
          Peter Czosnyka,
16        Steve Held,
          Adam Vavrick.
17
18
19
20
21
22
23
24
```

Page 3

```
 1                  I N D E X
 2
 3   WITNESS                      PAGE    LINE
 4
        TANYA KING
 5
     Examination By Ms. Nicholas     7     23
 6
 7                 EXHIBITS
 8
 9   EXHIBITS                     PAGE    LINE
10
     Exhibit No. 1                 14      2
11   Exhibit No. 2                 27      5
     Exhibit No. 3                 31      1
12   Exhibit No. 4                 33      5
     Exhibit No. 5                 40      7
13   Exhibit No. 14                46      8
     Exhibit No. 6                 47     22
14   Exhibit No. 7                 50     10
     Exhibit No. 8                 52      6
15   Exhibit No. 9                 55      6
     Exhibit No. 15                58     10
16   Exhibit No. 11                60     12
17
18
19
20
21
22
23
24
```

Page 4

```
 1        MS. NICHOLAS:  Can you please turn your camera on?
 2        THE WITNESS:  Do I have to have it on?  I have
 3   safety concerns as, I am assuming, this is being video
 4   recorded.
 5        MS. NICHOLAS:  It's not being video recorded.  The
 6   only --
 7        THE WITNESS:  Oh, okay.
 8        MS. NICHOLAS:  -- method of recording is going to
 9   be -- Ms. Durkin is the court reporter, and she will
10   take a transcription of everything.
11        THE WITNESS:  No worries.  As long as it's not
12   being video recorded.
13        MS. NICHOLAS:  Yeah.
14        THE REPORTER:  Before we proceed, I'll ask counsel
15   to agree on the record that under the current national
16   emergency, pursuant to Section 319 of the Public
17   Health Service Act, there is no objection to this
18   deposition officer administering a binding oath to the
19   witness remotely.
20             Please state your agreement on the
21   record.
22        MS. NICHOLAS:  Yes.  No objection.
23             And I'll just represent that I heard
24   from Mr. Gardiner's counsel this morning, who said he
```

Page 5

```
 1   was not going to be attending.  He'll just order a
 2   transcript after.
 3        THE REPORTER:  Anybody else want to agree?
 4        THE WITNESS:  Do I need to?  I agree.
 5        THE REPORTER:  Is other counsel there?
 6        MS. NICHOLAS:  Yeah.  So Mr. Carroll, who
 7   represents the defendant, is not going to attend.
 8        THE REPORTER:  Are you guys all with the same firm
 9   then?
10        MS. NICHOLAS:  So Mr. Weinberg is my co-counsel on
11   the case.
12             Mr. Held, Mr. Vavrick, and Mr. Czosnyka
13   are parties.  They're plaintiffs.  They're just here
14   to listen.
15        THE REPORTER:  Okay.
16             (Witness sworn.)
17        MS. NICHOLAS:  Ms. King, have you ever given a
18   deposition before?
19        THE WITNESS:  No.
20        MS. NICHOLAS:  So things go smoothly this
21   afternoon, I'll just go over a couple of ground
22   rulings.
23             The first and most important one is that
24   we can't talk at the same time.  It's because we have
```

TANYA KING, 09/26/2022                                    Page 6..9

Page 6

1  a court reporter taking down everything that's said,
2  and it's impossible to record two people talking at
3  once. So even if you know where I am going with my
4  question, just let me ask it completely before you
5  start to give your answer.
6          Likewise, if I start asking a new
7  question before you are done with your answer, just
8  raise your hand, and I'll let you finish before I
9  start a new question.
10         Okay?
11         THE WITNESS: Okay.
12         MS. NICHOLAS: By the same token, all your answers
13  today have to be verbal and out loud versus nods,
14  gestures, shakes of the head. Reason being, those
15  types of responses can't be recorded in a written
16  transcript, and we all want to be able to know what
17  happened during the deposition today.
18         Okay?
19         THE WITNESS: Okay.
20         MS. NICHOLAS: Answers like uh-huh and uh-uh do
21  not come out very clearly in a typed transcript. So
22  from time to time, if I say, is that a yes, or is that
23  a no, I am not doing that to be aggressive. I am just
24  doing that to make sure that we have a clear record.

Page 7

1          All right?
2  THE WITNESS: Okay.
3  MS. NICHOLAS: If I ask a question you don't
4  understand, say something, and I'll explain what I
5  mentor or ask a different question.
6          Because if you answer a question that's
7  asked this afternoon, we'll assume you understood it.
8          All right?
9  THE WITNESS: Okay.
10  MS. NICHOLAS: And then, finally, if you need to
11  take a break during the deposition, that's perfectly
12  permissible. Just let us know, and we can go off the
13  record temporarily for purposes of taking a break.
14          Only request we have regarding breaks is
15  that if there is a question pending, just answer the
16  question, and then we'll take a break.
17          All right?
18  THE WITNESS: Okay.
19          TANYA KING,
20          having been first duly sworn, was
21          examined and testified as follows:
22          EXAMINATION
23  BY MS. NICHOLAS:
24  Q. What did you do to prepare for your

Page 8

1  deposition?
2  A. Nothing.
3  Q. Did you talk to Alderman Gardiner about the
4  case?
5  A. No.
6  Q. Did you talk to Ethan Brady?
7  A. No.
8  Q. Did you review any documents in preparation
9  for the deposition?
10  A. No.
11  Q. How are you currently employed?
12  A. I'm currently employed. I don't want to
13  reveal my employer.
14  Q. Okay. If for purposes -- in the unlikely
15  event this case goes to trial, what would be the best
16  way for us to get a subpoena to you?
17  A. Email.
18  Q. Pardon?
19  A. Email.
20  Q. Okay. And that's the same email where I
21  contacted you in anticipation of this deposition?
22  A. Yes.
23  Q. Okay. And you're planning to keep that same
24  email address, and we'll be able to reach you there?

Page 9

1  A. You cut out the third word you said.
2  Q. Sure. You're planning to keep that same
3  email address so we could reach you there?
4  A. Yes.
5  Q. I understand you were previously employed in
6  the 45th Ward office with Alderman Jim Gardiner.
7          During what time period were you working
8  there?
9  A. In the office, I started the day after the
10  office opened. So I want to say that was maybe
11  May 21st of 2019. It was after -- though. And I left
12  my employment the Wednesday before Thanksgiving of
13  2019.
14  Q. Okay. So May through November of 2019?
15  A. Yes.
16  Q. What was your job title during that time?
17  A. It varied. It was -- sometimes I would be
18  called chief of staff. Sometimes I would be called
19  staff assistant.
20  Q. What were your duties?
21  A. Varied. I can't really even say what the
22  duties were. It was a very chaotic work environment.
23  I think it was basically just trying to keep the
24  office open and functioning.

TANYA KING, 09/26/2022                                    Page 10..13

Page 10

1     Q.  Was it mostly an administrative job?
2     A.  It was.  But everything leaned on a heavy
3  political slant.
4     Q.  What's your understanding of what this case
5  is about?
6     A.  Gardiner blocking people on Facebook and
7  other social media.
8     Q.  Okay.  That is a pretty good description of
9  what the case is about.
10       Plaintiffs allege that Mr. Gardiner violated
11  their First Amendment rights by blocking them from
12  their -- from his official Facebook page, and by
13  deleting or hiding particular comments that they had
14  posted.
15       While you were employed in the 45th Ward what
16  role, if any, did you play in managing Alderman
17  Gardiner's Facebook page?
18     A.  I comanaged it with him.  I would use it to
19  communicate with constituents, to potential voters,
20  with the community at large.
21       So if he wanted something posted, he would
22  tell me to post it.  He would text me photos, or
23  something along that nature, or say we should post
24  about this or that.

Page 11

1       Defendant Gardiner has difficulty composing
2  written sentences.  So he would give me basic
3  information so I could compose complete sentences for
4  him.
5     Q.  Okay.  So he would tell you he wanted to post
6  about a particular event or a photo, and ask you to
7  make a post on his behalf?
8     A.  Yes.
9     Q.  Were you involved in moderating content of
10  the page on his behalf?
11     A.  So, no, because -- just, no, I was not
12  involved in moderation.
13     Q.  Would you respond to comments that were left
14  on the page on his behalf?
15     A.  No.  I would not respond to comments.
16     Q.  Would you respond to messages that were sent
17  to the page?
18     A.  If I did, it was very rare.  Defendant
19  Gardiner was on the page 24/7.  So he would constantly
20  respond in the comment sections, and he would
21  constantly respond to the messages that -- the direct
22  messages that would come in.
23     Q.  Did you play any role in deciding what
24  content was permissible on the Facebook page while you

Page 12

1  were working for Alderman Gardiner?
2     A.  Yes.
3     Q.  How so?
4     A.  I constantly advised him all content was
5  permissible, and I would -- and I had a printed copy
6  of the -- the Board of Ethics had a document we all
7  received, and so I had had this on a corkboard in my
8  office, and it was highlighted.  And it was -- just I
9  highlighted, you can't moderate.  You just have to let
10  everything be posted.
11     Q.  Okay.  So you had actually printed out a copy
12  of the guidance, the ethics guidance from the Board of
13  Ethics about government officials' social media pages?
14     A.  Yes.
15     Q.  Had you ever discussed that document with
16  Alderman Gardiner?
17     A.  Routinely.
18     Q.  So your role in regulating content on the
19  page was to advise Mr. Gardiner that he couldn't block
20  people or delete comments?
21     A.  Yes.
22     Q.  While you were working for Alderman Gardiner,
23  who other than yourself had log-in credentials for the
24  Facebook page?

Page 13

1     A.  While I was working for Mr. Gardiner, Claudio
2  Medrano, M-E-D-R-A-N-O, I believe, or M-E-N-D-R-A-N-O,
3  and he's moved to Texas.
4     Q.  So Mr. Gardiner, yourself, and Mr. Medrano?
5     A.  Yes.
6     Q.  Anyone else?
7     A.  That's what I am trying to think.  No.
8     Q.  What was Mr. Medrano's role?
9     A.  None.  I honestly gave him admin access
10  because he was a web designer, and I thought he could
11  just make it a little prettier.
12     Q.  Okay.  That's fair.  So his only role in the
13  Facebook page was just aesthetically updating it?
14     A.  Right.  But he never did.  He never did
15  anything with it.  He never --
16     Q.  So, to your knowledge, did he have any role
17  in moderating the content on the Facebook page?
18     A.  Absolutely none.
19     Q.  How about posting to the page on
20  Mr. Gardiner's behalf?
21     A.  He never did.
22       MS. NICHOLAS:  Okay.  Let's -- I am going to share
23  my screen, and show you what I marked as Exhibit 1 to
24  your deposition.  It's a document you already

TANYA KING, 09/26/2022                                    Page 14..17

Page 14

1  mentioned.
2      (Whereupon, Exhibit No. 1 was identified.)
3  BY MS. NICHOLAS:
4      A.  I don't see anything.  Okay.
5      Q.  Okay.  Can you see Exhibit 1?
6      A.  Yes.
7      Q.  Okay.  So this is a press release from the
8  City of Chicago Board of Ethics dated January 8, 2019.
9  It is an 8-page document, and attached to the press
10  release is an advisory opinion called, Use of Social
11  Media, City-Owned Property, Prohibited Political
12  Activity.
13      Is this the ethics guidance you were talking
14  about?
15      A.  Yes.
16      Q.  You said that you printed out a copy that you
17  had highlighted and put on a corkboard in the 45th
18  Ward office.
19      Did you discuss this guidance with Alderman
20  Gardiner?
21      A.  Routinely.
22      Q.  When did you first receive a copy of it?
23      A.  I knew about this document when we were
24  campaigning.  I knew about this guidance when we were

Page 15

1  campaigning.  Gardiner and I would talk about it
2  during the campaign.
3      I printed out this document on my -- and I
4  didn't post all 8 pages.  I only printed out -- I
5  think if you scroll down a little bit, if it's this --
6  nope.  If you scroll back up.  I think it's just the
7  one page that it has the bullet points where it
8  completely says like -- there you go, this one --
9  should not block or delete followers.
10      This whole bullet point is what I had
11  highlighted.  Do you see that?
12      Q.  Yes.
13      A.  And then that page, that was on the
14  corkboard.  I didn't have all 8 pages or the press
15  release.  I just had this one page on the corkboard.
16      Q.  And so this is a guidance that says, elected
17  officials should not block or delete followers from
18  accessing such pages or delete critical or negative
19  comments unless the comments are obscene, profane,
20  libelous, or defamatory, or are commercial and posted
21  to sell goods and services.
22      That's the language you're talking about?
23      A.  Yes.
24      Q.  Why did you highlight that particular

Page 16

1  language, and put it on a corkboard in the office?
2      A.  Because I knew Jim Gardiner.
3      Q.  What do you mean by that?
4      A.  During my time with defendant Gardiner, he
5  had an inability to follow rules, to act above board.
6      And so I was gravely concerned that he would
7  violate -- prior to taking office, but after being
8  elected, he would constantly make comments to me such
9  as, I'm going to eradicate the ward of rats, and I'm
10  not talking about the kind with four legs.
11      So he had an agenda to go after certain
12  people once he was in office.
13      Q.  Did he ever expand on who he was referring to
14  as the rats he was going to eradicate?
15      A.  Pete Czosnyka is one.  Trisha Cannon is
16  another.  There were so many people, it's hard for me
17  to go through the whole list.
18      He constantly has enemies or people that he
19  deems as enemies that he must get rid of.  So there
20  was a ton of other names, you know, that he didn't
21  like.  There was a woman, and I can't think of her
22  name right now.  She owned a yoga studio in the Six
23  Corners area.  I think Kelly.  I think her first name
24  was Kelly.

Page 17

1      There was another woman.  I can't remember
2  her name.  She was on the Six Corners Association.  I
3  think she was a commissioner.  She said something on
4  Facebook that made him mad.  So he was coming for her.
5      Dominick Maino.  There is a woman who used to
6  be in the old neighborhood.  I can visualize her.  I
7  can't remember her name.  She was older, had grayish
8  hair.  She wore glasses.  She was shorter.  She was
9  active in the community.  He really hated her.  He
10  really had it in for her.
11      John Arena.  Joe Arena.  Jill Arena.
12      There is a lot of people that he had issues
13  with that he was going after or going to eradicate,
14  whatever suited his needs or verbiage at the time.
15      Q.  Okay.  So based on your conversations with
16  him, you had the impression that he wasn't going to
17  follow these ethics rules about moderation of his
18  Facebook page, is that fair?
19      A.  Yes.
20      Q.  So you thought it was important that this
21  policy actually be printed out as a reminder to him
22  that there were limitations on how he could use the
23  Facebook page?
24      A.  Yes.

TANYA KING, 09/26/2022                                    Page 18..21

Page 18

1    Q.  On page 8 of this document it repeats the
2  language that you said you had highlighted.
3       And it actually says that the board strongly
4  suggests that aldermen adopt and host a policy about
5  the content that can be posted on the page including
6  that obscene, profane, libelous, defamatory, or
7  commercial posts would not be allowed.
8       Did you ever discuss with Alderman Gardiner
9  the possibility of adopting a written policy about
10  what could and couldn't be posted on the Facebook
11  page?
12    A.  No.  I would refrain from trying to give him
13  any type of policy guidance like that because he was
14  very difficult to work with.
15    Q.  What do you mean by that?
16    A.  He would threaten.  He would constantly
17  question loyalties.  He would threaten.  Just
18  really -- and I am not talking my job.  He would make
19  threats and statements that were alarming.  And you
20  always knew kind of how far you could go with him.
21  And a lot of times there were just fights I didn't
22  want to take.  This was not my battle.  I was not
23  going to have this as my battle.
24    Q.  Okay.  So you felt you'd fulfilled your

Page 19

1  responsibilities by printing out the policy, and
2  highlighting it, and making sure it was somewhere
3  visible in the office.
4       And beyond that you didn't try to talk to him
5  about adopting an official policy, is that a fair
6  summary?
7    A.  I never tried to talk to him about an
8  official policy.  When he did delete people, I would
9  constantly tell him, stop it.  Or when he would block
10  people or hide their comments, I would tell him, stop
11  it.
12       Sometimes I would un-hide the comments, and
13  he would yell at me.  And then, eventually, I just
14  started to un-hide comments and then pretend that I
15  didn't un-hide the comments and just be like, oh, it
16  wasn't me.  It must be Facebook.  Because I was afraid
17  of getting in trouble.  So I did not want to be in
18  trouble, so...
19    Q.  Why would you un-hide the comments?
20    A.  Because I knew they were supposed to be
21  allowed.
22    Q.  Okay.  Well, we'll get into some specific
23  examples of that later on.
24       I think you said earlier that while you were

Page 20

1  working in the 45th Ward, you observed Jim was on the
2  Facebook page, I think, 24-7.
3       What gave you that impression that he was on
4  the Facebook page a lot?
5    A.  He was constantly on his phone looking at
6  Facebook saying, did you see this, did you see this,
7  did you see this?  He would text me at 6:00 o'clock in
8  the morning.  Did you see this?  He would call me at
9  11:00 o'clock at night.  Did you see this?
10       It was constant.
11    Q.  Okay.  So it's fair to say based on those
12  conversations where he would be calling and texting
13  you, you think he was actively monitoring the content
14  that was being posted to the Facebook page?
15    A.  Yes.  And I would see him actively
16  monitoring, and I would see him commenting.
17    Q.  So he would be responding to what people were
18  posting or interacting with people who were posting on
19  the Facebook page?
20    A.  He would be doing that, or he would be
21  contacting other people and asking them to comment.
