## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PETE CZOSNYKA, *et al.*,

    Plaintiffs,

        v.

JAMES GARDINER,

    Defendant.

21-cv-3240

Hon. Sharon Johnson Coleman

### PLAINTIFFS' RESPONSE IN OPPOSITION TO
### DEFENDANT GARDINER'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Pete Czosnyka, Adam Vavrick, Dominick Maino, Peter Barash, James Suh and Steve Held, through counsel, respond in opposition to Defendant-Alderman James Gardiner's motion for summary judgment as follows:

### INTRODUCTION

Plaintiffs are six residents of Chicago's 45th Ward who sought to petition their elected city council representative and participate in dialogue with other members of their community through an internet forum that was explicitly created for those purposes—namely, Defendant Alderman James Gardiner's Facebook Page. DSOF at ¶3-4.[1] In his motion for summary judgment, Defendant Gardiner admits that he interfered with the Plaintiffs' participation in this public forum because they "criticized him or his policies." DSOF at ¶5. But he argues that he shouldn't be held

---

[1] Plaintiff uses the following abbreviations to refer to the parties' statements of material facts: (1) "DSOF" refers to Defendant's Statement of Material Facts, ECF 83-1; (2) "PSOF" refers to Plaintiffs' Statement of Material Facts, ECF 85; and (3) "Plf. Add'l Facts" refers to Plaintiffs' statement of Additional Material Facts, filed simultaneously with this memorandum.

liable for violating the Plaintiffs' First Amendment rights under the doctrine of qualified immunity. Def. Memo., ECF 83-2.

Defendant Gardiner's attempt to evade responsibility for his conduct should be rejected and his motion for summary judgment denied. As explained below, Defendant's argument for qualified immunity lacks merit because any reasonable public official would know that interference with speech in a public forum based on the viewpoint expressed is forbidden by the First Amendment. Moreover, Alderman Gardiner continues to violate the First Amendment by engaging in content-based regulation of speech, and thus Plaintiffs have an ongoing claim for injunctive relief which is not barred by qualified immunity.

## RELEVANT FACTS

Most of the material facts are not in dispute. As set forth in his statement of material facts, Defendant Gardiner "administers and oversees" the Alderman Gardiner Facebook Page (www.facebook.com/AldermanGardiner) for the purpose of communicating "with his constituents about a variety of government functions." DSOF at ¶¶2, 3. He has "final say over whether individuals are blocked from interacting with the Page and whether comments are hidden or deleted." *Id*. The Facebook Page is a public forum through which 45th Ward residents and other Chicagoans are invited to "express opinions, ask questions and engage in debate." *Id*. at ¶4.

Defendant Gardiner admits that he has "hidden or deleted comments that criticized him or his policies" and "blocked constituents from being able to engage

with the Facebook Page after they posted comments critical of him or his policies." *Id*. at ¶¶5, 6. Defendant Gardiner further admits that he has blocked the Plaintiffs and/or hidden or deleted their comments "based on the content of their posts." *Id*. at ¶7.[2]

The one fact on which the parties disagree is whether Defendant Gardiner's content-based interference with Plaintiffs' speech has ceased. In his statement of facts, Defendant Gardiner states that he blocked Plaintiffs and hid or deleted their comments "in the past." DSOF at ¶¶6-7. In fact, the evidence shows that Defendant Gardiner continues to engage in content-based regulation of speech on the Facebook Page today. In the past week alone, he has hidden comments posted by Plaintiffs Czosnyka, Maino and Vavrick. *See* Plf. Add'l Facts at ¶¶1–12.

For example, on January 25, 2023, the *Chicago Tribune* ran a story with the headline "Embattled Ald. Jim Gardiner's fitness is key issue in race for 45th Ward." (https://www.chicagotribune.com/politics/elections/ct-45th-ward-alderman-20230125-rmlfvbza75eevn7hrj5d7q2z4u-story.html). The same day, the website *Block Club Chicago*, whose mainstay is local news, ran a story with the headline "Ald. Jim Gardiner Should Be Investigated For Harassing Challenger's Volunteers, Ethics Board Tells City Watchdog." (https://blockclubchicago.org/2023/01/25/ald-jim-gardiner-should-be-investigated-for-harassing-challengers-volunteers-ethics-board-tells-city-watchdog/); *see also* Plf. Add'l Facts at ¶1. Both articles made reference to

---

[2]    Details regarding various ways in which Defendant Gardiner interfered with each Plaintiffs' First Amendment rights are set forth in full in Plaintiffs' Statement of Material Facts and Opening Summary Judgment Brief. ECF 84, 85. Plaintiffs do not repeat all of those facts here.

