UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETE CZOSNYKA, et. al., individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>JAMES GARDINER, Alderman of the 45th Ward of the City of Chicago<br><br>Defendant. | )<br>)<br>)<br>) Case No. 21-cv-3240<br>)<br>) Judge Sharon Johnson Coleman<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, who are six residents of Chicago's 45th Ward, bring this First Amendment suit against Alderman James Gardiner ("Defendant" or "Gardiner") for blocking users from and deleting or hiding comments on his official Facebook Page. Before the Court are cross-motions for summary judgment from Plaintiffs and from Defendant. For the following reasons, the Court grants Plaintiffs' motion for summary judgment [84] and denies Defendant's motion for summary judgment [83].

**Background**

Defendant Gardiner is the elected Alderman in Chicago's 45th Ward. The briefing in this case is replete with facts that do not paint Defendant in a flattering light but are unrelated to the legal questions at issue. The Court will thus briefly summarize only those facts relevant to the pertinent legal analysis. Since May 2019, Gardiner has operated a "Page" on the social media platform, Facebook.[1] Pages are public profiles created by companies, public officials, and other public figures and entities. Pages are public and by default, all Facebook users can view and interact

---

[1] Since the filing of this suit, Facebook has been reorganized under a parent company now known as Meta. However, the social media site itself continues to operate under the name Facebook, which this opinion adopts.

with content on Pages. Users can comment on Posts made by the Page and can also post directly onto the Page. Gardiner's Page has approximately 10,000 followers and he posts at least once a week, frequently further engaging with his followers' comments.

Gardiner alone operates the Page, but a staffer, Tanya King, also had access to the account from May 2019 through November 2019. However, Gardiner alone was responsible for content moderation on the Page. He never had an official policy regarding moderation, but testified that he discretionarily deleted comments he considered "harassing," "threatening," "doxing," or "inciting." He also testified that he deletes comments or blocks users when he receives "complaints" about the user or post.

On January 8, 2019, the Chicago Board of Ethics published an Advisory Opinion (the "CBE Opinion") addressing, among other topics, "the use of social media accounts by City of Chicago elected officials." (Dkt. 86-1, ex. 1 at 1.) The CBE Opinion addresses "whether and to what extent elected officials can block and/or delete followers or 'friends' and/or delete comments." (*Id.* at 6.) The CBE Opinion opens by acknowledging that the effect of the First Amendment on elected officials' use of social media "is a fluid area of law." (*Id.*) However, the opinion unequivocally states the following: "comments posted to [official accounts] are protected by the First Amendment and cannot be deleted, and those commenting cannot be blocked from accessing the account." (*Id.* at 7.) The CBE Opinion uses less firm language to address elected officials' personal accounts, urging "those maintaining such sites to consult with qualified counsel before blocking or deleting users." (*Id.*)

Plaintiffs are all constituents of Gardiner's who interacted with his Facebook Page and subsequently had their accounts blocked or comments deleted. In all six cases, Plaintiffs were critical of Gardiner or of policy positions he espoused. Plaintiff Adam Vavrick engaged frequently, and critically, with Gardiner's Facebook Page. On January 27, 2021, Vavrick commented on one of

Gardiner's posts criticizing the Alderman's vote on a recent ordinance. Gardiner deleted the comment, but left the underlying post (which concerned Holocaust Remembrance Day) and other comments up. Gardiner proceeded to delete a number of comments and posts by Vavrick before blocking him on May 26, 2021. When Gardiner first created his Facebook Page, he blocked Plaintiff Pete Czosnyka, who had been vocal in opposition to Gardiner's election campaign. He later unblocked Czosnyka. Czoynka subsequently engaged in arguments in the comments of Gardiner's Facebook posts with other users. Gardiner then blocked Czosnyka again on June 25, 2019. Plaintiff Dominick Maino was also blocked from Gardiner's Facebook Page in "June or July 2019" after posting a number of comments critical of Gardiner's policy positions. (Dkt. 85 ¶ 59). Gardiner blocked or hid a number of comments and posts by James Suh on his Facebook Page before blocking him on June 7, 2021. Gardiner also deleted or hid critical comments on his Facebook Posts made by Plaintiffs Peter Barash and Steve Held.

After the filing of this lawsuit, Defendant unblocked each individual Plaintiff. (Dkt. 85 ¶¶ 10, 51, 59, 69). But Gardiner continues to maintain that it is within his discretion to continue to moderate his Facebook Page under the same policies (or lack thereof) that led him to engage in the actions described above.

**Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary

3

judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

    I.    <u>First Amendment Violation</u>

The Court begins with Plaintiff's motion for summary judgment on First Amendment grounds. In its previous Order denying Defendant's motion to dismiss, the Court determined that Plaintiffs had plausibly alleged that Alderman Gardiner had engaged in impermissible content-based speech regulation. Facts ascertained in discovery only further support this conclusion, and indeed, Defendant does not appear to contest the underlying First Amendment violation in his most recent submissions. However, given the higher burden moving parties face on both sides for summary judgment, the Court finds it important to again summarize the First Amendment inquiry.

The First Amendment analysis here takes three steps. First, as a threshold matter, the Court must determine whether Defendant's acts constitute state action; in other words, whether Alderman Gardiner acted under color of law in operating his official Facebook page. Second, the Court must determine whether Alderman Gardiner's Facebook page is a public forum. Only after those two steps are complete does the Court move to the third step of determining whether Alderman Gardiner's actions violated the First Amendment.

    *A. State Action*

"To state a claim under § 1983, a plaintiff must allege the violation of" a federal right "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). A public official acts "under color of law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50. Private individuals can similarly act under color of law if there is a "sufficient nexus between the state and the private

4

actor" such that "the deprivation committed by the private actor is fairly attributable to the state." *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (internal citation omitted).

The Seventh Circuit has not yet had the opportunity to consider whether elected officials act under color of law when they block individuals or delete comments from official social medica accounts. However, four of five Circuits to consider the issue have settled on a similar approach, applying the nexus test in a fashion analogous to the analysis for off-duty government employees. *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1170 (9th Cir. 2022), *cert. granted*, 143 S. Ct. 1779 (2023); *see also Davison v. Randall,* 912 F.3d 666 (4th Cir. 2019), *as amended* (Jan. 9, 2019); *see also Knight First Amend. Inst. at Columbia Univ. v. Trump,* 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 209 L. Ed. 2d 519, 141 S. Ct. 1220 (2021); *Campbell v. Reisch*, 986 F.3d 822, 827 (8th Cir. 2021) (applying similar test but finding that operation of social media account in question was not state action because account was more akin to campaign social media account); *cf Lindke v. Freed*, 37 F.4th 1199, 1201-02 (6th Cir. 2022) (applying "state-official test," asking whether the official is "performing an actual or apparent duty of his office" or "if he could not have behaved as he did without the authority of his office," and answering in the negative (internal quotation omitted), *cert. granted*, 143 S. Ct. 1780 (2023).[2] Likewise, another district within this Circuit has found that state legislators engage in state action when they establish official social media accounts. *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 951 (W.D. Wis. 2019)

In the Ninth Circuit's formulation, the key inquiry is whether a public official's conduct, even if "seemingly private" is "sufficiently related to the performance of his or her official duties to create 'a close nexus between the State and the challenged action'" or whether the official is merely

---

[2] In April, 2023, the Supreme Court granted cert in *Garnier v. O'Connor Ratcliff* and *Lindke v. Freed* on the question of the state action requirement for social media accounts operated by elected officials. The parties have not asked this Court to delay a ruling pending the Supreme Court's decision, and thus it will not. If the Supreme Court's decision ultimately departs from the reasoning set forth by the Second, Fourth, Eighth, and Ninth Circuits, and endorsed here, then Defendant may request leave to file a motion for reconsideration.

pursuing "private goals via private actions." *Garnier v. O'Connor-Ratcliff*, 41 F.4th at 1170 (quoting *Naffe v. Frey*, 789 F.3d 1030, 1037–38 (9th Cir. 2015)). More specifically, a "state employee who is off duty nevertheless acts under color of state law when (1) the employee purport[s] to or pretend[s] to act under color of law, (2) his pretense of acting in the performance of his duties ... had the purpose and effect of influencing the behavior of others, and (3) the harm inflicted on plaintiff related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Id.* at 1170 (quoting *Naffe v. Frey*, F.3d at 1037).

Each prong of the Ninth Circuit's test is met here. The Facebook Page in question is identified as belonging to James Gardiner, "Alderman of the 45th Ward" and lists his official City contact information. (Dkt. 85 ¶ 7.) Even a cursory review of some of the Page's posts reveals that they primarily relate to his duties as Alderperson and are not personal in nature, and Gardiner himself testified that he established the Page for "government purposes." *Id.* And the harm inflicted on plaintiffs is that they were unable to see or engage with information related to their elected Alderman or issues pertaining to the Ward and its residents.

B. *Public Forum Analysis*

The next question is whether Gardiner's Facebook Page is a public forum and if so, what level of forum. There are three levels of public forum:

> Traditional public forums are places with a long history of being devoted to assembly and debate, such as public streets and parks. Designated public forums are locations or channels of communication that the government opens up for use by the public for expressive activity. Public property not open for public communication by tradition or designation is deemed a nonpublic forum.

*Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). Gardiner's Facebook Page is clearly a designated public forum.

To determine whether the government has established a designated public forum, a court looks to the "policy and practice of the government" and the "nature of the property and its

6

compatibility with expressive activity." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 135 S. Ct. 2239, 192 L. Ed. 2d 274 (2015) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). The Supreme Court highlighted in *Packingham v. North Carolina* that the internet, and in particular, social media websites, are among the "most important places" where First Amendment-protected speech takes place today. 582 U.S. 98, 104 137 S. Ct. 1730, 198 L. Ed. 2d 273 (2017). Another district in this circuit has found that the highly interactive nature of Twitter accounts makes them compatible with expressive activity. *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 953-54 (W.D. Wis. 2019). This Court agrees, and finds that Facebook Pages with their robust comment features are also highly interactive and compatible with expressive conduct. Gardiner's Page is accessible to all Facebook users and contains a number of features designed to encourage expressive conduct and discussion. Indeed, he frequently engages in lively debate with other users on his Page. Gardiner's Facebook Page is thus a designated public forum.

### C. Content-Based Discrimination

Not all speech restrictions within forums designated as public are unconstitutional. The government can impose "reasonable time, place, and manner regulations." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45-46 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). It can also restrict speech based on its content but only when "necessary to serve a compelling state interest" and in a manner that is "narrowly drawn to achieve that end." *Id.* at 46. The record is clear that Gardiner engaged in both content-based and speaker-based restrictions on his Facebook Page. He deleted and hid comments from disfavored constituents voicing opposing political beliefs and even went as far as to block some of those constituents. Indeed, Defendant does not contest that his regulation of Plaintiffs' speech was content-based. Defendant also does not present a rationale for his content-based restrictions that would pass strict scrutiny, nor could he. It is impossible to discern any

coherent, legitimate policy underlying Defendant's restriction of Plaintiff's comments and posts. The Court thus finds Gardiner in violation of the First Amendment. Accordingly, the Court finds that summary judgment in favor of Plaintiff is proper.

### D. Injunctive Relief

There is some suggestion in the briefing that because Defendant has since unblocked Plaintiffs, injunctive relief is unnecessary. However, Gardiner himself does not seem to contest that some injunctive relief is called for, as his sole argument in the summary judgment briefing regards qualified immunity, which applies only to damages claims. Furthermore, Defendant's contention that it remains within his discretion to continue to restrict comments and/or block users on his Facebook Page suggests that an injunction may be the only way to prevent future First Amendment violations. Alderman Gardiner is hereby enjoined from future content restriction, including blocking any users from his official Facebook Page or deleting or hiding comments or posts on the Page, until he develops a content moderation policy that comports with the First Amendment's requirements. He may then commence moderation of his Page in accordance with that policy.

## II. Qualified Immunity

The Court now moves to Defendant's motion for summary judgment. As previously stated, Gardiner's sole argument on summary judgment is that he is entitled to qualified immunity. The doctrine of qualified immunity "shields government officials against suits arising out of their exercise of discretionary functions 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Jones v. Wilhelm*, 425 F.3d 455, 460 (7th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The core question is whether the defendant official has "fair warning" that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 731, 122 S. Ct. 2508, 2511, 153 L. Ed. 2d 666 (2002).

Qualified immunity analysis takes two steps. A court must ask (1) whether the official's conduct violated the plaintiff's constitutional rights, and (2) whether that right was "clearly established" at the time of the alleged violations. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because the Court has already found that Gardiner violated plaintiffs' First Amendment rights, it turns immediately to the second prong: whether those rights were clearly established at the time of the violation. As an initial matter, Gardiner's qualified immunity argument applies only to plaintiffs' request for damages; qualified immunity does not protect defendants in actions for injunctive relief. *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012)

When determining whether a right was clearly established, courts first look to relevant legal precedent at the time of the violation. "[A]bsent controlling authority," "a robust 'consensus of cases of persuasive authority' " can clearly establish law for purposes of qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). As noted above, there is no controlling Supreme Court or Seventh Circuit precedent establishing the First Amendment rights at issue here. In the absence of such precedent, courts must evaluate "whether there was such a clear trend in the caselaw" that recognition of the right in question was inevitable. *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989).

Plaintiffs' first argument in opposition to the application of qualified immunity is that the prohibition of viewpoint discrimination and application of the First Amendment to social media are clearly established. But the Supreme Court has instructed courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018). The inquiry, with respect to whether plaintiffs' rights were clearly established, is much more specific here.