22    Q.  Okay.  So he would actually reach out to
23  other people and -- well, let me expand on that.
24       What do you mean by that?

Page 21

1    A.  So if somebody posted something that he
2  didn't like, he would call up, you know, some of his
3  followers and say, hey, did you see this?  Go on
4  there, and then he would do it so then his followers
5  would go on and like try to shut down the people who
6  were saying something he didn't like.
7    Q.  Who would he call for those kinds of things?
8    A.  Tony Scribbons is one person that I know for
9  sure.  Jacqueline Hathaway is another person.  Tom
10  Strader is another person.  And then all three of
11  those people have multiple accounts.
12    Q.  What user names are you aware of that Tony
13  Scribbons uses to post?
14    A.  I don't.  I just know Jim -- defendant
15  Gardiner had said Tony Scribbons sits in his basement
16  on all his Facebook accounts and spends his time that
17  way.
18    Q.  Okay.  So, in your experience, if
19  Mr. Gardiner didn't like something that someone was
20  posting on the Facebook page, he would call some of
21  his fans and supporters and ask them to engage with
22  his critics?
23    A.  Yes.
24    Q.  What did he ask them to do?

Page 22

1    A.   Sometimes he would ask them just to go on
2  there and just fight with them or just shut them down.
3         In one instance, he asked Jacqueline Hathaway
4  to release court documents for James Suh.
5    Q.   You know, we'll talk about that in a little
6  bit more detail a little bit later on.
7    A.   Okay.
8    Q.   So, as a general matter, would you say he was
9  very engaged with the Facebook page when you were
10 working there?
11   A.   Completely engaged.
12   Q.   To your knowledge, did Alderman Gardiner,
13 have any policy regarding what content was allowed on
14 the Facebook page?
15   A.   No.
16   Q.   Did he ever discuss with you what standard he
17 was using for moderation of content?
18   A.   No.
19   Q.   Did he ever tell you that content that he
20 deemed to be harassing, inciting, bullying, or doxing
21 wasn't allowed?
22   A.   Never.  He actually encouraged it from his
23 followers.  He would refer to those who were posting
24 things he didn't like as haters, and he would use

Page 23

1  profanities, and he'd say, F 'em.
2    Q.   So, in your experience, he encouraged
3  harassing conduct by the people who were his
4  supporters?
5    A.   Absolutely.  He would monitor the Facebook
6  page, and he would laugh.  I would watch him while it
7  was going on in real time.  He would become animated.
8  It wasn't almost like he thrived on it.
9    Q.   While you were working for Alderman Gardiner,
10 who had the authority to determine whether a
11 particular post was permitted on the page?
12   A.   Defendant Gardiner.
13   Q.   Anyone else?
14   A.   No.
15   Q.   One thing that Alderman Gardiner mentioned in
16 his deposition is that if other constituents were
17 complaining about someone, that might be a reason to
18 delete comments or block a person from the page.
19        Was that ever a policy that he carried out
20 while you were working there?
21   A.   During my time, we never had anyone
22 complaining about what somebody else was posting.
23   Q.   So you never experienced that?  Did you ever
24 block someone from Alderman Gardiner's Facebook page

Page 24

1  without first getting Alderman Gardiner's approval?
2    A.   I never blocked someone from Alderman
3  Gardiner's Facebook page without getting approval from
4  Board of Ethics.  I have never blocked someone from
5  Gardiner's Facebook page because Gardiner approved it.
6  Gardiner made all the blocks himself.
7    Q.   So you mentioned something about the Board of
8  Ethics.  I know from some documents we received from a
9  subpoena we sent to the Board of Ethics that you had
10 some communications with them regarding Pete Czosnyka.
11        Was Pete Czosnyka somebody that you blocked
12 eventually?
13   A.   That's the one that Lisa Eilers gave
14 permission to block.
15   Q.   Other than Mr. Czosnyka, did you block anyone
16 else from the Facebook page while you were working for
17 Jim Gardiner?
18   A.   Never.
19   Q.   Did you ever delete or hide a comment on the
20 Facebook page without first getting directions or
21 instructions from Jim Gardiner to do so?
22   A.   Never.
23   Q.   Did Jim ever tell you to delete or hide
24 particular content?

Page 25

1    A.   I can't recall.  I don't think so because he
2  just did it himself.
3    Q.   Okay.  So, in your experience, he was the
4  person making those decisions regarding the Facebook
5  page?
6    A.   Yes.
7    Q.   Other than Pete Czosnyka, did you become
8  aware of anyone else being blocked from the Facebook
9  page while you were working for Jim Gardiner?
10   A.   Yes.
11   Q.   Who else?
12   A.   Sean Patrick Carter.
13   Q.   How do you know that Sean Patrick Carter was
14 blocked from the page?
15   A.   Sean Patrick Carter had sent over a FOIA
16 request to the ward office.  We do not have to comply
17 with FOIA requests from the ward office.  There is a
18 certain channel in which he needs to submit his
19 request.
20        So when I read the FOIA request, before I
21 submitted it over to -- I think I sent it to Board of
22 Ethics, I went to the Facebook page to see if he was
23 blocked because I was not aware.  And then I was able
24 to see the block list through my admin channels.

TANYA KING, 09/26/2022                                    Page 26..29

Page 26

1    Q.  What was Sean Patrick Carter's FOIA request
2  about?
3    A.  I think it was about the -- I think he was
4  complaining about being blocked, but I also think he
5  was complaining -- he wanted the meeting notes from
6  all of the Point in-home meetings.  All the meetings
7  about the Point Development.  So he wanted the notes
8  because Jim was holding private meetings inside
9  people's homes, and he wanted all documentation
10  related to that.
11    Q.  Okay.  So Sean Patrick Carter made a FOIA
12  request to the office concerning meetings that were
13  held about the Point, and about his being blocked from
14  the page?
15    A.  If I'm remembering correctly, yes.
16    Q.  And so that spurred you to actually look and
17  see whether he was actually blocked?
18    A.  Yes.
19    Q.  Other than Mr. Carter, did you see whether
20  anyone else was blocked at that time?
21    A.  Nobody else was blocked at that time.
22    Q.  Did you ever become aware that Dominick Maino
23  was blocked from the page?
24    A.  I can't recall.  It does not stand out, but I

Page 27

1  just can't recall.
2    MS. NICHOLAS:  Okay.  Let's look at a couple more
3  exhibits.  I am showing you what we marked Exhibit 2
4  to your deposition.
5    (Whereupon, Exhibit No. 2 was identified.)
6  BY MS. NICHOLAS:
7    Q.  This is a page from our discovery in this
8  case.  It has plaintiff Bates No. 45.
9    Do you recognize the phone number at the top
10  of this first screen, 773-307-7329?
11    A.  Yes.
12    Q.  Whose phone number is that?
13    A.  Defendant Gardiner.
14    Q.  Did you take this screenshot?
15    A.  I'm assuming I did.
16    Q.  So does this reflect a text message that Jim
17  Gardiner sent to you?
18    A.  Yes.
19    Q.  So I will direct your attention to a text
20  from Mr. Gardiner to you in the middle of this first
21  screenshot, and it says, Pete should be blocked.  He
22  is insulting other constituents on our page, and that
23  is unacceptable.  Let's talk about this.
24    Do you see that?

Page 28

1    A.  Yes.
2    Q.  Who did you understand Jim to be referring
3  to?
4    A.  Czosnyka.
5    Q.  While you working for Jim Gardiner, was being
6  insulting a sufficient reason to block someone?
7    A.  No.
8    Q.  Who decided whether something was insulting?
9    A.  Defendant Gardiner.
10    Q.  Did you instruct -- did you follow Alderman
11  Gardiner's suggestion to block Pete in this text?
12    A.  No.
13    Q.  Let's look at the second screen capture here.
14  This also looks like text messages, and it's from the
15  same number.
16    So is it your understanding that this screen
17  capture is also text messages that you received from
18  Alderman Gardiner?
19    A.  Yes.
20    Q.  I'll direct your attention to a text towards
21  the middle of the exchange, which says, can you delete
22  or hide Pete women to women FB comment from the
23  scissors thing.
24    What did you understand that to be referring

Page 29

1  to?
2    A.  Well, now that I see my own text, yes.  I
3  under -- so if I'm remembering correctly, there was a
4  women to women Facebook page created for 45th Ward
5  women, female residents.
6    The scissor thing is he opened up a business,
7  and he held a giant pair of scissors in front of his
8  penis, as though he was going to cut off his own
9  penis.  I am sorry.  It's ridiculous that I have to
10  even say this.
11    But apparently that was the photo, and there
12  was commentary about it.
13    Q.  Do you recall what the comment was?
14    A.  I don't.  I really wanted nothing to do with
15  that whole interlude.  So I don't.
16    Q.  Okay.  Was this on all -- was this referring
17  to a post that was actually on Alderman Gardiner's
18  Facebook page, or was this is on separate page that
19  was created for 45th Ward women?
20    A.  So my understanding from this text message
21  is, I'm assuming Pete must have been promoting the
22  women to women page on Alderman Gardiner's Facebook
23  page.
24    Does that make sense?

TANYA KING, 09/26/2022                                          Page 30..33

Page 30

1    Q.  Sure.  Okay.  And Alderman Gardiner asked you
2  to delete or hide the comment?
3    A.  Yes.
4    Q.  Okay.  And did you follow his direction to do
5  that?
6    A.  I must have if I said done, and I know he
7  would have checked.
8    Q.  For what reason was that particular post
9  deleted or hidden?
10   A.  Probably because Jim set himself up in a
11  photo as though he was going to cut off his own
12  genitalia with scissors.
13   Q.  So was it because Jim found this photo to be
14  embarrassing, or people were --
15   A.  Yes.
16   Q.  -- or people were making jokes about it?
17   A.  Embarrassing.  He was embarrassed that he set
18  himself up that way.
19   Q.  So the photo looked the way he intended it to
20  look, and people were making jokes about that, and he
21  wanted those comments -- or at least one of those
22  comments he wanted to be deleted?
23   A.  Yes.
24   MS. NICHOLAS:  Okay.  Let's look at Exhibit 3.

Page 31

1    (Whereupon, Exhibit No. 3 was identified.)
2  BY MS. NICHOLAS:
3    Q.  This is another page from our discovery.  It
4  has Plaintiff's Bates No. 43.  This is a series of
5  screen captures.
6    Can you tell us what we are looking at here?
7    A.  So this was Jim wanting to ban Sean Patrick
8  Carter.
9    Q.  So if you look at the second panel on the
10  right side of the top of the screen, it states, he
11  cannot call me a punk on social media and that be
12  okay.  That is bullying.
13   And then your response is, he can call you
14  names.  And you also instruct, if you look at the
15  first panel, you say, I would be very careful blocking
16  him.
17   Why is that the advice you were giving to Jim
18  Gardiner?
19   A.  Because Sean Patrick Carter is a journalist,
20  and my understanding -- or he is in the journalism
21  field.  He would understand freedom of speech, First
22  Amendment rights, and he would have the ability to go
23  after Jim for violating them.
24   Q.  So based on that, you thought it was not

Page 32

1  advisable for Jim to block Sean Patrick Carter?
2    A.  Yeah.
3    Q.  So there is a little bit more back and forth
4  in this first -- or in the second panel that we see at
5  the top of the page on the right side of the screen.
6    You respond, he can call you names.  And Jim
7  responds to that, he can?  And you say, yes.  And then
8  Jim responds, how the fuck is that possible?  And you
9  say, freedom of speech.  He can call you a punk.  He
10  can call you a stalker.  Because like it or not, that
11  stupid order of protection can support that statement.
12   After you explained this to Mr. Gardiner, do
13  you know what he did in response?
14   A.  I think he must have blocked him.
15   Q.  Did Jim tell you he was going to block Sean
16  Patrick Carter?
17   A.  No.
18   Q.  So you told Jim, don't block him.  The things
19  he is saying are allowed.  He has freedom of speech.
20   And Jim went ahead and blocked Sean Patrick
21  Carter anyway?
22   A.  Yeah.
23   Q.  Did you ever have further conversation with
24  Mr. Gardiner about his decision to block Sean Patrick

Page 33

1  Carter?
2    A.  No.
3    MS. NICHOLAS:  Let's look at what we have marked
4  as Exhibit 4 to the deposition.
5    (Whereupon, Exhibit No. 4 was identified.)
6  BY MS. NICHOLAS:
7    Q.  Exhibit 4 are two additional pages from our
8  discovery.  It has Plaintiff's Bates No. 41 and 42.
9    So let's look at this first screen capture
10  here.
11   A.  Okay.
12   Q.  Can you tell us what we're looking at here?
13   A.  This is a text exchange between myself,
14  defendant Gardiner, and Dave Feller.
15   Q.  Who is Dave Feller?
16   A.  Just a person who works in the political
17  realm.
18   Q.  Okay.  So he is like a political strategist
19  in the community?
20   A.  I genuinely don't know what he does.  He's
21  just always around.
22   Q.  Okay.  So it looks like from this screen
23  capture, Mr. Feller sent a text to yourself and
24  Mr. Gardiner with a screen capture of something from

Page 34

1   the Facebook page where Steve Held corrected a post by
2   Mr. Gardiner about the name of the Greater
3   Independence Park Neighborhood Association.
4         And then he says, Steve Held is a dick,
5   unfortunately.
6         What, if anything, do you do in response to
7   receiving this text from Dave Feller?
8   A.  So I want to go back.  Jim Gardiner did not
9   post that.  I posted that.  I posted that to Jim
10  Gardiner's Facebook page to the campaign -- to the
11  page we're all talking about.
12        I posted those photos, and I posted -- I'm
13  the one who made the error and said, I called Gipner
14  Gipna, whatever mistake I made, I made the mistake.  I
15  made the original post.
16        So you just said Jim had posted it.  So I
17  just wanted to clarify, I made that post.
18        So then what happened was Steve Held posted
19  that, and then I logged in under my own name, and, you
20  know, just -- I am not going to fight.  So I just
21  said, thank you, and I made the correction.
22        Dave Feller sent that and said, Steve Held is
23  a dick, unfortunately.  And then I responded, with
24  thanks.  It's okay.  It was totally my mistake.  I

Page 35

1   owned my mistake even back then.
2         For some reason, a few minutes later Jim
3   decided to hide this comment of Steve Held's.
4   Q.  Okay.  So let's look at the next screen
5   capture here.
6         Is this message between yourself and
7   Mr. Gardiner?
8   A.  Yes.
9   Q.  At the bottom here it says, I saw you hid the
10  comment.  You should un-hide it.
11        What is that in reference to?
12  A.  He hid the comment that I had just said
13  Steven Held sent to me -- or sent to the Facebook
14  page, and I responded to under my name.  It was my
15  mistake, but Jim went in and hid the comment.
16  Q.  Okay.  So Steve Held's comment was basically
17  just saying there was an error in the post that had
18  been made to the Facebook page, meaning that you had
19  gotten the name of the neighborhood association for
20  Greater Independence Park incorrect.
21        You just responded, thanks for the
22  correction, and left it at that.
23        But then you noticed that Jim went in and hid
24  the comment from Steve?

Page 36

1   A.  Yes.
2   Q.  Okay.  I think I understand from your
3   testimony so far today that these are certainly not
4   the only conversations you had with Jim Gardiner about
5   his right or ability to hide or delete comments from
6   the Facebook page, right?
7   A.  Correct.
8   Q.  About how often would you talk to
9   Mr. Gardiner about what could and couldn't be posted
10  to the Facebook page?
11  A.  We would talk about Facebook all the time.
12  So probably every other day, I would remind him of the
13  Board of Ethics.  You know, got to let everything be
14  up there, got to allow it.
15  Q.  Was he receptive to your feedback?
16  A.  No.
17  Q.  What was his thinking, or did he ever express
18  to you what his thinking was about regulating the
19  Facebook page?
20  A.  I can't speculate on his thinking.  I can
21  tell you my experience with him.  He believes he is
22  above everybody else.  He acts that way, and he acts
23  as though he makes the rules.  Nobody tells him what
24  the rules are.  He makes the rules, and the rules are

Page 37

1   whatever he deems they are to be at that particular
2   time.
3   Q.  So if he perceived a post to be potentially
4   embarrassing or annoying to him, he thought he had the
5   right to delete it?
6   A.  Absolutely.
7   Q.  Since you left your employment with the 45th
8   Ward, do you still have access to the Facebook page?
9   A.  I do.
10  Q.  When is the last time you made any changes to
11  the Facebook page?
12  A.  I haven't.
13  Q.  Since you worked there?
14  A.  Since I worked there.
15  Q.  So since the end of your employment with the
16  45th Ward, have you made any posts to the page?
17  A.  So there was one post made, but not to the
18  page.  It wasn't a page post.  Defendant Gardiner had
19  posted something, and everybody was fighting in the
20  comments.
21        And so I came in, and I thought I was under
22  my own -- this was two years ago when Facebook was
23  kind of a weird place where sometimes if you had
24  multiple admin access, you weren't sure where -- which

TANYA KING, 09/26/2022                                      Page 38..41

Page 38

1   account you were posting from.
2        So I thought I was posting from my personal
3   account, and my -- and I was in the comment section.
4   So in the comment section, I had clearly identified
5   who I was.  So there was no intent to deceive anybody.
6   I said who I was, and I said some of the things
7   Gardiner had been doing to me, including following my
8   husband and taking photos of him without his knowledge
9   or permission, threatening my children.  Just really
10  weird things during my employment and after my
11  employment.
12       And then when it posted, I saw that it posted
13  under the Gardiner account.  So I immediately deleted
14  it.  And then I contacted Gardiner via text message
15  twice and told him to remove me from the Facebook
16  page.
17       **Q.  So other than that one occasion when you
18  accidentally were logged in as the page and made a
19  post that appeared to be coming from Jim that you
20  immediately deleted, have you posted anything --**
21       A.  No.
22       **Q.  -- as Gardiner since the end of your
23  employment?**
24       A.  No.  I don't even go to the page.

Page 39

1        **Q.  Since the end of your employment with the
2   45th Ward, have you deleted or hidden any comments on
3   the page?**
4        A.  No.
5        **Q.  Have you blocked anyone from interacting with
6   the page?**
7        A.  No.
8        **Q.  You said you texted Alderman Gardiner and
9   asked him to take you -- to remove you as an admin
10  from the page.
11       Did he ever do that?**
12       A.  No.
13       **Q.  So if you log into Facebook today under your
14  own personal account, you would still theoretically be
15  able to access the Facebook page as an admin?**
16       A.  Yes.
17       **Q.  Did he ever explain to you why you still have
18  that admin access?**
19       A.  No.
20       MS. NICHOLAS:  Okay.  You mentioned earlier that
21  you had some conversations with the Board of Ethics,
22  particularly pertaining to Pete Czosnyka and his
23  interactions with the Facebook page while you were
24  working for the 45th Ward.

Page 40

1        So I want to look at what we've marked
2   as Exhibit 5 because these -- this is what we received
3   in response to a subpoena we sent to the Board of
4   Ethics.
5        So this is just a 2-page document with
6   the Bates No. City 001 and City 002.
7        (Whereupon, Exhibit No. 5 was identified.)
8   BY MS. NICHOLAS:
9        **Q.  And these were the only communications
10  between yourself and the Board of Ethics that we
11  received.  So I want to understand these a little bit
12  better.
13       So this document contains emails from the
14  email address tanya.king@cityofchicago.org, and
15  someone named Lisa Eilers, E-I-L-E-R-S, concerning
16  Pete Czosnyka.
17       Who is Lisa Eilers?**
18       A.  I just know that she works in the Board of
19  Ethics.
20       **Q.  Why were you speaking with Ms. Eilers
21  concerning Pete Czosnyka?**
22       A.  Because Jim -- defendant Gardiner wanted me
23  to delete and block Pete from the page, and I did not
24  want to make such an action without having some form

Page 41

1   of cover from a city entity.
2        And to be clear, my phone calls with Lisa
3   Eilers, my emails, Jim stood next to me in my
4   office, and he was telling me what I should write.
5        **Q.  Okay.  So Jim wanted to block Pete Czosnyka
6   from his Facebook page?**
7        A.  So there was a concerted effort between Jim,
8   Alderman Sposato, and, I believe, Alderman Napolitano.
9   And at the same time, they were complaining to Board
10  of Ethics about Pete as well.
11       **Q.  Okay.  So all three of these Northwest Side
12  aldermen were all hoping to get Pete off their
13  Facebook pages?**
14       A.  Yes.
15       **Q.  So the emails we're looking at that we marked
16  as Exhibit 5, you were sending these to Ms. Eilers at
17  the Board of Ethics at Mr. Gardiner's behest?**
18       A.  Yes.  Well, not necessarily at his behest.  I
19  told him I was not going to block Pete until I had
20  talked to the Board of Ethics.
21       So it was my choice to reach out to Board of
22  Ethics, and then once I started that ball, Gardiner
23  stood with me to compose my communications.
24       **Q.  Okay.  So Mr. Gardiner was aware that you**

TANYA KING, 09/26/2022                                    Page 42..45

Page 42

1  were communicating with the Board of Ethics regarding
2  Pete Czosnyka?
3      A.  Yes.
4      Q.  And he had input into what you sent to the
5  Board of Ethics?
6      A.  Yes.
7      Q.  If we look at the second half of the page
8  labeled City 001, Ms. Eilers writes to you, thank you
9  for sending the screen grabs, Tanya.
10         We did not receive the screen grabs that were
11 sent to Ms. Eilers.
12         Do you recall what you sent to her?
13     A.  They were probably just comments made by
14 Pete.
15     Q.  Okay.  So yourself and -- well, who decided
16 what screen captures to send to Ms. Eilers?
17     A.  So I want to be fair.  I believe this was
18 around the time that Gardiner had been calling some of
19 his fans to post to antagonize Pete Czosnyka.
20         And some of the things they did was they
21 posted the block he lived on.  They posted
22 descriptions of Pete's home.  They posted a photo -- a
23 lot of them changed their own Facebook profile photos
24 to be that of Mr. Czosnyka behind bars, alluding to a

Page 43

1  certain situation.
2          So he was -- Gardiner was getting his people
3  to rile up Pete Czosnyka in order to get Pete to
4  respond and leave a bunch of messages.  I don't
5  remember the content of Pete's messages.  I think they
6  were standard of, you're going off topic.  This is the
7  topic we're talking about.
8          If I remember correctly, that's what I sent.
9  And I think Pete probably did call out some of the
10 people.  It might have been Tony Sale or somebody else
11 saying they're a fireman or a policeman saying where
12 they worked in the city.
13         And so once he did that, Jim said, great,
14 because then that was Jim's way of saying -- of Pete
15 doxing people.  But Pete did the not engage in this
16 behavior until the Jim's followers started attacking
17 him online.
18     Q.  Who ultimately selected what posts to share
19 with the Board of Ethics?
20     A.  Defendant Gardiner.
21     Q.  Looking at the second page of what we've
22 marked as Exhibit 5, you said, I'm forwarding screen
23 grabs of the defamatory comments made by Peter
24 Czosnyka with regard to the alderman and children.

Page 44

1      Q.  What do you mean by defamatory in that email?
2      A.  I genuinely don't know.  I'm assuming
3  Gardiner gave me something flimsy, and in writing I
4  tried to make it sound a little more aggressive.  I
5  genuinely don't know.
6      Q.  Okay.  You said there were comments made by
7  Peter Czosnyka with regard to children.
8          What were you referring to with that?
9      A.  I don't know.  I don't know.  It would have
10 been something Jim would have told me to focus on.
11     Q.  You said he sends bizarre communication via
12 the U.S. Postal Service to the ward office.
13         What were your referring to?
14     A.  So we had assumed these were from Pete, but I
15 can't be sure.  Somebody would -- at that time, junk
16 collectors would drive down allies, or neighborhood
17 painters, or just small contractors would drive down
18 allies, and they would tape flyers to people -- the
19 sides of people's garages that would be like, paint
20 your house for $500, replace your garage door, stuff
21 like that.
22         Somebody kept mailing those little flyers to
23 the ward office, and on the back of the flyer they
24 would write, make it stop with an exclamation point.

Page 45

1  And then in the return address, they would put Pete C.
2      Q.  So someone was complaining about receiving a
3  bunch of commercial flyers.  It was made to appear
4  that Pete was the person who was sending them, but you
5  don't actually know whether that's the case?
6      A.  Exactly.
7      Q.  In the email that's on page 1 of Exhibit 5,
8  you state that Mr. Czosnyka, "has taken photos of
9  individuals, altered them, and then posted them to the
10 Facebook page."
11         What do you mean by that?
12     A.  I'm assuming after -- I don't even know.  I
13 am assuming, this is just an assumption, after people
14 started posting photos of Mr. Czosnyka with bars in
15 front of his face, that he did something -- I think
16 maybe he did something similar to them.  I genuinely
17 don't know.  I don't know.
18     Q.  Do you recall Pete ever posting a photo of
19 Jim Gardiner with Donald Trump's hair photoshopped
20 onto the top of his head?
21     A.  I don't know, but that's pretty funny.  I
22 don't know.  I don't know.  I genuinely don't know if
23 he did that.
24     Q.  Okay.  So you don't know what you were

Urlaub Bowen & Associates, Inc.    312-781-9586

TANYA KING, 09/26/2022                                    Page 46..49

Page 46

1   referring to with regard to --

2       A.  If he was referring to that, it seems pretty

3   comical.  Maybe I did see that image; but, honestly,

4   we're talking so long ago, and we're talking one

5   image, I genuinely can't remember.

6       MS. NICHOLAS:  Okay.  Well, let's look at Exhibit

7   14.

8       (Whereupon, Exhibit No. 14 was identified.)

9   BY MS. NICHOLAS:

10      Q.  This is a smaller image because it was

11  deleted from the page, but somebody did capture a

12  small screen capture of it.

13      This is a post from Pete Czosnyka with a

14  photo of Alderman Gardiner with Donald Trump's hair

15  photoshopped onto the top of his head.

16      Do you know if this is what you were

17  referring to?

18      A.  I'm sure it was.

19      Q.  Sitting here today, can you think of any

20  other photo that Pete Czosnyka posted that was altered

21  or photoshopped?

22      A.  No.  No, I can't.

23      Q.  Is it fair to say that yourself and

24  Mr. Gardiner -- well, let me strike that.

Page 47

1       Who decided actually what to share with the

2   Board of Ethics concerning Pete Czosnyka?

3       A.  Defendant Gardiner.  Once he realized I was

4   not backing down from I'm not blocking him, it has to

5   go to the Board of Ethics, then defendant Gardiner

6   kind of wanted to take control of the conversation

7   with Board of Ethics.

8       Q.  So he ultimately decided what to take screen

9   captures of and what to send to the Board of Ethics?

10      A.  Yes.  He stood next to me.

11      Q.  Would you agree that his aim was to make it

12  look like Pete was engaging in unwarranted harassment

13  of other constituents?

14      A.  Absolutely.

15      MS. NICHOLAS:  So your communication with the

16  Board of Ethics with these screen captures were on

17  June 25, 2019.  I want to show a few other posts from

18  around that same time period.

19      So what's marked as Exhibit 6 is another

20  page from our document production that has Plaintiff's

21  Bates No. 237.

22      (Whereupon, Exhibit No. 6 was identified.)

23  BY MS. NICHOLAS:

24      Q.  And the first post here is from someone named

Page 48

1   Tony Sale.  And it says, be careful of Pete.  Pete is

2   a known stalker of a woman.  Pete has a criminal

3   record for such an act.  But Kim Fox has a history of

4   not charging people like him, and Pete's criminal case

5   was dismissed by Kim Fox.

6       This post was dated June 15, 2019.

7       Did you share this particular post by Tony

8   Sale with the Board of Ethics?

9       A.  I don't know, but my memory is a little

10  better than I thought because I had known it was Tony

11  Sale who was part of the conversation.  So I don't

12  know.  Maybe.  Maybe.  I just don't know.

13      Q.  Do you know whether it was true that Pete was

14  a known stalker and has a criminal record?

15      A.  No.  I know that to not be true.

16      Q.  So that was a false statement?

17      A.  Yes.

18      Q.  Would you consider falsely implying that

19  someone is a stalker and has a criminal record to be

20  potentially defamatory?

21      A.  Absolutely.

22      Q.  Would you agree that it is?

23      A.  Yes.

24      Q.  Did you or Jim Gardiner ever ask Lisa Eilers

Page 49

1   or anyone else at the Board of Ethics whether Tony

2   Sale should be banned from the Facebook page for

3   making this comment?

4       A.  Oh, no, I could not.  I could not ask that.

5       Q.  Why not?

6       A.  Defendant -- or Tony Sale is one of defendant

7   Gardiner's fan boys.  That's one of the people that

8   does all of defendant Gardiner's heavy online lifting.

9   I could never.  Jim was right there.  I could not

10  whisper it.

11      Q.  So did Alderman Gardiner ever suggest that

12  Tony Sale should be banned from the page for this type

13  of page?

14      A.  No.

15      Q.  And did Alderman Gardiner ever suggest

16  deleting this post from Tony Sale?

17      A.  No.

18      Q.  You can see in the next comment, Pete

19  Czosnyka responds saying, among other things, hover

20  the cursor over your name reveals lives in Park Ridge,

21  Illinois.

22      Is that what you meant by Pete Czosnyka

23  doxing people in your emails to the Board of Ethics?

24      A.  It would have been that, or it would have

TANYA KING, 09/26/2022                                    Page 50..53

Page 50

1    been saying that they were police or fire.
2        Q.  Okay.  So either identifying that someone was
3    a public employee or posting information that the
4    person has made publicly available on Facebook like
5    the city they live in, are those the only things you
6    can think of that would have constituted doxing?
7        A.  Yes.
8        MS. NICHOLAS:  Let's look at what we have marked
9    as Exhibit 7 to the deposition.
10        (Whereupon, Exhibit No. 7 was identified.)
11    BY MS. NICHOLAS:
12        Q.  Exhibit 7 is a 2-page document from our
13    document production.  It has two comments from someone
14    named Mitch Ludwig.
15        First one says, Pete Czosnyka, just wondering
16    if you were one of the many criminals that Kim Fox
17    dropped criminal charges against?  Didn't you get
18    arrested in April or May?  When was it, Pete?
19        And then the next comment says, Pete is a
20    known criminal.  Right, Pete Czosnyka?  Have you been
21    arrested?  Yes.  Stop being a dick.  Your family must
22    be so proud.
23        And these posts are both dated June 22, 2019.
24        Again, you knew it was false that Pete

Page 51

1    Czosnyka was a criminal or had a criminal record,
2    right?
3        A.  I don't know that I pulled a background check
4    on him at that point.  I had just known that he was
5    arrested at that point.  So I don't know.
6        Q.  Okay.  Did you ever provide either of these
7    screenshots of Mitch Ludwig's comment about Pete to
8    Lisa Eilers or anyone at the Board of Ethics?
9        A.  No.
10        Q.  Did you ever ask the Board of Ethics whether
11    Mitch Ludwig ought to be banned from Jim Gardiner's
12    Facebook page for making this type of comment?
13        A.  No.
14        Q.  Did Alderman Gardiner ever suggest that Mitch
15    Ludwig should be banned from the page for making a
16    potentially defamatory statement about another
17    constituent?
18        A.  No.  He encouraged those posts.  When he
19    would read them, he would be like, good, and he'd
20    laugh.
21        Q.  So fair to say Jim Gardiner never suggested
22    that these two posts by Mitch Ludwig should be
23    deleted?
24        A.  No.  He never did.

Page 52

1        MS. NICHOLAS:  Let's look at Exhibit 8.  Exhibit 8
2    is a June 22nd, 2019 post by a user using the user
3    name Vince Gerage.
4        It appears to be a photo of Pete
5    Czosnyka photoshopped behind prison bars.
6        (Whereupon, Exhibit No. 8 was identified.)
7    BY MS. NICHOLAS:
8        Q.  Did you ever share this post with the Board
9    of Ethics?
10        A.  No.
11        Q.  Did you ever ask the Board of Ethics whether
12    Vince Gerage should be banned from the Facebook page
13    for posting this photo of Pete?
14        A.  No.
15        Q.  Did Alderman Gardiner ever suggest that Vince
16    Gerage should be banned from the page?
17        A.  Vince Gerage does defendant Gardiner's online
18    dirty work.  He would never make such a request.
19    Vince Gerage is somebody who defended Gardiner
20    constantly and routinely calls to help him out online.
21        Q.  So this is -- is it fair to say this is the
22    type of post that Jim Gardiner wanted to see on the
23    post?
24        A.  Actively encouraged.

Page 53

1        Q.  So Alderman Gardiner didn't suggest that
2    posts that had photoshopped photos of Pete Czosnyka
3    behind bars should be deleted, fair?
4        A.  No.
5        Q.  Maybe my question had a double negative in
6    it.
7        But is it fair to say that Alderman Gardiner
8    never suggested that photos of Pete Czosnyka
9    photoshopped behind bars should be deleted?
10        A.  He never suggested any posts that were
11    negative against Pete Czosnyka should be deleted.
12        Q.  Even if they were falsely implying that Pete
13    had a criminal record or was in jail?
14        A.  Especially if they were falsely implying
15    those situations.  He encouraged that particular photo
16    to be posted.
17        Q.  How do you know that?
18        A.  Because he asked me if he should change his
19    personal profile photo to that, and I told him, don't
20    do that.
21        Q.  Jim actually asked you whether he should
22    change his profile photo to the photoshopped image of
23    Pete Czosnyka behind bars?
24        A.  Yes.

TANYA KING, 09/26/2022                                    Page 54..57

Page 54

1    Q.  And what did you say?
2    A.  I said, don't do that.  We were laughing.
3  Like he asked me in a very tongue and cheek kind of
4  like -- like should I?  And I was like, no, don't do
5  that.
6    Q.  So fair to say Jim didn't see any problem
7  with people posting this photoshopped photo of Pete on
8  his Facebook page?
9    A.  Absolutely not.
10   Q.  How many times do you think you saw it posted
11 on the Facebook page?
12   A.  For months.  Not how many individual times.
13 We're talking a time frame.  I saw this for months.  I
14 think it started the day after the arrest, and I first
15 saw this photo from Gardiner.
16   Q.  So is it fair to say that when the Board of
17 Ethics gave you the go-ahead to block Pete Czosnyka
18 from the page, it was based on a set of screenshots
19 that were selectively chosen by Mr. Gardiner to
20 portray Pete as the person who was being harassing?
21   A.  Yes.
22   Q.  And when the Board of Ethics said, go ahead
23 and block Pete Czosnyka, they didn't have any of this
24 context, including the multiple people who were

Page 55

1  defaming Pete, and falsely claiming that he was a
2  criminal, right?
3    A.  Correct.
4    MS. NICHOLAS:  Hold on.  Just one more.  This one
5  is Exhibit 9.
6      (Whereupon, Exhibit No. 9 was identified.)
7  BY MS. NICHOLAS:
8    Q.  Exhibit 9 is a June 22nd, 2019 post by
9  someone named Sarah Silverton.
10       Do you know who that is?
11   A.  That is a fake account.
12   Q.  Do you know who it really is behind it?
13   A.  I have suspicions.
14   Q.  Okay.  Who do you think it is?
15   A.  I think it's Jacqueline Hathaway.
16   Q.  This post says, Pete, the serial harasser and
17 stalker.
18       Did you ever show this post to the Board of
19 Ethics?
20   A.  No.
21   Q.  And did Alderman Gardiner ever suggest
22 deleting this post?
23   A.  No.
24   Q.  Did Alderman Gardiner ever suggest blocking

Page 56

1  the Sarah Silverton Facebook account?
2    A.  No.
3    Q.  Who made the ultimate decision to block Pete
4  Czosnyka from Alderman Gardiner's Facebook page on
5  June 25th, 2019?
6    A.  In my opinion, Board of Ethics, based on the
7  information they were provided.
8    Q.  Which you agree was selectively chosen to
9  make Pete look bad while leaving out the context of
10 all the people who were going after him, right?
11   A.  Yes.
12   Q.  Other than being given the okay by the Board
13 of Ethics, what other reasons were there for blocking
14 Pete Czosnyka from the page?
15   A.  He was a John Arena supporter.  He would call
16 defendant Gardiner out constantly.  Defendant Gardiner
17 had personal grudge issues with Mr. Czosnyka that
18 borderlined a safety concern.
19   Q.  What do you mean by that?
20   A.  I know there was an incident, and I only know
21 this because defendant Gardiner relayed it to me, in
22 which Pete Czosnyka was at a bus stop or waiting for a
23 bus, something about a bus stop, and it was on
24 Milwaukee, I think, by Brown's Chicken.  Or is that

Page 57

1  Popeye's Chicken?  It's Popeye's Chicken, I think, by
2  Westin's.
3        The way defendant Gardiner relayed it was
4  that Pete Czosnyka was waiting at the bus top, and
5  defendant Gardiner pulled over, and told Pete to get
6  in, just kept telling him to get into his car.  But
7  Pete wouldn't get into his car.
8        And then I said to Jim, where would you take
9  him?  And he is like, I would drop him off on the
10 South Side and let the animals deal with him, so...
11   Q.  So you had concerns about Alderman Gardiner's
12 grudge against Pete Czosnyka?
13   A.  Yes.
14   Q.  Other than what we've seen in the emails that
15 we marked as Exhibit 5, did you have other
16 conversations with the Board of Ethics regarding
17 Mr. Czosnyka?
18   A.  Not that I can recall.
19   Q.  Do you know whether Jim Gardiner did?
20   A.  It would have been after my time.
21   Q.  Before blocking Pete Czosnyka from the
22 Facebook page, did Alderman Gardiner or yourself ever
23 talk with Pete directly about content moderation
24 policies for the page?

TANYA KING, 09/26/2022                                    Page 58..61

Page 58

1    A.  No.
2    Q.  Did yourself or Alderman Gardiner ever talk
3    with Pete Czosnyka about limits on how frequently he
4    could post?
5    A.  No.
6        MS. NICHOLAS:  Let's look at what we've marked as
7    Exhibit 15 to the deposition.
8        Exhibit 15 is a full printout of a post
9    that's still on the page today from June 24, 2019.
10       (Whereupon, Exhibit No. 15 was identified.)
11   BY MS. NICHOLAS:
12       Q.  And it says, while we always encourage
13   spirited discussions, please be aware harassment and
14   personal attacks will not be tolerated.  And then it
15   has as big smiley face, and it says, be nice.
16           Who posted that?
17   A.  I did.
18       Q.  Why did you post that?
19       A.  That was the warning that was, if you read in
20   some of those emails to the Board of Ethics, I believe
21   there was something like notification had to be made
22   if the behavior didn't change.  So we made a blanket
23   statement in order to get around that request from
24   Board of Ethics.

Page 59

1        Q.  Okay.  So instead of reaching out directly to
2    Pete to talk about what could and couldn't be posted
3    to the site or posting some kind of policy, the
4    decision was made just to post, harassment and
5    personal attacks will not be tolerated and be nice?
6    A.  Yes.
7        Q.  Right.  There is a long series of comments
8    from many different individuals on this be nice post,
9    but I want to draw your attention to the last one that
10   was posted which is from Pete Czosnyka that says,
11   Alderman Gardiner, what do you consider "harassment
12   and personal attacks?"
13           Did you anyone ever respond to Pete's
14   question regarding, what do you consider harassment
15   and personal attacks?
16   A.  Not that I'm aware.
17       Q.  Would you agree that what constitutes
18   harassment and personal attacks is rather subjective?
19   A.  Absolutely.
20       Q.  Would you agree that that standard was
21   unevenly applied when it came to Pete Czosnyka?
22   A.  Absolutely.
23       Q.  Is Jim Gardiner the only person who was
24   deciding whether something constituted harassment and

Page 60

1    personal attacks?
2    A.  Yes.
3        MS. NICHOLAS:  Could we just take a 5-minute
4    break, please?
5        THE WITNESS:  Sure.
6        (A break was taken.)
7        MS. NICHOLAS:  All right.  Ready to go back on?
8    Everybody else is.
9        THE WITNESS:  Yes.
10       MS. NICHOLAS:  Okay.  Let's look at what we have
11   marked as Exhibit 11 to your deposition.
12       (Whereupon, Exhibit No. 11 was identified.)
13   BY MS. NICHOLAS:
14       Q.  This is a screen capture of a post made to
15   Alderman Gardiner's Facebook page on October 16, 2020.
16           Ms. King, have you seen this post before?
17   A.  Through screenshots.
18       Q.  Are you familiar with the video that Alderman
19   Gardiner posted that day?
20   A.  I don't think I've ever watched the whole
21   video.
22       Q.  Who did you understand Alderman Gardiner to
23   be referring to with the comment, thank you to our
24   friends on 5700 North Menard, who came out today to

Page 61

1    acknowledge our efforts to improve long overlooked
2    infrastructure issues on their street, #besties?
3    A.  Pete Czosnyka.
4        Q.  What gave you that impression?
5        A.  Because he's purposefully filming in front of
6    his house so everyone can have his address.  He is
7    targeting him.
8        Q.  So when you saw this video, it was
9    immediately apparent to you that Mr. Gardiner was
10   deliberately filming himself in front of Pete
11   Czosnyka's home and deliberately giving the block that
12   Pete lived on, right?
13   A.  Absolutely.
14       Q.  Would you agree that others in the community
15   would have immediately understood this post to be
16   directed at Pete Czosnyka?
17   A.  Absolutely.
18       Q.  What gives that you impression?
19       A.  So I saw screenshots of this, and I saw
20   screenshots of the comments.  So the people who know
21   Pete Czosnyka know that's his home.  The people who
22   don't know Pete Czosnyka, or don't know where he
23   lives, they did in the comments because Jim's
24   supporters were calling it out and saying, that's

Page 62

1  where Pete lives, blah, blah, blah.  Look at -- I

2  think some of the comments were talking about his

3  lawn.

4      Q.  So would you agree that posting a photo

5  outside of someone's home with the precise block that

6  they live on is a lot closer to doxing someone than

7  commenting that they're a city worker, for example?

8      A.  This post to me, if you're looking at it from

9  a doxing situation, is a lot closer to doxing someone.

10  But as someone who knows defendant Gardiner, this was

11  a call to arms for people to hurt Mr. Czosnyka.

12     Q.  Why do you say that?

13     A.  Because that's been defendant Gardiner's

14  goal.

15     Q.  How do you know that?

16     A.  He talked about it during the campaign.  He

17  told me about the creepy bus stop incident.

18     Q.  Why do you think -- or don't speculate, but

19  do you know why Alderman Gardiner had such a problem

20  with Pete Czosnyka?

21     A.  Defendant Gardiner has a problem with anyone

22  who questions him, who speaks out against him, who

23  divulges his secrets, who calls him out, who dares to

24  defy defendant Gardiner.  He has a problem with

Page 63

1  anyone.

2      Q.  Would you say that Pete Czosnyka was one of

3  Alderman Gardiner's most vocal critics?

4      A.  Yes.

5      Q.  And would you agree that Pete was at least

6  perceived as an ally with the previous alderman, John

7  Arena?

8      A.  Yes.

9      Q.  And would you agree that Pete posted a lot of

10  criticisms of positioning that Mr. Gardiner took on

11  issues in the community?

12     A.  Yes.

13     Q.  For example, affordable housing developments?

14     A.  Yes.

15     Q.  And other kinds of economic development in

16  the community, including the proposed development at

17  Six Corners called the Point?

18     A.  Yes.

19     Q.  So was it your understanding that Jim

20  Gardiner found that criticism to be embarrassing or

21  damaging to his image as a successful politician?

22     A.  I don't believe he felt anything was

23  embarrassing aside from the only photo he set up

24  because defendant Gardiner has no shame.  So it would

Page 64

1  be politically harmful, sure, maybe.  Defendant

2  Gardiner does not care.

3      It was the fact that Pete would speak out

4  against him period.  Defendant Gardiner believes

5  nobody should have a voice against him.  Defendant

6  Gardiner has gone after firemen who supported him for

7  speaking out against him.  Defendant Gardiner attacks

8  anybody who speaks out against him.

9      And defendant Gardiner's campaign of terror

10  that he unleashed on Mr. Czosnyka has probably

11  silenced a lot of other critics as a result because

12  they don't want the things that have happened to

13  Mr. Czosnyka to happen to them.  So defendant

14  Gardiner's campaign of terror has succeeded.

15     Q.  What do you mean by campaign of terror?

16     A.  Defendant Gardiner had tickets written

17  against Pete Czosnyka's home fraudulently.  They were

18  fake.  They were lies.  There was nothing wrong with

19  the home.

20      Defendant Gardiner has posted this man's

21  address, a photo of the home.  A women drove across

22  this man's lawn and almost drove into his home

23  screaming liking a wild banshee listening to 80's rap

24  music at some ungodly hour of the night.

Page 65

1      This man has been besieged by Gardiner and

2  his supporters.  Now, if I'm being vocal, I don't want

3  that happening at my house.  I don't want that

4  happening.  And this is what Gardiner does.  He has

5  people call people's employers to get them in trouble

6  at work.  He has people create fake Facebook, Twitter

7  accounts to harass people.  He has done it to me.

8      Q.  And this all arose just over Pete not being a

9  supporter of the alderman politically?

10     A.  Yes.  Not supporting his campaign.  It's a

11  very small slice.  That's all it takes, and Gardiner

12  determines you to be an enemy or some type of

13  combatant of his.

14      And he does things that are, quite honestly,

15  mind boggling.  It boggles the mind at how aggressive

16  and how intrusive defendant Gardiner becomes.  He goes

17  to people's homes.  He squeezes their hands, and looks

18  in their eyes, and calls them asshole.

19      He sends people to other people's homes.  He

20  files fraudulent police reports, and he engages in

21  fraudulent court actions.  He creates unsafe

22  environments for people.

23      He stalked my husband.  He followed my

24  husband and took photos of him.  Literally, after I

Page 66

1  told him I was quitting, he followed my husband.  And

2  that was the very start of his campaign of terror on

3  my family.

4      Q.  Let's look at another post that Alderman

5  Gardiner made.  This one is from the time period when

6  you were working in the office.  It was posted

7  August 18, 2019.

8          This is a photo of Alderman Gardiner on a

9  dunk tank, and it says, for those of you who have

10  waited since February 26th (Pete!!!) now is your

11  chance to take aim at the Edison Park Fest.

12          Who did you understand Pete to be referencing

13  in this post?

14      A.  Czosnyka.

15      Q.  Did other participants on the Facebook page

16  also believe this was referring to Pete Czosnyka?

17      A.  Yes.

18      Q.  And at this point, Pete Czosnyka was blocked

19  from interacting with the Facebook page, right?

20      A.  Yes.

21      Q.  Did you have any concerns about the alderman

22  taunting someone who couldn't respond?

23      A.  I had concerns about him taunting people that

24  could respond.  Defendant Gardiner taunted everybody.

Page 67

1  He runs around that ward driving down -- the wrong way

2  down one-way streets, speeding, flying through school

3  zones; and he acts like it's his personal playground,

4  and he can do whatever he wants and say whatever he

5  want to whomever he wants.

6      Q.  I'm just trying to understand.

7          Do you know whether there was any personal

8  relationships between Pete Czosnyka and Alderman

9  Gardiner before Alderman Gardiner got involved in

10  politics?

11      A.  No.  I don't even know that they knew each

12  other.

13      Q.  So all of these taunting posts, and inciting

14  his supporters to go after Mr. Czosnyka, this all

15  arose simply from Alderman Gardiner not being able to

16  tolerate being criticized --

17      A.  Absolutely.

18      Q.  -- for doing his job?

19      A.  Defendant Gardiner cannot tolerate any

20  criticism for anything.

21      Q.  Is there any doubt in your mind that this

22  dunk tank post is referring to Pete Czosnyka?

23      A.  Zero doubt.

24      Q.  Not another Pete, right?

Page 68

1      A.  Nope.

2      Q.  Would you be surprised if Alderman Gardiner

3  testified at his deposition that he didn't know who

4  that was referring to?

5      A.  I want to say I would be surprised, but I

6  know Jim Gardiner to be a liar.

7      Q.  Did Alderman Gardiner ever talk to you about

8  plaintiff Steven Held having posted an order of

9  protection or a no-contact order that was entered

10  against Mr. Gardiner which prohibited him from

11  contacting an ex-girlfriend?

12      A.  Yes.

13      Q.  Was he unhappy about Steven Held having

14  posted that information?

15      A.  He was livid.

16      Q.  What, in particular, did he say about?

17      A.  He didn't say anything about the action.  He

18  just made threats and verbal attacks about Steven

19  Held.  So it wasn't the action that he focused on.  It

20  was more, who the fuck does he think he is?  He is

21  going to fucking pay.  He is going to suffer, his

22  bitch wife, too.  Like he was mad.

23          And then the now-criminally-indicted Charles

24  Sikanich, who was the ward sup, would drive by the

Page 69

1  house -- their house and made friends with the

2  neighbor.

3          Somehow Steven Held's neighbor got involved,

4  and they would have Steven Held's neighbor come to the

5  ward office, and the three of them would plot about

6  how they could get Steve, write tickets on Steve's

7  property, just all kinds of stuff.

8          The neighbor would constantly come, and Jim

9  would feed him.  He would come, and Jim would be like,

10  hey, let's get some lunch for him.  So it was a weird

11  situation.

12      Q.  Did Jim want to delete comments from the page

13  that mentioned the fact that he had had a no-contact

14  order entered against him?

15      A.  Yes.  He wanted that very much to disappear.

16      Q.  Did he ever tell you why?

17      A.  Because in his mind, he didn't feel he

18  deserved the no-contact order.

19      Q.  Did he ever mention that one of the reasons

20  he wanted to delete those comments was to protect the

21  identity of the ex-girlfriend who obtained a

22  no-contact order against him?

23      A.  Oh, no.  Never.

24      Q.  Did you ever --

TANYA KING, 09/26/2022                                    Page 70..73

Page 70

1    A.  He actually -- I would like to elaborate.  He
2  actually had me do a background search on her to find
3  out her new address, and he told me he was still in
4  love with her, and that he wishes he could contact her
5  to take him back.
6    So, no, there was never a situation where he
7  wanted to hide her identity or anything like that.
8    Q.  Did you ever see someone post a version of
9  the no-contact order to the Facebook page that did not
10  have her name redacted from it?
11    A.  No.  The name's always been redacted.
12    Q.  So would you agree that his concern with the
13  no-contact order having been posted on the page was
14  that it was embarrassing to him, not that he was
15  concerned about the best interest of the woman who had
16  to go to court to get an order stopping him from
17  following her?
18    A.  Right.  It was an embarrassment to him.  It
19  wasn't about her safety at all.  He never cared about
20  that.
21    Q.  You said he actually asked you to conduct a
22  background check on the woman who obtained a
23  no-contact order against her?
24    A.  Yes.  He wanted to find out her new address.

Page 71

1    Q.  Is that something he ask you to do in your
2  capacity an employee of the 45th Ward?
3    A.  Everything he asked me to was under my
4  capacity as an employee of the 45th Ward, according to
5  him.
6    Q.  Did you play any role in blocking James Suh
7  from the Facebook page?
8    A.  I don't think so.  I don't -- that does not
9  seem familiar.
10    Q.  Did Alderman Gardiner ever talk to you about
11  potentially blocking James Suh from the Facebook
12  page?
13    A.  So after we got the sign-off for Pete, it was
14  basically he'll block and do whatever he wants.  So
15  there was really no more discussion.  Once the Board
16  of Ethics kind of, in his opinion, supported him when
17  I was the one saying, we can't block Pete; and then
18  once the Board of Ethics was well, yeah, you can, here
19  you go, and we figured out a way to make it so,
20  defendant Gardiner just assumed we could make it so
21  for everybody.
22    Q.  Okay.  So he took that conversation with the
23  Board of Ethics to mean that he could exercise his own
24  discretion to block whomever he wanted?
25    A.  Yes.

Page 72

1    Q.  So Alderman Gardiner didn't actually talk to
2  you about whether he was going to block James Suh?
3    A.  Not that I recall.  But, again, if it
4  happened, we're talking, it's a long time ago.
5    Q.  How about Adam Vavrick, did Alderman Gardiner
6  ever talk to you about potentially blocking Adam
7  Vavrick from the Facebook page?
8    A.  I do think he talked to me about Adam
9  Vavrick.
10    Q.  What do you recall him saying?
11    A.  I think he made fun of his physical
12  appearance, and he had a lot of contempt for Adam
13  Vavrick because, I believe, at the time Adam Vavrick
14  had long hair, and he said that Adam Vavrick was
15  dirty.  He just had a lot of contempt for the way Adam
16  Vavrick looked.  That might have been why he wanted to
17  block him.  I don't know.
18    Q.  Do you recall Adam Vavrick also being someone
19  who criticized many of Alderman Gardiner's votes in
20  city council?
21    A.  You know, I don't.  I only remember during my
22  time I just remember Adam -- because there wasn't a
23  lot of votes when I went.  There wasn't a lot of
24  voting.  I went to work in May.  City council let's

Page 73

1  out for the summer kind of.  So like there wasn't, you
2  know, August, you don't even -- there wasn't a lot.
3    So, no, I think Adam Vavrick spoke at the
4  Point -- at Copernicus at the Point meeting, and then
5  that's where defendant Gardiner saw him, and then he
6  didn't like him anymore.  I think Adam Vavrick spoke.
7  He might have said, like I support the Point.  I
8  literally don't know.  I just don't know.
9    Q.  I know you and I are both familiar with this
10  from our involvement in the neighborhood, but this
11  will be for the benefit of a judge, you know,
12  potentially reading this transcript at some point.
13    So can you tell us what the Point is?
14    A.  The Point is a development at Six Corners.
15  It's a senior -- it's an up-market senior living
16  facility.
17    Q.  And you said there was a public meeting at
18  the Copernicus Center --
19    A.  Yes.
20    Q.  -- about the Point?
21    What was the purpose of that meeting?
22    A.  The purpose of that meeting was to look like
23  defendant Gardiner was soliciting feedback.
24    Q.  What was your understanding of whether

TANYA KING, 09/26/2022                                    Page 74..77

Page 74

1  **Alderman Gardiner wanted to approve that project?**
2      A.  He was never going to approve that project.
3      **Q.  Why was he opposed to it?**
4      A.  So a couple of reasons.  One, he did not
5  like -- and I can't remember his name.  He worked for
6  Clark Street Development.  He did not like either the
7  landowner or one of the developers.  I can't remember
8  his name.  I just can't.  I am sorry.
9          He did not like him.  He thought that he
10  was -- he didn't like him because he was wealthy, and
11  he lived on the North Shore.  So he thought he
12  shouldn't be making money from Six Corners
13  development.  He didn't -- that was one reason.
14          Another reason was he said that John Arena
15  was promised a condo somewhere if the building got
16  built, that was the deal that John Arena made with the
17  developers.  I have no idea where that came from, that
18  Jim said that to me.
19          He also said he couldn't afford to put his
20  dad there who was alive at the time.  So he did not
21  like Michael Alvarez who was, I believe, the lobbyist
22  working for the developers.
23          And so it was for all -- it was really
24  because he hated the developer and Michael Alvarez;

Page 75

1  but then he would say -- he would tout at development
2  meetings, I can't afford to put my dad there.  So
3  nobody else could afford it.
4          You know, the thing with Gardiner and his
5  personality is, if he can't do something, nobody else
6  should be able to or nobody else can.  So he has a
7  real contempt for people who have more money than him.
8          So it was really a situation of he didn't
9  like the one developer.  It wasn't -- there was two
10  people involved.  One was named Dan, and it was the
11  other person who worked at Clark Street Development.
12  It was that person, and he hated Michael Alvarez.
13      **Q.  Okay.  So Alderman Gardiner wanted to oppose**
14  **the development at the point for a variety of reasons,**
15  **and there was a public meeting held at Clark Street**
16  **Center, and you said Adam Vavrick spoke at the**
17  **meeting.**
18          **Do you recall what the nature of Adam's**
19  **statement was?**
20      A.  No.  I am assuming he just supported the
21  Point.
22      **Q.  Okay.  So was Alderman Gardiner happy about**
23  **people standing up in support of the development at**
24  **the Point?**

Page 76

1      A.  No.  He wanted people not to support it.  So
2  that way he could then go back and say, I don't
3  support this because, look, my community doesn't
4  support it.
5      **Q.  Okay.  So it would stand in the way of him**
6  **saying the community doesn't want this development if**
7  **people got up at public meetings and said, I'd like to**
8  **see this development built, right?**
9      A.  Right.  So much so that he called all of his
10  supporters, called his whole family, called everybody
11  he knew to make sure they were at that meeting so they
12  could pack the meeting.
13          He also called somebody -- hopefully, I can
14  remember his name.  Somebody who is a personal friend,
15  and this backfired on him.  He called somebody who is
16  a personal friend who wants to develop in the north
17  end of the 45th Ward to come and speak out against it,
18  and the person actually stood up and said, you're my
19  friend.  I've known you my whole life, but I support
20  the Point.
21      **Q.  Okay.  So that was one of the causes of**
22  **Alderman Gardiner having some contempt for Adam**
23  **Vavrick, was that Adam stood up at that meeting and**
24  **said something that the alderman didn't like?**

Page 77

1      A.  Yes.
2      **Q.  Forgive me if I already went over this, but**
3  **did you ever have a conversation with Alderman**
4  **Gardiner about blocking Dominick Maino from the**
5  **Facebook page?**
6      A.  That one I don't recall because I had my own
7  personal concerns about Dominick Maino.  So I just
8  don't recall.  I don't.  I might have.  That one I
9  might have.  I just don't recall.
10      **Q.  My understanding from conversations with my**
11  **client is that he was blocked during the time period**
12  **while you were working in the 45th Ward offices in**
13  **approximately June or July 2019.**
14          **Do you have any knowledge of why Dominick**
15  **Maino was blocked?**
16      A.  Probably because -- first of all, I don't
17  know for sure if he was blocked.  It does seem
18  familiar.  When I'm closing my eyes trying to think,
19  who did I see?  Could I have seen Dominick Maino?  I
20  mean, I really thought I only saw two people, but
21  maybe -- it's hard to remember, but he could have
22  been.
23          And also there were times where people were
24  blocked, and I didn't even know because it wasn't like

TANYA KING, 09/26/2022                                    Page 78..81

Page 78

1  I was going in the admin channels and looking and
2  saying, who is he blocking today? So, really, I would
3  only look and see when I was prompted to look because
4  I'm seeing some rumblings somewhere.
5      So I don't know. I'm not saying he wasn't
6  blocked. He probably was. I'm just saying I don't
7  know that I saw it. I don't know if I was made aware,
8  but, again, I could have been made aware. I just -- I
9  don't know. It doesn't sound crazy, though. If he's
10 saying he was blocked, he probably was.
11     **Q. Okay. But sitting here today, you don't have**
12 **any personal knowledge of why Dominick Maino was**
13 **blocked?**
14     A. No. I mean, I don't. I'm assuming it would
15 be for same commentary as Pete Czosnyka.
16     **Q. Okay. So the plaintiffs in this case, we**
17 **have talked about most of them today, are Pete**
18 **Czosnyka, Adam Vavrick, Dominick Maino, James Suh,**
19 **Steven Held, and Peter Barash.**
20     **Other than what we talked about already**
21 **today, did Alderman Gardiner ever talk to you about**
22 **any of the plaintiffs?**
23     A. Yes.
24     **Q. Did he consider them his political opponents?**

Page 79

1  A. Enemies.
2  **Q. Was he upset about their criticism of him**
3  **online?**
4  A. Absolutely.
5  **Q. And was Alderman Gardiner upset about their**
6  **activism in the community including, for example, the**
7  **protest they organized when he blocked the development**
8  **at the Point?**
9  A. Oh, he was livid. He was livid about James
10 Suh. He was livid by him.
11     **Q. What do you mean by that?**
12 A. How dare he organize a full-on protest like
13 that? He was -- he was a next level of anger. It
14 was -- he started -- he went behind -- he didn't even
15 ask me really to do my peripheral background look. He
16 went to the -- I think it's domestic violence court,
17 or I can't even think of the name, circuit court.
18 Circuit clerk court, whatever.
19     Charles Sikanich, again who was criminally
20 indicted, his mother works for the Clerk of the
21 Circuit Court, and she would pull background records
22 on people for Gardiner or Charles. I guess, Charles
23 would ask, and she would pull it. So she would pull
24 arrest records and stuff like that.

Page 80

1      Jim got those arrest records of James Suh.
2  Jim got James Suh's arrest records, sent them to me
3  via text, just like photos of them, sent to me via
4  text; and he told me to leak 'em. And I wasn't going
5  to a part of that.
6      I didn't even know -- to be honest, I didn't
7  even know that those were James Suh's court records.
8  I just thought like, oh, it's some guy with the same
9  name. I didn't know.
10     He wanted me to leak 'em. He wanted me to
11 leak 'em to Jacqueline Hathaway. So I did. I sent
12 them to her. If she wants to do his dirty work, she
13 can do his dirty work, but I did send them to her. He
14 went full court press on James Suh. He wanted to pull
15 his business permit. He was calling around trying to
16 really destroy him.
17     **Q. Okay. And this all arose from a protest and**
18 **demonstration that James was one of the most visible**
19 **organizers of?**
20 A. James was quoted in a Block Club Chicago
21 piece promoting the event, yes.
22     **Q. So the purpose of this demonstration was to**
23 **support the development at the Point and express**
24 **disappointment and anger with Alderman Gardiner**

Page 81

1  standing in the way of that development?
2  A. Yes.
3  **Q. And they made funny signs like calling the**
4  **big hole at Six Corners Lake Gardiner, right?**
5  A. Yes.
6  **Q. And so James Suh was one of most visible**
7  **organizers of that protest?**
8      **Do you know whether any of the other**
9  **plaintiffs were also involved in that?**
10 A. In hindsight, I don't. But at the time, I
11 don't think I knew. I don't think I knew. I mean, I
12 didn't pay attention to that. Kind of do what you
13 want to do. I just didn't pay attention to it.
14     So Jim paid way more attention -- defendant
15 Gardiner paid way more attention. I think maybe at
16 the time all I knew was James Suh and maybe Peter
17 Barash because -- the only reason why I say maybe is
18 because Jim was always talking about punching Peter
19 Barash in the face.
20     **Q. He actually said he wanted to punch Peter**
21 **Barash in the face?**
22 A. Yes.
23     **Q. Did he tell you why?**
24 A. No. And he didn't say, I want to punch Peter

TANYA KING, 09/26/2022                                    Page 82..85

Page 82

1  Barash in the face.  He said, I am going to punch him
2  in the face.  I am going to punch that mother fucker
3  in the face.  So he said, I'm going to.
4      **Q.  Do you know whether he had any personal**
5  **relationship with Peter Barash?**
6      A.  I don't think so.
7      **Q.  So this was all again over Peter Barash's**
8  **perceived political criticism of Alderman Gardiner?**
9      A.  Technically, it's all political criticism.
10 But Gardiner can't separate anything.  So he just
11 thinks it's personal.  Everything is personal.  He
12 doesn't support people's freedom of speech.  He
13 doesn't support people's freedom of political
14 expression.  He doesn't support anything like that.
15 If you do not align with him, you are against him
16 personally.
17     **Q.  Okay.  So he would take something like the**
18 **demonstration at the Point very personally, is that**
19 **fair?**
20     A.  Absolutely.
21     **Q.  How about with regard to posts criticizing**
22 **him on Facebook, if people posted critical comments or**
23 **questioned actions he was taking as the alderman,**
24 **would he take that personally?**

Page 83

1      A.  Yes.
2      **Q.  Did he ever talk to you about how he might be**
3  **able to stop the plaintiffs from criticizing him**
4  **online?**
5      A.  I'm assuming punching Peter Barash in the
6  face would make him think twice before posting again.
7         No.  It was just constantly -- you know,
8  again, it was a campaign of terror.  So I think, and
9  this is just me, you know, assuming nobody would
10 comment about him because, you know, you got Pete
11 Czosnyka, who can't defend himself online, his home
12 address is out for the whole world to see, and it's
13 basically a free-for-all on Pete Czosnyka on this
14 Facebook page that has what, 10,000 people on it.
15        Then you have got James Suh who Jim used his
16 influence and his connection to Charles, who used his
17 mother's position, to pull this man's court records to
18 disseminate them to anyone who would look at them and
19 to hurt his business.
20        So at a certain point, if you are somebody
21 who has something negative to say about Jim, you're
22 seeing all these small, little terror campaigns,
23 you're going to silence as a result.  You're going to
24 self silence.

Page 84

1         He would go to people's homes.  Like I said,
2  he would stomp on their porches.  He would call them
3  assholes.  He would drive one way down the -- the
4  wrong way down one-way streets and pull up on their
5  lawn.  I mean, he has done some outlandish things to
6  intimidate and harass people.  You know, Pete Czosnyka
7  got like $600 worth of tickets unlawfully.
8      **Q.  And these are tickets for allegedly having**
9  **overgrown weeds on his property?**
10     A.  Uh-huh.  Yes.
11     **Q.  And didn't Alderman Gardiner actually talk to**
12 **you about having Pete ticketed for alleged weeds?**
13     A.  Oh, yes.  It was a full conspiracy with the
14 ward sup from 39, Drew.  I can't even pronounce his
15 last name, Szorc or Stor -- I can't remember his last
16 name.
17        Charles Sikanich and Gardiner, and they
18 didn't want Charles Sikanich to write the tickets,
19 one, because I think at the time Charles Sikanich
20 didn't have his ticket book yet.
21        But, two, they wanted to push a little
22 distance to be like, oh, it wasn't me and my ward sup.
23 It was this rando who just drove out of his ward and
24 saw it.  And that was on Drew's recommendation.

Page 85

1      **Q.  Okay.  So Charles Sikanich was the 45th Ward**
2  **superintendent at the time?**
3      A.  Yes.
4      **Q.  You were present for conversations between**
5  **Alderman Gardiner, Charles Sikanich, Andrew Szorc, who**
6  **was the 39th Ward superintendent?**
7      A.  Yes.
8      **Q.  And they agreed that Drew would write bogus**
9  **tickets to the Czosnyka home for allegedly having**
10 **overgrown weeds?**
11     A.  Yes.
12     **Q.  Do you know what happened to those tickets?**
13     A.  They were thrown out.
14     **Q.  Do you know why?**
15     A.  Because it's not overgrown weeds.  They were
16 fraudulently written.
17     **Q.  Okay.  Do you know why Alderman Gardiner**
18 **wanted to have those tickets written against Pete**
19 **Czosnyka?**
20     A.  To silence Pete.  Every time you open your
21 mouth, it will cost you.  That is the message Gardiner
22 wants sent to everyone in the ward.
23     **Q.  Did you ever talk to Alderman Gardiner about**
24 **potentially having tickets written to Adam Vavrick for**

Page 86

1  his home?

2      A.  No.

3      Q.  **Did Alderman Gardiner ever talk to you about**

4  **his wanting to have Pete arrested?**

5      A.  So he talked to me after Pete was arrested,

6  and the way he framed it to me was he was part of a

7  setup.  It was a setup.  They set Pete up.  They put

8  him -- again, it's old.  This is old, so...

9          And this is coming from me from defendant

10  Gardiner.  So there was some meeting.  I don't know.

11  I think maybe it would have been for the Point

12  Development, but this was prior to defendant Gardiner

13  taking office.

14          And it was at the old Sears Auto Center, and

15  there was tables.  There was like break-out tables

16  where you sat in groups.  And Jim told me -- or

17  defendant Gardiner told me, he was part of some group

18  where they were supposed to hold Pete at his table,

19  and then he was arrested outside or something.  But

20  somebody had to call.  I don't know the situation.

21          All I know is the man got arrested, but

22  Gardiner -- defendant Gardiner was part of just

23  basically keeping him there long enough for the police

24  to come and arrest him in the most public and

Page 87

1  impactful way that they could.

2      Q.  **So there was a public meeting about potential**

3  **redevelopment of the old Sears site at Irving Park and**

4  **Milwaukee and Cicero?**

5      A.  Okay.

6      Q.  **Is that correct?**

7      A.  Yes.  I just know there was a public meeting

8  at the old Sears site, yes.

9      Q.  **Okay.**

10      A.  It was in the auto center.  It wasn't in the

11  Sears building.  It was in the auto center building.

12      Q.  **Based on your conversation with Alderman**

13  **Gardiner, he knew before Pete was arrested that there**

14  **was a plan to arrest him publicly at that meeting?**

15      A.  Yes.

16      Q.  **Do you know whether Pete was ever charged**

17  **with a crime as a result of that arrest?**

18      A.  I now know in hindsight that he was not.

19      Q.  **Other than what we have already talked about,**

20  **did Jim Gardiner ever ask you to help him retaliate**

21  **against any of the plaintiffs for their criticism of**

22  **him?**

23      A.  Yes.  I just cannot tell you who because we

24  used to make a joke whenever I come in the office, and

Page 88

1  it was vendetta, vendetta, and that was literally what

2  we would say.  It was constantly some vendetta against

3  somebody.  It was just constant.

4          It was a stressful work environment, which is

5  why I did not last long because my job was more trying

6  to talk him down from his vendettas against the whole

7  neighborhood.

8      Q.  **Other than what we have already talked about**

9  **today, do you know anyone else who Alderman Gardiner**

10  **has blocked from the Facebook page?**

11      A.  Gary Brady.

12      Q.  **Gary Brady.  B-R-A-D-Y?**

13      A.  Yes.

14      Q.  **Do you know why he blocked Gary Brady?**

15      A.  He was Ethan Brady's dad, and I guess Gary

16  Brady called defendant Gardiner out about his behavior

17  and treatment of his children after Ethan Brady quit.

18  And as a result defendant Gardiner blocked Gary Brady.

19      Q.  **Okay.  So Ethan Gardiner is somebody who**

20  **worked for Alderman Gardiner in the 45th Ward office?**

21      A.  Ethan Brady is someone who worked for --

22      Q.  **Sorry.  I misspoke.  Let's start that**

23  **question over.**

24          So Ethan Brady is someone who worked in the

Page 89

1  45th Ward office for Alderman Gardiner, right?

2      A.  He was my replacement.

3      Q.  **And after Mr. Brady left his employment with**

4  **Alderman Gardiner, Gary Brady, Ethan's father, was**

5  **critical of Alderman Gardiner?**

6      A.  Yes.

7      Q.  **Do you know what in particular he said?**

8      A.  I don't.

9      Q.  **But how do you know that Alderman Gardiner**

10  **blocked Gary Brady from the page?**

11      A.  I believe Ethan Brady told me.

12      Q.  **Okay.  Anyone else you can think of sitting**

13  **here today that you're aware of that Alderman Gardiner**

14  **has blocked from the Facebook page?**

15      A.  I don't know, but I wouldn't be surprised if

16  you give me a whole list of names I've never even

17  heard.

18      Q.  **Other than what we've already talked about,**

19  **do you recall any specific conversations with Alderman**

20  **Gardiner about deleting or hiding certain comments or**

21  **posts to the Facebook page?**

22      A.  I mean, all of my comments and all of my

23  conversations to him were just, stay on the right side

24  of this.  Don't do this.  So there was a lot of 'em.

TANYA KING, 09/26/2022                                    Page 90..93

Page 90

1   So, yeah, there are definitely some we
2   haven't covered, but can I tell you what they were,
3   no. I mean, it was a constant. I was constantly,
4   stop it. Stop going to people's homes. Stop. You
5   look like a maniac.
6        So I was trying to -- you know, my background
7   is PR and communications. I was trying to salvage
8   something. Once it became a hot garbage fire in that
9   office, I just left because he can't help himself.
10   **Q.  All right.  So you've told me about a couple**
11   **specific examples where he told you about particular**
12   **posts or comments he wanted to delete, and you told us**
13   **that you would tell him people have First Amendment**
14   **rights.  Don't do that.  People can post.  You shared**
15   **with him the ethics guidance.**
16        **Did he heed your advice?**
17   A.  No.  I'm a woman.  He would never listen to a
18   woman.  You know, once he became an elected official,
19   his head was so big, he couldn't fit through doors.
20   And women were really the target of his contempt and
21   ire, and any women in power disgusted him.
22   **Q.  Okay.  So he was the one making the decisions**
23   **what comments and content he was going to delete from**
24   **the page?**

Page 91

1   A.  Yes.
2   **Q.  Fair?  And at some point he stopped talking**
3   **to you about it or asking you whether it was okay?**
4   A.  He stopped asking me if it was okay, and he
5   stopped notifying me before he did it.  We would still
6   talk about it because sometimes he would catch me
7   un-hide people's comments, and he would ask me if I
8   did it.
9        I was un-hiding a lot of comments right after
10   I gave notice and before my last day.  So I was
11   un-hiding, un-hiding, un-hiding, and he was constantly
12   contacting me, and I was really cutting my
13   communication with him at the time because he had
14   started crossing the line by stalking my husband.
15        So I would deny it.  I would just be like,
16   oh, no, it couldn't have been me.  I was in school
17   meetings.  Or oh, no, I have no idea.  Nope, not me.
18   So just because I -- he was just being too weird, and
19   I didn't want to admit to it.  But, yes, I was
20   un-hiding comments towards the end there.
21   **Q.  Can you think of any particular examples of**
22   **comments that Alderman Gardiner had hidden that you**
23   **later un-hid?**
24   A.  Everything from Sean Patrick Carter.

Page 92

1   **Q.  Anything from the named plaintiffs?**
2   A.  I think probably from Adam Vavrick because,
3   honestly, he's never posted anything that I saw that
4   was inflammatory, defamatory, or anything.
5        Same with James Suh.  I probably would have
6   un-hid his.  I probably would have un-hid Peter
7   Barash's.  Honestly, at that point, if they were
8   making me laugh, and they were attacking -- even if
9   they weren't attacking Jim, but if Jim would have felt
10   that they were attacking him, I would have un-hid it
11   just because at that point Jim was so out of control,
12   and I wanted to be nowhere near him.  So I was just
13   like, let him deal with this.  So I was just un-hiding
14   everything.
15   **Q.  Was part of your reason for doing that, your**
16   **understanding was that the First Amendment protected**
17   **criticism of Alderman Gardiner?**
18   A.  That was part of the reason, and the other
19   part was, he should hear it.  He should read what his
20   constituents are saying.  He should be forced to
21   acknowledge his constituents.
22   **Q.  That's one of the reasons he had a Facebook**
23   **page, at least in theory, right?**
24   A.  The whole reason.

Page 93

1   **Q.  Was to be able to hear from constituents and**
2   **give constituents a method for reaching him?**
3   A.  To communicate with constituents, yes.  I
4   mean, even in that screenshot you said, we encourage
5   spirited dialogue.  Dialogue means communication
6   between two or more parties.  It wasn't a one-way
7   network.
8        We did not create the Facebook solely to post
9   information for the community to be aware of.
10   Otherwise, we would have turned off commenting, which
11   we had the right to do.
12        We could have set the page up where nobody
13   could comment, and I think we would have been above
14   board on that because it would have just been, we
15   should have no comments here.  It's not a commenting
16   function.
17        But we didn't do that.  We purposefully set
18   it up so it could be a two-way street.
19   **Q.  So part of the reason for having the Facebook**
20   **page was to invite comments and discussion from the**
21   **community?**
22   A.  Yes.  And information.  That's how defendant
23   Gardiner got information about a down tree, a flooded
24   street.  They sent DMs.  They sent direct messages

Page 94

1  through the Facebook page.  That's the easiest way.
2      The whole ward knows the quickest way to
3  reach defendant Gardiner is through Facebook because
4  he's always on it.
5      Q.  Okay.  So you would be more likely to reach
6  Alderman Gardiner by going to the Facebook page than
7  you would by, for example, calling the 45th Ward
8  office?
9      A.  Yes.  And that's why people who have flooding
10  at 12:00 o'clock at night, a tree down at 2:00 in the
11  morning, that's why you see people responding within
12  90 minutes or 2 hours because he is always on
13  Facebook, and he keeps it on where it's ding, ding,
14  ding.  He has got all of the notifications on.  He's
15  constantly on it.
16      Q.  Do you know what role, if any, Ethan Brady
17  played in moderating the Facebook page?
18      A.  He did whatever defendant Gardiner told him
19  to do.
20      Q.  Have you talked to Ethan Brady about Alderman
21  Gardiner's use of the Facebook page?
22      I know you told us about his blocking Ethan's
23  dad, but other than that?
24      A.  After Ethan Brady quit, Ethan Brady and I got

Page 95

1  in contact with each other because Ethan Brady wanted
2  to share with me that defendant Gardiner was actively
3  stalking me online; that in the less than three months
4  that Ethan Brady worked for defendant Gardiner,
5  defendant Gardiner would online stalk me on more than
6  100 occasions.
7      Defendant Gardiner and Charles plotted to
8  write tickets against properties they thought I owned
9  in the 45th Ward.  They plotted to send my court
10  records to my employer.  Charles Sikanich's mother
11  pulled my shoplifting arrest from when I was 18 years
12  old, and they were going to mail it to my employer.
13  They were going to write fraudulent tickets against my
14  property.
15      And Gardiner was stalking my Facebook page,
16  according to Ethan Brady, daily.  And he would
17  constantly refer to me as a cunt and a bitch.  So
18  that's the tip of the iceberg of what defendant
19  Gardiner has done to me because I quit, because I
20  could not be a part of his crazy circus anymore.
21      Q.  When you were working for the 45th Ward, did
22  you -- I think we saw from your earlier email that you
23  had a cityofchicago.org email address, right?
24      A.  Yes.

Page 96

1      Q.  Did you have communications with Alderman
2  Gardiner pertaining to the Facebook page using that
3  email address?
4      A.  I don't believe so.  I very rarely used that
5  email address because I assumed somebody was trying to
6  FOIA me.  So I was like, oh, I don't want to be
7  FOIA'd.  I don't want to be on the internet any more
8  than I have to be.  So I don't think so.  Maybe I did.
9  If I did, it would have been in August or September
10  towards the end when I knew I was already quitting
11  where I was just like, I don't care.  I want people to
12  know.
13      If I did, it would have been to leave a paper
14  trail.  It would have been to leave bread crumbs for
15  people to see what this man was doing in this
16  political position.
17      Q.  Did you ever communicate with Alderman
18  Gardiner about his use and moderation of the Facebook
19  page using a personal email address?
20      A.  I don't think so.  I mean, I really didn't
21  email with him.  He was constantly texting, constantly
22  calling, constantly coming to my home.  My own kids
23  were freaked out.  He would show up at our doorstep at
24  all hours of the day and night.  I had no reason to

Page 97

1  really email him all that much.  He wouldn't go away.
2      Q.  Other than what we looked at today, do you
3  have any saved text messages or emails from Jim
4  Gardiner regarding moderation of the Facebook page?
5      A.  I may.  I just don't know.  I would have to
6  go through everything and have to look up certain key
7  words to see.  I don't make it a habit of reading
8  through the 7,000 pages of texts, I probably have,
9  because the guy texted me so much.  I don't know.  I
10  probably do, though.
11      Q.  Did Alderman Gardiner always communicate with
12  you from the same phone number via text?
13      A.  Yes.
14      Q.  And that's the number that we saw earlier --
15      A.  Yes.
16      Q.  -- in the exhibits?
17      Since you left your employment in the 45th
18  Ward, have you ever been contacted by the Board of
19  Ethics or the Office of Inspector General regarding
20  this case?
21      A.  Regarding this case, so after it was filed,
22  no.  No.
23      Q.  So other than what we have already talked
24  about, have you had any conversations with the Office

TANYA KING, 09/26/2022            Page 98..101

Page 98

1  of Inspector General or the Board of Ethics concerning
2  Alderman Gardiner's Facebook page and his moderation
3  of content on the Facebook page?
4     A.  I did make the Office of Inspector General
5  aware that that post in front of Czosnyka's house was
6  a call to arms.  It was a call to action to hurt
7  Czosnyka.  I do believe I made that -- I do believe I
8  made that statement.
9     Q.  Okay.  So you actually proactively reached
10  out to the Office of Inspector General when you saw
11  that post in front of Pete's house?
12     A.  Yes.  I do believe I did because things had
13  happened at my own home.
14     Q.  Did the Office of Inspector General ever
15  interview you about Alderman Gardiner or about that
16  post?
17     A.  I need a 5-minute break.
18     MS. NICHOLAS:  Sure.  Yeah.  No problem.  I will
19  be here.  You just come back.
20        (A break was taken.)
21     THE WITNESS:  I am back.
22     MS. NICHOLAS:  Thanks.  I am very close to being
23  done.  I'll let you go in just a really few minutes.
24  I really appreciate you taking this time out of your

Page 99

1  day.
2  BY MS. NICHOLAS:
3     Q.  Have you ever given an interview to the Board
4  of Ethics or the Office of Inspector General
5  pertaining to Alderman Gardiner?
6     A.  Yes.
7     Q.  When was that?
8     A.  There was multiple interviews.
9     Q.  How many?
10     A.  At least five.
11     Q.  Who, in particular, did you speak with?
12     A.  Nathan Gallaway.
13     Q.  Anyone else?
14     A.  Steve Berlin, I believe, if I'm remembering
15  correctly.  That's it.
16     Q.  Did your interviews with the Board of Ethics
17  and OIG touch on Alderman Gardiner's blocking people
18  on Facebook or deleting their comments on Facebook?
19     A.  I think the Board of Ethics.  The OIG, in
20  terms of Facebook, was more about the safety concerns
21  of Pete Czosnyka, about the fraudulent tickets written
22  against Pete Czosnyka, about the campaign against Pete
23  Czosnyka.
24     Q.  Okay.  Other than what we have already

Page 100

1  discussed, are you aware of any communications between
2  Alderman Gardiner and the OIG or the BOE concerning
3  the moderation of his Facebook page?
4     A.  Steve Berlin personally came into the ward
5  office in May or possibly June and verbally told
6  defendant Gardiner what he could and could not do with
7  the Facebook page and left a copy of that 8-page
8  document.  He handed it out to everyone in the office.
9     Q.  You said May or June of what year?
10     A.  2019.  And during aldermanic training, and
11  that took place in early May of 2019, Gardiner was
12  provided a copy of that advisory opinion from the City
13  of Chicago during aldermanic training in a binder.
14     Q.  So if Alderman Gardiner testified that he
15  wasn't familiar with that ethics guidance, you don't
16  think that would have been true?
17     A.  Complete lie.
18     Q.  You mentioned earlier that there was some
19  communications with Alderman Sposato and Alderman
20  Napolitano concerning their interest in blocking Pete
21  from their Facebook pages or from their social media.
22  I don't know if they all have Facebook.
23     Were you involved in any conversations
24  between Alderman Gardiner and any of the aldermen in

Page 101

1  other wards pertaining to regulation of their social
2  media?
3     A.  No.  Those weren't conversations about
4  regulating social media.  Those conversations between
5  defendant Gardiner and Alderman Sposato were for the
6  purposes of getting Pete Czosnyka removed from the
7  internet.
8     Now, I only -- I wasn't privy.  I didn't hear
9  Alderman Sposato nor Napolitano on the phone.  That is
10  just what defendant Gardiner told me.
11     Q.  Okay.  So he told you that he was
12  coordinating with Alderman Napolitano and Alderman
13  Sposato about trying to get Pete Czosnyka off
14  Facebook?
15     A.  Yes.  He referred to them as Nick and Naps.
16     Q.  Okay.  Nick is Nick Sposato, right?
17     A.  Yes.
18     Q.  He is the 38th Ward alderman?
19     A.  Yes.
20     Q.  Napolitano is in which ward?
21     A.  I think 41.
22     Q.  You are here today in response to a subpoena
23  that we sent you, right?
24     A.  Yes.

TANYA KING, 09/26/2022                                    Page 102..105

Page 102

1    Q.  I think it's pretty clear from your testimony
2  today that you have some regrets about having worked
3  for Jim Gardiner.
4       Is that fair?
5    A.  Yes.  You know what, I don't know that I can
6  regret those actions.  I thought that I was working in
7  a normal environment.  I regret not recognizing the
8  signs of abuse sooner.
9    Q.  So, I mean, I think it's pretty clear that it
10  was not a positive experience for you working in that
11  office?
12    A.  No.
13    Q.  My question is, did that affect your
14  testimony at all today?
15    A.  No.
16    Q.  So you understand that you were under oath,
17  and you were just telling the truth about what you
18  experienced?
19    A.  The truth to the best of my knowledge and
20  recollection at this point.
21    MS. NICHOLAS:  Okay.  All right.  I don't have
22  anything else.
23       And since Alderman Gardiner's lawyer
24  decided not to come, there is no one to ask you any

Page 103

1  follow-up questions.  So I'll just explain signature.
2       You have the option to review the
3  transcript of your deposition.  You can't change your
4  answers, but you can make corrections if something is
5  spelled incorrectly, for example.
6    THE WITNESS:  Okay.
7    MS. NICHOLAS:  That's called reserving your
8  signature.
9       Otherwise, you can just waive your
10  signature, which means that we trust the court
11  reporter took down everything accurately, and we'll
12  just use the transcript that we receive in response to
13  this deposition.
14       So it's your decision.
15    THE WITNESS:  I would like to review.
16    MS. NICHOLAS:  Okay.  So the witness will reserve
17  signature, and that's it.
18       Thank you very much.
19    THE WITNESS:  Thank you.
20    MS. NICHOLAS:  Appreciate you.  Take care.
21    THE REPORTER:  Are you going to order now, or are
22  you going to wait?
23    MS. NICHOLAS:  We'll order for just regular
24  delivery.  PDF, please.

Page 104

1    THE REPORTER:  You said we should contact
2  Mr. Carroll?
3    MS. NICHOLAS:  I know he's going to order it, too.
4
              ***
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 105

1       IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
4
5         CZOSNYKA vs. GARDINER
              21-CV-3240
6
7         I hereby certify that I have read the
8  foregoing transcript of my deposition given on Monday,
9  September 26, 2022 consisting of pages 1 through 106
10  inclusive, and I do again subscribe and make oath that
11  the same is a true, correct, and complete transcript
12  of my deposition so given as aforesaid as it now
13  appears.
14
15       Please check one:
16       _____  I have no corrections.
17                  Number of errata sheets
                  _____  enclosed.
18
19       _____
20              TANYA KING
21  SUBSCRIBED AND SWORN TO
   before me this_____
22  day of_____20___.
23
24  _____
   Notary Public

TANYA KING, 09/26/2022                                    Page 106..107

```
                                              Page 106
 1   STATE OF ILLINOIS        )
                              ) SS.
 2   COUNTY OF COOK           )
 3
 4          I, Sally A. Durkin, Illinois CSR, and Notary
     Public, do hereby certify that on Monday, September
 5   26, 2022 at the hour of 12:00 o'clock p.m. appeared
     before me via Zoom videoconference from Chicago,
 6   Illinois, TANYA KING, in a certain cause now pending
     and undetermined in the United States District Court
 7   for the Northern District of Illinois, Eastern
     Division.
 8          I further certify that the said witness was
     first duly sworn to testify to the truth, the whole
 9   truth, and nothing but the truth in the cause
     aforesaid; that the testimony then given by said
10   witness was reported stenographically by me in the
     presence of the said witness, and afterwards was
11   transcribed via computer-aided transcription, and the
     foregoing is a true and correct transcript of the
12   testimony so given by said witness.
            I further certify that I am not counsel for
13   nor in any way related to any of the parties to this
     suit nor am I in any way interested in the outcome
14   thereof.
            IN TESTIMONY WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal on October 5, 2022.
16
17
18                   _____
                     Sally A. Durkin, CSR
19                   State of Illinois
                     CSR License No. 003144
20
21
22
23
24
```

```
                                              Page 107
 1   Errata Sheet
 2
 3   NAME OF CASE: PETE CZOSNYKA, et al. vs JAMES GARDINER
 4   DATE OF DEPOSITION: 09/26/2022
 5   NAME OF WITNESS: Tanya King
 6   Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                   _____
```

Exhibit 1



B O A R D   O F   E T H I C S

C I T Y   O F   C H I C A G O

## PRESS RELEASE

January 8, 2019

In response to inquiries raised by numerous aldermen to the staff of the Board of Ethics, the Board has issued Advisory Opinion 18038.A.1, addressing the use of social media accounts such as Facebook or Twitter by City of Chicago elected officials or candidates, Chicago Police Department personnel, and, by extension, City employees and officials generally.

The opinion addresses the three (3) primary types of social media accounts or websites used by City elected officials: (i) official City pages; (ii) political/campaign pages; and (iii) personal pages that typically have elements of the first two. It discusses in detail what content can be posted to each type of account, consistent with the City's Governmental Ethics Ordinance. The Executive Summary section of the opinion provides an overview of the Board's advice and determinations with respect to each type of account. The opinion also establishes general rules covering, among other topics: (i) when disclaimer language should be used; (ii) when the City seal and/or other official indicia of the City can be used, and when they cannot be used; (iii) when account administrators can block followers or delete comments; and (iv) the key distinction between "political" commentary or content and "electioneering" content — the latter cannot be posted on any account or page that is or functions as an official City account page by, for example, dispensing information to constituents about how to request City services.

Please contact the Board at 312-744-9660 with questions.



BOARD OF ETHICS

CITY OF CHICAGO

**ADVISORY OPINION**

Date:     January 8, 2019

Re:     Case No. 18038.A.1, Use of Social Media; City-owned Property, Prohibited Political Activity

---

<u>Executive Summary</u>

This Board of Ethics advisory opinion addresses: (i) the use of social media accounts[1] by City of Chicago elected officials and Chicago Police Department personnel, and, by extension, City employees and officials generally; and (ii) what content can be posted to each type of social media account, consistent with the City's Governmental Ethics Ordinance (the "Ordinance"). There are three (3) essential types of these accounts or sites discussed: (i) official, (ii) political/campaign, and (3) "personal" ones displaying elements of the first two.

The issues we address are nuanced.  Websites, Facebook pages, Twitter accounts – all are, by design and intention – personalized.  Yet, we can, and do here, establish the following general rules:[2]

• City elected officials' "political/campaign" (as described below) websites or social media accounts may include content regarding City/ward business, provided these websites or accounts: (i) are not funded or maintained with City resources; (ii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; and (iii) contain appropriate disclaimer language on the main page identifying the accounts as personal, non-governmental accounts that do not represent the official policies or positions of the City of Chicago.

• Elected officials may post political or electioneering content on their "personal" (and, of course, their "political/campaign") accounts or websites, including friendly or critical commentary on other politicians or their policies, campaign donation links, sample ballots, candidate endorsements, etc., provided these accounts or pages: (i) are not funded or maintained with City resources; (ii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; and (iii) contain appropriate disclaimer language on the main page identifying the accounts as personal, non-governmental accounts that do not represent the official policies or positions of the City of Chicago.

• If City elected officials' "official" or "personal" websites or social media accounts (as described below) do include the City seal and/or other indicia of an "official" City or ward website and otherwise meet the criteria described above, they must remain free of "electioneering" content, such as "Reelect me for the

---

[1] For purposes of this opinion, "social media" refers to, but is not limited to, Facebook, Instagram and Twitter accounts.  The meaning of the term "social media" for purposes of this opinion is Merriam-Webster's: "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos).  *See* https://www.merriam-webster.com/dictionary/social%20media

[2] This advisory opinion is intended to supplement the **Handbook for Effective and Ethical Ward Operations,** First Edition (2019) (the "Handbook"), currently being produced by the City Council's Committee on Workforce Development.  The *Handbook* contains significant content written by staff of the Board of Ethics, and our staff will update it accordingly.

following reasons …" and may have no links to any political committee or for making campaign donations, even if the sites or accounts are funded fully with political or campaign funds and include any legally mandated language about their funding.

• Elected officials whose "personal" social media accounts include political content, such as political endorsements and/or opinion pieces on topics related to official City business, or include no political content but include postings commenting on public affairs or matters involving City government, **should not** block or delete followers from accessing such pages or delete critical or negative comments, unless the comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods or services.

• Chicago Police Department ("CPD") personnel are prohibited, pursuant to a departmental order, from posting intellectual property of the CPD or the City of Chicago, such as badges and logos, on their personal social media accounts.

## I. Background

Several questions were posed to Board staff by aldermen before, during and after our agency's budget hearing on October 30, 2018, regarding how the Ordinance limits what elected officials (and CPD personnel) may post on social media platforms, namely, their "official City" pages; their purely "political" pages; and their "personal" pages. This opinion addresses these questions.

Some City elected officials may have all three types of pages, while others may have only one or two.

In addition to the questions posed at the budget hearing, requests for informal advisory opinions and guidance from aldermen and other elected officials or their staff regularly come to the Board by phone or email regarding whether, and to what extent, the Ordinance applies to aldermanic social media accounts and what content can be posted, and on which accounts. This opinion is intended to address these as well.

The Board recognizes the ever-expanding role of social media as a means of communication[3], and, in turn, the increase in the number and complexity of related issues raised.  In the course of preparing this opinion, our staff has examined dozens of "official," "personal," and "political" social media account and websites of City, state, and federal elected officials. Accordingly, and as stated by our Executive Director at our agency's budget hearing, we issue this formal advisory opinion pursuant to our authority under §§2-156-380(e) and (l) of the Ordinance.

## II. Relevant Governmental Ethics Ordinance Provisions

In this opinion, we discuss and interpret two (2) Ordinance sections.  They are:

**§2-156-060. City-owned property. No official or employee shall engage in or permit the unauthorized use of any real or personal property owned or leased by the City for City business.**

**§2-156-135. Prohibited political activities…**
**(b)        No official or employee shall intentionally misappropriate any city property or resources of the city in connection with any prohibited political activity; provided, however, any official or employee may reserve and rent a city-owned facility at a fair market value before any such activity or event connected therewith.**

---

[3] In a 2017 case, the U.S. Supreme Court recognized that social media platforms like Facebook and Twitter provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S.Ct. 273, 582 U.S. _ (2017).

### III. Application of the Ethics Ordinance to the Questions Posed

A. Chicago Police Department Personnel. Prior to our budget hearing, Alderman        asked "what are the limits in terms of posting political content on one's Facebook or Twitter or Instagram page, particularly for City employees, like Chicago Police Department ["CPD"] members, who may describe themselves factually as Chicago Police personnel, or even display a CPD badge or reasonable facsimile thereof on their social media pages?"

With respect to the alderman's specific question regarding CPD officers who may describe themselves factually as police officers and/or display a Department badge on their personal social media pages, the CPD's General Order G-09-01-06(V)(c)[4] prohibits the "posting, displaying, or transmitting" on social media outlets of:

(5) any intellectual property of the Department or the City of Chicago without the specific authorization of the Superintendent or his/her designee. Department or City of Chicago   intellectual property includes but is not limited to logos, uniforms, [and] official photographs…

Police departments across the country have policies similar to that of CPD.[5] In light of CPD's order regarding the use of social media, the Board advises that, while CPD officers cannot post the intellectual property of the department, such as a badge, on their social media accounts, they may use their job title, and may post political content, provided they: (i) include disclaimers making it clear that they are not speaking for the Chicago Police Department; and (ii) comply with any CPD-specific directives and rules.

B. Elected Officials' Social Media Pages.  We set our discussion of elected officials' social media accounts and websites in the context of the overarching general principle: government funds or resources should not be spent to help incumbents gain reelection.[6]

With that cardinal rule in mind, we advise, in general, that non-official "personal" or "political" social media accounts of City elected officials (or any City employees or officials) who may wish to comment on public affairs or matters involving City. State, or federal government policies or politicians include a disclaimer, visible on the account's main page, identifying the account as a personal or political account. For example:

*"This is the personal, non-governmental account of Alderman Jane Smith" or "This is the political account of the Friends of Jane Smith, and is paid for entirely by funds from that organization in accordance with any applicable State laws or policies."*

Or

*"This is a private account that contains my personal views and impressions. While I may occasionally provide information of an official nature as a convenience to my readers, this is not an official social media account of the City of Chicago and does not represent the official policies or positions of the City of Chicago (or the Department of X or the City Council").*

---

[4] http://directives.chicagopolice.org/directives/data/a7a57bf0-135f9205-ceb13-5f94-7e998c13b2be7890.pdf

[5] *See, e.g.,* Philadelphia Police Directive 6.10 http://www.phillypolice.com/assets/directives/D6.10-SocialMediaAndNetworking.pdf;   Minneapolis Police Department Policy and Procedure Manual http://www.minneapolismn.gov/police/policy/mpdpolicy_1-300_1-300; and Albuquerque Police Department Order SOP1-2 http://documents.cabq.gov/police/standard-operating-procedures/1-02-social-media.pdf

[6] *See Common Cause v. Bolger*, 574 F. Supp. 672,683 (D.D.C. 1982), aff'd, 461 US 911 (1983); *see also* Board Case No. 18038.A.2, in which we determined that aldermen and their staffers may not engage in "political activity" (as defined) in or with visitors to their City or ward office, but that they may give out general information such as where to vote and assist walk-ins in completing voter registrations form while on City time or with City resources, though these activities are fraught: no "political activity" can occur. https://www.chicago.gov/content/dam/city/depts/ethics/general/AO_ElectOfficials/18038.A.2.pdf

Similarly, should City elected officials have Twitter (or Facebook) accounts that link to or list their "City" or "official" website or pages (e.g., in the left-hand column, underneath the user's profile (@) and location icons (⌖), or next to the user's website icon (✐), then: (i) if they choose to include "electioneering" content (for example, "reelect me because …" or "my opponent claims this … here's why that's bad policy …") on these accounts, the accounts become "political" or campaign accounts, and thus cannot contain any links to their "City" or any other "personal" website or social media account that displays the City seal[7]; and (ii) the Twitter (or Facebook) pages must have a prominent disclaimer such as the following: "This is the political, non-official twitter account of Alderman A, and represents his or her personal and political views only.  To view his or her official Aldermanic Twitter account, see @AldermanChicago51."

However, we note that our examination of dozens of websites and Facebook and Twitter accounts shows that many include political commentary (for example, retweeting President Trump's tweets with critical commentary) but are not otherwise campaign or "political" sites.  We conclude that such postings are analogous to public statements politicians regularly make to the media, and are qualitatively different from "electioneering" content.  While we recognize that this distinction – which is a critical one – may be subtle in some instances (some could argue that all actions or posting made by an incumbent are in part to secure reelection), we here determine that "electioneering content" may occur only on "political" or campaign websites or accounts, and that any site or account that contains such statements may not contain links to their official City pages or any other pages or accounts that display the City seal.

C.  Posting Community Events or Other Notices.  Aldermen                           and         raised additional questions regarding what they can post on their official City and their political or personal social media pages. The general advice outlined in section III.B of this opinion is responsive to their questions.

However, Alderman            question was more specific. He has two Facebook pages. On one, he advertises ward events, like job fairs, and posts links to City operating departments (like the Departments of Planning & Development, Water Management, Streets & Sanitation, and Transportation), and his ward newsletter, many of which postings feature the City seal.  (This site, we conclude, is and functions as an "official" City site, regardless of how it is funded.) He has another page that is for his re-election campaign, which does not display the City seal, but of course uses his title, "Alderman." (This site includes political content, and a link for users to contribute to his re-election campaign – we conclude that it is "political" and subject to the conditions described two paragraphs below and in section III.B, above).

His question: a local business is hosting a free shredding event, and he knows it is of interest to his constituents. May he post a notice advertising the event on both of these pages?

The answer: it depends. We advise that, if he received notice of this event as alderman, and no other residents or campaign opponents received notice of the event, then he cannot post it on his political page (but of course can post it on his "official page"). However, if the event is in fact advertised by its host on

---

[7] An already-settled question is whether a City elected official can include the City seal or other indicia of an official City or ward social media platform (like Facebook or Twitter) on a "political/campaign" or "personal" website or social media account. In Case No. 15014.C, we issued a letter of admonition to an alderman whose campaign-funded website had become "in effect, a City or ward website" precisely because it had all the indicia of an official City/ward site," but it also included a button for making campaign donations.  This was a problem. On the Board's advice, the alderman immediately removed the donation button from this website, and placed it on his campaign website. The Board determined that having this political contribution button on the site – which he thought of as his campaign-funded, "personal" website – but which included the City seal, links for residents or other users to request City services, information about ward nights, and news – constituted an improper use of City-owned property for political purposes in violation of §2-156-060 of the Ordinance (prohibiting unauthorized use of City-owned property), and created the impression that the City officially supported the alderman's candidacy, in violation of §2-156-135(b) of the Ordinance (prohibiting the use of City property or resources for any prohibited political activity). The Board advised the alderman that, if a website/social media account includes "the City seal and/or other indicia of an official City or ward website," it cannot include electioneering content and may have no links to a political committee or links for making campaign donations, even when the site is fully campaign-funded and includes any legally mandated language about its funding.  See https://www.chicago.gov/content/dam/city/depts/ethics/general/AOMinorViolations/15014.mem.doc.

More recently, in Case No. 18036.A1, the Board recently determined that no person may use the City seal in any printed, filmed, broadcast or web-based electioneering communications supporting a candidate for City office, unless the appropriate City authorities specifically authorize it, by ordinance or licensing agreement. See https://www.cityofchicago.org/content/dam/city/depts/ethics/general/AO_PolActvty/18036.A.1.pdf.

(but of course can post it on his "official page"). However, if the event is in fact advertised by its host on the host's own social media pages, or through mass media like hyper-local newspapers, websites, radio, etc., then the alderman may use it on *both* pages – as could his election opponents, as it's public information.

More generally, we reiterate the principle that aldermens' "personal" or "political/campaign" social media pages or websites may include content regarding City/ward business, provided these pages or sites: (i) are not funded or maintained with City resources; (ii) do not use or display the City seal or any likeness thereof; (iii) do not take on the character of an "official" City website or page, such as including the City seal or links to the City's website or City services in such a manner as users could reasonably think it is a City page; (iv) may have newsworthy content (for example, they may have photos of the alderman participating in ground-breaking ceremonies for new construction in the ward with other elected officials and business leaders, or discuss how many miles of streets or water mains have been improved during the alderman's term, or other achievements the alderman has had while in office), with links to an official City site to back up such claims (*e.g.*, a link to a bulletin from the website of the Chicago Department of Transportation); and (v) state clearly and prominently that the sites are the aldermens' (or employee's or other official's) own personal or political/campaign website or social media page and do not represent the official views of the City.[8]

We have also been asked whether aldermen can convert their pre-existing "personal" social media accounts to a political/campaign account. Our advice is that, if the "personal" pages or accounts have displayed links to City services, or ward events, ward newsletters, or other indicia of an "official" account (*see* Case No. 15014.C, discussed in fn. 7), then the aldermen may ***not*** convert those accounts into political/campaign pages or accounts, which would thereby in effect convert these pages' subscribers, followers or friends and their contact information to what would now be a political/campaign account.[9]

D.  Posting Political Photos; Blocking or "Defriending" Users. Following the budget hearing, Alderman _____ shared her Facebook page with the Board's Executive Director. The page has announcements and photos of her appearing as alderman at various public events, and photos of her appearing with other politicians. It also has City service announcements on it, as well as her official reaction as alderman to the Van Dyke verdict,[10] and links to her ward newsletter. She asked whether: (i) she can post her political endorsements on this page; and (ii) whether she can block/defriend followers who have posted profanity and/or called her racist or other offensive names on the page. As we explain, our answers are: (i) no: we advise creating a third purely "political/campaign" page or account to do this; and (ii) users or followers can be deleted or blocked only under rare circumstances.

i.  Political photos or other political content. First, we address whether elected officials can post political endorsements or other political content on "personal" social media pages or platforms like this one, which is not purely "official" or purely "political." The Board has consistently advised City elected officials that they may share political content on their *personal* or *political/campaign* accounts.[11] Posting political

---

[8] The Board advises that disclaimers must be prominent, written in a font that is easily legible, and in a color that contrasts with the background, following the example of the City of Los Angeles. *See* LAMC § 49.7.34(A): https://ethics.lacity.org/wp-content/uploads/2018/02/law_CFO_2017.pdf

[9] Analogously, our colleagues at the New York City Conflicts of Interest Board have determined that a list of contact information maintained by an elected official's City office to disseminate official City communications is a City resource and therefore cannot be used for any non-City purpose. They have also said, and we agree, that the opposite transfer is allowable: an elected official may accept from his or her campaign the campaign-maintained list of email addresses or contact information and use this in pursuit of his or her own official City duties. *See* COIB Advisory Opinion No. 2017-4, at 8-9, https://www1.nyc.gov/assets/coib/downloads/pdf5/aos/2017/AO2017-4.pdf. *See also* Handbook, at 4.4.1.

[10] *See* https://www.chicagotribune.com/news/local/breaking/ct-met-laquan-mcdonald-jason-van-dyke-trial-verdict-20181005-story.html

[11] Similarly, in Advisory Opinion 11-02E, the Seattle Ethics and Elections Commission determined that if a public official maintains a personal social media account, and does **not** provide links to these platforms from a City social media account or other City communication, then the official can post political or electioneering material to the site. http://www.seattle.gov/ethics/etpub/pdfs/1102e.pdf

*See also* New York Conflicts of Interest Board Advisory Opinion No. 2017-1 (Revised), in which the Board explained that although the endorsement of candidates for elective office is a political activity, a City official may use his or her City title in connection with the endorsement of

content (such as endorsements for upcoming elections for public office, sample ballots, political party-based messages, links for users to make political contributions, *etc.*), however, is not the same as maintaining a personal, non-official social media account, such as the one our Executive Director reviewed, that *de facto* includes governmental information, *e.g.*, a calendar of job fairs and ward nights, and/or posts promoting such events and otherwise publicizing City services – because the public will reasonably view this kind of "personal" page as directly related to the official's performance of their governmental duties. Put another way, these "personal" pages will either tend toward being an "official" page (as in Case No. 15014.C), or a "political/campaign" page, depending on the bulk of the content on the page.

Accordingly, if an alderman wishes to maintain such a "personal page," we advise that he or she in effect have three (3) distinct social media pages:

(1) one that is purely political/campaign-related, and may include political or electioneering content such as endorsements, political advertisements, party-supplied content, sample ballots, links for campaign donations, or other kinds of electioneering communications or postings (note: this page may identify the alderman as an alderman, and may also include factual statements about the alderman's accomplishments in office, and photographs of the alderman at ground-breaking ceremonies, *e.g.*, *but no images or likenesses of the official City seal* (per Board Case No. 18036.A1, cited in fn. 7, above)), and of course, this page may not be funded with City money, and City employees or campaign staff may not maintain this kind of page on or with City property, such as during compensated City time or in or with City offices, computers, smart phones, *etc.*;

(2) a second, "personal page," that *could* include governmental information, such as photographs of the alderman in his or her capacity as alderman, <u>or even the City seal</u>, and links to City services or operating departments, but if it does, then it may NOT include electioneering content; and

(3) should the alderman wish, a third, "official" City site, that can be funded with City (or political[12]) money, with the assistance of professionals at the City's Department of Innovation and Technology, and that can display all official City insignia, including the City seal, and have links to City departments, but may NOT have any electioneering content on it.

In all cases, aldermen should take reasonable steps to ensure that shared content avoids creating the impression that a political/campaign or "personal" account is a City resource or an official City account. Further, as we have advised informally, but now formally: an "official" City site *cannot* include links and/or information regarding an alderman's political/campaign social media pages, nor even a disclaimer that the page is an official City page, not a political/campaign page, nor a link re-directing users to the political/campaign page.

ii.  <u>Blocking or deleting comments, friends or followers.</u>  Second, we address whether and to what extent elected officials can block and/or delete followers or "friends" and/or delete comments.  We first note that this is a fluid area of the law.  In a case that centers on the issue of how the First Amendment applies to social media platforms used by government officials to interact with people, *Knight First Amendment Institute v. Trump*, 302 F.Supp.3d 541 (S.D.N.Y. 2018), *appeal filed*, Dkt. No. 18-1691 (2d Cir. June 5, 2018),[13] a New York federal district court recently ruled that, when an elected official uses a personal

---

candidates for elective office.  Accordingly, an elected official may speak as an elected official on his or her personal social media account. https://www1.nyc.gov/assets/coib/downloads/pdf5/aos/2017/AO2017_1.pdf

[12] We note here the Illinois Election Code specifically authorizes City elected officials (and other elected officials in the State) to use funds from their official candidate committees "to defray the customary and reasonable expenses . . . in connection with [their] performance of governmental and public service functions." *See* 10 ILCS 5/9-8.10(c). How a site is funded does not determine whether it is a "City," "personal" or "political/campaign" site. Only its content is relevant in making that determination, and thus which postings can or cannot be made on them.

[13] The U.S. Department of Justice has appealed the Second Circuit's ruling and the appeal is pending.

account to take or describe actions in his or her official capacity, the account becomes a public forum. Thus, comments posted to this type of account are protected by the First Amendment and cannot be deleted, and those commenting cannot be blocked from accessing the account.  In *Knight*, the plaintiffs were seven (7) individuals who were blocked by President Trump from viewing or responding to tweets from his "personal" Twitter account.[14] The plaintiffs argued that, by blocking people from reading his tweets, or from viewing and replying to message chains based on them, the President violated their First Amendment rights because they expressed views he did not like. The District Court agreed, holding that the President's actions in barring access of users to his account were the result of viewpoint discrimination in violation of the First Amendment.  The case is on appeal to the Second Circuit.

Accordingly, the Board advises that elected officials whose "personal" account includes postings commenting on public affairs or matters involving City government, ***should not*** block followers from accessing such pages or delete critical comments, ***unless*** the user's comments are obscene, profane, libelous or defamatory, or are commercial and posted to sell goods or services.[15] Moreover, we strongly recommend that personal accounts (and of course political/campaign accounts) that include political content include a policy, visible on the main page, outlining posting guidelines and explaining that postings are moderated and what types of comments will be deleted. However, if an alderman's personal account does not include content related to political/campaign or official City business, but is truly "personal," with postings only about non-work related matters like the official's family, vacations, favorite movies, restaurants, sports teams' performance, *etc.*, then the official is **not** required to provide access to all members of the public, and nothing in the Ordinance prohibits the official from blocking or deleting comments, users, or followers.  We express no opinion regarding whether users can be blocked or deleted from purely political/campaign pages or accounts, as that is beyond the purview of this Board or the Ordinance.  We urge those maintaining such sites to consult with qualified counsel before blocking or deleting users.

Finally, regardless of the type of social media account at issue, the Board urges that all posted content be true and accurate to the best of the poster's knowledge.

### IV.  Conclusion

The Board's conclusions and advice are based solely on the application of the Ethics Ordinance to the situations and facts described in it. Other laws and/or regulations may apply.  As the issues surrounding social media are often fact-specific, we urge Chicago's elected officials to seek confidential guidance from Board staff with any questions they may have about social media use and the appropriateness of a specific posting.

William F. Conlon
Board Chair

---

[14] The Twitter handle at issue is @realDonaldTrump.
[15] *See also* Seattle Ethics and Elections Commission, Opinion 11-02E:  http://www.seattle.gov/ethics/etpub/pdfs/1102e.pdf

Exhibit 2

5.  Gardiner suggesting they block Pete for being "insulting"

There are dozens of examples of high-volume commenters on Gardiner's pages who insult Gardiner's critics, yet their comments remain and they are not banned.



6.  Gardiner directing Tanya to hide a comment from Pete on "Women to women" post



Exhibit 3



The screenshot on the right appears to be from a later conversation, while the left is continuation of above.



Exhibit 4

    d.  Link to further documentation:
        https://www.facebook.com/AldermanGardiner/posts/706631540220922?comment_id=706744570209619

## Text messages provided by Tanya King related to blocking or silencing critics

1.  Additional evidence that Gardiner personally hid one of my comments related to #7 above.

    a.  First David Feller texts Gardiner and Tanya a screenshot of my comment correcting the name of the neighborhood group in their post, along with his own colorful commentary:



b. Then in a separate SMS chat between Gardiner and Tanya, she points out that he hid my comment and advises that he unhide it, which he apparently did not do.



2. Gardiner messages Tanya regarding hiding and banning Sean Patrick Harder

CITY001

Re: Pete Czosnyka                    Exhibit 5

Tanya King <Tanya.King@cityofchicago.org>
Tue 6/25/2019 2:08 PM
To: Lisa Eilers <Lisa.Eilers@cityofchicago.org>

Hi Lisa,

In the 10 days since our last communication, Pete Czosnyka continues to harass, name call, bully (including doxxing almost every other user that comments), make untruthful statements, etc. We have had constituents reach out to us requesting relief from his harassment. He has commented close to 500 times in the last 10 days. He has taken photos of individuals, altered them and then posted them to the Facebook page. He has posted where individuals live and/or work. he engages in constant cyber-bullying of anyone who posts anything on the Facebook page. Due to his behavior and per our conversation, we are going to block Mr. Czosnyka from the Facebook page.

Thank you for your assistance.
Tanya King
Assistant to the Alderman
Alderman James M. Gardiner, 45th Ward
(773) 628-7224
5425 W. Lawrence Avenue
Chicago, Illinois 60630

From: Lisa Eilers
Sent: Thursday, June 13, 2019 2:17:39 PM
To: Tanya King
Subject: Re: Pete Czosnyka

Thank you for sending the screen grabs, Tanya.  If Mr. Czosnyka posts another questional comment, call me at that time and we can discuss whether the content meets all the elements of defamation before you block him.

- Lisa

Lisa S. Eilers
Deputy Director
City of Chicago Board of Ethics
740 North Sedgwick
Suite 500
Chicago, Illinois 60654-8488
(312) 744-9660
fax: (312) 744-2793
Lisa.Eilers@CityofChicago.org

**CITY002**

**From:** Tanya King
**Sent:** Thursday, June 13, 2019 12:18 PM
**To:** Lisa Eilers
**Subject:** Fw: Pete Czosnyka

Dear Ms. Eiler,

Thank you for taking the time to speak with me this morning. I am forwarding screen-grabs of the defamatory comments made by Peter Czosnyka with regard to the Alderman and children. This individual has been arrested at neighborhood meetings for harassing women in the community and he's well-known for going to people's homes, taking videos of where they live and posting the information on social media. Additionally, he sends bizarre communication via the US Postal Service to the Ward office.

Per our conversation this morning, I will reply to his comment informing him that any further defamatory commentary will result in him being blocked from the Aldermanic and Campaign Facebook pages.

Thank you for your guidance,

Tanya King
Assistant to the Alderman
Alderman James M. Gardiner, 45th Ward
(773) 628-7224
5425 W. Lawrence Avenue
Chicago, Illinois 60630

---

**From:** Tanya King <tamena76@msn.com>
**Sent:** Thursday, June 13, 2019 12:08 PM
**To:** Tanya King
**Subject:** Pete Czosnyka

---

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

Exhibit 6

===========================================

Source:
www.facebook.com/AldermanGardiner/posts/304311680452912



Exhibit 7



Exhibit 7





Exhibit 9



Exhibit 11

 **Alderman Jim Gardiner**
October 16, 2020 · 🌐

Thank you to our friends on the 5700 N Menard who came out today to acknowledge our efforts to improve long overlooked infrastructure issues on their street.

#besties



0:06 / 0:56

👍❤️ 136                                                                143 Comments  5 Shares

 Like          💬 Comment          ➤ Share

Exhibit 14



Exhibit 15

**Alderman Jim Gardiner**
June 24, 2019 · 🌐

While we always encourage spirited discussions, please be aware harassment and personal attacks will not be tolerated.



👍 Dennis Davis, Carma Lynn Park and 173 others    226 Comments  3 Shares


Like          Comment          Share



✏ Author

**Alderman Jim Gardiner**
Hello everyone, As stated, harassment and personal attacks will not be tolerated. The individual who has posted more than 200 comments in the last 72 hours is being removed and blocked from this page. I have monitored your posts and read every single comment requesting relief from their harassment including sharing personal information about where people live and work. Thank you for your understanding. - Tanya

Like   Reply   3y                                           20

◻ 10 Replies

 **Steve Held** ◻
"The First Amendment prohibits an official who uses a social media account for government purposes from excluding people from an "otherwise open online dialogue" because they say things the official disagrees with"

https://www.nytimes.com/2019/07/09/u… **See more**

 NYTIMES.COM
Trump Can't Block Critics From His Twitter Account, Appeals Court Rules

Like   Reply   3y                                           2

 **Brandon Michael Weninger**
Keep breaking the law!

Like   Reply   3y

 **Dan Sheahan**
**Congratulations** brother!

Like   Reply   3y

 **Pete Czosnyka**
Can we list the fake profiles commenting here?
"Sarah Silverton"
"Keyser Soze"… **See more**

Like   Reply   3y   Edited

 **Barbara Gannon**
I can't see that repulsive persons comments either because I blocked him 3 years ago

Like   Reply   3y                                           6

**Mike Rendak**
Keep the high road **Jim Gardiner**! I blocked Pete and Arena long ago. Much happier

Like    Reply    3y                                    👍😆 11

**Pete Czosnyka**
Would this Mitch Ludwig comment be ""harassment and personal attacks "?



Like    Reply    3y                                    👍

**Sandy Rae**
Good luck

Like    Reply    3y

**Robert Groya**
Truth hurts some people and they don't get over it.

Like    Reply    3y                                    👍

🔲 72 Replies

**Moira Cahill**
Given the fact I cannot see a lot of the responses to this post, I can only assume a particularly verbose and unkind person I blocked some time ago is having a field day. 🙄🙄🙄

Like    Reply    3y                                    👍😆 17

🔲 1 Reply

**John Kelly**
Jim Gardner the person who Harasses has not been banned on your page.

Like    Reply    3y                                    👍 2

🔲 11 Replies

**David Forgue** 🔲
LOL. A post asking people to refrain from personal attacks degenerates into . . . personal attacks. Facebook is a cesspool.

And also, yes, those were fireworks.

Like    Reply    3y                                    👍😆 7

🔲 1 Reply



**Pete Czosnyka**

Tone policing now? 

Like  Reply  3y



**Pete Czosnyka**

Would this Ken Schabelski comment be ""harassment and personal attacks "?



Like  Reply  3y



**Amado Eddie**

Just wanted to say thanks to the best and most responsive alderman this ward has had in awhile. The grass across my street has been growing for months and was now waist high. I called Alderman Gardiner's office last week and this morning the problem wa... **See more**





Like  Reply  3y                               31

⬛ **6 Replies**



**Ken Schabelski** ⬛

-

The repetitive toxic rantings of Pete is unwarranted and unnecessary.

I, for one, will not be intimidated by his abuse and bullying.... **See more**

Like  Reply  3y  Edited                       12

⬛ **11 Replies**

 **Pete Czosnyka**
Would this "Sarah Silverton" comment be "harassment and personal attacks "?



Like    Reply    3y

 **Pete Czosnyka**
Would this "Sarah Silverton" comment be "harassment and personal attacks "?



Like    Reply    3y

 4 Replies

 **Pete Czosnyka**
Would this "Sarah Silverton" comment be "harassment and personal attacks "?



Like    Reply    3y

 **Pete Czosnyka**
Would this Tim Gillespie comment be "harassment and personal attacks "?



Like    Reply    3y

 **Pete Czosnyka**
Would this Tim Gillespie comment be "harassment and personal attacks "?



Like    Reply    3y



**Pete Czosnyka**
Would this Tim Gillespie comment be "harassment and personal attacks "?

Like   Reply   3y

⬜ 24 Replies

**Pete Czosnyka**
Would this Ken Schabelski comment be "harassment and personal attacks "?

Like   Reply   3y

**Pete Czosnyka**
Would this Ken Schabelski comment be "harassment and personal attacks "?

Like   Reply   3y

**Pete Czosnyka**
Would this Ken Schabelski comment be "harassment and personal attacks "?

**Emily Reisbeck**
Mr. Gardiner, you are our alderman. You are a public servant representing our interests. If we do not feel you are representing our interests, you should know that we will not always be polite in saying so.

**Like**   **Reply**   3y                                    👍😆 8

⬜ 31 Replies



**Pete Czosnyka**

Would this Mitch Ludwig comment be ""harassment and personal attacks "?



Like    Reply    3y



**Heidi Carrell Bassie**



Like    Reply    3y

 4



**Pete Czosnyka**

.
Alderman Gardiner,
What do you consider "harassment and personal attacks "?

Like    Reply    3y