an incident wherein Defendant Gardiner was captured on video confronting an individual who was collecting signatures for an opposing candidate for 45th Ward Alderperson. *Id.*

In apparent response to the articles, Defendant Alderman Gardiner posted on his Facebook Page on January 26, 2023: "When you #SpeakTruthToPower you become a target... #chicago #standforsomethingorfallforanything #theprideof45." *Id.* at ¶2. Members of the community posted more than 100 comments in response to the Alderman's claim that he was being "targeted" and to the press coverage about his alleged misconduct. *Id*. Plaintiff Adam Vavrick commented on the post as follows:

> This is actually one of the more truthful things Alderman Jim Gardiner has ever posted.
>
> - He made a target of his ex girlfriend when she left him for greener pastures, so much so that she requested and received an emergency order of protection to get him to stop stalking her.
> - He made a target out of the former Alderman, anyone he just blithely assumes supported the former Alderman, and any project or development the former Alderman touched, and any business who he sees as "friendly" to the former Alderman as a way of showing his dominance, all [at] the expense of the constituents he pretends to serve.
> - He made a target of Pete Czosnyka for speaking truths about his lack of planning and competence.
> - He made a target of James Suh when James organized against his mishandling of The Point at six corners.
> - He made a target of Block Club and other media outlets that would dare to publish anything remotely negative (and demonstrably true!) about him, refusing to engage with the media at all.
> - He made a target of myself and several others for sharing publicly available municipal funding information on this page that proved that Jim lies about basic city services and ward fund allocations
> - He made a target of women who didn't toe the line for him or were not afraid of him ….

4

> I could go on, and on, and on, but let's not forget the person who Jim has placed the largest target on: Himself.

*Id.* at ¶3. Defendant Gardiner hid the comment, making it invisible to members of the community who view the Page unless they are connected to Plaintiff Vavrick as a friend on Facebook. *Id.* at ¶4.

In addition, on January 27, 2023, Plaintiff Dominick Maino posted a link to the above-mentioned *Block Club Chicago* article in the comments section of the Page with the following comment:

> Alderman Jim Gardiner, it seems as if your stalking behavior now extends to constituents who want to support a candidate for the 45th Ward that is NOT YOU. As a noted stalker, you should not harass those who live in the 45th Ward no matter who they support.

*Id.* at ¶5. Again, Defendant Gardiner hid the comment from the Page, making it invisible to members of the community who view the Page unless they are connected to Plaintiff Maino as a friend on Facebook. *Id.* at ¶6.

Next, on January 27, 2023, Alderman Gardiner posted a notice of an upcoming Chicago Police Department entrance exam, writing as follows: "The #45thward wants to inform residents of a great opportunity for those brave enough to #bethechange they want." *Id.* at ¶7. Visitors to the Page posted more than 150 comments on the post, discussing their varying views on the Chicago Police Department, the Fraternal Order of Police, and publicized incidents of police misconduct. In one exchange, Plaintiff Pete Czosnyka posted an article that discussed a pattern of unlawful traffic stops by Chicago police officers on the West Side of Chicago. *Id.* at ¶8. An individual named Kevin Wilson responded to

Czosnyka's comment, writing that "they should be glad they got off with a warning." Czosnyka replied, "racial profiling is endemic in the CPD to the detriment of us all. You write like a cop using a pseudonymous account. Do better." Wilson replied, "I don't represent CPD but I certainly support them." Czosnyka replied, "You're not supporting them very well. You're more the bootlicker-back-the-blue-mindlessly type." *Id*. Defendant Gardiner hid Czosnyka's final comment, making it invisible to members of the community who view the Page unless they are connected to Plaintiff Czosnyka as a friend on Facebook. *Id*. at ¶9.[3]

The above-described incidents demonstrate that Defendant Gardiner is still engaged in content-based regulation of content on the Page.

## ARGUMENT

Defendant Gardiner's motion for summary judgment based on qualified immunity fails for three reasons: (1) qualified immunity does not shield public officials from claims for injunctive relief to halt ongoing violations of constitutional rights; (2) qualified immunity does not shield Defendant Gardiner from liability for nominal and/or compensatory damages because the law regarding content-based regulation of speech in a public forum was clearly established; and (3) qualified immunity does not shield public officials from liability where, as here, they choose to undertake a course of action that violated citizens' constitutional rights after

---

[3]    As discussed more fully in the argument below, Plaintiffs believe that Alderman Gardiner is using Facebook's "keyword filtering" function to automatically hide comments that contain certain keywords that he identified, including "stalk" or variations of that word, and the word "bootlicker." *Id*. at ¶12.

having an opportunity to reflect and seek counsel. Plaintiffs address each point in turn below.

## I. Qualified Immunity Does Not Shield Public Officials from Claims for Injunctive Relief

Even if the Court determines that Defendant Gardiner is entitled to qualified immunity from Plaintiffs' damages claims, his motion for summary judgment should be denied. Plaintiffs seek injunctive relief to halt ongoing violations of their First Amendment rights and prevent future violations, and it is well established that "the defense of qualified immunity does not protect defendants from an action for injunctive relief." *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012); *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010); *Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003); *see also* ECF 1, Complaint at ¶5, 92 (seeking a "permanent injunction prohibiting Defendant Gardiner from engaging in content-based regulation of speech on his Facebook Page.")

Although Defendant Gardiner unblocked all of the Plaintiffs after being served with this lawsuit (*see* PSOF at ¶40), injunctive relief is still necessary for two reasons. First, Defendant Gardiner is still engaged in content-based regulation of comments on his Page by hiding comments containing words that he considers to be "derogatory." Plf. Add'l Facts, at ¶10. And second, in the absence of injunctive relief, Defendant Gardiner would be free once again to return to content-based moderation of the Page, such as blocking individuals with whom he disagrees.

### A. Injunctive Relief Is Warranted Because Defendant Gardiner Is Still Engaged in Impermissible Content-Based Regulation of Speech

As explained in the statement of relevant facts above, Defendant Gardiner is still engaging in content-based regulation of speech on his Facebook Page, either by proactively hiding the Plaintiffs' comments or by using a "keyword filter" to automatically hide certain comments. Simply put, Defendant Gardiner continues to suppress speech based on disagreement with the viewpoint expressed.

In his deposition, Defendant Gardiner testified that he had enabled Facebook's "keyword filtering" function on his Page to automatically "hide" comments containing words that he deems to be "derogatory," such as "stalker." Plf. Addl' Facts at ¶10. He testified that he did this because the word "stalker" was being used in a "derogatory manner" towards him. *Id*. He could not recall the word "stalker" having been used about anyone other than himself. *Id*. He further testified that he used keyword filtering to hide comments containing other words that he deemed to be "derogatory in nature," although he could not recall precisely what words he had included. *Id*. Defendant Gardiner testified that he had stopped using keyword filtering at the time of his deposition. *Id*. at ¶11. As set forth above, however, the evidence shows that Alderman Gardiner continues to hide comments that include certain words such as "stalker" (or variations of it) and "bootlicker." *Id*. at ¶12; *see supra* at 2–6.[4]

---

[4] To carry out this suppression, Alderman Gardiner is likely using a keyword filter to hide individuals' comments, but it is possible that he is personally reviewing comments and hiding those containing language he deems to be "derogatory." *See* Plf. Add'l Facts, at ¶12.

Defendant Gardiner may not like it when members of the public refer to him as a "stalker."[5] But whether he likes it or not, the First Amendment protects citizens' right to criticize government officials. *See N.Y. Times Co. v. Sullivan*, 37 U.S. 254, 272–73 (1964). The Supreme Court has repeatedly affirmed that government officials may not prohibit speech on the basis that it is offensive. As the Court put it in *Matal v. Tam*, "Giving offense is a viewpoint." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *see also Street v. New York*, 394 U.S. 576, 592 (1969) ("the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.")[6]

Thus, because Defendant Gardiner is engaged in ongoing First Amendment violations by hiding comments he deems to be "derogatory," injunctive relief is necessary and Defendant is not entitled to qualified immunity.

---

[5]    The designation is based on the Alderman's history of having an Order of Protection entered against him and documented incidents of his harassing constituents who criticize or oppose him. *See* PSOF at ¶¶25, 54, 87; Plf. Add'l Facts at ¶¶1, 3, 5.

[6]    As set forth in Plaintiffs' opening brief, Plaintiffs believe it would be consistent with the First Amendment for Alderman Gardiner to adopt a written policy prohibiting comments that are profane, obscene, defamatory, or commercial. *See* ECF 84, Plf. Mot. at 5. However, an unwritten policy whereby Alderman Gardiner retains discretion to remove content that he personally considers "offensive" or "derogatory" towards him is not neutral within the meaning of the First Amendment.

**B. Injunctive Relief Is Warranted Because in the Absence of an Injunction, Defendant Gardiner Could Revert to Content-Based Moderation of the Page**

Injunctive relief is also necessary because, in the absence of an injunction, Defendant Gardiner would be free to revert to the practices that led Plaintiffs to bring this lawsuit, including blocking individuals with whom he disagrees and hiding or deleting comments that he does not like.

A defendant's voluntary cessation of unconstitutional conduct does not render a claim for injunctive relief moot because the defendant remains "free to return to his old ways." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1953). Indeed, a case will become moot only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *see also id.* (The "heavy burden" of persuading the court that the challenged conduct "cannot reasonably be expected to start up again" lies with the party asserting mootness.).

When a government official asserts that a claim for injunctive relief is moot because he has voluntarily ceased an unconstitutional practice, courts evaluate whether the change in conduct reflects a permanent, explicit policy change that "'irrevocably eradicated the effects of the alleged violation," or a measure that may later be rescinded. *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747–48 (7th Cir. 1999) (challenge to constitutionality of police department directives was not mooted by Department's memorandum instructing officers to disregard the policies "immediately and until further notice.").

Here, it is true that Defendant Gardiner, at the advice of corporation counsel, unblocked the Plaintiffs after he was served with this lawsuit and testified that he does not currently "censor" users' posts on the Page. PSOF at ¶¶10, 51, 59, 69; *see also*, Plf. Add'l Facts, at ¶13 (testimony that Defendant Gardiner "no longer block[s] anybody" and "[doesn't] censor anything."). But Defendant Gardiner made clear that this decision did not reflect a permanent change in policy. To the contrary, he testified that he has not adopted any formal "policy with clear guidelines about what contents can and can't be posted on the page"; and he still considers it to be within his "discretion" to decide whether a particular comment on the Page is allowed based on his sense of whether a post is "harassing in some way" or made someone "uncomfortable." Plf. Add'l Facts at ¶16. Indeed, Alderman Gardiner testified that he may again delete comments or block users in the future. In particular, he was asked the following questions and gave the following answers:

> Q. Are there circumstances under which you would block someone from the Facebook page in the future?
> A. I don't know.
> Q. Is it your understanding that you have the discretion to make a judgment call about whether to block someone from the page?
> A. Can I judge whether or not to block somebody? Yes, I have the decision to block or unblock somebody.
> Q. I understand your testimony is at the present time no one is blocked. Do you know what might lead to your blocking someone in the future?
> [Objection omitted]
> A. Yeah. No. I can't speculate just on what the future would hold.
> …
>
> Q. The same with regard to comments. I understand that you've now adopted a hands-off moderation policy. Might that change at any point in the future?
> A. I cannot speak about what would happen in the future.
> Q. So it's not your official policy that you will never moderate content on the Facebook page in the future; is that fair?

A. I don't know what the future holds.

Q. So it's possible that at some point in the future you may start moderating content on the Facebook page even though right now you're not?

A. It's possible.

Plf. Add'l Facts, at ¶14.

Moreover, when asked why he was currently not moderating content on the Facebook Page, Defendant Gardiner did not attribute the decision to a permanent policy change but stated that he did not "have the time" to moderate the Page. *Id.* at ¶15 ("Q. Why don't you currently moderate any of the content on your Facebook page? A. I don't have the time with the responsibilities that I have as an alderman.")

Under these circumstances, Plaintiffs have a continuing entitlement to injunctive relief to prevent future violations of their constitutional rights. Thus, Defendant's motion for summary judgment based on qualified immunity should be denied.

## II. The Right at Issue Is Clearly Established

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendant Gardiner's argument for summary judgment hinges entirely on his claim that it was not "clearly established" that it would violate the First Amendment for a public official to block his constituents from his official social media accounts and/or delete comments with which he disagreed. Def. Memo. at 4.

There are two principal reasons this argument fails: (1) at the time Defendant Gardiner blocked the Plaintiffs and deleted or hid their comments, the pertinent legal principles were clearly established such that it is fair to hold Defendant Gardiner liable for damages; and (2) if there was any lack of clarity about how the First Amendment would apply to Defendant Gardiner's Facebook Page, it was dispelled by this Court's motion to dismiss decision and other more recent decisions holding officials liable for similar acts, and thus Gardiner is liable for damages for his *ongoing* First Amendment violations.

## A. The Pertinent Legal Principles Were Clearly Established

To show that a right is "clearly established," Plaintiffs need not point to an "identical case finding the alleged violation unlawful, but existing precedent must have placed the statutory or constitutional question beyond debate." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (*citing Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). In the absence of controlling precedent from the Supreme Court or the Seventh Circuit, courts "broaden [their] survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that [they] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (*quoting Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)). Even "in the absence of controlling or persuasive authority, plaintiffs can demonstrate clearly established law by proving that the defendant's conduct was 'so egregious and unreasonable that ... no reasonable official could have thought he was acting lawfully." *Id.* (*quoting Abbott v.*

*Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013)); *see also Jacobs v. City of Chi.*, 215 F.3d 758, 767 (7th Cir. 2000) ("[W]here the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases ... .").

Applying these principles here, Plaintiffs show that during the time period that Defendant Gardiner blocked the Plaintiffs and/or deleted and hid their comments as outlined in Plaintiffs' Statement of Facts (late 2020 through June 2021), a reasonable public official in Defendant Gardiner's position would have known that his conduct violated the First Amendment.

### 1. Viewpoint Discrimination Violates the First Amendment

Defendant Gardiner's argument for qualified immunity blatantly ignores bedrock First Amendment doctrines. More than 50 years ago, the Supreme Court held that when a government entity opens a forum for speech by members of the public, the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). The Supreme Court has described viewpoint discrimination as a "blatant and egregious" First Amendment violation. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (*citing Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828-29 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.")); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 804-06 (1985) (when the

government opens a limited forum for speech, it may not "discriminate against speech on the basis of its viewpoint" within that forum.). The Court has also repeatedly made clear that regulations of speech that "favor[] some speakers over others" violate the First Amendment where, as here, "speaker preference reflects a content preference." *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 658 (1994).

Based on these principles, no reasonable public official in Defendant Gardiner's position could have thought it was lawful to pick and choose who can participate in a forum explicitly established for the purpose of fostering dialogue with and between members of the community; nor could a reasonable public official have believed it was lawful to hide or delete particular comments based on disagreement with the viewpoints expressed.

### 2. The Supreme Court Has Held that the First Amendment Applies to Regulation of Speech on the Internet and Social Media

The Supreme Court has made clear that the principles articulated above apply not only to physical forums like a public sidewalk or town hall meeting, but also to "metaphysical" forums where speech occurs. *Rosenberger*, 515 U.S. at 830 (a university's "student activities fund" which was authorized to subsidize printing costs for student publications constituted a public forum).

Contrary to Defendant's claim that the application of First Amendment principles to speech on the Internet is "unsettled" and "far from clear" (Def. Memo. at 6–7), the Supreme Court held more than 25 years ago that First Amendment principles apply with full force to speech that takes place on the Internet, finding

"no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Long before the advent of today's social media platforms, the Supreme Court recognized the particular importance of protecting from undue government interference speech that takes place on Internet forums that facilitate dialogue and debate between citizens, noting that applications such as "newsgroups and chatrooms" allowed anyone "to become a town crier with a voice that resonates farther than it could from any soapbox." *Id.* at 870.

In *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court again affirmed that First Amendment protections apply to "the vast democratic forums of the Internet in general, and social media in particular." 137 S. Ct. at 1735–36. There, the Court held that a statute prohibiting individuals required to register as sex offenders from posting on social media sites violated the First Amendment. *Id.* Key to the Court's decision in *Packingham* was its observation that social media platforms were particularly well suited to facilitating the precise type of speech with which Defendant Gardiner interfered—namely, "petition[ing] elected representatives and otherwise engag[ing] with them in a direct manner." *Id.*

Thus, at the time that Alderman Gardiner blocked the Plaintiffs and deleted or hid their comments, it was clear that the First Amendment protects against viewpoint discrimination by the government on social media. *Packingham*, 137 S. Ct. at 1735.

### 3. A Robust Consensus of Persuasive Authority Made Clear that Content-Based Regulation of Speech on Government Officials' Social Media Pages Was Unconstitutional

The above authority, standing alone, would have made it clear to a reasonable public official that content-based regulation of citizens' speech on social media violated the First Amendment. However, if there were any doubt about the extent to which First Amendment doctrines would apply to government officials' regulation of speech on their social media pages, numerous decisions explicitly held that such regulation was impermissible prior to Plaintiffs' bringing this case. These decisions constitute a "clear trend" that made clear that "recognition of the right by a controlling precedent was merely a question of time.'" *Cleveland-Perdue*, 881 F.2d at 431.

### a. *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019)

Defendant claims in his brief that "this Court is the first within the Seventh Circuit's jurisdictional territory to pass on the issue and hold, at the pleading stages, that a party may state a cause of action for violations of the First Amendment because a public official is alleged to have blocked their access or deleted their comments on a public-facing, interactive social media page." Def. Memo. at 4. This contention is wrong.

In *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019), which was decided more than a year before Plaintiffs filed their lawsuit, the district court granted summary judgment to One Wisconsin Now ("OWN"), a liberal advocacy organization, on its First Amendment claim against three elected members of the

Wisconsin State Assembly who blocked OWN's account on their respective Twitter pages. *Id*. at 941. The court found that "(1) defendants acted under color of state law in creating and maintaining their respective Twitter accounts in their capacity as members of the Wisconsin State Assembly; (2) the interactive portion of defendants' Twitter accounts are designated public forums; and (3) defendants engaged in content-based discrimination when they blocked the plaintiff's Twitter account." *One Wis. Now*, 354 F. Supp. 3d at 949-50. As a result, the court found "plaintiff is entitled to a grant of summary judgment on its liability claims." *Id*

### b. *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)

Likewise, the Fourth Circuit decided *Davidson v. Randall*, 912 F.3d 666 (4th Cir. 2019) more than a year prior to the 2020 and 2021 acts for which Plaintiffs seek to hold Defendant Gardiner liable. In *Davidson*, the Fourth Circuit held that the chair of a county Board of Supervisors violated the First Amendment when she banned "an outspoken resident" from commenting on her Facebook Page for approximately 12 hours and deleted a comment on the Page in which the resident accused School Board members of "taking kickback money." *Id*. 912 F.3d at 675. The Court concluded that "the interactive component of the Chair's Facebook Page constituted a public forum, and [defendant] engaged in unconstitutional viewpoint discrimination when she banned [the plaintiff's Facebook account] from that forum." *Id*., at 688. The Fourth Circuit also upheld the district court's decision to the extent it "rejected [defendant's] qualified immunity argument." *Id*. at 676.

### c. *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019)

Similarly, in *Knight First Amendment Institute v. Trump*, 928 F.3d 226 (2nd Cir. 2019) (*vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021)), the Second Circuit affirmed a district court decision concluding that comment threads on former President Donald Trump's personal Twitter account, @realDonaldTrump, constituted a public forum and that content-based regulation of who could respond to the tweets posted by the account violated the First Amendment. *Id.* at 235. In reaching its conclusion, the Court cited *Packingham* and noted that "social media is entitled to the same First Amendment protections as other forms of media" (*id.* at 237) and that the president created a public forum when he "made [the Twitter account's] interactive features accessible to the public without limitation." *Id.*[7]

---

[7]   Defendant correctly notes that the Second Circuit's decision was vacated as "moot" after Trump lost his reelection bid. But Defendant is wrong to contend that vacatur means the decision "cannot be counted as persuasive authority." Def. Memo. at 5. Courts have consistently held the opposite. *See, e.g., Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.,* 778 F. Supp. 2d 858, 871 n.4 (N.D. Ill. 2011) ("The Supreme Court's decision vacating the judgment in *Tellabs I* did not address the Seventh Circuit's materiality holding. As such, the Court will consider *Tellabs I* as persuasive authority on the issue of materiality."); *Spears v. Stewart,* 283 F.3d 992, 1017 n. 16 (9th Cir. 2002) ("Vacated opinions remain persuasive, although not binding authority."); *United States v. Young,* 846 F. App'x 179, 182 (4th Cir. 2021) ("the unchallenged portion of an opinion containing a vacated judgment is at least persuasive authority."); *Brown v. Kelly,* 609 F.3d 467, 476 (2d Cir. 2010) (treating a relevant decision that was vacated on other grounds as "persuasive authority"). Accordingly, numerous courts, including this one, have treated the Second Circuit's decision in *Knights* as persuasive. *See Czosnyka v. Gardiner,* No. 21-cv-3240, 2022 U.S. Dist. LEXIS 24070 (N.D. Ill. Feb. 10, 2022) (citing *Knights* in decision denying Defendant Gardiner's motion to dismiss).

### d. *Felts v. Reed*, 504 F. Supp. 3d 978, 985 (E.D. Mo. 2020)

In *Felts v. Reed,* 504 F. Supp. 3d 978 (E.D. Mo. 2020), which Defendant does not cite, the court denied a motion to dismiss First Amendment claims for injunctive relief and nominal damages brought by a citizen who alleged the "president of the St. Louis Board of Aldermen … violated her First Amendment rights by blocking her from his Twitter account in an act of viewpoint discrimination in a designated public forum." *Id.* at 982.[8] The conduct at issue in *Felts* occurred in January 2019, and the decision denying the motion to dismiss the plaintiffs' damages claim was entered approximately six months prior to Plaintiffs' bringing this suit.

### e. *Robinson v. Hunt Cty.*, 921 F.3d 440 (5th Cir. 2019)

In *Robinson v. Hunt Cty.*, 921 F.3d 440 (5th Cir. 2019), the plaintiff alleged that a local sheriff's department violated the First Amendment when in January 2017 it blocked her from the Department's Facebook Page and deleted a comment that criticized the sheriff's policies and made "highly offensive remarks" about a deceased police officer. *Id.* at 445. The Fifth Circuit reversed the district court's decision granting the sheriff's motion to dismiss and its denial of plaintiffs' motion for a preliminary injunction, finding that the sheriff's actions constituted impermissible "viewpoint discrimination" in a "forum subject to First Amendment protection." *Id.* at 447-48 (citing *Rosenberger*, 515 U.S. at 829).

---

[8]   Judgment for declaratory relief, nominal damages, costs and attorneys' fees was later entered in favor of the plaintiff. *See Felts v. Vollmer*, No. 4:20-CV-00821 JAR, 2022 U.S. Dist. LEXIS 222205 (E.D. Mo. Dec. 9, 2022).

Defendant correctly notes that the district court in *Robinson* had found that certain sheriffs' department employees were entitled to qualified immunity for their role in the decision to block the plaintiff, and the plaintiff did not appeal that decision. Def. Memo. at 6. But this is of little help to Defendant Gardiner. Gardiner's decision to block the Plaintiffs and/or delete their comments occurred years after the conduct challenged in *Robinson*, which took place in January 2017. Moreover, in contrast to Defendant Gardiner's conduct, the conduct challenged in *Robinson* took place prior to the Supreme Court's decision in *Packingham*, which made the law pertaining to government regulation of social media clearer.

### f. *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018)

Defendant Gardiner's strongest authority for the idea that the law was unclear at the time Plaintiffs brought suit is *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky., 2018), which he describes as "contrary district-level authority holding that a public official was within his rights to block social media users and delete posts under very similar circumstances to those in this case." Def. Memo. at 6. But even this case ultimately doesn't help Defendant. It is true that in December 2018, the district court in *Morgan* found that the plaintiffs had not established entitlement to a preliminary injunction against Gov. Matt Bevin based on his decision in "late 2016 or early 2017" to block the plaintiffs on Facebook and Twitter. *Id*. at 1008. But later in the case, Gov. Andy Beshear, who replaced Bevin, "voluntarily changed positions," adopted a new "social media policy for the governor's office" and did not oppose the plaintiffs' motion to vacate the preliminary injunction ruling. *See* Ex. 1,

July 3, 2020, Unopposed Motion to Vacate Preliminary Injunction Ruling in Light of New Social Media Policy (noting that "the legal landscape has shifted significantly in the two years since this Court's preliminary ruling."). The parties ultimately settled the case.

In sum, at the time Defendant Gardiner acted, there was a robust consensus among the federal courts that public officials' social media pages are forums for speech to which the First Amendment applies and that it violates the First Amendment for a public official to engage in content-based regulation of speech within such forums. Given this authority, a reasonable public official in Defendant Gardiner's position would have known that his conduct violated the First Amendment.

### B. It Is Now Clear that the First Amendment Prohibits Alderman's Gardiner's Content-Based Censorship of Comments

Finally, even if Alderman Gardiner had a legitimate claim that the law applicable to his actions was "unsettled" in 2020 and 2021, he is not entitled to qualified immunity from damages for his recent acts of content-based deletion of comments because this Court's decision denying his motion to dismiss made the constitutional principles applicable to his conduct unequivocally clear. *See Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 U.S. Dist. LEXIS 24070 at *5–*6 (N.D. Ill. Feb. 10, 2022) ("federal courts have concluded that when the government or a government official uses a social media account for official business, the interactive portions of the social media platforms are public forums for First Amendment purposes. [citations omitted] … Here, plaintiffs have plausibly alleged that

22

Alderman Gardiner restricted their access to a public forum in violation of the First Amendment by barring them or deleting their comments from the interactive portions of his Facebook Page that designates Alderman Gardiner as a government official.").

Thus, Defendant Gardiner's motion for summary judgment based on qualified immunity should be denied as to his recent acts of content-based regulation on the Page.

## III. Qualified Immunity Isn't Available Where, as Here, an Official Has Fair Warning that His Conduct Was Unconstitutional and Time to Deliberate

When Congress enacted 42 U.S.C. §1983, its explicit purpose was to provide a private right of action against state officials who violate federally protected rights. Over a century after its passage, however, the Supreme Court overrode that legislative judgment out of fear that Congress crafted a rule too harsh for those occasions when law enforcement officers "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (same); *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (the "proper perspective" for judging official conduct is that of "a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events."). Punishing only those violations of clearly established law protects officers acting in the field at times when they can't hesitate and it's "difficult ... to determine how the relevant legal

doctrine ... will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (citation omitted).

This policy undermines the "foundational constitutional principle" that §1983 embodies: "Where there is a right, there must be a remedy." Evan Bernick, *It's Time to Limit Qualified Immunity*, Geo. J.L. & Pub. Pol'y: Legal Blog (Sept. 17, 2018), http://bit.ly/3HtbfNi. There are many well-documented practical, textual, and separation-of-powers problems with the judiciary establishing immunity doctrines to insulate officials from liability for their constitutional violations—especially when the legislature has provided an explicit right of action like §1983.[9] Although this Court cannot overrule qualified immunity, it should not extend the doctrine beyond its foundational basis.

The Supreme Court created qualified immunity to let officers cross unclear constitutional lines in "the spur (and in the heat) of the moment" without fear of "surviving judicial second-guessing months and years" later. *Atwater v. Lago Vista*, 532 U.S. 318, 347 (2001); *see also Ryburn*, 565 U.S. at 477 (admonishing judges to "be cautious about second-guessing a police officer's assessment, made on the scene,

---

[9]    *See, e.g., Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (Qualified immunity has effectively "gutt[ed]" constitutional protections.); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part) ("[W]e have diverged from the historical inquiry mandated by the statute [and] have completely reformulated qualified immunity along principles not at all embodied in the common law." (cleaned up)); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under [] §1983 has not purported to be faithful to the common-law immunities that existed when §1983 was enacted, and that the statute presumably intended to subsume"); *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring) ("[I]n the context of qualified immunity ... we have diverged to a substantial degree from the historical standards.").

of the danger presented by a particular situation"). As a result, §1983 protects only those rights that are established clearly enough to ensure that officers have fair notice of what the law requires when deciding whether "to show restraint ... 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Lewis*, 523 U.S. at 853 (citation omitted).

Qualified immunity is not a one-size-fits-all "license to lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Even under qualified immunity, officers are not "wholly free from concern for [] personal liability" when they have the chance to deliberate. *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985). The balance the Supreme Court struck between remedying constitutional harms and protecting government officials is a "fair notice" standard. *See Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). Qualified immunity deprives individuals of redress for constitutional injuries only when a reasonable officer could not be "expected to know that certain conduct would violate ... constitutional rights." *Harlow*, 457 U.S. at 819. Officers remain subject to liability when they had "fair warning that their alleged [behavior] was unconstitutional." *Hope*, 536 U.S. at 739–41. When officers should know that their actions will violate constitutional rights, they must still "be made to hesitate" and will be held liable if they don't. *See id*. Put another way, the immunity standard still requires officers to deliberate and seek legal counsel when they can. *See id*.

That is, an official who has time to deliberate and seek legal advice has a fair opportunity to determine whether their actions will violate someone's constitutional rights. When internal deliberations or legal advice should reasonably be able to

25

determine how the law will apply to an official's conduct, there is no reason to treat that official any more leniently than courts do in cases when the law is immediately obvious. *See Hope*, 536 U.S. at 741 ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question[.]" (cleaned up)). There is nothing unfair about holding an official accountable "for actions that he or she knew, or should have known, violated the constitutional rights of the plaintiff." *Crawford-El v. Britton*, 523 U.S. 574, 591 (1998).

Here, qualified immunity does not apply because Defendant Gardiner was not in a high-pressure situation that required immediate action. He had an opportunity to deliberate and seek advice, and, having received such advice from the City, he had fair notice that blocking his critics from his official Facebook Page and/or deleting comments critical of him was a violation of the First Amendment.

Specifically, the City of Chicago's Board of Ethics published an ethics guidance for elected officials in January 2019 that explicitly states that elected officials "should not block followers from accessing [social media pages on which they communicate about government activities] or delete critical or negative comments unless the user's comments are obscene, profane, libelous or defamatory or are commercial and posted to sell goods and services." PSOF at ¶17.[10] The guidance warns that "comments posted to [officials' social media pages where they discuss government business] are protected by the First Amendment and cannot be deleted

---

[10] The guidance is set forth in full at ECF 86-2 at 29–36.

and those commenting cannot be blocked from accessing the account." *Id*. Gardiner's former staffer, Tanya King, testified that she printed out this guidance, highlighted the language stating that elected officials should not block users or delete their comments, and posted it on a corkboard in the 45th Ward Office. PSOF at ¶18. A copy of the guidance was also mailed to Alderman Gardiner by the Office of the Inspector General on July 1, 2020. *Id*.[11]

In short, with fair warning that he would face liability, Defendant Gardiner cannot now duck the consequences of his actions by relying on qualified immunity, a doctrine aimed at protecting police officers who make split second decisions under dangerous circumstances without the opportunity for deliberation.

## CONCLUSION

For the above-stated reasons and those set forth in Plaintiffs' cross motion for summary judgment, Plaintiffs respectfully request that this Honorable Court deny Defendant's motion for summary judgment based on qualified immunity.

Respectfully submitted,

/s/Adele D. Nicholas
/s/ Mark G. Weinberg
*Counsel for Plaintiffs*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913

---

[11] The letter appears at ECF 86-1 at 55–56 (filed under seal).