Still, at the time of the events in question, there was an evolving consensus among the Circuit Courts of Appeals that public officials may not permissibly block their constituents from

9

their social media accounts or censor their comments. It is true, as Gardiner notes, that the Ninth Circuit, addressing this precise question of whether public officials who had admittedly violated the First Amendment by censoring constituents on their social media accounts, found that *in 2017*, such a right was not clearly established. *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1184 (9th Cir. 2022), *cert. granted*, 143 S. Ct. 1779, 215 L. Ed. 2d 669 (2023). The court found that given the "novelty" of the constitutional analysis applied, it [could not] say that reasonable officials in the [defendants'] position were on notice that blocking the [plaintiffs] from individual government officials' social media pages could violate the First Amendment." *Id.*

However, much changed from 2017 to 2021, when Plaintiffs filed this suit. In the intervening time, Circuits and another district court within this Circuit all found that conduct comparable to Gardiner's was impermissible under the First Amendment. *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Robinson v. Hunt Cty.*, 921 F.3d 440 (5th Cir. 2019); *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019).[3] Plaintiff argues that the Court should ignore the Second Circuit's decision in *Knight v. Trump* because the opinion was later mooted and vacated by the Supreme Court after President Trump left office. This is unpersuasive; as the opinion was in effect at the time Gardiner continued to violate plaintiffs' First Amendment rights, it can contribute to a finding that those rights were clearly established. At the time Gardiner was involved in the conduct at issue, the clear, evolving trend in circuit case law was that his constituents had a First Amendment right to view and engage with his official Facebook Page.

---

[3] During the period in question, the Second, Fourth, and Fifth Circuits each considered whether public officials who block users or delete comments from their official social media accounts violate the First Amendment and ruled in the affirmative. Two others, the Eighth and Ninth Circuits, have since joined them. The Sixth Circuit, the only circuit court thus far to rule negatively, issued its decision after this suit was filed, so that decision is not relevant to the "clearly established" analysis. *Lindke v. Freed*, 37 F.4th 1199 (6th Cir. 2022).

Just as important as the state of caselaw from 2021 is Alderman Gardiner's actual, contemporaneous knowledge that his conduct was violating the First Amendment. At its heart, the doctrine of qualified immunity protects public officials who act in good faith. The immunity is "defeated if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow v. Fitzgerald*, 457 U.S. 800, 815 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (quoting *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)) (emphasis omitted). The record makes it clear that Gardiner is not deserving of good faith protection.

As noted above, in 2019 the Chicago Board of Ethics published an CBE Opinion addressing, among other topics, "the use of social media accounts by City of Chicago elected officials." (Dkt. 86-1, ex. 1 at 1.) It concluded that: "comments posted to [official accounts] are protected by the First Amendment and cannot be deleted, and those commenting cannot be blocked from accessing the account." (*Id.* at 7.) Per the testimony of a Gardiner's former staffer, it is also clear that he received a copy of the CBE Opinion and was aware of its contents. (Dkt. 86-2, at 14-18) (Deposition of Tanya King noting that she printed out the CBE Opinion, highlighted the parts related to Facebook comments, and discussed it with Gardiner.) Gardiner's own former staffer affirmed in her deposition that she "had the impression that he wasn't going to follow [the CBE Opinion]" and that his content moderation was often based on personal and political animus directed at his constituents. (*Id.* at 16-17).

This CBE Opinion informed Gardiner in clear terms that his conduct violated the First Amendment. It is true that failure to follow training "does not itself negate qualified immunity where it would otherwise be warranted." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 616, 135 S. Ct. 1765, 1777, 191 L. Ed. 2d 856 (2015). However, the ultimate determination that qualified immunity applied in *Sheehan* relied in large part on the Court's contention that juries should

11

not "second-guess…life and death decisions" as well as the fact that the training there had a high degree of generality, factors not present here. *Id.* (internal citation omitted). And indeed, the CBE Opinion is more pertinent than mere training – it is legal advice from the City's own ethics counsel that the precise conduct Gardiner engaged in was unconstitutional.

Given the robust and evolving consensus in the caselaw and the specific guidance from the Chicago Board of Ethics that Gardiner's conduct was violating plaintiffs' rights, it is clear that a reasonable Alderman in his position knew or should have known that deleting comments and blocking users on his official Alderman Facebook Page ran afoul of the First Amendment. This Court thus holds that Gardiner is not entitled to qualified immunity from Plaintiffs' claim for damages and accordingly denies Defendant's motion for summary judgment.

**Conclusion**

Accordingly, Plaintiffs' motion for summary judgment is granted and Defendant's motion for summary judgment is denied. Alderman Gardiner is hereby enjoined from blocking any users from his official Facebook Page or restricting any comments or posts on his Facebook Page until he develops a content moderation policy that comports with the First Amendment's requirements. A trial will be scheduled regarding nominal and/or compensatory damages.

IT IS SO ORDERED.

Date: 9/25/2023

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge